UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 16-1221

NICO ELECTRICAL CONTRACTOR INC., ET AL
*Plaintiff-Appellants*

*v.*

CITY OF CAMDEN., ET AL
*Defendant-Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
HONORABLE ANN MARIE DONIO, U.S.D.J.
CIVIL ACTION NO. 1:13-cv-06353

APPENDIX
VOLUME II

David J. Khawam, Esq.                    NJ STATE BAR
*Counsel of Record*
LAW OFFICES OF DAVID J. KHAWAM, ESQUIRE, LLC
216 Haddon Avenue • Sentry Office Plaza • Suite 604
Westmont, New Jersey 08108
Tel.: (856) 858-1011F

*Attorney for Plaintiff-Appellant, NICO ELECTRICAL INC., ET AL*

# TABLE OF CONTENTS

## VOLUME II
## [PAGES 35-211]

**VI.**    Complaint of Plaintiffs *[Doc 1]*
           *Filed 10/24/13* .................................... 35a

**VII.**   Answer to the Complaint with Jury Demand, Crossclaims by James
           Rizzo, Eugene Emenecker, William Revaitis, Iraida Afranador,
           and City of Camden *[Doc 8]*
           *Filed 12/02/13* .................................... 42a

**VIII.**  Motion for Summary Judgment by defendants, James Rizzo, Eugene
           Emenecker, William Revaitis, Iraida Afranador, and City of
           Camden *[Doc 20]*
           *Filed 03/16/15* .................................... 52a

**IX.**    Statements of Facts (Only) from Defendants' Brief In Support
           of Defendants' Motion for Summary Judgment - pages 1-17 *[Doc
           20]*
           *Filed 03/16/16* .................................... 54a

    **A.** *Exhibits 1 through 21* to Defendants' Brief In Support of
           Defendants' Motion for Summary Judgment *[Doc 20]*
           *Filed 03/16/16* ................................ 71a

        *1.* **Exhibit 1**, July 18, 2002 Contract *[Doc 20]*
                    *Filed 03/16/16* ...................... 72a

        *2.* *Exhibit 2,* October 21, 2014 deposition transcript of
             Marshall Williams *[Doc 20]*
                    *Filed 03/16/16* .......................... 76a

        *3.* *Exhibit 3*, November 5, 2014, deposition transcript
             of William F. Revaitis *[Doc 20]*
                    *Filed 03/16/16* ......................... 112a

        *4.* *Exhibit 4*, November 5, 2014, deposition transcript
             of Eugene R. Emenecker *[Doc 20]*
                    *Filed 03/16/16* ......................... 119a

        *5.* *Exhibit 5,* November 5, 2014, deposition transcript
             of James R. Rizzo *[Doc 20]*

Filed 03/16/16 ........................... 125a

6. *Exhibit 6*, November 5, 2014, deposition transcript of Iraida Afanador *[Doc 20]*
   **Filed 03/16/16** ........................... 129a

7. Exhibit 7, Contractor Project Listing *[Doc 20]*
   **Filed 03/16/16** ........................... 136a

8. *Exhibit 8*, Janaury 3, 2013 email from Rizzo to Williams wherein Rizzo stated "I told you that I would speak to the electrical inspector and have either provide a code section to support his decision or reverse it." *[Doc 20]*
   **Filed 03/16/16** ...................... 143a

9. *Exhibit 9,* Williams January 4, 9 and 10, 2013 response to Rizzo email *[Doc 20]*
   *Filed 03/16/16* ........................... 146a

10. *Exhibit 10*, Electrical Subcode Technical Section for 931 S. 7th St. *[Doc 20]*
    **Filed 03/16/16** ........................... 148a

11. *Exhibit 11*, October 8, 2013 Statement of Ayana Jordan *[Doc 20]*
    **Filed 03/16/16** ........................... 150a

12. *Exhibit 12*, January 13, 2015, deposition transcript of Marshall F. Williams *[Doc 20]*
    **Filed 03/16/16** ........................... 152a

13. *Exhibit 13*, undated letter from Williams to CO Rizzo *[Doc 20]*
    **Filed 03/16/16** ...................... 160a

14. *Exhibit 14,* August 27, 2013, Statement of Bernice Holland *[Doc 20]*
    **Filed 03/16/16** ........................... 162a

15. *Exhibit 15*, Revised Electrical Subcode Technical Section dated June 7, 2013 *[Doc 20]*
    **Filed 03/16/16** ........................... 164a

16. *Exhibit 16*, September 23, 2013 statement from Israel Miller/Tony *[Doc 20]*
         ***Filed 03/16/16*** .......................... 166a

17. *Exhibit 17*, undated letter from Plaintiff to DCA *[Doc 20]*
         ***Filed 03/16/16*** ..................... 168

18. **Exhibit 18**, January 16, 2015 deposition of Ken Verbos **[Doc 20]**
         ***Filed 03/16/16*** .................... 170a

19. *Exhibit 19*, September 20, 2013 letter of Marshall Williams to Director City of Camden, re: Meeting with Director of Building Dept *[Doc 20]*
         ***Filed 03/16/16*** .......................... 187a

20. Exhibit 20, October 4, 2013 email from Revaitis to Afondor *[Doc 20]*
         ***Filed 03/16/16*** ......................... 189a

21. Exhibit 21, October 3, 2013 email from Dir. Afandor to ESCO Revaitis *[Doc 20]*
         ***Filed 03/16/16*** ......................... 191a

X. Plaintiffs' Responses to Statements of Facts (Only) from Plaintiffs' Brief in Opposition to Motion for Summary Judgment *[Doc 24]*
         ***Filed 04/20/2015*** ................................ 193a

XI. Defendants' Reply to Plaintiffs' Responses to Defendants' Initial Statement of Material Facts (Only) from Defendants' Brief in Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment *[Doc 25]*
         ***Filed 04/27/15*** ................................ 207a

F.   MICHAEL DAILY, JR., LLC
ATTORNEY AT LAW
216 Haddon Avenue ○ Sentry Office Plaza
Suite 106
Westmont, New Jersey 08108
Telephone No.   (856) 833-0006
Fax No.   (856) 833-1083
Our File #F-2414-13
Attorney for the Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

| | |
|---|---|
| NICO   ELECTRICAL   CONTRACTOR,:<br>INC.,   and   MARSHALL   B.<br>WILLIAMS,   : | CIVIL ACTION NO. |
| : | |
| Plaintiffs, : | |
| vs.   : | COMPLAINT WITH JURY DEMAND |
| : | |
| CITY   OF   CAMDEN,   EUGENE<br>EMENECKER,   WILLIAM   REVAITIS,:<br>JAMES   RIZZO,   and   IRAIDA<br>AFANADOR, | |
| Defendants. | |

The Plaintiffs, Nico Electrical Contractor, Inc., and Marshall
B. Williams, by way of complaint against the Defendants say:

**PARTIES, JURISDICTION AND VENUE**

1.    The Plaintiff, Nico Electrical Contractor, Inc., is a

-1-

corporation created under the laws of the State of New Jersey and
has a principal place of business at 5328 Browning Road,
Pennsauken, Camden County, New Jersey.

2.   The Plaintiff, Marshall B. Williams, is an individual who
is the sole owner and operator of the Plaintiff, Nico Electrical
Contractor, Inc.

3.   The Defendant, City of Camden, is a governmental entity
created under the laws of the State of New Jersey and has a
principal office at 520 Market St. Camden, Camden County, New
Jersey.

4.   The Defendant, Eugene Emenecker, is an individual who at
all times relevant to this matter was employed by the City of
Camden as an electrical inspector under the supervision of
Defendant, William Revaitis. He is sued in this matter in both his
official and individual capacities.

5.   The Defendant, William Revaitis, is an individual who at
all times relevant to this matter was employed by the City of
Camden as the Electrical Sub Code Official under the supervision of
Defendant, James Rizzo. He is sued in this matter in both his
official and individual capacities.

6.   The Defendant, James Rizzo, is an individual who at all
times relevant to this matter was employed by the City of Camden as
the Construction Official of the Department of Code under the
supervision of Defendant, Iraida Afanador. He is sued in this

-2-

36a

matter in both his official and individual capacities.

7.    The Defendant, Iraida Afanador, is an individual who at all times relevant to this matter was employed by the City of Camden as the Director of the Department of Code. She is sued in this matter in both her official and individual capacities.

8.    In this matter the Plaintiffs assert that they were deprived of their rights to association as guaranteed by the First Amendment and as a result thereof the Court has jurisdiction over Plaintiffs' claims pursuant to 38 U.S.C. §1331, as an action arising under the Constitution of the United States, and 28 U.S.C. §1343(A)(3), to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States.

9.    Venue is properly laid pursuant to 28 U.S.C.§1391(b) in the District of New Jersey, because the defendants are located in this district, and the events giving rise to the claim occurred in this district.

**FACTUAL ALLEGATIONS**

10.    The plaintiff Marshall Williams is a New Jersey licensed electrical contractor.

11.    Prior to the year 1998, Marshall Williams was a member of the IBEW Union.

12.    In approximately 1998 Marshall Williams left the union and became an independent non-union electrical contractor.

13.    Defendants Eugene Emenecker and William Revaitis are both

-3-

37a

former members of the IBEW Union.

14.   Initially Marshall Williams performed work under the name "Nico Electric" and then in 2005 he formally incorporated his business as Nico Electrical Contractor, Inc.

15.   In the year 2002 Marshall Williams was the low bidder on a contract to provide electrical maintenance services to the City of Camden for a period of three years.

16.   Not long after being awarded this contract Marshall Williams had a telephone conversation with Richard Feliciano the chief financial officer of the City of Camden.

17.   In that conversation Marshall Williams was advised by Mr. Feliciano that he had received a call from Donald Norcross of the IBEW and had been screamed at by Mr. Norcross for the City having awarded a contract to a non-union contractor.

18.   In addition during this period of time Marshall Williams had a conversation with the Defendant, Revaitis, who asked Marshall Williams how he was going to deal with the union when attempting to perform work for the City of Camden.

19.   Not surprisingly during the entire three-year period of the contract Marshall Williams did not receive one job to perform under the contract.

20.   Over the following years Marshall Williams and Nico continued to receive disparate treatment from the Defendants, Eugene Emenecker and William Revaitis, aimed at discouraging them

-4-

**38a**

from performing non-union work within the City of Camden.

21. This included the Defendants, Eugene Emenecker and William Revaitis, regularly refusing without basis to approve work performed by the Plaintiffs for private persons and entities located when the City of Camden.

22. Such conduct has continued to the present time and has within the last two years included the incidents set forth hereafter.

23. Rejection of the Plaintiffs' work performed at 1302 Browning Street, Camden, New Jersey, by the Defendant Emenecker without a reasonable basis.

24. Rejection of the Plaintiffs' work performed at 931 South 7th Street, Camden, New Jersey by the Defendant Revaitis without a reasonable basis.

25. Rejection of the Plaintiffs' work performed at 1571 S. 8th Street, Camden, New Jersey, by the Defendant Emenecker without a reasonable basis and accompanied by disparaging remarks to the homeowner regarding the Plaintiffs.

26. The Defendant Revaitis during an inspection advising the owner of 1207 Mt. Ephraim Avenue, Camden, New Jersey that he should use the services of a contractor other than the Plaintiffs.

27. The aforesaid occurrences were reported by the Plaintiffs to the Defendants, Rizzo and Afanador, however, said defendants have failed to take action, have ratified the aforesaid actions of

-5-

39a

their subordinates, and have continued the long existing policy of
the City of Camden to discourage non-union contractors from working
in the city.

28. As a result of the foregoing the Plaintiffs have
sustained pecuniary losses in the form of lost income and profits.

29. As a result of the foregoing the Plaintiff, Marshall
Williams has sustained non-pecuniary losses including emotional
pain, suffering, inconvenience, mental anguish, loss of enjoyment
of life and such other non-pecuniary losses as maybe disclosed in
discovery.

30. The aforesaid actions of the individual defendants were
performed intentionally and maliciously and were especially
egregious.

### FIRST COUNT

31. At all times relevant to this matter the Plaintiffs had
a right to associate or not associate with a union and such right
of association was protected by the First Amendment.

32. On account of the Plaintiffs exercising such right by
electing to work as a non-union contractor, the Defendants under
color of state law retaliated against the Plaintiffs as set forth
above at ¶¶ 20 to 27 of this complaint.

33. As a direct result of the foregoing violation of their
First Amendment rights, the Plaintiffs sustained the damages set
forth above at ¶¶ 28 & 29 of this complaint.

40a

34.   Pursuant to 42 U.S.C. §1988, plaintiff is entitled to attorney's fees and expert fees in connection with the bringing of the claims asserted in this matter.

Wherefore, plaintiff, demands judgement against the defendants for:

a.   Compensatory damages;

b.   Nominal damages in the event no compensatory damages are allowed;

c.   Punitive damages against the individual defendants;

d.   Costs of the action;

e.   Reasonable attorney's fees and costs; and,

f.   Such other and further relief as this Court may deem appropriate and just.

> **F. MICHAEL DAILY, JR., LLC**
> **Attorney for the Plaintiff**
>
> **BY:** /s/ *F. Michael Daily, Jr.*
> **F. Michael Daily, Jr.**

**Jury Demand**

Plaintiff herewith demands a jury trial as to all issues which are triable by jury.

> **F. MICHAEL DAILY, JR., LLC**
> **Attorney for the Plaintiff**
>
> **BY:** /s/ *F. Michael Daily, Jr.*
> **F. Michael Daily, Jr.**

Dated: October 17, 2013.

41a

John C. Eastlack, Jr., Esq. (ID No 022991986)
Daniel E. Rybeck, Esq. (ID No. 039232007)
**WEIR & PARTNERS LLP**
*A Pennsylvania Limited Liability Partnership*
The Liberty View Building
457 Haddonfield Road, Suite 420
Cherry Hill, NJ 08002
T: 856-662-1018
F: 856-662-1592

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NICO ELECTRICAL CONTRACTOR, INC., and MARSHALL B. WILLIAMS, Plaintiffs, | **CIVIL ACTION: 1:13-cv-06353 (JHR-AMD)** |
| v. | |
| CITY OF CAMDEN, EUGENE EMENECKER, WILLIAM REVAITIS, JAMES RIZZO, and IRAIDA AFANADOR, Defendants. | **ANSWER TO COMPLAINT** |

Defendants, by way of Answer to Plaintiffs' Complaint, say:

### PARTIES, JURISDICTION & VENUE

1.    Neither admitted nor denied as Defendants are without information to formulate a

response to same.  Plaintiffs are left to their proofs.

2.    Neither admitted nor denied as Defendants are without information to formulate a

response to same.  Plaintiffs are left to their proofs.

3.    Admitted that the City of Camden is a municipality within the State of New

Jersey.

4.    Admitted that Defendant Eugene Emenecker is an employee of the City of

Camden.

5.    Admitted that Defendant William Revaitis is an employee of the City of Camden.

**42a**

6.   Admitted that Defendant James Rizzo is an employee of the City of Camden.

7.   Admitted that Defendant Araida Afanador is an employee of the City of Camden.

8.   Neither admitted nor denied as the statement is a legal conclusion to which no response is required.

9.   Neither admitted nor denied as the statement is a legal conclusion to which no response is required.

## FACTUAL ALLEGATIONS

10.   Neither admitted nor denied as Defendants are without information to formulate a response to same. Plaintiffs are left to their proofs.

11.   Neither admitted nor denied as Defendants are without information to formulate a response to same. Plaintiffs are left to their proofs.

12.   Neither admitted nor denied as Defendants are without information to formulate a response to same. Plaintiffs are left to their proofs.

13.   Neither admitted nor denied as Defendants are without information to formulate a response to same. Plaintiffs are left to their proofs.

14.   Neither admitted nor denied as Defendants are without information to formulate a response to same. Plaintiffs are left to their proofs.

15.   Neither admitted nor denied as Defendants are without information to formulate a response to same. Plaintiffs are left to their proofs.

16.   Denied.

17.   Denied.

18.   Denied.

19.   Denied.

43a

2

20.   Denied.

21.   Denied.

22.   Denied.

23.   Denied.

24.   Denied.

25.   Denied.

26.   Denied.

27.   Denied.

28.   Denied.

29.   Denied.

30.   Denied.

## FIRST COUNT

31.   Neither admitted nor denied as the statement is a legal conclusion to which no

response is required.

32.   Denied.

33.   Denied.

34.   Denied.

**WHEREFORE**, Defendants demand judgment on this Count dismissing Plaintiffs'

Complaint with prejudice together with counsel fees, costs of suit, and any such other relief as

the Court deems equitable and just.

44a

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiffs have failed to comply with the notice provisions of the New Jersey Tort Claims

Act, specifically 59:8-1 et seq., and Answering Defendants reserve the right to move to dismiss

Plaintiffs' Complaint on this basis.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs' Complaint is barred by the applicable Statute of Limitations.

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs' Complaint fails to set forth, with specificity, facts alleging constitutional

violations, and as such Plaintiffs' Complaint is barred, and Answering Defendants reserve the

right to move to dismiss Plaintiffs' Complaint on this basis.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' Complaint for punitive damages must be dismissed pursuant to N.J.S.A. 59:9-

2c.

### FIFTH AFFIRMATIVE DEFENSE

Answering Defendants hereby reserve the right to claim damages recoverable under

Federal Rule 11 and/or the New Jersey Frivolous Law Suit Statute, N.J.S.A. 2A:15-59.1 et seq.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' Complaint fails to state a cause of action upon which relief may be granted.

### SEVENTH AFFIRMATIVE DEFENSE

This Court lacks in personam jurisdiction to hear the Complaint.

### EIGHTH AFFIRMATIVE DEFENSE

Answering Defendants are immune from suit for the acts alleged in Plaintiffs' Complaint.

**45a**

## NINTH AFFIRMATIVE DEFENSE

Answering Defendants acted reasonably and in good faith based upon the information available to Answering Defendants.

## TENTH AFFIRMATIVE DEFENSE

This Court lacks subject matter jurisdiction to hear the Complaint.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs are barred by the Doctrine of Equitable/Legal Estoppel.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs' Complaint is barred by the Doctrine of Unclean Hands.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' Complaint is barred by the Doctrine of Laches.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs lack standing to bring the within Complaint.

## FIFTEENTH AFFIRMATIVE DEFENSE

Answering Defendants breached no duties to Plaintiffs.

## SIXTEENTH AFFIRMATIVE DEFENSE

The incident described in the Complaint was caused wholly or partly by the negligence or intentional acts of the Plaintiffs and Plaintiffs are barred from recovery or their recovery is reduced thereby.

## SEVENTEENTH AFFIRMATIVE DEFENSE

A public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct pursuant to N.J.S.A. 59:2-10.

5

46a

### EIGHTEENTH AFFIRMATIVE DEFENSE

Answering Defendants have breached no obligation and/or duty owed to the Plaintiffs.

### NINETEENTH AFFIRMATIVE DEFENSE

Answering Defendants acted upon reasonable grounds and without malice and are

therefore not answerable to the Plaintiffs in damages.

### TWENTIETH AFFIRMATIVE DEFENSE

In the event that it is found that the remaining Defendants named or unnamed were

performed with malice and based upon unreasonable grounds, said acts are outside the scope of

authorization from Defendant City of Camden, and is outside the scope of employment. As

such, answering Defendants are not answerable to the Plaintiffs for damages as liability would

not attach to said Defendants.

### TWENTY-FIRST AFFIRMATIVE DEFENSE

The City of Camden properly trained and supervised its employees.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

Answering Defendants have performed each and every duty owed to the Plaintiffs. If

Answering Defendants are found to have breached any obligation or duties owed to the

Plaintiffs, which breach is specifically denied, such breach was not the approximate cause of any

injuries which may have been sustained by the Plaintiffs.

### TWENTY-THIRD AFFIRMATIVE DEFENSE

Answering Defendants plead all those defenses that would have been permissible to

Answering Defendants in accordance with common law.

**47a**

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

The Plaintiffs' contributory negligence or intentional acts were the sole and/or proximate cause of any alleged injuries suffered by the Plaintiffs.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Answering Defendants plead all those statutory defenses permissible in accordance with New Jersey Criminal Code.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

This action is barred by N.J.S.A. 59:1-1 et seq.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

This action is governed by the provisions of N.J.S.A. 59:1-1 et seq., and the same are incorporated herein as if set forth herein at length.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

Pursuant to N.J.S.A. 59:9-2(d), Plaintiff is not entitled to recover for pain and suffering.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

Answering Defendants claim credit for all collateral sources from which Plaintiffs have received or may receive benefits, pursuant to N.J.S.A. 59:1-1 et seq.

## THIRTIETH AFFIRMATIVE DEFENSE

At all relevant times, Answering Defendants acted in compliance with all applicable federal, state and local laws, statutes, ordinances and regulations, which compliance bars Plaintiffs from asserting the claims herein.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

Plaintiffs' Complaint should be dismissed for failing to file a timely and adequate Notice of Tort Claim pursuant to N.J.S.A. 59:8-1 et seq.

48a

## THIRTY-SECOND AFFIRMATIVE DEFENSE

Plaintiffs' Complaint is barred pursuant to N.J.S.A. 59:2-5 and 59:3-6.

## THIRTY-THIRD AFFIRMATIVE DEFENSE

Plaintiffs' Complaint is barred pursuant to N.J.S.A. 59:2-6 and 59:3-7.

## WEIR & PARTNERS LLP

Dated:  December 2, 2013           /s/ John C. Eastlack, Jr., Esq.
                                    John C. Eastlack, Jr., Esq.

## CROSS-CLAIM FOR CONTRIBUTION AND/OR INDEMNIFICATION

While denying any liability in this action, the Answering Defendants allege that in the

event that the Plaintiffs obtain a judgment against Answering Defendants, Answering Defendants

are entitled to contribution and/or indemnification against the remaining Defendants or John

Does.  Accordingly, and without admitting any liability whatsoever, Answering Defendants

hereby demand from any/all Co-Defendants currently named or to be named to this action for

contribution and/or indemnification pursuant to any and all applicable provisions of common law

and/or contract and/or statute, including but not limited to the New Jersey Joint Tortfeasor

Contribution Act, N.J.S.A. 2A:15-5.1 et seq.; the New Jersey Tort Claims Act, N.J.S.A. 59:9-3

and 59:9-4 and/or by way of demand for complete indemnification against all other Defendants

currently named or to be named, assert that any negligence on the part of Answering Defendants

is only secondary, vicarious and imputed whereas the negligence of any/all such other defendants

is primary, direct and active.

**WHEREFORE**, Answering Defendants demand that the remaining Defendants or John

Does or parties later added be held jointly and/or severally liable for contribution and/or

8

49a

indemnification to Answering Defendants for any recovery made by the Plaintiffs in the present

matter.

## RESERVATION OF DEFENSES AND OBJECTIONS

Answering Defendants reserve the right to assert and raise any additional objections and

affirmative defenses which become known during the course of discovery.

## DEMAND FOR STATEMENT OF DAMAGES

**TAKE NOTICE** that Answering Defendants herein hereby demand the Plaintiffs,

though their attorney, to serve a Statement of Damages claimed within five (5) days of the date

of service hereof.

## JURY DEMAND

Answering Defendants demand trial by jury on the issues.

## DESIGNATION OF TRIAL COUNSEL

John C. Eastlack, Jr., Esquire, attorney for Answering Defendants, is hereby designated

as trial counsel in the within action.

## CERTIFICATION PURSUANT TO L.CIV.R.11.2

I, John C. Eastlack, Jr., Esquire, hereby certify as follows:

1.    To the best of my knowledge, this matter is not the subject of any other action

pending in any court or any pending arbitration proceeding.

50a

2.     To the best of my knowledge, no other action or arbitration proceeding is
contemplated.

3.     To the best of my knowledge, there are no other parties who should be joined in
this litigation at this time.

4.     I certify that the foregoing statements made by me are true. I am aware that if any
of the foregoing statements made by me are willfully false, I am subject to punishment.

**WEIR & PARTNERS LLP**

Dated:  December 2, 2013                By: /s John C. Eastlack, Jr., Esq.
                                            John C. Eastlack, Jr., Esq.

**CERTIFICATION OF SERVICE**

I certify that a copy of this Answer of Defendants was served via electronic filing upon
all counsel of record.

**WEIR & PARTNERS LLP**

Dated:  December 2, 2013                By: /s John C. Eastlack, Jr., Esq.
                                            John C. Eastlack, Jr., Esq.

51a

10

Case 1:13-cv-06353-JEI-AMD    Document 20    Filed 03/13/15    Page 1 of 39 PageID: 52

Daniel E. Rybeck, Esq. (DR8652)
WEIR & PARTNERS LLP
*A Pennsylvania Limited Liability Partnership*
The Liberty View Building
457 Haddonfield Road, Suite 420
Cherry Hill, NJ 08002
T: 856-662-1018
F: 856-662-1592
Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NICO ELECTRICAL CONTRACTOR, INC., and MARSHALL B. WILLIAMS, <br> Plaintiffs, <br><br> v. <br><br> CITY OF CAMDEN, EUGENE EMENECKER, WILLIAM REVAITIS, JAMES RIZZO, and IRAIDA AFANADOR, <br> Defendants. | **CIVIL ACTION:** <br> **1:13-cv-06353 (JEI-AMD)** |

## Notice of Motion for Summary Judgment

TO:    F. Michael Daily, Jr., Esq.
       F. Michael Daily, LLC
       Sentry Office Plaza
       216 Haddon Avenue, Suite 106
       Westmont, New Jersey 08108

   **PLEASE TAKE NOTICE** that Defendants, City Of Camden, Eugene Emenecker,

William Revaitis, James Rizzo, and Iraida Afanador, will move before the Honorable Joseph E.

Irenas, Sr. U.S.D.C.J., United States District Court for the District of New Jersey, Camden

Vicinage, Mitchell H. Cohen U.S. Courthouse, 4th and Cooper Streets, Camden, New Jersey,

08101, for an Order granting the Motion for Summary Judgment in favor of the Defendants.

52a

In support of this motion, Defendant will rely upon the attached Brief submitted

herewith.

Oral argument is requested.

**WEIR & PARTNERS LLP**

/s Daniel E. Rybeck
DANIEL E. RYBECK, ESQUIRE

Dated: March 13, 2015

2

**53a**

## STATEMENT OF FACTS

1.      Plaintiff, Marshall Williams (hereinafter "Williams"), is a New Jersey licensed electrical contractor. See ECF #1 at ¶10.

2.      Prior to 1998, Williams was a member of the International Brotherhood of Electrical Workers union (hereinafter "IBEW"). *Id.* at ¶11.

3.      In approximately 1998, Williams left IBEW and became an independent non-union electrical contractor. *Id.* at ¶12.

4.      Initially, Williams worked as an independent contractor under the trade name of "Nico Electric," and in 2005 he formally incorporated his business as "Nico Electrical Contractor, Inc." (hereinafter "Nico"). *Id.* at ¶14.

5.      In 2002 Nico was awarded a contract (hereinafter "2002 Contract") to provide electrical maintenance services to the City of Camden for a period of, according to Plaintiffs' Complaint, three (3) years. *Id.* at ¶15.

6.      The 2002 Contract term was not for 3 years; it was for two (2) years on an "as needed" basis. See July 18, 2002 contract, attached hereto as Exhibit "1" and incorporated herein by reference.

7.      Shortly after being awarded the 2002 Contract, Williams alleges he received a telephone call from the then Chief Financial Officer (CFO) for the City of Camden, Richard Feliciano, wherein CFO Feliciano allegedly stated he received a telephone call from IBEW Assistant Business Manager Donald Norcross. During the conversation between Mr. Norcross and CFO Feliciano, Mr. Norcross purportedly stated he [Mr. Norcross] wanted the 2002 contract to be rebid and that he [Mr. Norcross] did not want Williams performing any work for the City

**54a**

1

of Camden. See October 21, 2014 deposition transcript of Williams, attached hereto as Exhibit "2" and incorporated herein by reference, at 24:22 to 25:20.

8.      Williams claims CFO Feliciano inquired of Williams during the aforementioned telephone call what was going on between Williams and Mr. Norcross, to which Williams replied that Mr. Norcross was "pissed off" that Williams was no longer a member of IBEW. *Id.* at 35:18 to 37:18.

9.      Williams claims he did not receive a single job during the term of the 2002 Contract. See ECF #1 at ¶19.

10.     William Revaitis is a former member of IBEW, having ended his membership in IBEW in 1994. See November 5, 2014 deposition of William Revaitis, attached hereto as Exhibit "3" and incorporated herein by reference, at 6:19 to 8:12.

11.     Mr. Revaitis was hired by the City of Camden as an electrical inspector in 1996, and has been the Electrical Subcode Official (ESCO) since approximately 1999-2000. *Id.* at 5:10 to 6:2.

12.     ESCO Revaitis never had any conversations with CFO Feliciano. *Id.* at 11:2-9.

13.     Eugene Emenecker is a former member of IBEW, having retired from his employment as a union electrician and from his membership in IBEW in November 1999. See November 5, 2014 deposition transcript of Eugene Emenecker, attached hereto as Exhibit "4" and incorporated herein by reference, at 6:4-7, 7:11-20.

14.     Mr. Emenecker has been employed since 2004 as an Electrical Inspector for the City of Camden, Building Bureau. *Id.* at 6:11-15.

15.     ESCO Revaitis is Insp. Emenecker's supervisor. See Exhibit 3 at 6:3-7; see also Exhibit 4 at 12:2-11.

2

55a

16.     To perform electrical work in the City of Camden, an electrical contractor must obtain a permit by way of application to the Building Bureau, with the ESCO determining whether to issue the permit, and the Construction Official signing the permit once the work has been approved by way of inspection. See Exhibit 4 at 17:9-21.

17.     After work is performed by an electrical contractor, an inspection is scheduled and subsequently performed. *Id.* at 26:10-15.

18.     Since 2002, Plaintiffs claim they received "disparate treatment" from ESCO Revaitis and Insp. Emenecker, "aimed at discouraging [Plaintiffs] from performing non-union work within the City of Camden." See ECF at ¶20.

19.     The "disparate treatment" by ESCO Revaitis and Insp. Emenecker claimed by Plaintiffs encompasses the following:

a.  Plaintiffs' customers being told by ESCO Revaitis and Insp. Emenecker that Williams is a bad contractor; and

b.  Jobs where Plaintiffs were the electrical contractors were failed by ESCO Revaitis and Insp. Emenecker for violations outside the scope of Plaintiffs' scope of work;

c.  Jobs where Plaintiffs were the electrical contractors were failed by ESCO Revaitis and Insp. Emenecker when there was no violation as Plaintiffs' work was performed in accordance with the law.

See Exhibit 2 at 99:3 -16, 105:3-6.

20.     Within a month of being awarded the 2002 Contract, Williams alleges ESCO Revaitis inquired of Williams how Williams was going to deal with IBEW when attempting to perform work in the City of Camden, to which Williams responded "well, I'll just deal with it as

3                    56a

it comes, you know, just like every other day, I just take it day as it comes...Donald's not happy, but I'm just trying to survive." *Id.* at 41:1 to 42:21.

    21.    During the aforementioned conversation between Williams and ESCO Revaitis, ESCO Revaitis did not mention Mr. Norcross. *Id.* at 42:22 to 43:3.

    22.    Plaintiffs allege ESCO Revaitis made comments about how Williams was going to deal with IBEW on three (3) to four (4) separate occasions, stating "how you making out?", "getting any flak from the union?" and "guys that are local [union] probably look down upon you because you were a union member." *Id.* at 86:7 to 88:3.

    23.    Other than the aforementioned 3-4 occasions when ESCO Revaitis asked Williams how Williams was dealing with the union between 2002 and 2004, ESCO Revaitis has never mentioned the union to Williams. *Id.* at 111:7 to 112:6.

    24.    Plaintiffs allege that the evidence that Insp. Emenecker treated him disparately because of their non-union membership occurred on two (2) occasions:

        a.    During an inspection at 420 Chambers Street, Insp. Emenecker asked why Williams was not wearing a rubber suit when Williams was taking a panel cover off, and when Williams said he did not need a suit, Insp. Emenecker allegedly stated "see? Since you've been working nonunion you got away from all the good habits that we use out of the local."

        b.    During an inspection at 1302 Browning St., Insp. Emenecker stated to Williams "you know how you supposed to do it, y'all working out of the local before, you know that."

*Id.* at 109:1 to 111:6.

**57a**

4

25.    Williams has never any problems with IBEW since being awarded the 2002 Contract. *Id.* at 43:16-18.

26.    James Rizzo became a Building Inspector with the City of Camden in 2005, he was promoted to Building Subcode Official, and then became the Construction Official (CO) in or around 2009. See November 5, 2014 deposition transcript of CO Rizzo, attached hereto as Exhibit "5" and incorporated herein by reference, at 6:17 to 8:19.

27.    As the Construction Official, CO Rizzo oversees all of the Building Bureau, which included ESCO Revaitis. See Exhibit 3 at 6:8-12; see also Exhibit 5 at 8:18-22.

28.    Iraida Afanador was the Director of the City of Camden Department of Code Enforcement up to January 2014. See November 5, 2014 deposition transcript of Dir. Afanador, attached hereto as Exhibit "6" and incorporated herein by reference, at 4:18 to 5:1.

29.    As Director, Dir. Afanador was CO Rizzo's supervisor. *Id.* at 8:15-16.

30.    Plaintiffs claim the disparate treatment they received from ESCO Revaitis and Insp. Emenecker was reported by Plaintiffs to CO Rizzo and Dir. Afanador, and that CO Rizzo and Dir. Afanador "failed to take action, have ratified the aforesaid actions of their subordinates, and have continued the long existing policy of the City of Camden to discourage non-union contractors from working in the city." See ECF #1 at ¶27.

**B.  Specific Inspections Claimed to be Unlawful**

**1. 1302 Browning Street**

31.    Plaintiffs' claim Insp. Emenecker rejected their work at 1302 Browning Street without a reasonable basis. See ECF #1 at ¶23.

**58a**

32.   The property owner's name was Vynne Lewis. See Exhibit 2 at 112:7-12; see also City of Camden Contractor Project listing, attached hereto as Exhibit "7" and incorporated herein by reference, at 5.

33.   The scope of work for this property was replacing a service cable that feeds to the electrical panel and connects to the utility company's line on an electrical pole. See Exhibit 2 at 113:24 to 114:9.

34.   According to Williams, the electrical code states an existing service can be cut out, and so as to not deface Ms. Lewis' property, Williams cut the cable out where it could not be re-energized as the cable was embedded in the mortar facial. *Id.* at 97:19-24.

35.   Plaintiffs completed the work, and Ms. Lewis scheduled an inspection in December 2012. *Id.* at 118:3-11; see also Exhibit 7 at 5.

36.   During the inspection, Ms Lewis telephoned Williams and advised him that there was a problem with the inspection. Insp. Emenecker then spoke to Williams on the phone, and Williams contends that Insp. Emenecker stated "you're going to do the job according to the fucking way I want it done or you're not going to get it passed," to which Williams responded "Gene, who's going to be responsible for defacing the lady's property? Long as I cut the cable off where it can't be re-energized, it's legal." See Exhibit 2 at 98:4-12.

37.   Williams and Insp. Emenecker screamed back and forth at one another, with Insp. Emenecker eventually hanging up the phone on Williams. *Id.* at 118:12 to 119:17.

38.   Williams complained verbally and in writing to CO Rizzo about Insp. Emenecker's conduct during this inspection. See Exhibit 2 at 123:22 to 124:23.

39.   Williams' complaint regarding Insp. Emenecker was the first time CO Rizzo became aware of Plaintiffs. See Exhibit 5 at 9:3-23.

6

59a

40.   It is Plaintiffs' position that Insp. Emenecker was required, per New Jersey law, to cite to a code section, and that the property owner be sent a notice that the work Plaintiffs performed met the code requirements and that Insp. Emenecker made a mistake. See Exhibit 2 at 127:22 to 129:24.

41.   After speaking with Williams, CO Rizzo wrote Williams an email wherein he stated "I told you that I would speak to the electrical inspector and have either provide a code section to support his decision or reverse it." See January 3, 2013 email, attached hereto as Exhibit "8" and incorporated herein by reference.

42.   CO Rizzo further requested in his January 3rd email to Williams "what was it that constituted conduct unbecoming a public official? I need specific information, not vague and unclear allegations. Give me a comprehensive written account of these disrespectful actions that you elude to." *Id.*

43.   Williams responded to CO Rizzo on January 4, 9 and 10, 2013 via email, but never furnished the information requested from CO Rizzo about what specific conduct of Insp. Emenecker rose to the level conduct unbecoming a public official. *Id.*; see also January 9-10 emails, attached hereto as Exhibit "9" and incorporated herein by reference.

44.   After receiving Williams' complaint, CO Rizzo questioned Insp. Emenecker, with Insp. Emenecker stating he had had no problem with Williams. See Exhibit 5 at 10:9-13.

45.   CO Rizzo characterizes the disagreement between Williams and Insp. Emenecker as a difference of opinion, with the matter being resolved when Insp. Emenecker passed the job. See Exhibit 2 at 127:3-8; see also Exhibit 5 at 10:13-20; see also Exhibit 9.

**60a**

7

2. <u>931 South 7th Street</u>

46.　Plaintiffs claim ESCO Revaitis rejected their work at 931 South 7th Street without a reasonable basis. See ECF at ¶24.

47.　Plaintiffs' contact person for the 931 South 7th St. job was the property owner's daughter-in-law, Ayana Jordan. See Exhibit 2 at 133:15 to 134:23.

48.　Plaintiffs' scope of work for this property was installing new electrical service and interior wiring. *Id.* at 137:10 to 138:8.

49.　After completing the work, Ms. Jordan scheduled the inspection. *Id.* at 141:5-13.

50.　During the inspection on January 17, 2012, Ms. Jordan telephoned Williams and notified him that the inspection failed because of a lighting problem on the second floor of the residence, as indicated on the Electrical Subcode Technical Section for this property. See Exhibit 2 at 141:14-20; see also Electrical Subcode Technical Section for 931 S. 7th St., attached hereto as Exhibit "10" and incorporated herein by reference.

51.　During said phone conversation, Williams stated the 2nd floor lighting problem was not within his scope of work. The circuit breaker had tripped out because of an overload, and during the inspection a breaker was off in the electric panel. See Exhibit 2 at 141:21 to 142:5.

52.　In regard to the tripped circuit breaker, Plaintiff claims ESCO Revaitis "didn't look into it in detail to find out whether it was the old existing work or something I did." *Id.* at 142:6 to 143:8.

53.　After speaking with Ms. Jordan, Williams went to the property and confirmed the tripped breaker had nothing to do with his work. *Id.* at 143:9-14.

61a

8

54.     Williams then called ESCO Revaitis and stated the job was failed for something outside of Plaintiffs' scope of work, to which ESCO Revaitis allegedly replied "the only thing I know is there was a breaker off." Williams says he then told ESCO Revaitis that he [ESCO Revaitis] did not take the panel cover off to determine if the problem was old or new wiring, to which ESCO Revaitis supposedly replied "yeah, you know, you get busy and I just didn't take the cover off." *Id.* at 143:15-22.

55.     ESCO Revaitis has testified that he initially failed Plaintiffs' job without issuing a red failure sticker because the 2nd floor had no lights and the breaker would not reset; and he spoke to Williams at the time of the inspection, to which Plaintiff responded that those issues were outside the scope of his work. See Exhibit 3 at 17:20 to 18:24.

56.     After thinking about his conversation with Plaintiff, ESCO Revaitis decided the breaker would not reset because of a direct short in it, so he passed Plaintiffs' job on February 1, 2012 and delivered the approval to Ms. Jordan. *Id.*; see also Exhibit 10.

57.     According to Plaintiffs, the week after the initial inspection, ESCO Revaitis went back to the property and did another inspection, and then approved the job with Williams later received a notice from the City of Camden that the job was approved. See Exhibit 2 at 146:10-15, 150:7-12.

58.     Williams complained about this job to CO Rizzo. *Id.* at 144:21 to 145:23; see also Exhibit 5 at 10:21 to 11:13.

59.     CO Rizzo characterizes the disagreement between Williams and ESCO Revaitis as a difference of opinion, with the end result being the job passed. *Id.* at 11:14-20.

60.     Ms. Jordan provided a statement to the City of Camden that unequivocally states that her property did not pass inspection, "but not due to Marshall [Williams]," and that she hired

9

62a

another electrician after Williams, with the 2nd electrician fixing the problem which allowed the

property to pass inspection. See October 8, 2013 statement of Ayana Jordan, attached hereto as

Exhibit "11" and incorporated herein by reference.

### 3. **1571 South 8th Street**

61.     Plaintiffs claim Insp. Emenecker rejected their work at 1571 South 8th Street

without a reasonable basis, and that Insp. Emenecker made disparaging remarks to the

homeowner regarding Plaintiffs. See ECF at ¶25.

62.     The owner of 1571 S. 8th St. was Bernice Holland, with Williams' neighbor, Tony

Parker (a relative of Ms. Holland), requesting that Williams fix an electric problem at Ms.

Holland's residence. See Exhibit 2 at 209:2 to 210:21.

63.     Thereafter, Williams replaced an electrical panel and upgraded the ground system

at the property. *Id.* at 211:2-11.

64.     Ms. Holland arranged for an inspection, and in his deposition Williams testified

ESCO Revaitis was the inspector for this property. *Id.* at 211:12-14, 212:25 to 213:1.

65.     After the inspection occurred, Williams claims he received a telephone call from

Ms. Holland wherein she stated ESCO Revaitis told her during the inspection that Williams

should have corrected a cable on the outside and a loose outlet in the basement, and that she

should not have paid Williams. *Id.* at 211:12 to 213:1.

66.     There was also a problem with the service head, with ESCO Revaitis wanting

more straps on the service head, which Williams claims "was like that all along" and "it wasn't

like the service head couldn't function," and that the service head straps were outside the scope

of his work. *Id.* at 213:2-13.

10

63a

67. Williams claims the service head was properly attached when he performed his work, and that it became detached at some point between his work and the inspection as a result of inclement weather. See January 13, 2013 deposition transcript of Williams, attached hereto as Exhibit "12" and incorporated herein by reference, at 46:16 to 47:18.

68. Mr. Parker telephoned Williams and asked that Williams fix the problems, which Williams did without compensation for work that he would have charged approximately $250.00. See Exhibit 2 at 213:17 to 214:9.

69. About a week after the initial inspection, Williams complained in writing to CO Rizzo about this job wherein Williams averred a statement from Ms. Holland would be provided to validate his complaint. See Exhibit 12 at 40:15 to 41:2; see also undated letter from Williams to CO Rizzo, attached hereto as Exhibit "13" and incorporated herein by reference.

70. Williams also went to City Hall and complained to CO Rizzo in-person about this job. See Exhibit 2 at 215:12 to 217:22.

71. Williams prepared a statement for Ms. Holland to sign, which states that ESCO Revaitis failed the job due to the fact that the service head was not supported and that Williams should not have been paid for work that was done incorrectly; and that when Mr. Parker called Williams, Williams stated the service head was attached to the property when Williams performed work at the property. See statement of Bernice Holland, attached hereto as Exhibit "14" and incorporated herein by reference; see also Exhibit 12 at 45:24 to 46:3.

72. The job was approved approximately three (3) weeks later. See Exhibit 2 at 217:23 to 218:13.

73. Plaintiff's deposition testimony that ESCO Revaitis was the inspector for this job is in contradiction to his Complaint (which alleges Insp. Emenecker was the inspector for this

11

64a

job) and the Electrical Subcode Technical Section which contains Insp. Emenecker's initial's and

handwriting in the inspections portion of the document indicating that the initial failure was due

to the service head not being attached to the building. See ECF at ¶25; see also Exhibit 2 at

212:25 to 213:1; see also Exhibit 4 at 42:23 to 43:10; see also Electrical Subcode Technical

Section for 1571 S. 8th St., attached hereto as Exhibit "15" and incorporated herein by reference.

### 4. 1207 Mt. Ephraim Avenue

74.     Plaintiffs claim ESCO Revaitis, while performing an inspection at 1207 Mt.

Ephraim Avenue, advised the owner of the property that the owner should use the services of a

contractor other than Plaintiffs. See ECF at ¶26.

75.     A tattoo shop owned by Israel "Tony" Miller entitled "Twisted Tattoos" is located

at 1207 Mt. Ephraim Ave. See Exhibit 2 at 195:22 to 196:2.

76.     After Plaintiffs performed electrical work at Twisted Tattoos in October 2011,

Mr. Miller scheduled an inspection wherein ESCO Revaitis allegedly stated to Mr. Miller that if

he [Mr. Miller] needed additional work, that ESCO Revaitis had a "good old boy" by the name

of George Cassidy that is an electrical contractor that ESCO Revaitis would recommend as

opposed to calling Plaintiffs. See Exhibit 2 at 200:20 to 202:7; see also Exhibit 7 at 5.

77.     ESCO Revaitis denies making the comments Mr. Miller claims were uttered by

ESCO Revaitis. See Exhibit 3 at 15:6-16.

78.     Williams prepared a statement for Mr. Miller that Mr. Miller signed. See

September 25, 2013 statement of Mr. Miller, attached hereto as Exhibit "16" and incorporated

herein by reference; see also Exhibit 2 at 207:17-23.

79.     George Cassidy has never been a member of IBEW. See Exhibit 12 at 19:3-8.

12

**65a**

80.    Plaintiffs concede that being non-union was not an issue for this job; Plaintiffs

complaint was that ESCO Revaitis was improperly recommending another electrical contractor.

*Id.* at 19:9 to 20:6.

81.    Every single one of Plaintiffs' jobs referenced above was approved by the City of

Camden inspectors. *Id.* at 116:14-20.

## C. Plaintiffs' 2013 Complaint to the New Jersey Department of Community Affairs (DCA)

82.    In 2013, Plaintiffs sent a written complaint to Carmine Gangeruso of the DCA,

wherein Plaintiffs complained that when an initial inspection would occur in the City of Camden

and an inspector would say there was a violation, so specific citation to the electrical code was

being provided in support of the inspector's position that a violation was present. See undated

letter from Plaintiffs to DCA, attached hereto as Exhibit "17" and incorporated herein by

reference; see also Exhibit 12 at 117:4-14.

83.    Ken Verbos has been an employee of the State of New Jersey, DCA, Department

of Regulatory Affairs, since 1993. See January 16, 2015 deposition of Mr. Verbos, attached

hereto as Exhibit "18" and incorporated herein by reference, at 6:19 to 7:1.

84.    Mr. Verbos first became aware of Plaintiffs after Plaintiffs complained to Mr.

Verbos' supervisor, Mr. Gangeruso. *Id.* at 7:21 to 8:7.

85.    Williams complained to Mr. Verbos about City of Camden inspectors not

providing code citations when failing a job, improperly requiring Williams to make repairs that

were not Williams' responsibility, and making derogatory remarks about Williams to Williams'

customers. *Id.* at 9:3-13.

86.    No formal investigation was ever conducted by Mr. Verbos into the inspectors'

respective conduct. *Id.* at 16:9-16.

13

66a

87.     As a result of Plaintiffs' complaints, Mr. Verbos spoke to the City of Camden

inspectors when he was in Camden on an unrelated issue, and advised the inspectors they had to

cite a specific electrical code section if they failed a job. *Id.* at 17:3-9, 38:9-20.

88.     In situations where an inspector mistakenly believes Plaintiffs performed work

that constituted a failure, there is no requirement for inspectors to explain to the property owners

that a mistake was made; the inspectors are required to issue an approval sticker in such a

situation. *Id.* at 13:14 to 15:10; 46:13 to 47:1.

89.     The demeanor of the inspectors is not a DCA issue, it is an issue to be handled by

the municipality. *Id.* at 9:14-22, 10:11-14.

90.     Mr. Verbos spoke to Mr. Gangeruso about Plaintiffs' issues with the City of

Camden inspectors, and they agreed that the dispute did not rise to a level that required action by

the DCA. *Id.* at 22:10 to 23:7.

### D.  Plaintiffs' Complaints to Mr. Rizzo & Director Afanador

91.     Plaintiffs take issue with situations wherein initially the inspectors stated there

was a violation, and then Williams protested and the jobs were ultimately approved by the

inspectors; and that CO Rizzo did not send Williams and the property owner something in

writing stating that there was nothing wrong with the work Plaintiffs performed. It is Plaintiffs'

contention that an approval notice being sent to Plaintiffs and the property owner is insufficient

in such situations. See Exhibit 2 at 99:17 to 102:20.

92.     On September 20, 2013, Williams submitted a request to meet with Dir.

Afanador. See September 20, 2013 letter of Williams, attached hereto as Exhibit "19" and

incorporated herein by reference.

67a

93.     Williams purposefully did not set forth any specific complaint in his September

20th letter because:

> I don't trust them people in the City of Camden, you gotta be very discreet
> what you say to them. If I was to tell [Director Afanador] in advance what
> the contents of what I wanted to speak about, they prepare themselves. You
> gotta be very careful when you communicate with them, you can't let them
> know what your hand is. Like playing a game of poker, you can't let 'em
> know what your hand is. You gotta reveal that at the time.

See Exhibit 2 at 180:5-24.

94.     If Williams had notified Dir. Afanador the specific nature of his complaints,

"[t]hey would have turned around and gathered information...and interviewed certain people..."

*Id.* at 181:6-21.

95.     Pursuant to Williams' request, a meeting occurred in September 2013 at City Hall

with Williams, Dir. Afanador and other City personnel. *Id.* at 159:3 to 163:5, 185:13-15.

96.     During the meeting, Williams claims he provided statements and telephone

numbers of persons for Dir. Afanador to contact, including Ms. Jordan, and information

regarding the properties discussed *supra*: 1207 Mt. Ephraim Ave., 1302 Browning St., 931 S. 7th

St., and 1571 S. 8th St. *Id.* at 190:4 to 191:11.

97.     Dir. Afanador confirms that Williams provided information regarding Ms. Jordan

and Mr. Miller. See Exhibit 6 at 14:1-7.

98.     Dir. Afanador requested CO Rizzo to investigate Williams' complaint of his jobs

failing inspections, and CO Rizzo advised Dir. Afanador that none of Plaintiffs' jobs had failed

as they all received approval. *Id.* at 14:1 to 15:3.

99.     CO Rizzo spoke to ESCO Revaitis about not citing to the code for Plaintiffs' jobs,

to which ESCO Revaitis replied that there was no reason to cite to the code when he has never

15                                                       **68a**

failed a job of Plaintiffs' as said jobs all received approval for the work performed by Plaintiffs.
See Exhibit 3 at 16:18-25.

100.    Dir. Afanador contacted Mr. Miller and he confirmed that ESCO Revaitis made
the comments attributed to him [ESCO Revaitis] in Mr. Miller's statement. See Exhibit 6 at
16:10 to 17:8.

101.    Dir. Afanador contacted Mr. Miller a second time and asked him if he wrote his
statement, and Mr. Miller advised that Williams prepared the statement and he [Mr. Miller]
signed the same. Dir. Afanador advised Mr. Miller that she needed a statement directly from Mr.
Miller, but Mr. Miller refused to cooperate. *Id.* at 17:9 to 19:16.

102.    During Dir. Afanador's and CO Rizzo's investigation of Plaintiffs' complaints,
ESCO Revaitis denied, via email, Mr. Miller's accusations. See October 4, 2013 email from
ESCO Revaitis to Dir. Afanador, attached hereto as Exhibit "20" and incorporated herein by
reference.

103.    Director Afanador stated to Williams after their meeting that she was going to
reach out to Ms. Jordan. See Exhibit 2 at 187:20 to 188:5.

104.    Dir. Afanador contacted Ms. Jordan via telephone with CO Rizzo and the
Director's secretary also parties to the phone conference, with Ms. Jordan having a negative
feeling towards Williams as a result of Williams' behavior when Williams called ESCO Revaitis
a "cracker"; with Williams' improper behavior rising to such a level that Ms. Jordan had to resort
to having her husband speak to Williams on the phone so as to cause Williams to cease harassing
her by calling and text messaging her. See Exhibit 5 at 12:1 to 13:5; see also Exhibit 6 at 20:14
to 22:11.

**69a**

105.   Dir. Afanador requested that Ms. Jordan provide a statement, and Ms. Jordan complied when she provided the statement referenced *supra*. See Exhibit 6 at 20:14 to 22:11

106.   Ms. Jordan's aforementioned statement contradicts Williams' version of events regarding the inspection of her property; Ms. Jordan states Williams was present for the inspection and that when ESCO Revaitis initially approached them for the inspection, Williams called ESCO Revaitis a "racist son of a bitch," and that the initial failure of the inspection was not due to work performed by Plaintiffs. See Exhibit 11.

107.   Plaintiffs accounts for Ms. Jordan's version of events contradicting his as a result of Dir. Afanador and Ms. Jordan both being Hispanic, and "if you don't know this about the Spanish community, they're very close. No disrespect to anybody, but they're very close. They will support each other, lie, or whatever it is. They will lie. They lie for one another. That's one population, group of people that will lie for each other..." See Exhibit 2 at 157:2-20.

108.   The week after the meeting, Dir. Afanador telephoned Williams and allegedly stated that the electrical inspectors had done an excellent job and that Williams was the problem, to which Williams replied "I understand your position, you're the director and it's only fitting that you take that position because it makes it look like you don't have any control over your office." *Id.* at 185:25 to 186:25.

109.   In light of the only evidence supporting Plaintiffs' allegations being Mr. Miller's statement prepared by Williams, and ESCO Revaitis' denial of same, Dir. Afanador found no wrongdoing on the part of ESCO Revaitis or Insp. Emenecker at the conclusion of her investigation due to a lack of evidence/merit to Williams' complaints. See Exhibit 6 at 23:3-6; see also Exhibit 20; see also October 3, 2013 email from Dir. Afanador to ESCO Revaitis, attached hereto as Exhibit "21" and incorporated herein by reference.

**70a**

# Exhibits 1 through 21

## Defendants' Brief
## In Support of Defendants' Motion for Summary Judgment

## [Doc 20]

## Filed 03/16/16

1

72a

CODE #6-02-161

This Contract and Agreement, made and entered into this *8th* day of *July*, in the year of Our Lord, Two Thousand Two (2002).

The City of Camden, a Municipal Corporation of the State of New Jersey of the first part, hereinafter referred to as the party of the first part and **Nico Electrical Contractor, 5328 Browning Road, Pennsauken, New Jersey 08109** of the second part, hereinafter referred to as the party of the second part.

**Witnesseth:**

In Consideration of the mutual promises and covenants of the parties hereto it is agreed as follows:

The party of the second part shall provide the goods and/or services, more particularly described in the specifications and proposal attached hereto and made a part hereof within the time limits stated therein:   Provide electrical installation and repairs for various departments of the City on an "as needed" basis for a period of two (2) years, per attached bid dated May 14, 2002 and Resolution R-11 adopted June 13, 2002.

The party of the second part does hereby agree and covenant that it, he or she will comply with the Labor Laws of the State of New Jersey and of the United States of America as it may pertain to the manufacture, assembly or performance of the goods or services to be supplied hereunder and to further pay to its employees a sum no less than the prevailing daily rate for wages in the locality where the work is to be performed or services rendered pursuant to law.

**AND** the party of the second part further agrees to comply with the provisions of N.J.S.A. 10:5-12 regarding unlawful employment practices and discrimination; and all other applicable federal, state laws and municipal ordinances regarding employment practices and discrimination.   The violation of any of the aforesaid statutes or ordinances by the party of the second part shall be a breach of the entire contract and the party of the first part shall have the option of canceling the remaining portion of the contract, rescinding the contract in its entirety or continuing the contract subject to the remedies, penalties or other mandatory action available to the party of the first part under the law.   (See Addendum #1 and Execute).

1

(01-12-15)

**Williams 36**   73a

AND the party of the second part hereby certifies that no bonus, or other consideration has or will be given, received or promised to the servants, agents or employees of the party of the first part of the awarding of this contract.

AND the party of the second part shall furnish a Performance Bond in the amount of WAIVED BY THE PURCHASING AGENT.

The party of the first part does covenant, promise and agree, to and with the said party of the second part, to pay or cause to be paid unto the said party of the second part the sum of ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000.00), lawful money of the United States of America, as per attached bid dated May 14, 2002 and Resolution R-11 adopted June 13, 2002. The parties acknowledge that the City is subject to the Local Public Contracts Law, N.J.S.A. 40A:11-15, which states that this contract shall be subject to the availability and appropriation annually of sufficient funds.

The payment of said price, or consideration money, shall be paid to the said party of the second part, upon certification of the Department of Administration that the work was done or articles furnished and delivered in a satisfactory manner; then upon presentation by the said party of the second part, to the Department of Finance of said City, a Certificate in Lieu of Affidavit that the work done or articles furnished are according to law and not upon any secret promises to pay any bonus in money or property as detailed on the invoice.

AND, it is further agreed by the parties hereto in the event of a default by the party of the second part in any of the terms and/or conditions hereof then in such an event, of the second part as liquidated damages and not as a penalty; the party of the second part shall be liable for the payment of any costs or expenses incurred by the party of the first part in excess of the contract price required to complete this contract.

It Is Further Understood and Agreed that in the event of the default as aforesaid, the party of the second part, it successors, heirs or personal representatives shall pay such excess costs and expenses upon the presentation of an invoice by the party of the first part.

2

**(01-12-15)**                                    **Williams 37**  74a

In Witness Whereof, the party of the second part has caused these presents to be signed and sealed and the said CITY OF CAMDEN has caused these presents to be signed by its proper officers and sealed with its common or corporate seal, the day and year first aforesaid.

CITY OF CAMDEN

Signed, Sealed and Delivered:

BY: _____
GWENDOLYN A. FAISON
Mayor

in the presence of:

(SEAL)

_____

ATTEST: _____
LUIS PASTORIZA
Municipal Clerk

Approved as to form:

NICO ELECTRICAL CONTRACTOR

_____
DENNIS G. KILLE
City Attorney

_____

_____
Witness

3

(01-12-15)                    Williams 38    75a



76a

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 1:13-cv-06353(JHR-AMD)

NICO ELECTRICAL CONTRACTOR, INC., and
MARSHALL B. WILLIAMS,

                              Plaintiffs,

            vs.

.CITY OF CAMDEN, EUGENE EMENECKER,
WILLIAM REVAITIS, JAMES RIZZO and IRAIDA
AFANADOR,

                              Defendants.

                 ------------------

                   October 21, 2014

                 ------------------


                    Oral sworn deposition of
MARSHALL B. WILLIAMS, 5328 Browning Road,
Pennsauken, New Jersey, was taken at the law office
of F. MICHAEL DAILEY, JR., LLC, 216 Haddon Avenue,
Westmont, New Jersey, before Linda S. Scholz,
Registered Professional Reporter and Certified Court
Reporter of the State of New Jersey, on the above
date, commencing at 10:05 a.m., there being present:


            F. MICHAEL DAILEY, JR., LLC
            BY: F. MICHAEL DAILEY, JR., ESQUIRE
                216 Haddon Avenue
                Westmont, NJ 08108          REC'D NOV 0 5 2014
                (856) 833-0006
                Attorney for Plaintiffs


                       APPEARANCES CONT.,

Page 22

1  trying to make sure -- maybe two thousand -- I think
2  it was 2005. I believe it was 2005.
3       Q    Okay. And why did you not incorporate
4  until 2005?
5       A    I just -- I decided to incorporate
6  because I spoke to several attorneys, and I even had
7  a judge mention to me it would be in our best
8  interest to incorporate to protect myself.
9       Q    Is that as -- protect yourself as for
10  personal liability?
11       A    Personal liability.
12       Q    Okay. You said you had a judge --
13       A    I even had a judge recommend to me that
14  it might be in my best interest.
15       Q    Which judge?
16       A    He was -- Judge Wingate. Judge
17  Wingate. He's been retired some time. My father
18  used to worked for --
19       Q    Okay.
20       A    -- Wingate.
21       Q    Okay.
22       MR. DAILEY: He's dead, isn't he?
23       MR. RYBECK: I've heard the name. I
24  never appeared before him, so --
25       MR. DAILEY: He was -- as long as I

D E G N A N & B A T E M A N , I N C.

Page 23

1  knew he never left the criminal division.
2       THE WITNESS: He spoke at my dad's
3  funeral. That's the last time I seen him. I didn't
4  see him since then.
5  BY MR. RYBECK:
6       Q    In paragraph 15 of your complaint you
7  allege that in 2002 you were the low bidder on the
8  contract to provide electrical maintenance services
9  to the city of Camden for a period of three years.
10  Explain to me how that bidding process works.
11       A    What happens, it's an open bid process
12  to the public, it's put out and all -- anyone that's
13  a -- that meets the qualifications can apply.
14  And I applied and I was informed that I was
15  the lowest bidder and was awarded the contract.
16       Q    Okay. And do you have any of those bid
17  documents in your possession?
18       A    I don't have them on me, but I may have
19  to -- you should be able to research and have those
20  documents, they should be available.
21       Q    Sure. Anything in your possession
22  regarding that 2002 bid I ask you provide to your
23  attorney and he provide to me. Okay?
24       A    Uh-huh.
25       Q    And it was for electrical maintenance

D E G N A N & B A T E M A N , I N C.

Page 24

1  services. Explain to me what that means.
2       A    Electrical maintenance service means
3  like say for instance if -- something as simple as
4  like say for instance if you have lighting out that
5  may be out at a building that's owned or monitored
6  by the City of Camden, they would reach out to you
7  and say, well, look, we have a problem here. If the
8  maintenance guys -- if it's something the
9  maintenance guys won't do, they'll reach out to you.
10  Some of the guys that they have on maintenance
11  they won't do because they're not knowledgeable as
12  far as construction and they'll reach out to someone
13  who's more advanced.
14       Q    Okay. And it was a period of three
15  years. Was that what the bid specs said?
16       A    I believe it was a period of three
17  years. Back then I think it was three years. I
18  think they changed it to two years now.
19       Q    Were you the sole person that was
20  awarded that bid?
21       A    Yes.
22       Q    In paragraph 16 you allege that not
23  long after being awarded the contract you had a
24  telephone conversation with a Richard Feliciano, --
25       A    Yes.

D E G N A N & B A T E M A N , I N C.

Page 25

1       Q    -- who was a CFO for Camden. Who
2  initiated that -- the telephone call?
3       A    He called me.
4       Q    Okay. And please tell me what
5  transpired in that conversation.
6       A    Well, Rich called me and he says, I
7  just got a phone call, he says, do you know Donald
8  Norcross? I said, yes, me and Donald, we served an
9  apprenticeship together, I know Donald very well.
10  And he said, he called me, he -- and also he turned
11  around and he marched -- he said he marched into the
12  purchasing agent's office, Rich Feliciano was the
13  purchasing agent, and he said that he wanted the bid
14  to go back out for bids, he said he didn't want me
15  doing any work and that he didn't want me performing
16  any work.
17  So he was upset because I was awarded the bid,
18  he wanted to go back out for bid. And he said,
19  we're going to have a problem with him. And that's
20  where it was pretty much left.
21       Q    Okay. And this is -- when you say, he
22  didn't want you to have the bid, he being Donald
23  Norcross?
24       A    Right, Donald Norcross placed the phone
25  call and he also came into his office also. And he

D E G N A N & B A T E M A N , I N C.

Page 34

1   Sometimes I'll be over near Cooper River Park I'll
2   run into him.
3        Q      I just ask you if you recall, or if
4   there's any kind of research you can do to find out
5   his last name, --
6        A      Sure.
7        Q      -- just provide it to your attorney.
8        A      Sure.
9        Q      Any other interaction with Mr. Norcross
10  since '94?
11       A      Not that I can think of, no.
12       Q      Going back to 2002 after you were
13  awarded the bid, at that time what was Mr.
14  Norcross's position? Business wise.
15       A      He was the -- classified as assistant
16  business agent. Then he held a position
17  politically, too. I'm not sure what he was. He was
18  linked in some way politically in Camden County.
19  But with the electrician's union he was an assistant
20  business agent.
21       Q      To your knowledge has Mr. Norcross ever
22  held any kind of position, either political
23  appointment wise or just regular employment wise,
24  with the city of Camden?
25       A      I'm not sure where he's seated, I don't

D E G N A N & B A T E M A N , I N C.

Page 35

1   know where -- what seats he holds or what he has
2   with regard to the city of Camden.
3        Q      Do you know if he ever has had any kind
4   of political appointment with the City of Camden?
5        A      I can't totally speak on that.
6        Q      You don't know?
7        A      I'm not sure.
8        Q      Okay. And how about any kind of
9   employment with the City of Camden?
10       A      I don't know whether he's employed by
11  the city of Camden, no.
12       Q      At any time?
13       A      Not to my knowledge.
14       Q      Okay. If you don't know, I understand
15  that, you know, you're qualifying your answer, so
16  that's fine.
17       A      Yeah.
18       Q      As a result of having -- well, strike
19  that. Going back to your conversation with Mr.
20  Feliciano, what did you say in response?
21       A      He -- Rich said to me, he says, what's
22  going on? With the two guys. Says, well, -- I
23  explained to him, I made it real brief, I said to
24  him, he wanted me to sign the book as a union
25  contractor, Rich, I said, I just don't have the

D E G N A N & B A T E M A N , I N C.

Page 36

1   financial resources to pay the wages week by week,
2   I'm just starting off, I just don't have the money.
3        And I said, he's pissed off me at me because
4   we were all called brothers out of the local and I
5   told him I just didn't have the money. And I
6   explained to him when I was out of work when we
7   merged all the locals I couldn't take care of the
8   family, so I had to do something to take care of the
9   family. That's why I became a contractor. And that
10  basically summarized the reason why he was pissed
11  off at me.
12       Then when he found out that I was awarded the
13  bid and he had so many guys out of the -- locals out
14  of the local, he wanted guys out of the local to be
15  doing that work, because previously the contractor
16  that did the work for the city of Camden, from my
17  understanding, was a union contractor.
18       So when they have it, they want to maintain
19  it, they don't want to lose any form of employment
20  where they could send the guys out to work.
21       Q      Did Mr. Feliciano tell you this is what
22  Mr. Norcross said, or are you inferring that from
23  Mr. --
24       A      We had a conversation about that. We
25  spoke in detail. He said that he was really pissed

D E G N A N & B A T E M A N , I N C.

Page 37

1   off, he said he wanted the job to go back out for
2   bid.
3        Q      Mr. Feliciano told you that?
4        A      Yes.
5        Q      Okay. That Mr. Norcross was pissed
6   off?
7        A      Right.
8        Q      Okay. And what was your response?
9        A      I just told him, doesn't surprise me,
10  that's Donald, that's what he does. I says -- I
11  told him that he also comes out and he hassles me
12  too. But that's what he does.
13       Q      Okay. Did anything else transpire in
14  that conversation?
15       A      That's pretty much summarizing the gist
16  of our conversation.
17       Q      Anything else you can recall?
18       A      No.
19       Q      In paragraph 18 you also allege that
20  during this period -- well, strike that. When was
21  the conversation with Mr. Feliciano?
22       A      I don't recall the exact date.
23       Q      Was it within a year of being awarded
24  the bid?
25       A      Yes.

D E G N A N & B A T E M A N , I N C.

Page 38

1    Q     Was it within a month?

2    A     It was within a month, yeah, it was

3  within a month.

4    Q     Yeah?

5    A     Yeah, because they guys -- guys at the

6  local, they monitor what's going out. Like if

7  there's work going out in Camden County they fine

8  tooth comb, they watch for anything that's going

9  to -- they can send the guys to work or they can

10  obtain those jobs. They get pissed off when they

11  lose them.

12    Q     And you talked about these interactions

13  with Mr. Norcross in '91 or '92 on Pine Street and

14  then also '93 or '94. I thought it was -- I thought

15  you you testified that you were a member of IBEW up

16  until '98.

17    A     I left the local, I'm going to

18  approximate and say -- I worked out of the local for

19  roughly about maybe 14, 15 years. And the time

20  period I could base it when they merged all the

21  locals I was out of work on a regular basis, and

22  then I started studying to take the test in New

23  Jersey and Delaware.

24    Q     I understand. But your complaint, if

25  you go to paragraph 11, you say prior to 1998 you

D E G N A N & B A T E M A N, I N C.

Page 39

1  were a member of IBEW.

2    A     Paragraph 11? Yes, I was a member

3  prior to 1998.

4    Q     So why would Mr. Norcross be coming to

5  you in 1994 asking you to sign up to become a member

6  if you were already a member?

7    A     Getting back to the question, paragraph

8  11?

9    Q     Yeah. You were just discussing

10  instances in '91 or '92 and '93 or '94 where Mr.

11  Norcross was talking about having to sign you up to

12  become a member of the union, but I thought you

13  testified you were a member of the union prior to

14  1998.

15    A     I left the local -- let me see. --

16  real close to that time period. I worked for the

17  local out of -- let me see. I finished my

18  apprenticeship in '83, '84 and I worked for 14, 15

19  years. That's pretty close to that time.

20        Prior to the year of 1998 Marshall William was

21  a member of IBEW. Yeah, that's true.

22    Q     So how could Mr. Norcross be coming to

23  you prior to 1998 asking you to sign up for the

24  union if you were already a member?

25    A     It was after that time period.

D E G N A N & B A T E M A N, I N C.

Page 40

1    Q     Okay.

2    A     Yeah. It's real close, but it was

3  after. As soon as I wind up getting my license,

4  that's when he -- he aggressively started coming at

5  me. Like I said, I worked at the local for 14, 15

6  years. And that's real close to that time period.

7    Q     So these conversations you were

8  discussing about Mr. Norcross trying to sign you up,

9  such as waiting at your driveway, that was after

10  1998?

11    A     Right, after he found out I had my

12  license, that's when he --

13    Q     Okay.

14    A     Yep.

15    Q     Why did you think that that incident on

16  Route 70 at Fox Electric happen at '93 or '94? Was

17  that just a mistake in time?

18    A     I would say that that was a mistake on my

19  part.

20    Q     Okay.

21    A     Yeah.

22    Q     Any time after the bid was awarded in

23  2002 did you have any interaction with Mr. Norcross,

24  any conversations?

25    A     No.

D E G N A N & B A T E M A N, I N C.

Page 41

1    Q     In paragraph 18 of your complaint you

2  allege that in addition during this period of time

3  you had a conversation with the defendant, Mr.

4  Revaitis, asking how you were going to deal with the

5  union when attempting to perform work in the City of

6  Camden.

7        When did this conversation occur?

8    A     This conversation occurred after it was

9  publicly known that I was awarded the maintenance

10  contract for the City of Camden.

11    Q     Was that within a month of you being

12  awarded the bid?

13    A     I would say within a month, because I

14  had to go to the building inspection department to

15  pick up a permit for a job I was doing in the city

16  and he seen me at counter and walked over and

17  inquired about that.

18    Q     What was Mr. Revaitis' position at this

19  time?

20    A     He was the inspector for the city of

21  Camden, electrical inspector for the City of Camden.

22    Q     Do you remember where the job was that

23  you were getting the permit for?

24    A     I believe it was for Mr. Rowland, I

25  believe it was Nate Rowland. He lived on Newton

D E G N A N & B A T E M A N, I N C.

Page 42

1   Avenue.

2        Q.       How do you spell Mr. Rowland's last

3   name?

4        A        R-O-W-L-A-N-D.

5        Q        He lives on Newton Avenue?

6        A        He used to live on Newton Avenue. He's

7   deceased now.

8        Q        So you come in to get a permit for

9   Mr. Rowland's property on Newton Avenue and

10  Mr. Revaitis asked you this question?

11       A        Correct.

12       Q        Okay. What was your response?

13       A        I just shrugged it off. I says, well,

14  I'll just deal with it as it comes, you know, just

15  like every other day, I just take it day as it

16  comes.

17       Q        Okay.

18       A        I said, I know there's going to be

19  opposition, I said, Donald's not happy, but I'm just

20  trying to survive. That's what I would always say,

21  I'm just trying to survive, just like everybody.

22       Q        Did Mr. Revaitis mention Mr. Norcross's

23  name at any point in that conversation?

24       A        He said, how you going to deal with the

25  local? And I said, I just deal with it as it comes.

         D E G N A N & B A T E M A N , I N C .

Page 43

1        Q        I understand that. But did he mention

2   Mr. Norcross specifically by name?

3        A        No, he didn't mention his name.

4        Q        Okay. What was your understanding of,

5   how are you going to deal with the local? What that

6   meant?

7        A        The opposition that would come with it.

8   Because we all know how the rules are played. He

9   was a union member, I was a union member, and we

10  know the opposition that comes when you don't, you

11  know, go according to what they want you to do.

12       Q        And is the opposition meaning the

13  things you were referencing earlier about people

14  flatting your tires, things of that nature?

15       A        Those things could take place.

16       Q        Okay. Have you ever had any problems

17  with the union since being awarded this bid?

18       A        Not with the local in New Jersey, no.

19       Q        Okay. In paragraph 19 you state that

20  during the entire three-year period of the contract

21  you did not receive one job to perform. Is that

22  correct?

23       A        That's correct.

24       Q        Okay. I believe you testified earlier

25  that maintenance workers could perform some work in

         D E G N A N & B A T E M A N , I N C .

Page 44

1   the City of Camden, but you would be called in for

2   jobs that were essentially above their

3   qualifications, for lack of a better word. Correct?

4        A        Normally that's the procedure.

5        Q        Okay. And who had that contract prior

6   to you?

7        A        I'm not sure. I remember the name

8   being mentioned, but I forget. So much time has

9   passed I don't remember the actual name.

10       Q        Okay. So from 2002 to 2005 the City of

11  Camden never hired you for one maintenance job?

12       A        I went out and looked at a lot of work

13  and I would -- never got any of those jobs.

14       Q        Okay. Do you have any knowledge if

15  anyone else performed maintenance work for the City

16  of Camden during that time period?

17       A        I was informed by the property manager

18  that those jobs were performed that I was scheduled

19  to do work on.

20       Q        Who was the property manager?

21       A        His name was John Carnegie.

22       Q        And who -- what was he the property

23  manager of?

24       A        I believe he was the property manager

25  for all the rec centers, all the facilities.

         D E G N A N & B A T E M A N , I N C .

Page 45

1        Q        And was Mr. Carnegie an employee of the

2   City of Camden?

3        A        Yes.

4        Q        Do you know what his position was?

5        A        I believe it was property manager.

6        Q        Just property --

7        A        I believe that's what his

8   classification was, property manager.

9        Because what would happen was Mr. Feliciano

10  would call me up and he says, call John, John wants

11  you to meet with him and look at some, you know,

12  jobs that were going to start up.

13       And that would be basically what would happen,

14  I would meet with him because he knew the buildings

15  and he had access to all the buildings and I would

16  meet with him and we'd walk the walk-throughs.

17       Q        So this was -- the walk-throughs you

18  did were pursuant to the contract?

19       A        This is what they had planned on doing,

20  these were the jobs that they had planned on doing.

21       Q        And that was after you were awarded the

22  bid?

23       A        That's correct.

24       Q        So where were the jobs at that you

25  walked through with Mr. Carnegie?

         D E G N A N & B A T E M A N , I N C .

Page 86

1   terrible contractor, he should have done that for
2   you. Don't call him no more.
3       Things like that. They would make comments to
4   the customers, not knowing who the customers were.
5   Some of them were good enough to share some of their
6   experiences with me.
7       Q    Any other disparate treatment other
8   than stating words to the customers that you were a
9   bad contractor?
10      A    Billy Revaitis would make comments
11  about, you know, how you going to deal with doing
12  work in -- when I had the maintenance contract --
13  with the City of Camden? How you going to deal with
14  the union? Things like that, you know. Because I
15  know they're not too thrilled with people doing work
16  for the City of Camden, and that was previously a
17  contractor was -- by a union contractor.
18      Q    How many times did Mr. Revaitis say
19  that to you?
20      A    Maybe three or four times.
21      Q    When was the first time?
22      A    When I was awarded the contract, maybe
23  a month after that, because I was dropping off a
24  permit. He seen me at the counter and it gave him
25  an opportunity to speak to me about it.

D E G N A N & B A T E M A N,   I N C.

Page 87

1       Q    We talked about that earlier, correct?
2       A    That's correct.
3       Q    When was the last time?
4       A    Maybe a couple years later. But he
5   periodically would make side comments.
6       Q    Such as?
7       A    How you making out? Getting any flack
8   from the union? Stuff like that.
9       Q    Now, what was your understanding of
10  what those comments were? Were they in jest or was
11  he actually concerned?
12      A    I would tell him sometimes, Donald --
13  I'd see Donald, run into Donald Norcross and Donald
14  would make certain comments and say, you know, he's
15  not happy. I said, Billy, I just don't have the
16  financial resources to be a union contractor.
17  That's how I would leave it.
18      Then he would make his little side comments,
19  you know, being sarcastic, and I would just -- I'd
20  just walk away from him, I'd try to like shut him
21  down. I'd hear him, but I don't hear him.
22      Q    What were his side comments?
23      A    Like comments like, you know, guys that
24  are local probably look down upon you because you
25  were a union member. I says, I understand all that,

D E G N A N & B A T E M A N,   I N C.

Page 88

1   but I'm trying to take cake of my family. My focus
2   was just trying to support the family.
3       Q    Any other comments?
4       A    No.
5       Q    Okay. I believe you testified that you
6   had not seen Mr. Norcross since you were awarded the
7   bid in 2002. Correct?
8       A    I seen Donald -- last time we actually
9   talked was that time he came by the house, he came
10  outside my house. He would come out there in the
11  morning and try to irritate me in the morning.
12      Q    But that was prior to you receiving the
13  bid in 2002, correct?
14      A    After I received -- no. After I
15  received the bid I was the contractor and he would
16  come through and he would periodically try to
17  encourage me to sign the book as a union contractor.
18      Time period now? I know we jockeying around
19  from year to year, I'm just trying to remember. I
20  can only reflect upon the timeframe when I was
21  awarded the contract.
22      When I was awarded the contract, that's when I
23  started seeing him more frequently and the
24  communication -- he would call me and then he would
25  actually stop over in the morning. Like I'd back

D E G N A N & B A T E M A N,   I N C.

Page 89

1   the truck up at 7:00 o'clock in the morning and he'd
2   be outside sitting outside the house.
3       Q    And that was after you were awarded the
4   contract in 2002?
5       A    Yes.
6       Q    When was the last time you saw Mr.
7   Norcross?
8       A    When me and Donald actually had words?
9   I seen him I'm going to say maybe -- that time at
10  the supply house, that might have been -- come on
11  Marshall. I'm trying to think. I'm trying to be as
12  accurate as possible. Maybe 2006 at the supply
13  house that day. Whenever that was. I mentioned it
14  previously.
15      That's the last time we actually had verbal
16  contact with each other at the supply house that
17  time.
18      Q    So when you say the supply house,
19  that's Fox Electric?
20      A    That's correct.
21      Q    And you previously testified that was
22  1993 or 1994, and now you're saying it was around
23  2006?
24      A    Last time -- if I did say -- no, '96
25  or -- that's when I got my license then.

D E G N A N & B A T E M A N,   I N C.

Page 94

1  member and I kind of like went through the same
2  thing that you're going through.
3       He says, I'm going to visit those guys but I'm
4  going to visit them unannounced, he said, they don't
5  know I'm coming, but between me and you I'm going to
6  visit them.
7       And he went there, I didn't know what day he
8  was going there, but he went there and he called me
9  and he told me, he says, I visited them, and he
10  says, you're absolutely right, he says, they're
11  failing your jobs and they're not documenting the
12  reason why.  He says, you've got a valid complaint.
13       He says, they're supposed to document.  He
14  says, when those guys are given a license they're
15  supposed to document when they fail a job the reason
16  why and he says, they're failing jobs for work
17  unrelated to your scope of work on the permit
18  application.  He says, I spoke to Jim Rizzo about
19  it.
20       And I told him also I've had multiple meetings
21  with Jim Rizzo, but he's very protective of those
22  inspectors there.  And he says, you're right, he
23  says, everything that you said is right.  He says --
24  he said that everything that you told me was -- he
25  says, I got much respect for you because what you

D E G N A N & B A T E M A N, I N C.

Page 95

1  said was accurate.
2       Q    Did you make a formal complaint to the
3  DCA?
4       A    Yes, I did.
5       Q    When was that?
6       A    That might have been like months prior
7  to 2013.
8       Q    So sometime in 2012 or 2013?
9       A    I'm going to say between the beginning
10  of two thousand -- between January and maybe prior
11  to his visit of nine -- I think he went there on
12  9-13, I think that's the date he visited the City of
13  Camden.  I know it was on a Monday he went, because
14  he called me that day.
15       Q    So your complaint was submitted
16  sometime in 2013, Mr. Verbos went to the City of
17  Camden and confirmed that your complaint was valid
18  in September of 2013.  Correct?
19       A    He called me and he told me it was
20  valid and we spoke on the phone.
21       Q    And what was the result of your
22  complaint?  Was there any kind of censure or
23  anything against the city?
24       A    He explained to me that he spoke to
25  Mr. Rizzo, who's the code official, and he said that

D E G N A N & B A T E M A N, I N C.

Page 96

1  you guys are not -- went through the proper
2  procedure in regards to permit applications.  He
3  said, what happens is if you fail a job you're
4  supposed to cite the reason why you're failing the
5  job and you're not doing that.
6       And he says, and what he's saying is correct,
7  speaking of myself, he says that -- he informed me
8  about this here and he says -- because he said he
9  went in and he asked them for applications for the
10  permits that I had put in previously.  And he said
11  that I noted that nothing was documented, the reason
12  why they failed the jobs.  And the reason why they
13  failed the jobs, it didn't have nothing to do with
14  the scope of work.
15       Q    So you're saying that you were doing a
16  discreet action regarding electrical work and they
17  would fail you for some other kind of electrical
18  problems unrelated to your work?
19       A    When you say discreet, what do you
20  mean?
21       Q    Well, you were performing a certain
22  task regarding an electrical box, I think you gave
23  the example, and they would fail you for something
24  unrelated to that electrical box.  Correct?
25       A    Right, they would fail the job for

D E G N A N & B A T E M A N, I N C.

Page 97

1  something not related to the permit application,
2  which is called a scope of work.
3       Q    Okay.  So it was outside the scope of
4  work?
5       A    That's correct.
6       Q    And for work that you never performed?
7       A    That's correct.
8       Q    Okay.  Other than failing you for jobs
9  for work you didn't perform and telling customers
10  you were essentially a bad contractor, anything else
11  that Mr. Emenecker or Mr. Revaitis did to you?
12       A    I remember one time that sticks in my
13  mind very clearly, Gene Emenecker, he got nasty and
14  cursed me out on the phone.
15       Q    Over what?
16       A    What happened was, there's an issue on
17  the job, it was on Browning -- Browning Road.
18  Browning Street, rather, Browning Street in Camden.
19       And it was an issue -- the codes state that
20  you have to -- any existing service, you can cut it
21  out.  What happened was the service cable was
22  embedded in the mortar facial, so by code, as
23  opposed to defacing of the lady's property, I cut
24  the cable out where it couldn't be re-energized.
25       And Gene Emenecker, his name is Eugene, Gene

D E G N A N & B A T E M A N, I N C.

Page 98

1  called me up. And we never really had a real good
2  relationship, even when I was an apprentice. He
3  always mistreated me when I was an apprentice.
4       But he called me up off -- the customer calls
5  me up, and says, Marshall, we got a problem here.
6  And he says, you're gonna -- no disrespect, he says,
7  you're going to do the job according to the F'ing
8  way I want it done or you're not going to get it
9  passed. I says, Gene, I says, who's going to be
10 responsible for defacing the lady's property? I
11 says, long as I cut the cable off where it can't be
12 re-energized, it's legal.
13      And I turned around and I called Ken Verbos
14 about it, I spoke to Jim Rizzo about it and the
15 lady -- the customer, her name was Vynne, her name
16 is Vynne, V-Y-N-N-E, she says to me, she says, I
17 have never in my life seen anything -- she says, I'm
18 standing here, he's cursing at you, you guys are
19 going back and forth. But, she said, he's a public
20 official, he should never act like that.
21      Q    Was Vynne her first name or last name?
22      A    I believe that's her first name.
23      Q    Do you recall her last name?
24      A    No, but if I look at my records I could
25 get it for you. But her -- I think the address was

D E G N A N & B A T E M A N , I N C .

Page 99

1  1302 Browning Street. I think it was 1302 Browning
2  Street.
3       Q    Okay. So you have three complaints now
4  against Mr. Emenecker and Mr. Revaitis: One being
5  they tell your customers you're a bad contractor;
6  two, they failed you for work outside the scope of
7  your work; and three, they were failing you for work
8  that was legal.
9       A    They failed me for work that's legal?
10 That's -- I'm misunderstanding that last one.
11      Q    What you just described at Browning
12 Street, you said the manner in which you were
13 performing the work was legal, but they still failed
14 you for the job.
15      A    That's correct, that's a true
16 statement.
17      Q    Okay. And anything else either
18 Mr. Emenecker or Mr. Revaitis did?
19      A    Well, that was very hurtful because
20 what it does, it leaves a bad taste. Because what
21 would happen, as soon as this would happen the
22 customers -- when they hire you they put faith in
23 you that you're going to perform the job correctly.
24 But once this here takes place, the customer's going
25 to question your ability to perform work properly.

D E G N A N & B A T E M A N , I N C .

Page 100

1       All I could do is turn around and go to the
2  code and validate what I did was correct. And I
3  would go to Mr. Rizzo, their supervisor or their
4  boss, and explain to him what was going on. And I
5  would always try to huddle with Mr. Rizzo and
6  explain to him what was going on, I would always
7  send him an email and update what was going on.
8       And I asked him, could he send me something in
9  writing or provide the customer something in writing
10 to state that there's nothing wrong with the work I
11 did? But he never would do that.
12      And Ken Verbos even said that you're not
13 asking for anything but to validate the fact that
14 you did the job correctly and what they did was
15 incorrect. But Dr. Rizzo would not support me with
16 regard to that.
17      Q    Well, were you ultimately approved for
18 the work?
19      A    Yes.
20      Q    So wouldn't that approval evidence that
21 the work was done properly?
22      A    After they were informed that what they
23 did was wrong, they had no other choice. But Mr.
24 Rizzo, he just wanted to suppress it, he just wanted
25 to put a blanket over it and that's what --

D E G N A N & B A T E M A N , I N C .

Page 101

1  Mr. Verbos said the same -- he said, it's still not
2  addressing -- they're supposed to provide you
3  something in writing that, hey, look, we made a
4  mistake based on this here code statute. And as of
5  today they still have not addressed anything in
6  writing, it's always verbal.
7       It's always like -- I received a call from
8  James Rizzo, the code official, he says, look, we
9  decided to just let you go. I said, can you provide
10 me that in writing and state the reason why in
11 writing and why we had the mistake? But nothing was
12 ever committed in writing, it was always verbal
13 stuff.
14      Q    But if the work was ultimately
15 approved, isn't that evidence that the work was done
16 properly?
17      A    Yes, it's evidence that the work's done
18 properly, but my concern was, just like I shared
19 with the investigator from the state, was that I
20 needed validation from -- to the customer, because
21 those customers will never call me back.
22      Q    Couldn't -- sorry. Keep going.
23      A    The harm that it does to you as a
24 contractor, words can't even say.
25      Q    Couldn't you show the customer the

D E G N A N & B A T E M A N , I N C .

84a

Page 102

1  approval?
2      A    Me saying it means nothing, as opposed
3  to an official -- public official saying it.  A
4  public official saying it means much more.
5      Q    Well, the approval is granted by the
6  public official, correct?
7      A    Yes.
8      Q    So couldn't you show the customer the
9  approval from the public official and say, this work
10  was done properly, they approved it?
11      A    I have talked to customers about that.
12  I could do that, but they wanted more than for to
13  say, I didn't do anything wrong, they said -- the
14  customer's position, all I want is for my job to get
15  passed so I can move on and sell the property.
16      But the damage is already done because they --
17  it raises a question mark in the customer's mind;
18  well, if he's having problems with these inspectors,
19  I don't want to deal with him, I'm call another
20  contractor.  And that's what happened.
21      Q    So it wasn't so much that -- strike
22  that.  It was more that the customer saw a problem
23  with you and the inspectors, that -- and you
24  wanted the inspector to say there is no problem?
25      A    I wanted the inspector to distinguish

D E G N A N & B A T E M A N , I N C .

Page 103

1  the fact that he made a mistake in regard to saying,
2  I made a mistake, I should have just addressed the
3  scope of work on the permit, I should have never
4  addressed anything non-related to the scope of work.
5      That was the biggest thing -- that's the thing
6  that the inspector -- investigator from DCA was
7  saying, he said, Marshall, I fully understand what
8  you're saying, they're bringing up issues that don't
9  relate to your work and what it does in the mindset
10  of the customers is damaging to you as a contractor,
11  that that's where the problem lie.
12      Q    So you want a letter, essentially, from
13  someone from the City of Camden, saying you didn't
14  do anything wrong?
15      A    That was requested back in 2012.
16      Q    That's the relief you were requesting,
17  correct?
18      A    That was part of it.
19      Q    What other relief?
20      A    Any form of harm.
21      Q    I mean regarding the that specific
22  instance.
23      A    I haven't even put a dollar value on
24  the relief dollar wise what I asked for in regard to
25  that, but I know I can't even measure the damage

D E G N A N & B A T E M A N , I N C .

Page 104

1  that has been done by the inspector, what they have
2  done, because I don't even -- like the one customer
3  Vynne, if I called her, she treats me like I'm
4  cancer, she afraid and intimidated.
5      When they see the inspector coming and he has
6  a badge on -- you have to understand the mindset of
7  a person that's just trying to go through life and
8  not have any problems, they say, I gotta live in
9  this city, I don't want any problems.
10      So if I call her or call someone, they shy
11  away from me because -- he's a good electrician, but
12  he has a problem with the inspectors in Camden.  But
13  they don't understand the history of it, the reason
14  why.
15      Q    Is her name Ayana Jordan?
16      A    Oh, she's extremely terrible, she's
17  not --
18      Q    That's not Vynne?
19      A    No, that's another one that's
20  unbelievable what happened on that particular job.
21      Q    We'll get to that later.  Anything else
22  that either Mr. Emenecker or Mr. Revaitis did
23  regarding this disparate treatment you allege in
24  your complaint?
25      A    Primary thing is like misdirecting the

D E G N A N & B A T E M A N , I N C .

Page 105

1  customers regarding me as an individual and as a
2  contractor.
3      Q    I understand.  But other than those
4  three things that we talked about, anything else?
5      A    Presently I can't think of anything
6  else.
7      Q    Okay.  And it's your claim that those
8  instances where they were engaging in disparate
9  treatment of you was because you were performing
10  nonunion work?
11      A    Your question is a little misleading
12  when you say I was performing nonunion work.  It's
13  just work, I don't look at it as nonunion work.
14      Q    Let's go to your complaint.  In
15  paragraph 20 you state, quote: over the following
16  years, Marshall Williams and Nico continued to
17  receive disparate treatment from the defendants,
18  Eugene Emenecker and William Revaitis, aimed at
19  discouraging them from performing nonunion work
20  within the City of Camden.
21      A    Okay.  I can answer that question.  The
22  reason why it's looked upon like that is because I
23  was an ex-union member.  We were all union members,
24  so they looked at me as a trader.  Because we were
25  all union members.  If you're a union member, you're

D E G N A N & B A T E M A N , I N C .

Page 106

1    a union member 'til the day you die. That's the
2    way -- that's how the union guys look at it.
3         Q    Mr. Emenecker and Mr. Revaitis are not
4    union members any more, correct?
5         A    No, previous union members, but they're
6    pro union.
7         Q    Okay. They were not members at the
8    time that they were employed by the city of Camden,
9    correct?
10        A    That's correct.
11        Q    Okay. What evidence do you have --
12        A    No, I'm sorry, let me take that back.
13   For me to say they're not union members, that's not
14   true, because they still pay union dues and they
15   still attend union meeting. So technically they're
16   still union -- they're still affiliated with the
17   union.
18        Q    To this day?
19        A    Oh, yeah.
20        Q    Okay. What evidence do you have that
21   the disparate treatment you received at the hands of
22   Mr. Emenecker and Mr. Revaitis was because they
23   wanted to prevent you from performing nonunion work?
24        A    What?
25        Q    You're claiming they're pro union and

D E G N A N  &  B A T E M A N ,  I N C .

Page 107

1    they were doing these things because they're pro
2    union.
3         A    Right.
4         Q    What do you base that upon?
5         A    Oh. Because of my direct contact with
6    them, I've been to jobs where they came out and did
7    their inspections and I was physically there to meet
8    them at the job sites.
9         And things that I observed, the customers
10   would observe, sometimes I was too busy, I was at
11   another job site, a customer would call me up and
12   tell me, hey, they failed the job for this reason.
13   They made personal comments about you as an
14   individual.
15        So compositely from me being there when they
16   would come out and do inspections, and not only
17   that, I would received phone calls from customers
18   that would say, some of the comments that were made,
19   it's just -- something's wrong here. And they
20   voiced their opinion previously about me not signing
21   the book as a union contractor that is like going
22   against the grain.
23        Q    When did Mr. Emenecker make a comment
24   about you not signing the book to be a union
25   contractor?

D E G N A N  &  B A T E M A N ,  I N C .

Page 108

1         A    I remember one time it came out some
2    time ago, I did a job on Chambers, I remember the
3    address even, it was 420 Chambers in Camden. That's
4    another job I did.
5         He came out and there was a carpenter present
6    on the job and as soon as he came down the basement
7    where I was at I said to him, Gene, would you like
8    me to take the panel cover off? And he said, you
9    know what the F to do. I looked at him, the guy
10   looked at me. What the hell's going on here?
11   That's what he said to me.
12        Q    He said what?
13        A    He said, you know what the F to do.
14        Q    Okay.
15        A    To take the -- because he got to see
16   the grounding and all, with ground wires. A lot of
17   times inspectors, if they know you, they don't --
18   they just say, fine, I know the guy's work, it's
19   apparent that the ground wire and everything is in
20   place where it's at.
21        I had to take the panel cover off and, you
22   know, he had -- he had nasty -- he got nasty -- that
23   guy's got a very nasty attitude. And the people
24   working for him, everybody says the same thing, he's
25   a very negative guy.

D E G N A N  &  B A T E M A N ,  I N C .

Page 109

1         Q    I understand your comment, but my
2    question was: How is it disparate treatment? What
3    evidence do you have that that was a result of
4    Mr. Emenecker not wanting you to perform nonunion
5    work in Camden?
6         A    What evidence do I have?
7         Q    You stated that you had a conversation
8    with Mr. Emenecker about you not signing the book,
9    and and then you gave --
10        A    They weren't --
11        Q    Hold on one second. And then you gave
12   an instance of 420 Chambers --
13        A    Um-hmm.
14        Q    -- as when he made a comment about not
15   signing the book, but you didn't just say anything
16   about that. So that's my question.
17        A    Oh, okay. When I was taking the cover
18   off, the panel cover off, he said to me, where is
19   your suit? I said, a suit? And he's like, a rubber
20   suit you put on. I says, I don't really need a
21   suit, all I'm doing is taking the cover off. He
22   says, see? Since you've been working nonunion you
23   got away from all the good habits that we use out of
24   the local. Comments like that, stuff like that.
25        Q    Any other comments other than that?

D E G N A N  &  B A T E M A N ,  I N C .

Page 110

```
 1      A      No.
 2      Q      So that one lone comment makes you
 3  believe that the disparate treatment you were
 4  receiving from Mr. Emenecker was a result of him not
 5  wanting you to perform nonunion work in Camden?
 6      A      And Browning Road also, the job at the
 7  location -- I believe it was 1302 Browning Street in
 8  Camden. That's the other time we had verbal
 9  confrontation.
10      Q      Was any union work mentioned --
11  anything about the union mentioned in the Browning
12  Street?
13      A      He made comments, like side comments;
14  well, you know how you supposed to do it, y'all
15  worked out of the local before, you know that.
16  Stuff like that he would say. He made comments like
17  that.
18             He'd always say something in a little comment
19  about the union, something like that, that would --
20  say, okay, fine, I remember y'all worked out of the
21  local. Little comment. He would say something real
22  brief, wouldn't be like he would go on, he would
23  make a little comment, like a brief comment.
24      Q      So the comment, you knew how to do
25  something because you worked in the union, other
```

D E G N A N & B A T E M A N , I N C.

Page 111

```
 1  than that, did he say anything else?
 2      A      No.
 3      Q      So we have two comments; one on
 4  Chambers, one on Browning Street. Any other
 5  comments by Mr. Emenecker about the union?
 6      A      No.
 7      Q      Okay. How about Mr. Revaitis, other
 8  than his initial question to you when you came in to
 9  get the permit where he said, how are you going to
10  deal with the union, being a nonunion member,
11  pursuant to the 2002 contract, has he ever mentioned
12  the union to you?
13      A      He's mentioned that particular comment
14  four or five times; how you making out dealing with
15  the union? And I told him, the only problem I have
16  every now and then I'd run into Donald and Donald
17  pulled out after a while. That was it.
18      Q      So from 2002 to 2004 I believe you said
19  there was three to four times Mr. Revaitis made that
20  comment about --
21      A      That's correct.
22      Q      Okay. Any other time since 2004 has
23  Mr. Revaitis ever mentioned the union to you?
24      A      No. I try to avoid him. I try to
25  avoid them guys.
```

D E G N A N & B A T E M A N , I N C.

Page 112

```
 1      Q      That's a no?
 2      A      No.
 3      Q      Okay. And those questions were solely;
 4  how are you going to deal with being a nonunion
 5  member working in Camden?
 6      A      Yes.
 7      Q      Let's go to paragraph 23. We're going
 8  to talk about the incident at Browning Street which
 9  you briefly mentioned before. Who was the property
10  owner?
11      A      Vynne. I can't think of her last name.
12  Vynne. I can't think of her last name.
13      Q      That was Vynne, correct?
14      A      Yeah. Might be in my phone.
15      Q      You can check.
16             MR. RYBECK: Off the record.
17             (Discussion off the record.)
18             THE WITNESS: I have her name, the
19  correct spelling is V-Y-N-E.
20  BY MR. RYBECK:
21      Q      Okay. So Vyne is the property owner?
22      A      She sold the property, she's not
23  presently the property owner. I know she was trying
24  to prepare that property for sale. That's what her
25  objective was. Presently she's not -- may not be
```

D E G N A N & B A T E M A N , I N C.

Page 113

```
 1  the property owner now.
 2      Q      Was she a resident or was she just an
 3  owner?
 4      A      From my understanding she was the owner
 5  and I think she was renting the property, but I
 6  think her place of residency is in Delaware,
 7  because -- I know it's in Delaware because she said
 8  she always would go back and forth to Delaware every
 9  day.
10      Q      How did you first meet Vyne?
11      A      Referrals. I forget even who it was.
12  Someone referred -- said they were looking for an
13  electrician and they directed her to me and she
14  called me.
15      Q      You don't recall who referred Vyne to
16  you?
17      A      I forget.
18      Q      Okay. Was this the first work you had
19  ever performed for Vyne?
20      A      Yes.
21      Q      So have you performed work for Vyne
22  since then?
23      A      No.
24      Q      So what was the exact nature of the
25  work you were performing for Vyne?
```

D E G N A N & B A T E M A N , I N C.

Page 114

1    A    Replacement of the service cable.
2    Q    And what does that --
3    A    That's the --
4    Q    -- entail?
5    A    -- cable that feeds the electrical
6    panel, that's -- the power comes -- attaches to the
7    utility company's line that's on the pole and it
8    links into your meter and the panel in your basement
9    or exterior, wherever it may be.
10   Q    And what was the amount of the
11   contract?
12   A    Dollar value?
13   Q    Yes.
14   A    I think it might have been 1300.
15   Q    And how long does that job take?
16   A    It was completed that same day.
17   Q    And explain to me the procedure for
18   getting an approval.  You -- before you did the work
19   you went and applied for a permit, correct?
20   A    That's correct.
21   Q    And the permit lists the work
22   performed, correct?
23   A    Yes, scope of work.
24   Q    And who fills that out?
25   A    I do.

D E G N A N & B A T E M A N , I N C .

Page 115

1    Q    Okay.  And then someone from the code
2    office initials it saying, you know, the work is
3    approved to be done, correct?
4    A    Right.  But under those circumstances
5    that was -- from what I remember, it was an
6    emergency because of the condition of the service
7    cable.  I listed it as an emergency.  Under state
8    law I have 72 hours I can perform the work and --
9    within 72 hours and just put the application in in
10   that timeframe.
11   Q    So you submitted the application to do
12   the work after you did the work?
13   A    I believe I did the job prior to doing
14   it.  It was an emergency job.
15   Q    My question is:  You didn't file any
16   paperwork with the city until after you completed
17   the work?
18   A    No, always put my paperwork in first,
19   always do that first.
20   Q    Okay.
21   A    Then I'll -- if it's an emergency I can
22   do it afterwards.  Like if somebody called me for an
23   emergency today I would put the paperwork in and
24   then I'd go ahead and do it.
25   But that particular job I know I put the

D E G N A N & B A T E M A N , I N C .

Page 116

1    paperwork in, then I did it.
2    Q    Okay.  So right before doing the work
3    you submitted the work -- or the paperwork to
4    Camden, then you did the work?
5    A    That's correct.
6    Q    Okay.  But as of the time you were
7    doing the work they hadn't approved your request to
8    do the work yet, had they?
9    A    You don't have to, if it's an
10   emergency.
11   Q    But they hadn't approved it.
12   A    That's correct.
13   Q    Okay.  And then who arranges for the
14   inspector to come out?  Is that you on the owner?
15   A    Normally you recommend the owner to
16   request, because they know their schedule when
17   somebody can be there to allow the inspector in.  So
18   you tell them, hey, look, the job's completed, you
19   can call for the inspection whenever's convenient
20   for you.
21   Q    Okay.  Do you recall when you received
22   the call from Vyne?  Was it the day before the work
23   was done or the day of?
24   A    No, it was following that time.  After
25   I did the job for her, maybe two days later she

D E G N A N & B A T E M A N , I N C .

Page 117

1    called for an inspection, or might have been after
2    she actually received a permit, but that particular
3    day when the inspector came out I received that
4    phone call from Vyne and she put Gene Emenecker on
5    the phone.
6    Q    When did you first come in contact with
7    Vyne?
8    A    I don't remember the exact date.  I'd
9    have to look at the permit.
10   Q    Because it was an emergency, correct?
11   A    That's correct.
12   Q    So do you recall if it was the same
13   day?
14   A    Same day as of?
15   Q    When you began the work.
16   A    No, I didn't do it the same day.  I
17   looked at the job first and I schedule it and I told
18   her I would try to get out there -- I think I did it
19   the following day, said I would try to take care --
20   address that the following day.
21   Q    Okay.  So you do the work, you tell
22   Vyne to contact the city, they'll have an inspector
23   come out to inspect the work.  Correct?
24   A    Once it's completed.
25   Q    Yes.  Well, you complete it that day.

D E G N A N & B A T E M A N , I N C .

88a

Page 118

1    A    The day I started, the day I completed,
2    yes.
3    Q    So once you were done the work that day
4    you spoke to Vyne, told her to get an inspection
5    done, --
6    A    I'm sorry. Whatever's convenient for
7    her. I'm sorry, I cut you off.
8    Q    Okay. And did she do that, to your
9    knowledge?
10    A    I think she did it maybe the following
11    day. It was somewhere close to that timeframe.
12    Q    And what's your understanding of what
13    transpired during that inspection?
14    A    Well, I received a phone call from her
15    and she said, I'm going to put the inspector on the
16    phone. And that's when me and Gene was on the phone
17    and there was like a lot of screaming back and
18    forth, he got nasty and I hollered back at him.
19    That's pretty much what happened.
20    Q    What did Gene say to you?
21    A    You want this job inspected? You know
22    what the F to do. That's it. And I said, what did
23    you say? And then I got nasty back with him.
24    Q    What did you say?
25    A    I said, do you talk -- I said, that's

D E G N A N & B A T E M A N, I N C.

Page 119

1    the way you talk to people? I said, you got a
2    problem, I said, you're a public official. I said,
3    you know what, Gene? I'll deal with you. I said,
4    when I tell somebody -- I said, I don't -- I just
5    turn around and my mindset, I'll just report you to
6    your superiors.
7    Q    Did you --
8    A    That's what I normally would do.
9    Q    Did you use any profanity?
10    A    I said maybe, the hell with you, man, I
11    ain't got no time to mess with you. I said
12    something like that. But F? Nothing like that, I
13    didn't say nothing like he said, no, I didn't say
14    nothing like F you, nothing like that.
15    Q    What was his response?
16    A    He hung up the phone on me, that's
17    what -- he hung up the phone on me. I called him
18    back. And she was like almost like in tears. She
19    said, I don't believe what I just witnessed, she
20    said, this is crazy. She said, this is crazy, she
21    said she never seen -- she never thought she'd see
22    like that from a public official, somebody works for
23    the city.
24    And she -- all she said, Marshall, all I want
25    to do is just get this here correct so I can sell my

D E G N A N & B A T E M A N, I N C.

Page 120

1    property, I just want to sell this property, she
2    said, I never thought -- she said, I wish that -- I
3    didn't know she had problems with the inspector,
4    like, she said, your work's good, nothing against
5    you, your work is good, she said, but I didn't know
6    that these guys have a problem with you like this
7    here.
8    Q    And that was -- that conversation was
9    the same day as the inspection that took place?
10    A    Yeah, same day of the inspection, yeah.
11    Q    And what did you tell her was going to
12    be done?
13    A    I told her I was going to report him.
14    And I said to her, would you be willing to validate
15    what just happened? And she said yes. And I turned
16    around and tried reaching out to her and she's
17    afraid. Her thing is she don't want no problems,
18    she works in the city and she don't want -- she's
19    intimidated, she's intimidated by the inspectors or
20    anybody holding a badge or something.
21    Q    Well, you asked her to validate,
22    meaning some kind of written statement from her
23    saying what happened?
24    A    Yeah, just to validate what happened.
25    All I asked her for, I said, Vyne, all I'm asking

D E G N A N & B A T E M A N, I N C.

Page 121

1    you to do is just tell the truth. I'm not going to
2    ask you to add or subtract, could you just validate
3    the truth?
4    Q    And what was her response?
5    A    She said yes at the time.
6    Q    Okay.
7    A    And I called, she reached out to me,
8    but after a time period she like avoided my phone
9    calls. Like if I call her right now, she ain't
10    going the pick up the phone once she see my name on
11    the phone.
12    Q    Okay. Did she ever state any words to
13    you that she was intimidated or afraid to give a
14    statement?
15    A    She said, I gotta live here, she said,
16    I don't want no problems with these people. That's
17    how she would say; I don't want no problems.
18    Q    I thought she lived in Delaware.
19    A    Yeah, but she comes in Camden all the
20    time. She was living in Camden, too. She lives in
21    Delaware but she has a property in Camden, so she --
22    you know, worked at the hospital. She works at
23    Lourdes Hospital.
24    So in turn, like say for instance if she has
25    to stay locally, because she says sometimes she'll

D E G N A N & B A T E M A N, I N C.

Page 122

1  stay a little late, she'll stay in Camden, sometimes
2  go to Delaware.
3      Q    Do you know where she stays in Camden?
4      A    I know she's got a daughter in Camden
5  right near that house, somewhere near that house,
6  'cause she would say my daughter lives around the
7  corner.
8      Q    You don't know where?
9      A    No.
10     Q    And did she say anything else about a
11 fear to give a statement?
12     A    I'm sorry? Say it again.
13     Q    Did she say anything else about being
14 fearful to give a statement?
15     A    No.
16     Q    Okay. What was your response to her?
17     A    I said -- I told her what I was going
18 to do, I was going to report what he did to his
19 superior, Mr. Rizzo. And I asked her to -- you
20 know, would she support basically what happened?
21 That's all I'm asking you is to just tell the truth.
22 But you could tell she didn't want to be bothered.
23 She don't want to be involved in nothing.
24     Q    And once she didn't want to be
25 involved, did you tell her anything in response?

D E G N A N & B A T E M A N , I N C .

Page 123

1      A    I just stopped trying to reach out to
2  her, 'cause she wouldn't answer my phone calls no
3  more.
4      Q    Does she own other properties in
5  Camden?
6      A    I don't know a lot of personal
7  information, I don't know that much. Only thing I
8  know is that I was just trying to perform a job for
9  her.
10     Q    Were you paid for the job?
11     A    Yes.
12     Q    Was there any other prospective work
13 you had set up with Vyne?
14     A    She would say to me, I'm going to use
15 you in the future. She said, I just don't need
16 these problems with these inspectors.
17     Q    Did she say what properties she was
18 going to use you for?
19     A    Uh-uh. No. But she said she had
20 family members who had work, too, but our
21 communication's gone, I don't talk to her any more.
22     Q    Did you make a complaint about
23 Mr. Emenecker's conduct?
24     A    Yes, I did.
25     Q    To who?

D E G N A N & B A T E M A N , I N C .

Page 124

1      A    Dr. Rizzo.
2      Q    When was that?
3      A    Probably within a couple weeks,
4  maybe -- knowing me, within a couple days, because I
5  move on things pretty quick.
6      Q    And how did you make that complaint?
7      A    I sent a notice to Mr. Rizzo, and it
8  might have been on my emails. I think -- I believe
9  I sent it to him by email. I might have physically
10 handed him a letter.
11        That particular one I think I sent him a
12 certified letter, I think I sent maybe also, but I
13 know I sent him notice on that too.
14     Q    Some kind of written notice?
15     A    Some kind of written notice, yes.
16     Q    And did you explain to him what
17 happened in that notice?
18     A    Yes, I did.
19     Q    Okay. And did you request any kind of
20 relief in that notice?
21     A    Same thing, I just asked -- he needs to
22 get control of his inspectors, they're out of
23 control.
24     Q    Okay. Anything else?
25     A    No. We actually had meetings too, sat

D E G N A N & B A T E M A N , I N C .

Page 125

1  in his office and discussed it.
2      Q    Did Mr. Rizzo respond to your
3  complaint?
4      A    He would say, oh, I'll talk to him
5  about it and I'll deal with the situation. But then
6  I didn't hear nothing back. And I said, could you
7  put me something -- never put nothing in writing. I
8  said, could you provide me something in writing?
9  Nothing never comes back in writing, it was always
10 like sitting here having a little conference
11 meeting, and after that you never get nothing in
12 writing.
13        I said, could you -- and I sent an email,
14 could you not verbally send me anything or talk to
15 me, I would prefer for something in writing so I can
16 document it. Never -- they never provided nothing
17 in writing.
18     Q    What did you want back from him in
19 writing?
20     A    That it was addressed and that -- to
21 contact the customer that his inspector made a
22 mistake.
23     Q    So you also requested that the customer
24 be contacted?
25     A    Yeah, that I did nothing wrong and that

D E G N A N & B A T E M A N , I N C .

90a

Page 126

1 the inspector was wrong in his analysis.
2     Q    And did he ever state he was going to
3 do that?
4     A    He told me verbally he will do it, but
5 that's verbal. He never did it.
6     Q    He told you verbally he would contact
7 the customer?
8     A    No, he would speak to Gene Emenecker
9 about his conduct and that he would get back to me.
10 And I would say, fine, could you put -- I would
11 always follow up and say, could you provide me it in
12 writing as opposed to verbal? Because I know he
13 never wanted a paper trail.
14    Q    Did he ever say he was going to contact
15 the customer?
16    A    No, he said that he would have his
17 office -- I'll have my office send a notice out to
18 her.
19    Q    A notice saying what?
20    A    That the electrician did nothing wrong,
21 his work was up to code, and that I would receive a
22 copy of it.
23    Q    Okay.
24    A    Because that would keep me in good
25 grace with the customer. That's all I was asking

D E G N A N & B A T E M A N, I N C.

Page 127

1 for, I wanted to be kept in good grace. I don't
2 want to have a bad relationship.
3     Q    But the work was ultimately approved,
4 correct?
5     A    Yes.
6     Q    And when was the work approved? Prior
7 to your conversation with Mr. Rizzo or afterwards?
8     A    It was after.
9     Q    Okay. And did you ever receive some
10 kind of written notification that it was approved?
11    A    I believe he called me on the phone and
12 he said to me -- eventually they do send you out a
13 notice in the mail, but he said to me, he said,
14 well, look, we're just going to let this here go.
15 I said, that does not address the issues,
16 you're not documenting anything. See, that's what I
17 would always say, address the issues and do what
18 you're supposed to do by state law.
19 But they never addressed the issue, they
20 always try to like, you know, put a blanket over it,
21 sugar coat things.
22    Q    What is the state law?
23    A    State law says that if an inspector
24 fails a job he's supposed to cite the code section
25 that he fails the job for. He can't turn around and

D E G N A N & B A T E M A N, I N C.

Page 128

1 say, because you do it my way or I'm going to fail
2 the job. That's illegal. You have to cite the code
3 section.
4     Q    But the job was approved, correct?
5     A    Yes.
6     Q    So it wasn't failed?
7     A    Yes, but they still didn't follow the
8 state law.
9     Q    If the job wasn't failed how would they
10 cite a statute saying why it failed?
11    A    It has to be documented, because it was
12 never documented in the code, the statute was never
13 documented.
14    Q    I think you're missing my question
15 here. If the job was approved, what code statute
16 would they cite saying it failed?
17    A    I'm not sure, but my understanding was,
18 speaking to Ken Verbos, he said that's a violation.
19 He said, even though they doing that, it's still a
20 violation. In regard to the rules that inspectors
21 is supposed to abide by. And he said, I spoke to
22 Mr. Rizzo about that. And they act they like they
23 on deaf ears.
24 He said, even they're approving the job --
25 they're approving the job so that you'll -- they

D E G N A N & B A T E M A N, I N C.

Page 129

1 just want you to go away so you'll stop complaining.
2 But they're still not addressing what you're saying.
3 They're supposed to -- like if I -- he said, if I
4 walk in that office, just like I did, he said, that
5 day I walked in the office and I seen when they
6 failed your job, he said, I asked Mr. Rizzo, where's
7 the code section on this here notice, the reason why
8 you failed the job? Oh, we didn't put it on there.
9 He said, that's not acceptable. That's what he's
10 saying.
11    Q    I'm still confused here. The job
12 wasn't failed, it was approved.
13    A    Right.
14    Q    So what would you want in writing about
15 a failure if no failure occurred?
16    A    Okay. I'll try to answer your
17 question. What I was asking for was for it to be
18 done according to the rules laid out by the State of
19 New Jersey that the code section is noted and that
20 also that a notice be sent out to the customer that
21 the work that I performed meets the code
22 requirements and that the inspector made a mistake.
23 This would actually put me in good standing with the
24 customer.
25    Q    What state law requires them to do

D E G N A N & B A T E M A N, I N C.

91a

Page 130

1  that?
2       A    You would have the speak to Ken Verbos.
3  If I spoke to Ken I would be able to furnish you
4  that information.
5       Q    I'm going to ask you provide that
6  information to your attorney; he can, in turn,
7  provide it to me, any law that requires them to
8  contact the customer.
9       A    No, the state law -- I'm stating that
10 the requirement that they're supposed to code the
11 statute, the statute's supposed to be cited on that
12 violation notice.
13      Q    But there was no violation.  Correct?
14      A    They failed the job initially.  The job
15 failed for that reason.  So if they failed the job
16 they have to have a reason to fail it.  So why did
17 they fail the job?
18      Q    But --
19      A    That's what I'm saying.
20      Q    -- that job was ultimately approved,
21 correct?
22      A    Yeah, but they never said that we
23 changed our mind because we wanted -- that's what --
24 Mr. Rizzo said, well, we just decided to let it go.
25 That's how he would say it, we just decided to let

D E G N A N & B A T E M A N ,   I N C.

Page 131

1  it go.  That don't fly.  Ken Verbos said -- he said,
2  that don't fly, we just going to let it go.
3       Q    So you want something in writing
4  saying, this was the code we violated for, but we're
5  not violating it?
6       A    That's what Ken Verbos asked for also.
7  But they never acknowledged him.
8       Q    How do you know Mr. Verbos asked for
9  that?
10      A    Me and Ken talk all the time.  Ken
11 said, Marshall, they have -- still have not
12 responded back to me also.
13      Q    Okay.  Now, does Mr. Verbos have any
14 kind of supervisory role over the code office in
15 Camden?
16      A    They respond to the whole entire State
17 of New Jersey.
18      Q    Could he cite them for any kind of
19 violation?
20      A    He could.  He was trying to avoid it.
21 He said, I'm trying to get these guys to do right
22 by, you know, taking another step.
23      Q    Okay.  Did he ever take it another
24 step?
25      A    I don't know.  Me and Ken have been out

D E G N A N & B A T E M A N ,   I N C.

Page 132

1  of contact with each other.
2       Q    Why is that?
3       A    I get -- I'm busy trying to survive and
4  I sent him an email last night, I asked him could he
5  update me on -- we were supposed to have a meeting
6  and he was supposed to update me in regard to
7  following up -- the one job, the young lady's name
8  that you mentioned, Ayana, Spanish girl, and that
9  was one of the biggest problems, he said that I'm
10 going to contact her.  He was going to contact her.
11 And he said, I'll clear this up that you did nothing
12 wrong, it was the inspectors in Camden that were
13 wrong.
14      Q    I want to stick to the Browning Street
15 job.  Did Mr. Verbos ever find any kind of violation
16 and create any kind of discipline against the City
17 of Camden for that job?
18      A    Now, what he's documented, I have no
19 knowledge of, I only know what he's told me.
20      Q    Did he ever tell you he found any kind
21 of violation --
22      A    Yes, he did.
23      Q    -- and discipline them?
24      A    He did tell me they were in violation.
25 Now, whether he took actions to discipline them,

D E G N A N & B A T E M A N ,   I N C.

Page 133

1  that's another story.  I can't speak on behalf of
2  what actions he's taken, but I know that he did tell
3  me that, you, you're absolutely right in regard to your
4  findings.
5       Q    Okay.
6            MR. RYBECK:  Good time to break.
7            (Luncheon recess.)
8  BY MR. RYBECK:
9       Q    Back on the record now.  Mr. Marshall,
10 I'll reference you back to your complaint.  Go to
11 paragraph 24 where you discuss a rejection of your
12 work performed at 931 South Seventh Street by
13 Mr. Revaitis.  When was that work done?
14      A    I believe that was in 2013.
15      Q    And who was the owner of the property?
16      A    I forgot the lady's name, but her -- I
17 was communicating with her -- I think that's her
18 daughter-in-law.
19      Q    Was the female you can't remember her
20 name, was she the owner of the property?
21      A    No.  I look at it like she was a
22 liaison for the owner.
23      Q    The daughter-in-law was the liaison?
24      A    Daughter-in-law, yes.
25      Q    Okay.  And who was the owner?

D E G N A N & B A T E M A N ,   I N C.

Page 134

```
1      A      unfortunately I can't think of her name
2  right now.
3      Q      Was it her mother?
4      A      Her mother-in-law.
5      Q      Okay.
6      A      I guess it's the mother-in-law.
7      Q      Yes.
8      A      Um-hmm.
9      Q      So the mother-in-law owned the property
10  but you dealt with the daughter-in-law?
11     A      Yes.
12     Q      Okay. Do you remember the
13  daughter-in-law's name?
14     A      Ayana. I think her name was Ayana.
15     Q      How do you spell that?
16     A      I'm going to try this here one. I
17  think it's A-Y-A-N-I-A. Pretty good.
18     Q      Yes. I believe we reference this
19  earlier.
20     A      Okay.
21            MR. RYBECK: Let me just mark this.
22            (P-2   Handwritten statement from Ayana
23        Jordan marked for identification.)
24  BY MR. RYBECK:
25     Q      Mr. Marshall, I'm showing you what's
```

D E G N A N & B A T E M A N , I N C .

Page 135

```
1  been marked as P-2, which is a handwritten letter by
2  Ayana, A-Y-A-N-A, and maybe you can help with the
3  last name there, because I can't read that.
4      A      Oh, boy. Looks like letters. D-A-N?
5      Q      Is it Jordan?
6      A      That may be Jordan, maybe.
7      Q      All right. Actually it states in the
8  first line that I, Ayana Vania Jordan. So I believe
9  that's her name. Does that refresh your
10  recollection?
11     A      I never remember her last name, but I
12  remember Ayana, I used to always --
13     Q      Okay. You can put that down for a
14  second.
15     A      Okay.
16     Q      So how did you get in touch with Ayana
17  originally?
18     A      Ayana contacted me through the
19  internet, she seen my company name on the internet.
20     Q      Where do you advertise on the internet?
21     A      Through Google.
22     Q      How does that work?
23     A      I'm not sure exactly how that does --
24  works, but I've had people call me and say, you
25  know, I got your name off the internet through
```

D E G N A N & B A T E M A N , I N C .

Page 136

```
1  Google out of contractors of South Jersey and you
2  popped up and you're rating's, you know, pretty
3  high. So that's what prompts people to call me.
4  That's the only --
5      Q      Okay.
6      A      I'm just going by what people --
7  because I always ask them, I say, how did you get my
8  name or who referred you to me? Sometimes I get
9  customers in that manner.
10     Q      And do you have a website for your
11  company?
12     A      No. Not presently, no.
13     Q      So someone searches your company's name
14  on Google or searches for contractors and your name
15  pops up on some website, essentially?
16     A      That's correct.
17     Q      Okay. You don't know what website it
18  is, though?
19     A      From what I remember she said Google.
20  I'm not exactly what -- sure what website, but
21  that's what I remember.
22     Q      Okay. So Ayana contacts you by phone?
23     A      Correct.
24     Q      And what did she say?
25     A      She says that we're having electrical
```

D E G N A N & B A T E M A N , I N C .

Page 137

```
1  problems over at a property in Camden, she said, I'm
2  having problems getting contractors to come out to
3  Camden and do work and we would like to have you
4  come out and give us a quote in regards to work we
5  need done.
6      Q      And what did you say?
7      A      I made arrangements to accommodate.
8      Q      Okay. And you went to the property?
9      A      That's correct.
10     Q      Okay. And what was the work that
11  needed to be done?
12     A      She needed a new electrical service,
13  and then there was interior wiring that needed to be
14  done.
15     Q      When you say new electrical service,
16  what do you mean by that?
17     A      The services -- the incoming power that
18  comes from the outside of the property, that's
19  your -- your primary cable or main cable on the
20  outside, the meter enclosure and the panel box.
21     Q      So you were replacing all of those
22  things?
23     A      That's correct.
24     Q      Okay. And what else were you doing?
25  I'm sorry.
```

D E G N A N & B A T E M A N , I N C .

Page 138

1          A          There was a need for interior wiring.
2    Speaking of the power, which is receptacle circuitry
3    and lighting circuitry.
4          Q          Was that throughout the house?
5          A          Not the entire house, but a percentage
6    of the house.
7          Q          It's a private residence?
8          A          Correct.
9          Q          Okay. And what was your quoted price?
10         A          The quoted price I believe might have
11   been -- I'm going to approximate, I think it
12   probably was like maybe 44 or 4900, something in
13   that ball park.
14         Q          Anywhere from four to $5,000?
15         A          Yeah, I would say so.
16         Q          And did you go to the property to
17   perform the work?
18         A          Initially did I go to the property to
19   perform the work, did you say?
20         Q          Yes.
21         A          I went over to review the work
22   initially.
23         Q          Okay. And once you did the review and
24   gave the quote, did you then thereafter go to the
25   property and perform the work?

        D E G N A N & B A T E M A N , I N C .

Page 139

1          A          Once we agreed to a price I scheduled
2    and that's when the work commenced.
3          Q          And how long would this job typically
4    take?
5          A          Circumstances always vary. I would
6    say, considering what we did there, we were looking
7    at maybe ten days. But I think I brought that in in
8    like seven days.
9          Q          And you did the work yourself?
10         A          Yes.
11         Q          Is it fair to say that for the past
12   five years you always worked by yourself?
13         A          No, not all the time.
14         Q          Do you hire subcontractors?
15         A          Sometimes I might turn around and ask
16   another contractor to offer me a hand that's
17   licensed.
18         Q          Okay. I believe I forgot to ask you
19   before; for the 1302 Browning Street job, was
20   that --
21         A          Um-hmm.
22         Q          -- work that was only performed by you?
23         A          Yes.
24         Q          Okay. And the same for 931 South
25   Seventh Street, you were the only contractor that

        D E G N A N & B A T E M A N , I N C .

Page 140

1    worked on that property?
2          A          That's correct.
3          Q          Okay. Did you file a permit
4    application with the City of Camden prior to
5    commencing work?
6          A          Yes, I did.
7          Q          Okay. And that work was approved to be
8    done?
9          A          It was approved once it was completed.
10         Q          Okay. Once you file the request for a
11   permit, do they have to sign off saying yes, you can
12   do the work?
13         A          Yes. The only other time that -- when
14   it's not necessary is if it's an emergency, if it's
15   something I deem to be an emergency I can use my own
16   discretion in starting it if I feel as though it's a
17   potential fire hazard.
18         Q          And you filled out the permit
19   application outlining all the work that was to be
20   performed, correct?
21         A          That's correct.
22         Q          Okay. And you finished the job in
23   seven days?
24         A          I'm going to say approximately that
25   timeframe.

        D E G N A N & B A T E M A N , I N C .

Page 141

1          Q          Okay. At any point up until the time
2    you finished the work did you have any contact with
3    any inspectors from the City of Camden?
4          A          No.
5          Q          So after the work was done who
6    scheduled the inspection?
7          A          The -- the liaison for the owner, I
8    believe her name is Ayana.
9          Q          And did you advise Ayana that she
10   needed to schedule an inspection?
11         A          Yes, she -- you always mention to the
12   customer to schedule an inspection when it's at your
13   convenience when someone will be available.
14         Q          And what's your understanding of what
15   transpired during the inspection?
16         A          Okay. During the inspection Ayana
17   called me and she said that my inspection failed.
18   And I said, for what reason? She said, because we
19   have a problem with the lighting up on the second
20   floor.
21         And I had mentioned to her that what she was
22   referring to did not reflect my scope of work. The
23   problem that she had during the inspection was an
24   old knob and tube circuit and the circuit breaker
25   tripped out. And that's pretty common. She could

        D E G N A N & B A T E M A N , I N C .

94a

Page 142

1  have been using something, but it was tripped out
2  because of an overload.
3      But it had nothing to do with the new work
4  that I performed. But the inspector failed the job
5  because there was a breaker that was off in the
6  panel, but he didn't look into it in detail to find
7  out whether it was the old, existing work or
8  something I did.
9      If it was something that I did, then he would
10 have had cause to fail the job. But he failed it
11 for non-related work in respect to my work.
12     Q    Now, is there some kind of test that
13 the inspector could have performed to determine
14 where the problem was?
15     A    He could have very simply removed the
16 panel, and that would have identified the old wiring
17 from the new wiring, if he had removed the panel.
18     Q    And how would the inspector be able to
19 tell what was old wiring as opposed to new wiring?
20     A    Because when you pull the panel off
21 you'll be able to distinguish a new wire from an old
22 wire. Once you remove the panel cover off you'll
23 see what's old and new.
24     Q    Just from a visual observation you can
25 tell the old wire is worn and used, is that what --

D E G N A N & B A T E M A N, I N C.

Page 143

1      A    Yeah.
2      Q    -- you're saying?
3      A    You can see the age differential.
4      Q    It's your understanding that the
5  inspector -- who was Mr. Revaitis, correct?
6      A    Correct.
7      Q    -- did not perform that test?
8      A    No, he didn't.
9      Q    All right. So once Ayana calls you and
10 tells you you failed, what did you do?
11     A    I went out to the job, you know, out of
12 respect and turned around and, you know, verified
13 that it has nothing to do with the work I did. So I
14 did that.
15     And when I found out what it was, I called
16 Billy Revaitis and I said, Billy, you failed it for
17 something that's not related to what I did. And he
18 said, the only thing I know is there was a breaker
19 off. I says, but you didn't take the cover off to
20 identify what was old and new. And he said, yeah,
21 he says, you know, you get busy and I just didn't
22 take the cover off.
23     But she was -- she was pissed off, the girl
24 was pissed off at me.
25     Q    How -- why do you believe she was

D E G N A N & B A T E M A N, I N C.

Page 144

1  pissed off at you?
2      A    If you get a chance to meet her, she's
3  very temperamental. She's a very nasty person.
4      Q    What did she say to you that led you to
5  that belief?
6      A    You want me to tell you what she said?
7      Q    You can.
8          MR. DAILEY:  He's asking you the
9  question.
10         THE WITNESS:  She said, you fucker, you
11 fucked up. And I said, hold on, before you draw
12 conclusions, let me come over and see what you got
13 going on there.
14 BY MR. RYBECK:
15     Q    And after --
16     A    When you meet up with her, she a little
17 vicious little thing.
18     Q    How old is Ayana approximately?
19     A    She gotta be about 20 years younger
20 than me. She a young little Spanish girl.
21     Q    So once you talked to Mr. Revaitis and
22 he essentially admits that he didn't check to see if
23 the work was old wiring or new wiring that caused
24 the failure, what happened after that?
25     A    Well, I met with Mr. Rizzo, as always I

D E G N A N & B A T E M A N, I N C.

Page 145

1  was trying to create a paper trail, document things.
2  And I explained to what was going on. And Billy
3  Revaitis sat in on the meeting too, he called Billy
4  in. Billy happened to be in that afternoon, we all
5  sat in there.
6      And I said to Billy, I said, you gotta see
7  this girl's very temperamental, she came at me with
8  some aggression. And the problem is she doesn't
9  understand that the reason why the circuit breaker
10 was off was because it was an old circuit. And I
11 was supposed to do another project for her
12 mother-in-law, which is a daycare center, and she's
13 not going to use me now, she's pissed off.
14     He said, don't worry about it, you know, some
15 you win, some you lose. I says, I'm asking you
16 could you go back there and explain to her that
17 there was a mistake made? And me, Billy and
18 Mr. Rizzo, we talked about it. And nothing became
19 of it.
20     I followed up and asked him, could you respond
21 back to me? And it's really nonchalant, like it was
22 no big thing. And that girl, she's something
23 different, she's very temperamental.
24     Q    Who said the words to you, some you
25 win, some you lose?

D E G N A N & B A T E M A N, I N C.

Page 146

```
 1      A       Billy Revaitis. William Revaitis.
 2      Q       What did Mr. Rizzo say during this
 3   meeting?
 4      A       He said, we'll talk to her and see if
 5   we can get this here cleared up.  I said, it's real
 6   simple, just send her something in writing.  Like I
 7   always ask; could you send them something in
 8   writing?  Get me a copy, carbon copy me?  But they
 9   wouldn't do it.
10      Q       Was the job approved ultimately?
11      A       Yes.
12      Q       Did you receive the notification from
13   the city that the job was approved?
14      A       Yes.  Standard, they always send out
15   the notice.
16      Q       Did you provide that to Ayana?
17      A       No, she wouldn't -- no, she don't want
18   me near her.  I was at the TD Bank one day, I
19   thought she wanted to fight me in the bank.  I
20   walked into the bank and she was pissed off because
21   she -- like I said, she's like whatever the
22   inspector says, it's like holy, like the Bible.
23      Q       Well, when did you see her at TD Bank?
24      A       Maybe a month after that job.
25      Q       What TD Bank did you see her at?
        D E G N A N & B A T E M A N , I N C .
```

Page 147

```
 1      A       On Browning Road.  I live right near
 2   Browning Road in Pennsauken.
 3      Q       And explain to me what happened.
 4      A       Like if I'm -- like say for instance if
 5   you're standing in the bank like and you looking
 6   straight ahead.  She walked on the side of me like
 7   this here and says, you fucker.  Like that.
 8           What the hell's this all about?  And I said,
 9   oh, my goodness, that's her.  I was just like, I
10   ain't going to get in no verbal thing with her.  She
11   got pissed off and walked out.
12      Q       Now, just for the record, you had your
13   arms crossed at --
14      A       She walked up to me.  Like say for
15   instance -- like I can --
16      Q       Hold on a second.
17      A       I can show --
18      Q       Just for the record I'm saying you were
19   demonstrating what Ayana was doing, you had your
20   arms crossed, --
21      A       She was -- like I look at you like, I
22   said, you F'er, like that, and I look at you like
23   that.  And standing -- and people in line's, what
24   the hell's this all about?
25      Q       Because the court reporter can't
        D E G N A N & B A T E M A N , I N C .
```

Page 148

```
 1   transcribe what you're doing --
 2      A       Okay.
 3      Q       -- so I'm just describing it for the
 4   record.
 5      A       Okay.
 6      Q       Did you say anything to her?
 7      A       No, I don't get in no argument with a
 8   woman in public, that's a no-win situation.  I'm
 9   cool about that.  I looked over at her -- I looked
10   at her and says to myself, she's just a crazy woman
11   there.  I couldn't believe it.
12      Q       Other than, you fucker, did she say
13   anything else to you?
14      A       No.  She said -- that girl's a loose
15   cannon, man.  The guys looked, I said, the girl's a
16   loose cannon, man, that's some crazy situation, man.
17   The guy looked, I said, that's a crazy situation.
18      Q       Now, was this encounter with Ayana at
19   TD Bank before or after your meeting with
20   Mr. Revaitis and Mr. --
21      A       It was after.
22      Q       -- Rizzo?  So the job had already been
23   approved at this point when you saw her at TD Bank?
24      A       No, I don't think -- I don't think --
25   let me get my timing right.  Was the job approved?
        D E G N A N & B A T E M A N , I N C .
```

Page 149

```
 1   Yeah, Billy went back out there the following week
 2   and he approved the job.
 3           But in her mind she feels as though I did her
 4   wrong, because she called me up about something
 5   else, too after the job was approved, but didn't
 6   relate to nothing else.  It was some crazy theory
 7   that she came up with.
 8      Q       What was the crazy theory?
 9      A       The crazy theory was they had a
10   property that was next door and there was no
11   electricity there.  And she said her breaker's
12   tripping out in the house because the electricity is
13   leaking through one wall coming into the house and
14   it's causing the breaker to trip.
15           So I said, there's no power in the property
16   next door, there's no connection between the
17   vacant -- and the reason whey she was speaking about
18   that was because they own the property.  And I said,
19   you don't even have service coming to that property,
20   there's no link in that property.
21           But she came up with some crazy theory and
22   then she said, you messed my house up.  She just
23   angry.  And I kept telling her, I says, no, that has
24   nothing to do with it.
25           I even called the utility company and they
        D E G N A N & B A T E M A N , I N C .
```

Page 150

1  says, no, everything's fine there. But she has a
2  short -- it's old knob and tube wiring and I tried
3  to explain to her, I says, you plug something into
4  that circuit and it overloads and it trips out.
5        But she cannot get in her mind what an
6  overload is. So she's just angry.
7        Q      And when did this phone conversation
8  occur? How long after you saw her at TD Bank?
9        A      No, this was before then. Like Billy
10  Revaitis did the inspection, then the following week
11  he came out and did another inspection and got the
12  job approved.
13       And then like before that month time span,
14  then she had me come back out. And I said, okay,
15  I'll come back out. I says, Ayana, I can't keep
16  coming out here, I completed my contractual
17  obligation and I can't keep coming back out here, I
18  said -- with your theory.
19       Then she thought I was insulting her. And I
20  said, the theory that you come up with just doesn't
21  make sense, there's no -- there's no power next door
22  and there's nothing next door that's causing the
23  breaker to trip out. I said, here you got an
24  internal problem with the branch circuit wiring in
25  the house and you have to address it.

D E G N A N  &  B A T E M A N ,  I N C.

Page 151

1        And she thought I was trying to promote more
2  work. And all I -- I didn't want to do more work, I
3  wanted to just get away from her, because she's
4  temperamental.
5        Q      So this phone conversation with her
6  about the -- her crazy theory, your words, that
7  occurred --
8        A      That was not a phone conversation. I
9  physically went over to the house and met with her.
10       Q      Okay. But when she notified you about
11  the problem she called you originally, correct?
12       A      Correct.
13       Q      Okay. And that occurred before you saw
14  her at TD Bank?
15       A      Yes, that was like maybe a week before.
16  Week before.
17       Q      So the last time you saw Ayana was at
18  TD Bank?
19       A      That's correct, that's a true
20  statement.
21       Q      Going back to the daycare center, where
22  was that at?
23       A      I have no idea where the daycare
24  center. She says, my mother-in-law has a daycare
25  center, we're looking at rewiring the place and

D E G N A N  &  B A T E M A N ,  I N C.

Page 152

1  we're going to have you do it once we finish this
2  project.
3        Q      And you didn't know where that was,
4  though?
5        A      No.
6        Q      And obviously that worked did not come
7  to fruition?
8        A      That's correct.
9        Q      Okay. Other than Mr. Revaitis
10  essentially wrongfully failing you for the job, was
11  there any other conduct on his part relating to the
12  931 South Seventh Street property that you're
13  claiming was wrongful?
14       A      There was -- there was several
15  properties, there's several -- I'm sorry. You asked
16  me a question.
17       Q      Just relating to this property.
18       A      Oh, no, that's the only thing with that
19  property, that's the issue with that property.
20       Q      Are you claiming that he recommended or
21  badmouthed you -- strike that. Are you claiming
22  that Mr. Revaitis badmouthed you to Ayana or
23  recommended another contractor?
24       A      No. What he said to her was he should
25  have corrected this here problem before he finished

D E G N A N  &  B A T E M A N ,  I N C.

Page 153

1  your job. And that's what the issue became, that's
2  why I needed him or Mr. Rizzo to clarify that.
3        And I also asked the guy from the state, Mr.
4  Verbos, he said he was going to call her, but we
5  lost contact. He said, I'll clear this up,
6  Marshall. But he -- I don't think he ever followed
7  up and called her.
8        Q      Okay. Going back to P-2, the letter
9  from Ayana that's in front of you --
10       A      P -- okay. Um-hmm.
11       Q      It states: I, Ayana Vania Jordan, did
12  not get any -- I believe the word is
13  recommendations -- from the inspectors at all at no
14  time. The second electrician I found was on Craig's
15  List or Angie's list. I heard Marshall the
16  electrician say, oh, his a racist son of a bitch
17  when the gentleman got out of the car.
18       Do you have any knowledge as to why Ayana
19  wrote a letter saying that no one recommended the
20  second electrician?
21       A      I'm trying to think who the second
22  electrician was. I have no idea what she's talking
23  about.
24       Q      Okay. But you didn't make any claim to
25  the City of Camden that they had recommended another

D E G N A N  &  B A T E M A N ,  I N C.

## Page 154

1  electrician?
2  A  There was a different issue, but it
3  didn't involve Ayana.
4  Q  Okay.  I'm saying for this property you
5  didn't make that claim, correct?
6  A  No.
7  Q  Okay.  And her saying that you said,
8  oh, his a racist son of a bitch, do you have any
9  idea what she's referencing there?
10  A  No.
11  Q  Have you ever claimed that any of the
12  defendants in this lawsuit were racist?
13  A  The only one I know who's a racist,
14  because I worked with him and I know the comments he
15  would make, is Gene Emenecker.  I know for a fact
16  Gene's got issues.
17  Q  Okay.  Are you claiming that
18  Mr. Revaitis is racist?
19  A  Well, this is what I understand
20  about -- he's got -- I heard he's got issues because
21  his daughter married a black guy and I heard the
22  guys at the local say that the local say that
23  he's got psychological issues behind that.
24  Q  But that's --
25  A  He never came off to me like that, but

D E G N A N & B A T E M A N , I N C .

## Page 155

1  I know that Gene Emenecker came directly with me
2  making racial comments.
3  Q  We'll get back to that.  So you,
4  yourself have never experienced any racism on behalf
5  of Mr. Revaitis?
6  A  He make little joking comments, but we
7  ignore that guy, the more comments he be making.
8  Q  What comments?
9  A  Like he'll say, you're -- like black
10  guys be making in the hood, they be saying like pots
11  and pans.  My man pots and pans.  What's up brother?
12  He be saying little comments.  People say, where the
13  hell he come from?
14  Then he said, you know -- you know, it's like
15  a code, like if you know something and, you know, if
16  you really been in the trenches you know how to like
17  talk the lingo.  He try to talk like he's all that
18  and that.  He got some bullshit with him.
19  MR. DAILEY:  Getting all this?
20  BY MR. RYBECK:
21  Q  So Mr. Revaitis is saying to you, my
22  man pots and pans, --
23  A  Yeah.
24  Q  -- are you claiming that's racist?
25  A  No.  He comes off like he's like

D E G N A N & B A T E M A N , I N C .

## Page 156

1  down -- down low, like cool, you know, but then he
2  do shit to you.  This is where he coming from.  He
3  plays a two sided coin.
4  Q  So you're not claiming Mr. Revaitis is
5  racist to you?
6  A  Billy ain't bad, but Gene, Gene's just
7  racist, Gene makes it obvious.
8  Q  I just want to make clear that you're
9  not claiming Mr. Revaitis is racist?
10  A  No, I never looked at -- like with him
11  being racist, just the way he handled me over the
12  years is wrong because I wasn't a union contractor.
13  Q  We'll get back to that.  Mr. Rizzo, are
14  you claiming he has any racism against you?
15  A  I can't say that about Mr. Rizzo
16  neither, no.
17  Q  How about Miss Afanador?
18  A  She's a very deceitful person, very
19  conniving.
20  Q  I want you to concentrate on my
21  question.  Are you claiming she's racist?
22  A  Oh, racist?  She may be.  Possibility.
23  Q  What do you base that on?
24  A  Because -- I'll tell you what happened.
25  As a matter of fact, the guy from the state kind of

D E G N A N & B A T E M A N , I N C .

## Page 157

1  like he said, you're right on point.
2  When this girl named Ayana, I remember
3  Afanador contacted her, right?  And she turned
4  around and said that Ayana said that you were the
5  problem, you cursed the inspector out and all this.
6  I said, I never did nothing like that.  I says,
7  that's -- I never, ever cursed any inspector out on
8  the job.  Why would I do something like that?
9  And her and Ayana, they're both Spanish,
10  right?  And if you don't know this about the Spanish
11  community, they're very close.  No disrespect to
12  anybody, but they're very close.  They will -- they
13  will support each other, lie, or whatever it is.
14  They will lie.  They lie for one another.
15  That's one population, group of people that
16  will lie for each other.  They will turn -- you can
17  be wrong as wrong and they will turn around and
18  say -- there's a code of loyalty in the Spanish
19  community, they will support each other to the very
20  last breath.
21  Q  And is that --
22  A  Rarely will they turn on one another.
23  Q  Is that what you're claiming occurred
24  with Miss Afanador and Miss Jordan?
25  A  Well, what happened was, when Miss

D E G N A N & B A T E M A N , I N C .

98a

Page 158

1  Afanador got ahold of Ayana I called her back,
2  because she deceitfully -- she said to me, let's
3  have a meeting.
4      She brought me and a bunch of Spanish people
5  in the meeting and they sat there and listened to me
6  divulge all my information to the city of Camden.
7      And then she betrayed me, she turned around
8  and did a flip -- she did a 180, she flipped the
9  script on me.
10     And then the guy from the state says, I
11  thought that's what she's going to do, because she
12  turned around a week later and says, oh, you're the
13  problem, all my inspectors are good people, and this
14  and that.
15     And then the girl Ayana, she said that Ayana
16  said that I cursed the inspector.  I said, I never
17  did anything like that.  So that doesn't surprise
18  me, that Miss Afanador, being Spanish, she talked to
19  her and she did a total flip on me.
20     Because I spoke to Ken Verbos, I said, Ken, I
21  spoke to Miss Afanador and her whole personality,
22  her view toward me changed.  First she was going to
23  support me in regard to trying to clear up this
24  problem I've been having with the inspectors, and
25  now she totally flipped the script.  Ken said to me,

D E G N A N & B A T E M A N, I N C.

Page 159

1  I thought she was going to do that.  He said, does
2  not surprise me.
3      Q    Let's go back to this meeting you were
4  talking about.  How did that come about?
5      A    The meeting?
6      Q    Yes.
7      A    The meeting with Miss Afanador and all?
8      Q    Yes.  Who was at the meeting?
9      A    Let me see.  I know her secretary was
10  there, and then there was a girl from Weights and
11  Management that was there.  These are people that
12  run the departments.
13     Then there was this other girl that's in
14  charge of code violations, but they -- but after
15  they had the meeting I found out none of them were
16  supposed to have been there.  But these are all
17  Spanish people.
18     Q    They're all --
19     A    The one girl from code enforcement,
20  she's not Spanish, she's a Caucasian girl, but
21  she -- but the other girls was Spanish.
22     Q    Let's just go one person at a time
23  here.
24     A    Um-hmm.
25     Q    The Weights and Management female, --

D E G N A N & B A T E M A N, I N C.

Page 160

1      A    Um-hmm.
2      -- she's a Hispanic woman?
3      A    Little, short Spanish girl.
4      Q    Okay.  Approximate age?
5      A    I'm going to say -- I think her name
6  was Judy, too.  I think she might have been maybe
7  late 20s.
8      Q    You think her name is Judy?
9      A    I think her name was Judy.
10     Q    Any other distinguishing
11  characteristics you can recall?
12     A    She's a little, small girl.  That's the
13  greatest thing that stands out, she's a little,
14  small girl.
15     Q    What about her hair color?
16     A    Dark color.  Might be black, but dark
17  color.
18     Q    Okay.  Anything else you can remember
19  about the way she looks?
20     A    She's kinda -- not the way she looks.
21  She kind of shy, kind of shy and she only speaks
22  when asked to speak.
23     Q    How about Miss Afanador's secretary,
24  she's also Hispanic?
25     A    She an older lady.

D E G N A N & B A T E M A N, I N C.

Page 161

1      Q    Hispanic?
2      A    Yeah.  I remember her, she worked in
3  the city of Camden for a long time, I remember her.
4  I don't remember her last name or nothing, but I
5  remember that face.  I'll never forgot her.  She
6  stills works up there.
7      Q    What's her approximate age?
8      A    She's gotta be late 50s, near 60.
9      Q    Any others -- like any other
10  distinguishing characteristics you can remember
11  about her?
12     A    Just an older lady, wears glasses.
13     Q    Christine Tucker?
14     A    I don't think her name was Christine.
15     Q    Okay.  And you said someone from code
16  violations was there?
17     A    Yeah, this girl, this lady here,
18  she's -- she's a lesbian, I know that everybody,
19  they all just talk about her down there, I know
20  she's a lesbian, but I don't think you want to say
21  that.  That's what she is.
22     Q    She's Caucasian?
23     A    Yes.
24     Q    Approximate age?
25     A    She -- maybe 50.

D E G N A N & B A T E M A N, I N C.

Page 162

1  Q    Anything else you can remember about
2  the way she looks?
3  A    She look boy-ish.
4  Q    What color hair does she have?
5  A    Sandy color hair.
6  Q    How long is her hair?
7  A    Short.  She wears her hair short.
8  Q    Like a buzz cut?
9  A    Yeah, something like that, yeah.
10  Q    Was anyone else at the meeting?
11  A    No.  She just brought me in and they
12  all sat there and gathered as much information as
13  they could from me.
14  Q    What information did they gather from
15  you?
16  A    They wanted to hear everything.  Like
17  Miss Afanador, she was angry because she says, I
18  didn't know that the department of DCA came in to do
19  an investigation.
20  And what happened was Mr. Rizzo never told her
21  that and she was angry behind it.  So when they -- I
22  said, you sure you want me to march in there if you
23  guys have a meeting?
24  So all of them sitting in there in the
25  morning, I had to march past all of them to go back

D E G N A N & B A T E M A N ,  I N C .

Page 163

1  in Miss Afanador's office.  And I says, there's a
2  lot of tension.  And she shut the door and we had a
3  meeting back there.
4  Q    Now was this city Hall?
5  A    City Hall on the fourth floor.
6  Q    Four floor?
7  A    Yep.  And the mayor didn't know
8  neither, the mayor was supposed to know.  They never
9  told the mayor.  And she wanted to suppress
10  everything.
11  Q    That's mayor Dana Redd?
12  A    Yes.
13  Q    And why was the mayor supposed to know?
14  A    Because I talked to a few people, they
15  said the protocol is you first bring it to the --
16  what's that?  The finance manager or something.
17  Because what happened was I got a phone call
18  from the mayor's secretary and she says, did you --
19  did -- it's my understanding that DCA came in.  I
20  said, who gave you my number?  She never told me.
21  So I listened to her.  I said, let me hear her out.
22  And then when she told me who her mother was,
23  I said, I need to hear even more, because I know her
24  mother, right?
25  So I said, yeah, DCA came in and they did an

D E G N A N & B A T E M A N ,  I N C .

Page 164

1  investigation.  And she says, our office knew
2  nothing about that.  And they were a little angry
3  that they didn't communicate that with them.
4  Q    And who was the mayor's secretary?
5  A    A young girl.  I can't think of her
6  name.  I can't think of the girl's name.
7  Q    You know her mother, though?
8  A    Yeah.  Her mother's name's Phyllis.
9  What was Phyllis' last name?  She married now.
10  Phyllis Byrd.  Might have been Byrd.  I think her
11  mother's maiden name was Byrd.
12  Q    B-Y-R-D?
13  A    Right, that's right, yeah.
14  Q    And the mayor's secretary, is she
15  Hispanic?
16  A    No, black girl.
17  Q    Approximate age?
18  A    I'm going to say she might be in her
19  30s or something, because sometimes I go up on the
20  fourth floor to get permits, I look over there and
21  it looks like her mother, the girl looks just
22  like -- the one, Phyllis, but I think that's the
23  daughter.
24  But I never walked up to her and said, hi, my
25  name is Marshall, and talk, I don't do that, I just

D E G N A N & B A T E M A N ,  I N C .

Page 165

1  keep moving.
2  Q    So the mayor's secretary called you,
3  you don't know how or why she called you?
4  A    She said, I heard that DCA came in.
5  And I said, yes.  And I says, I'm supposed to have a
6  meeting with Miss Afanador the following week.  And
7  I -- so I said to her, I says, isn't protocol that
8  you suppose to tell the mayor's office?  And she got
9  like quiet on the phone.  I said, can you hear me?
10  And she wouldn't say anything.  And I kept pursuing
11  it.  She said, yeah, we should have known about it
12  first.
13  She says, when somebody like DCA comes in you
14  supposed to contact business -- oh, business
15  administration, you're supposed to contact the
16  business administrator and then you supposed to
17  contact -- the business administrator tells the
18  mayor.  That's how it's supposed to go, how it go.
19  That's what I meant.  That's what she told me.
20  Because it goes down -- you're supposed to share
21  information.
22  Q    Let's talk about the DCA investigation.
23  When did that begin?
24  A    Oh, we been talking about the City of
25  Camden for years.  This guy came on in September,

D E G N A N & B A T E M A N ,  I N C .

## Page 178

1   And I thought that we had achieved that, but
2   once we walked out of the meeting I had an idea what
3   might turn opposite, because she had -- my opinion,
4   just my opinion, she had to take the position to
5   protect her office, because she was the director
6   there. So it makes sense that she would turn around
7   and then call rounding the troops up or circling the
8   wagons, say, look, we gotta make Marshall look like
9   he's a problem. And that's my opinion.
10   So when I talked to her a week later she did a
11   total flip-flop on me, and one of the key factors
12   that girl Ayana, I told her that she was
13   temperamental, I told her she's not going to talk to
14   you.
15   But they're Spanish, they're going to -- they
16   work together. It's easy for one Spanish person to
17   say, look, we gotta work together, gotta make it
18   look like he's an asshole, whatever. That don't --
19   that's pretty common.
20   Q   So is that just what you believe
21   happened with Miss --
22   A   I experienced it.
23   Q   Hold on one second. -- with Miss Ayana
24   Jordan, that Miss Afanador said to her, we're both
25   Spanish, we have to make --

D E G N A N & B A T E M A N , I N C .

## Page 179

1   A   I can't say that.
2   Q   Hold on. -- we have to make Marshall
3   look like an asshole?
4   A   No, I can't say that.
5   Q   Okay.
6   A   I'm just basing it upon when I talked
7   to Miss Afanador the next time, she said that Miss
8   Ayana said that no, you cursed the inspectors out.
9   I've never done it in my entire life. That's easy
10   to tell the truth, there are certain thing I just
11   don't do.
12   Q   So the comment in P-2 that you stated,
13   oh, his a racist son of a bitch, that never
14   occurred?
15   A   No. No.
16   Q   Did you ever once complain to
17   Miss Afanador that the problems you were having were
18   racially based?
19   A   I just said to her, Gene Emenecker
20   could be racially based. And she said that she
21   wouldn't put it past him.
22   Q   When did she say that?
23   A   During that meeting we had.
24   Q   Okay. And was there anyone else
25   present for that?

D E G N A N & B A T E M A N , I N C .

## Page 180

1   A   All them other girls was there. All of
2   us -- there was four of us in the meeting, including
3   myself. Yes, four females, including Miss Afanador,
4   and myself.
5   Q   At any time did you ever submit a
6   complaint in writing that the problems you were
7   having with the City of Camden were racially based?
8   A   No. I was very discreet. I sent
9   Miss Afanador a letter stating that I would -- I was
10   requesting to meet with her because of the internal
11   problems. But I never detailed what it was about, I
12   didn't want to reveal that until I met with her.
13   And during the meeting I disclosed that.
14   Q   Why did you not want to reveal that?
15   A   Because I don't trust them people. I
16   don't trust them people in the city of Camden, you
17   gotta be very discreet what you say to them. If I
18   was to tell her in advance what the contents of what
19   I wanted to speak about, they prepare themselves.
20   You gotta be very careful when you communicate with
21   them, you can't let them know what your hand is.
22   Like playing a game of poker, you can't let 'em know
23   what your hand is. You gotta reveal that at the
24   time.
25   Just like the guy from the state. He said, I

D E G N A N & B A T E M A N , I N C .

## Page 181

1   came in there and caught them with their pants down.
2   He said, I'm not going to let them know what day I'm
3   coming to see them. He said, I caught them with
4   their pants down, Marshall, he said, they didn't
5   know when I was coming.
6   Q   What do you mean, they would prepare
7   themselves if you had written your complaints in
8   writing to Miss Afanador prior to the meeting? What
9   could they have done, in your opinion that --
10   A   I'll give you --
11   Q   Hold on. -- that would have prepared
12   them for the meeting?
13   A   What do I believe they would have done?
14   Q   Yes.
15   A   They would have turned around and
16   gathered information. Like say, for instance, I
17   want to speak about this or speak about that. I
18   believe they would have turned around and
19   interviewed certain people, they would have
20   postponed the meeting, delayed to prepare
21   themselves.
22   Just like, an example the guy from the state,
23   he says, I came here, but if I told them they were
24   coming, they would have been prepared. He said, by
25   state law we can walk in to any municipality and

D E G N A N & B A T E M A N , I N C .

Page 182

1    demand the records right there. And if they don't
2    give us the records, we have the authority to shut
3    the office down. He says, so when I went in and
4    asked for it, they had to give it to me.
5        Q    Let's get away from Investigator Verbos
6    here. I want to concentrate on Miss Afanador.
7    You're claiming they would have interviewed
8    witnesses had you notified them of specific
9    instances. Correct?
10       A    I believe that.
11       Q    And what's the problem with that?
12       A    Because I don't trust them. I don't
13   trust the politics in the city. Because I've seen
14   what they've done over the years. I wanted to walk
15   into a meeting and have an open forum and share with
16   her that -- the only thing I wanted her was, I'm
17   having certain problems with doing business in the
18   city of Camden, would you be so good to meet with
19   me?
20       And I remember years ago I told her that one
21   day at the front desk and she said, if you ever
22   continue to have problems, feel free to come to my
23   office and talk to me. So she remembered me from
24   years and years ago. This is like ten years ago we
25   had a conversation one day.

D E G N A N & B A T E M A N , I N C .

Page 183

1        And so when I walked up to her she said, yeah,
2    I remember you, your brother works up at the print
3    shop. I said, yes. I said, I'd like to meet with
4    you. So she was receptive to meeting with me.
5        And then when she found out that DCA came in,
6    she wanted to meet with me even more, because she
7    should have been informed that DCA came in. Her
8    right-hand man in the office never said to her, hey,
9    we've got a problem, DCA came in. He never shared
10   that with her.
11       So she was more than welcome -- see, I had her
12   at a point that she was willing to meet with me.
13   She said, well, this guy -- she said, I'm willing to
14   meet with him. That's what I'm saying.
15       So I had her eager to meet with me. As long
16   as I had her interest, then I knew she was willing
17   to meet with me.
18       Q    But you take issue with -- if you had
19   given them names of persons, of property owners, if
20   they would have interviewed them you would have had
21   a problem with that?
22       A    Not necessarily. Not necessarily. But
23   I didn't want her to know exactly the details of
24   what I wanted to talk about, because after I met
25   with her she said, I'll get back to you tomorrow.

D E G N A N & B A T E M A N , I N C .

Page 184

1    And tomorrow wind up being maybe four or five days,
2    because I knew she was trying to come back at me
3    differently.
4        See, when you tell somebody something it gives
5    them a chance to put their -- you know, put their
6    apples in line and -- you know, figure of speech,
7    and that's what happened. She said, I'll get back
8    to you tomorrow, after we had that meeting, and I
9    called her and she was evasive. She was evasive.
10       And then when we finally did talk a week later
11   she took a defense, like she was like opposed to me
12   then. All of a sudden you embrace me, then the
13   following week you're opposed to me. See, that's
14   what I anticipated.
15       Q    Why did you anticipate that?
16       A    Because for her to turn around and go
17   along with me, it would be totally -- it would sort
18   of -- I have a problem and she's going against her
19   office. She's gotta protect the rest of the office
20   because it shows that she doesn't have control of
21   her office. See, I was using basic common sense.
22       Q    So you anticipated prior to the meeting
23   that Miss Afanador was going to go against you?
24       A    Not necessary, but I knew that if I
25   shared everything with her, then in turn she

D E G N A N & B A T E M A N , I N C .

Page 185

1    wouldn't be so receptive. I had to maintain her
2    interest. I didn't let her know all the details
3    what I wanted to talk about.
4        Q    Did you anticipate that she would
5    investigate your complaints after --
6        A    Of course.
7        Q    -- the meeting?
8        A    Yes, of course.
9        Q    And to your knowledge, did she?
10       A    I don't know the extent of what she
11   did, but all I did was try to be receptive and, you
12   know, make myself available.
13       Q    And this meeting occurred when?
14       A    I am going to say -- had to be in
15   September of 2013.
16       Q    So was it after Investigator Verbos
17   came to the code office, correct?
18       A    I met with Miss Afanador?
19       Q    Yes.
20       A    Yes.
21           MR. RYBECK: Let's take a five minute
22   break.
23           (Brief recess.)
24   BY MR. RYBECK:
25       Q    We were talking about the meeting you

D E G N A N & B A T E M A N , I N C .

Page 186

1  had with Miss Afanador and approximately -- she told
2  you that she was going to call you the next day and
3  she called you approximately four to five days
4  later.
5       A       The following week.
6       Q       Okay. And was that in September or
7  October, that phone call?
8       A       If it was September it had to be maybe
9  the last week in September or the first week in
10 October. For some reason it might have been the
11 first week in October, because -- yeah, I remember
12 it was right during that time period. I don't
13 forget much, but pretty close to that time period.
14      Q       And what took place in that
15 conversation?
16      A       I says -- I asked her, I says, what's
17 the status? Have we made any progress? And she
18 went on the attack on me, she says, oh, my
19 inspectors have done an excellent job, you're the
20 problem. That's how she came off.
21      And so I turned around and said to her -- she
22 didn't like what I said -- I said, I understand your
23 position, you're the director and it's only fitting
24 that you take that position because it makes it look
25 like you don't have any control over of your office.

D E G N A N & B A T E M A N ,  I N C .

Page 187

1       She got pissed off. She hung the phone up.
2       Q       Did she say anything else?
3       A       She said, I ain't gotta put up with
4  this shit. I ain't gotta put up with this shit.
5  And hung up the phone.
6       Q       Anything else transpire in that
7  conversation?
8       A       No, that's it.
9       Q       Okay. Have you ever spoken to her
10 again?
11      A       No. She did that, she hung up on me.
12 Somebody hang up on me, we're done. Yeah.
13      Q       She called you that day, though?
14      A       I called her and then she called me
15 back. I initiated the call maybe about 9:15 in the
16 morning and then she turned around and called me
17 back.
18      Q       Have you ever seen this letter in P-2?
19      A       No.
20      Q       Did Miss Afanador ever tell you that
21 she had spoken to Miss Jordan?
22      A       Yes, she did, she said she did. She
23 said she was going to reach out to her and she said
24 she did speak to her.
25      Q       When did she say that?

D E G N A N & B A T E M A N ,  I N C .

Page 188

1       A       After we met -- that same day we met at
2  the office she said, I'm going to reach out to her.
3  And I told her, I said, I don't think that you're
4  going to have a productive meeting with her because
5  she's angry with me.
6       Q       What was your understanding of why she
7  was contacting Miss Jordan?
8       A       Why was Miss Afanador's reason for
9  contacting her?
10      Q       Yes.
11      A       Because she wanted to speak to her.
12 She said she wanted to speak to the individuals that
13 witnessed or have knowledge of what's been taking
14 place with the inspectors.
15      Q       And what knowledge did Miss Jordan have
16 about what took place with Mr. Revaitis?
17      A       She was there, the -- when Mr. Billy
18 Revaitis went out to do the inspection she met him
19 there at the property to do the inspection. She
20 basically was available to let him in the property
21 to review.
22      Q       But no one was disputing that the
23 property was violated, correct?
24      A       Was it violated? I'm sorry.
25      Q       Well, denied.

D E G N A N & B A T E M A N ,  I N C .

Page 189

1       A       I'm sorry, I misunderstood.
2       Q       Your application was denied.
3       A       It was denied initially, it was -- the
4  job failed inspection --
5       Q       Okay.
6       A       -- initially.
7       Q       But this meeting that occurred with
8  Miss Afanador, the job had been approved at that
9  point, correct?
10      A       At that point in time when we had the
11 meeting it was closed out, they had approved it.
12 But she understood, she says, yes, our inspectors
13 are supposed to note the records.
14      Q       Miss Afanador said that?
15      A       Yes.
16      Q       Did Miss Afanador state what she was
17 going to ask Miss Jordan?
18      A       No, she didn't go into detail what she
19 was going to explain to her, she said she was going
20 to talk to her. And I told her, I said, you may
21 have more luck than me, because she's Spanish. I
22 said, no disrespect, because, you know, she may be
23 receptive to you, but she's a very angry woman
24 because she think I did her wrong.
25      Q       And did Miss Afanador say she was going

D E G N A N & B A T E M A N ,  I N C .

Page 190

1  to reach out to any other individuals?
2      A      She said she was going to speak to Jim
3  Rizzo.
4      Q      How about any property owners?
5      A      I gave her the list of everything, I
6  gave her the statements, I gave her everything, you
7  know, and I said, you can -- I even gave her phone
8  numbers of people that she could contact. I even
9  gave her this girl's phone number.
10     Q      Miss Jordan?
11     A      Yeah. Ayana, yeah, Jordan. I'm just
12  now remembering her last name Jordan, Jordan.
13     Q      Who else -- what other names did you
14  give Miss Afanador of private citizens?
15     A      There was a guy at the tattoo shop, I
16  can't think of his name right now. Tony? It's
17  called Twisted Tattoos. I gave her the property of
18  Browning Street, the -- the property we spoke about
19  earlier.
20         There was one on Seventh Street, there was an
21  older lady by the name of Miss Bernice, that was
22  another inspection. That's one we did speak about.
23         But I gave her -- you know, I spoke and I gave
24  her some verbal information about other properties I
25  encountered problems with inspections. I told her

D E G N A N & B A T E M A N , I N C .

Page 191

1  about -- there was a property, Nate Rowland on
2  Newton Avenue that I had to do a commercial service
3  when it should have been just a residential service
4  because the inspector misinterpreted the code and it
5  cost the homeowner another $3,000 to do the job the
6  way he wanted me to do it.
7         But the guy Nate Rowland had money so he says,
8  look, we're going to do what we gotta do. He says,
9  Mr. Marshall, let's just get the job done, he said,
10  I got money, that doesn't mother me. So we went
11  ahead and did it.
12     Q      What other properties or property
13  owners did you notify Miss Afanador about?
14     A      I just told her about some other ones
15  that weren't written, but they were all documented
16  in the records, because I always pulled permits on
17  those jobs. I'm trying to think of some. I can't
18  really think of them at the moment.
19         But we just had a general conversation. She
20  said, what's some of the other problems you've had
21  on this job? And I told her the times, concerns,
22  what I had problems with Gene and Mr. Revaitis. We
23  had just an open forum.
24         At one time when we was just talking I said,
25  this has been going on for years, I said, I've been

D E G N A N & B A T E M A N , I N C .

Page 192

1  putting up with this here for over ten years. And I
2  told her, I said, I've been talking to the state
3  about this for a long time, too.
4      Q      Well, you notified them about the DCA
5  investigation at this meeting, correct? Or prior to
6  this meeting, correct?
7      A      You mean Miss Afanador?
8      Q      Yes.
9      A      I told her how long I had been in
10  communication with them.
11     Q      Well, you had notified the mayor's
12  office prior to the meeting with Miss Afanador about
13  the DCA investigation, correct?
14     A      No, the mayor's office called me, the
15  secretary called me. The secretary called me and
16  asked me, you know, it's my understanding that DCA
17  came out. And I said, yes, they did come out. I
18  actually even asked her, who gave you my phone
19  number? She never -- the girl never answered.
20     Q      So the properties we have that you
21  talked about with Miss Afanador at this meeting were
22  1302 Browning, 931 South Seventh Street, 1571 South
23  Eighth Street. Is that correct?
24     A      That sounds familiar.
25     Q      Okay. And 1207 Mount Ephraim. That's

D E G N A N & B A T E M A N , I N C .

Page 193

1  the tattoo shop?
2      A      I believe that is it, yes.
3      Q      Seventh Street was Miss Bernice?
4      A      I believe Miss Bernice is one of the
5  same streets, I think it's Seventh Street. I think
6  it's the same related address and name.
7      Q      Was that the 931 South Seventh Street?
8      A      I think that's Miss Bernice's address,
9  I believe.
10     Q      I thought you said 931 South Seventh
11  was Miss Ayana Jordan.
12     A      I'm not sure, but I know I could very
13  easily -- I could call her son-in-law and he could
14  tell me his mother-in-law's address.
15     Q      Do you have a recollection of what the
16  property of Miss Jordan, what street that was on?
17     A      Yeah, that's that street where all the
18  winos hang out in Camden, that's that street -- it's
19  a wide street. I think that's -- that's the street
20  just before you go onto 676. I think that is --
21  bear with me for a second. Ninth? I think that's
22  Seventh Street.
23     Q      So --
24     A      I think Ayana lives on Seventh, I think
25  that property is Seventh Street.

D E G N A N & B A T E M A N , I N C .

## Page 194

1    Q     So there were two properties on Seventh
2    Street, Miss Ayana Jordan and Miss Bernice?
3    A     Miss Bernice lives on Ninth Street.
4    Q     Ninth Street?
5    A     Yeah, there you go. Ninth Street, yes.
6    Q     All right. So we have 1302 Browning,
7    931 South Seventh, 1571 South Eighth, 1207 Mount
8    Ephraim, Ninth Street with Miss Bernice and Newton
9    Avenue with Nate Rowland.
10   A     Yes.
11   Q     Any other properties you complained
12   about in the meeting with Miss Afanador?
13   A     Oh, there were a lot. I mean, problems
14   that I've had with the inspectors?
15   Q     Um-hmm.
16   A     There's a whole lot of them we spoke
17   about, but the ones that recent at that time.
18   Q     What other properties?
19   A     I would need time to look back on my
20   old records. I could look up addresses and notes
21   and all, but I'd have to go over records.
22   Q     I ask that you do that. We're going to
23   come back for a second day of deposition, so when
24   you come back the next day, just have the -- all the
25   properties you spoke about with Miss Afanador at

D E G N A N & B A T E M A N , I N C .

## Page 195

1    that meeting. Okay?
2    A     Okay.
3    Q     Thanks. So after you hung up with
4    Miss Afanador, did anyone else contact you that was
5    in that meeting, any of the females in the meeting
6    with Miss Afanador thereafter?
7    A     No, none of the other females reached
8    out to me.
9    Q     Let's go on to the 1571 South Eighth
10   Street. Do you know who the owner of that property
11   is?
12   A     1571 South Eighth Street?
13   Q     It's referenced in your complaint in
14   paragraph 25.
15   A     1571 South Eight Street. Is that
16   Miss Bernice's address? 'Cause I don't know. I
17   need names. I need names with regard to address and
18   I'll remember the story.
19   Q     We'll get back to that one at the next
20   time of your deposition.
21   A     Okay.
22   Q     How about 1207 Mount Ephraim?
23   A     That's the tattoo shop.
24   Q     Okay. Who is the owner -- the owner's
25   name of that?

D E G N A N & B A T E M A N , I N C .

## Page 196

1    A     I don't know Tony's last name, but his
2    first name is Tony. Antonio or Tony. Spanish guy.
3    Q     What it is Tony's age, approximately?
4    A     I think Tony might be in his mid 30s.
5    And his last name might be Miller. I think his last
6    name is Miller, too.
7    Q     And what color is his hair?
8    A     I know it's a dark color, I'm not sure
9    exactly.
10   Q     I'm taking a guess here, but does Tony
11   have tattoos?
12   A     He's got some tattoos, yeah.
13   Q     Do you remember what kind of tattoos he
14   has?
15   A     I know he got some pretty big ones on
16   his arm.
17   Q     Anything specifically you can remember?
18   A     He lifts weights. He kind of a big
19   guy.
20   Q     Do you remember what any of the tattoos
21   were?
22   A     The most distinguishing thing I
23   remember is his arms.
24   Q     I'm saying, do you remember what any of
25   the pictures were or words on his arms, the tattoos?

D E G N A N & B A T E M A N , I N C .

## Page 197

1    A     There might be some type of religious
2    symbol or something. Might be a religious symbol or
3    something.
4    Q     How did you first get in touch with
5    Tony?
6    A     Tony reached out to me. I did work for
7    his family for years.
8    Q     Who in his family?
9    A     There's Carl Miller's Funeral Home.
10   Q     And where is Carl Miller's Funeral Home
11   located?
12   A     On Carl Miller Boulevard in Camden.
13   Q     That was my guess. Is the family
14   actually named Carl Miller?
15   A     They last name's Miller, I know that.
16   Q     Okay. And who were you in touch with
17   at the funeral home?
18   A     Are we speaking about the job I did?
19   Q     You said you had done work at Carl
20   Miller's Funeral Home.
21   A     Yes.
22   Q     Who was the contact person there?
23   A     Oh, the contact person there would be
24   Miss Miller or her daughter Pam.
25   But I did the job for Tony. Tony has his own

D E G N A N & B A T E M A N , I N C .

Page 198

1  tattoo shop, it's two different --
2      Q      I understand that. I just want to --
3      A      Okay.
4      Q      I'm going to move on to the -- we're
5  going to come back to the tattoo shop, I just want
6  to talk about the funeral home for a little bit.
7      A      Okay.
8      Q      So it was Pamela or Pam's mom?
9      A      Pam runs the operation for her mother
10  now.
11     Q      Do you know the mother's name?
12     A      I'm not sure Miss Miller's first name,
13  I just know -- I always call her Miss Miller.
14     Q      And when did you work at the funeral
15  home?
16     A      I did a job for them about maybe
17  five -- five, six years ago I put a new service in
18  for them.
19     Q      So 2008, 2009?
20     A      Yeah, I think that was the year, I
21  think it was 2008.
22     Q      And when you say new service, what do
23  you mean?
24     A      They have split service coming -- new
25  power coming into the building. That's the service,

D E G N A N  &  B A T E M A N ,  I N C.

Page 199

1  incoming lines coming in.
2      Q      What does that entail?
3      A      Service cable on the outside, changing
4  the meter setup, changing all the panel boxes out
5  throughout the place and a little bit of interior
6  wiring.
7      Q      And how much money did that cost the
8  Millers?
9      A      I think that was probably like an
10  $18,000 job.
11     Q      And you were paid that?
12     A      Yes.
13     Q      One question I forgot to ask you about
14  Miss Jordan's property. Were you paid for that job
15  in full?
16     A      Yes.
17     Q      Okay. So for Tony's tattoo shop on
18  Mount Ephraim, Tony gave you a call?
19     A      Yes.
20     Q      And that call came about because of the
21  prior work did you at his family's funeral home?
22     A      Yes.
23     Q      Okay. Is that what he said?
24     A      Yes.
25     Q      Okay. What else transpired during that

D E G N A N  &  B A T E M A N ,  I N C.

Page 200

1  conversation?
2      A      Well, he was telling me that I need
3  some work done on my tattoo shop and can you come
4  out and give me a price?
5      I came out and gave him a price and I told him
6  that we would have to take the permit, and I applied
7  for a permit and we went through the process of the
8  paperwork and we scheduled a date and I did the job
9  for him.
10     Q      How much was the job?
11     A      Very small amount. I think that job
12  was maybe 400 some odd dollars.
13     Q      And what did it entail?
14     A      He needed some receptacles placed at
15  his work stations.
16     Q      And that requires a permit?
17     A      Yes. Any new work requires permits.
18     Q      Okay. And you obtained the permit?
19     A      Yes.
20     Q      And I take it that -- is that a one-day
21  job?
22     A      When I went there and did the job it
23  was a one-day job.
24     Q      And when did you do this work?
25     A      Oh, boy. I'm not sure the exact date.

D E G N A N  &  B A T E M A N ,  I N C.

Page 201

1  I know it was during the winter time I did that job.
2  Might have been like in the month of November.
3      Q      What year?
4      A      Maybe a couple years ago, approximately
5  a couple years, may two or three years ago.
6      Q      2012 approximately?
7      A      Yeah, around that time. I think it was
8  around that time. I know it was during the cold
9  months, I think it was like in November when I did
10  that job for him.
11     Q      And did Tony schedule the inspection?
12     A      Yes, he would have to be there. I just
13  told him, use the permit number and just call in,
14  re-inspection whenever you're ready.
15     Q      Are you ever present for inspections?
16     A      Sometimes. Like if it's a lot of
17  detailed wiring an inspector might have questions,
18  I'll make myself available. But if it's pretty
19  basic, I'll just -- the inspectors know what to look
20  for.
21     Q      So Tony schedules the inspection.
22  What's your understanding of what transpired during
23  that inspection?
24     A      Well, after the inspector left --
25  William Revaitis did the inspection. And Tony calls

D E G N A N  &  B A T E M A N ,  I N C.

Page 202

1    me up and he says, what's up with you and the
2    inspector? I said, what do you mean? He said -- he
3    turned around and said, I see you called Nico
4    Electric up. He said, man, you should call my man.
5    He says, I got a good-old-boy. That's what he
6    called -- this guy name George Cassidy. Don't call
7    Nico Electric, call him. He gave him his card.
8        And then he says, Tony says, man, no, he said,
9    I would call Marshall, he said, he's been doing work
10   for our family for a long time. We don't have a
11   problem with him.
12       But Tony was surprised that he discredited me
13   and recommended somebody else. Inspectors aren't
14   supposed to do that. When they give them their
15   license they tell them not to do that, you're not
16   supposed to discredit anybody. And that's what --
17   then Tony called me and informed me that he had did
18   that.
19       Q    Other than telling Tony not to use you,
20   did he discredit you in any other way?
21       A    He said, oh, he'll give you a better
22   price, his work is much better. Inspectors aren't
23   George Cassidy. George Cassidy's no longer around,
24   everybody know George is a butcher, he does butcher
25   work. And Tony seen my work and he was satisfied

D E G N A N & B A T E M A N, I N C.

Page 203

1    and -- but that's what transpired.
2        Q    Do you know the specific statute, rule
3    or regulation that prevents Mr. -- or any code
4    inspector from commenting on workers?
5        A    I forget -- I've heard it mentioned to
6    me by several inspectors. I'll find out because
7    I'll make a phone call to an inspector and he'll be
8    able to tell me. But I know they're not supposed to
9    do that. That's one of the -- they got like bylaws
10   they're supposed to comply with. They're not
11   supposed to do that.
12       Q    I'm going to ask that before the next
13   deposition any kind of actual statutes or rules or
14   regulations that you're claiming were violated by
15   the defendants in this lawsuit, you have those ready
16   for the next deposition. Okay?
17       A    (Witness indicating).
18       Q    Is that yes?
19       A    Yes, I'll reach out to --
20       Q    Okay.
21       A    -- an appropriate sources and gather
22   what I can.
23       Q    Who would you reach out to to obtain
24   that information?
25       A    I could go to the state, the inspection

D E G N A N & B A T E M A N, I N C.

Page 204

1    department, Ken Verbos would be able to tell me.
2    Then there's -- there's some guy named Robbins.
3    There's a lot of people at the state that are
4    familiar with the rules that the inspectors supposed
5    to comply with.
6        Q    Is there a specific code book?
7        A    They have some -- like I said, they
8    have a bylaw book they supposed to comply with, from
9    my understanding. I don't have that because I'm not
10   an inspector, but I know inspectors first hand, I
11   got a bunch of them in my phone book, I'll call them
12   up and ask them. I'll know that information within
13   the next couple of hours.
14       Q    So the work at 1207, once Tony calls
15   you, what do you do in response to that?
16       A    So I told Tony, I said, you know what?
17   Same thing I did -- say, I'll log the information,
18   I'll record it and I'm going to report it. And he
19   kept doing this -- things were happening so
20   frequently in the close time proximity, I said, I'm
21   going to turn around and keep a record of it,
22   because it was happening too frequently.
23       And I said, would you provide me a statement
24   on that? And he said, sure, he said, I'll sign it.
25   That's what he did. He said, I'll provide you a

D E G N A N & B A T E M A N, I N C.

Page 205

1    statement. He said, just truthful, that's what the
2    guy did, he said, I was insulted with the fact he
3    was going to tell me who to hire. That's what he
4    said.
5        Q    And you submitted that to whom?
6        A    Miss Afanador had a copy of that.
7        Q    Did you bring that to you -- did you
8    bring that with you to the meeting with
9    Miss Afanador?
10       A    Yes, I did. I provided her a lot of
11   information, which was foolish on my part. But I
12   did it trying to be cooperative.
13       Q    Why was it foolish?
14       A    Because I felt as though I was talking
15   to my adversary.
16       Q    Who should you have provided it to?
17       A    Someone that would have protected my
18   interest.
19       Q    Who was that?
20       A    Like an attorney.
21       Q    Any government agent?
22       A    I worked with a government agency, I
23   spoke with Ken and his -- Ken Verbos and his boss, I
24   communicated with them.
25       But me and Ken have talked about this

D E G N A N & B A T E M A N, I N C.

Page 206

1   situation for over ten years. But I wish I had --
2   but the biggest problem I had was finding an
3   attorney that would have listened here that wasn't
4   linked to the politics in Camden.
5       Q       I just want to instruct you that any
6   conversations you had with your attorney I'm not
7   allowed to know about. Okay? So anything you
8   talked about --
9       A       I understand.
10      Q       -- with Mr. Dailey, that's
11  confidential. Okay?
12      A       Yes.
13      Q       And what did Miss Afanador say about
14  the statement, if anything?
15      A       She just looked at it and she was
16  surprised about the documentation I presented to
17  her. And she -- my opinion, she like -- she was
18  pissed off that the office kept everything away from
19  her. Like, you know, right hand -- she said, but
20  Jim is my right hand man and all this is going on
21  and he didn't share this with me. She like this,
22  she was disappointed and pissed off. But she was
23  out on disability leave during that time period,
24  too.
25      Q       Who was?

D E G N A N & B A T E M A N , I N C .

Page 207

1       A       Miss Afanador.
2       Q       Explain that to me.
3       A       She was out on disability, she had some
4   kind of physical ailment. I think she had a problem
5   with her back or something. I think she told me she
6   was in traction or something.
7       Q       When?
8       A       The latter part of the year or
9   something like -- when I met with her the week
10  before I think she told me, or a week or two weeks
11  before, that she had just got out of the hospital or
12  something. Said she was in an accident or
13  something.
14      Q       Okay.
15      A       Some kind of auto accident, she said.
16      Q       Well, the meeting with Miss Afanador
17  occurred sometime in September 2013, correct?
18      A       Yes, that's right.
19      Q       But the incident with Tony occurred in
20  November of 2012. Correct?
21      A       Approximately during that time.
22      Q       Okay. So prior to September of 2013
23  had you provided Tony's statement to anyone at the
24  City of Camden?
25      A       No, I just kept a record of what was

D E G N A N & B A T E M A N , I N C .

Page 208

1   going on. I just started logging information.
2   Whenever something would happen I would just keep
3   records of it, records of it.
4       So when it escalated to a point, then I turned
5   around and said, you know, could you guys provide me
6   statements of what was happening? And surprisingly
7   some of the customers were willing to not be
8   intimidated and they offered statements.
9       Q       When did you request a statement from
10  Tony?
11      A       I think I got that statement -- it was
12  close to that time he shared that with me, I
13  believe.
14      Q       Is his name Israel Miller?
15      A       Israel, that's right, Israel, yeah. We
16  all call him Tony. Israel.
17      Q       And that's I-S-R-A-E-L. Who typed up
18  the statements for Mr. Israel?
19      A       He wrote it down and I typed it up and
20  I showed it to him. I said, this is what you said?
21  And he said, yup. And he signed it.
22      Q       Who actually typed it up?
23      A       I prepared it for him.
24      Q       Okay.
25      A       He said, this is exactly how it went

D E G N A N & B A T E M A N , I N C .

Page 209

1   down.
2       Q       Let's talk about the Miss Bernice job.
3   Was her name Bernice Holland?
4       A       Yes.
5       Q       Actually -- and you don't recall the
6   exact address of her property?
7       A       That's on Ninth Street.
8       Q       My records indicate that the inspection
9   occurred on or about August 26, 2013. Does that
10  sound correct?
11      A       That's right, it was one of the warmer
12  months, it was a real hot day when I did that job
13  for her.
14      Q       Okay. How did you first get in touch
15  with Bernice?
16      A       She contacted me -- her son-in-law
17  lives diagonally across the street from me and he
18  says, my mother-in-law got problems with her
19  electricity, can you go over there and see if you
20  can find out what the problem is?
21      Q       Who is the son-in-law?
22      A       His name is Tony.
23      Q       Do you know Tony's last name?
24      A       I can tell you in a second if I can get
25  my phone.

D E G N A N & B A T E M A N , I N C .

Page 210

```
 1      Q       Sure, go ahead.
 2      A       Parker, Tony Parker.
 3      Q       Not the basketball player, right?
 4      A       No, no, no.  I didn't think that Tony
 5 got that same name.
 6      Q       So Tony contacted you in person or via
 7 phone?
 8      A       He called me at work.  He was at work
 9 and called me.  He happened to catch me at home that
10 morning.
11      Q       And he asked you to take a look at his
12 mother-in-law, Bernice Holland's property?
13      A       Yes.
14      Q       Okay.  And did Tony impart what the
15 problem was?
16      A       He said the electricity keeps going off
17 and on.
18      Q       And did he give you Bernice's number?
19      A       Yes.  I called her to confirm that she
20 would be home and made arrangements, told her I
21 would be over shortly.
22      Q       And did you go to the property?
23      A       I went to the property, yes.
24      Q       And what was the quote?
25      A       The quote?  The quote was -- I think I
       D E G N A N  &  B A T E M A N ,  I N C.
```

Page 211

```
 1 quoted her, I think it might have been 12 or $1,300.
 2      Q       And what did the work entail?
 3      A       I believe it entailed replacement of
 4 electrical panel and upgrading of the grounding.  I
 5 believe I upgraded the grounding system.
 6      Q       And you obtained a permit?
 7      A       Yes.
 8      Q       And you did the work?
 9      A       Yes.
10      Q       How long did the work take?
11      A       It was completed that same day.
12      Q       And then did Bernice coordinate the
13 inspection?
14      A       Yes.
15      Q       Were you present?
16      A       No.
17      Q       And what transpired during the
18 inspection, as far as you know?
19      A       She called me up and said that the
20 inspector said that I should have corrected the
21 cable on the outside.
22      And the cable on the outside was not in my
23 scope of work on the permit application.  And he
24 turned around and he said, you should have never
25 paid him.  And he turned around and said there was
       D E G N A N  &  B A T E M A N ,  I N C.
```

Page 212

```
 1 something that he knows in the basement that I
 2 should have taken care of that was not on the scope
 3 of work also.
 4      Q       What was the problem with the basement?
 5      A       There was an outlet or something that
 6 was sitting loose at a wall point or something, a
 7 loose outlet.  But how was I to see that?  That not
 8 my scope of work.
 9      Q       Did you do an inspection of the
10 property in total?
11      A       No, I'm not supposed to do an
12 inspection of the property, I'm just there for what
13 the person tells me the problem is.
14      Q       I understand that, they told you what
15 the problem was, but do you look at the entire
16 property?
17      A       No.
18      Q       How did you know what the problem was?
19      A       From experience you know when --
20 initially when Tony called me?  From experience.
21 Normally somebody calls, I pretty much know what's
22 going on before I get there, just from experience.
23      Once I got there and looked at it, I could
24 determine what -- how to resolve the problem.
25      Q       And who was the inspector?
       D E G N A N  &  B A T E M A N ,  I N C.
```

Page 213

```
 1      A       William Revaitis.
 2      Q       And there was a problem with the
 3 service head?
 4      A       There was -- the service head, it was a
 5 service head and I think he wanted a couple more
 6 straps in it.  And it was like that all along.  But
 7 it wasn't like the service could not function, but
 8 that wasn't in the scope of work.
 9      Because if somebody says, this is what I want
10 you to correct, I'm only going to bill them for what
11 I'm doing.  But if something can continue to
12 function, I'm not going to work on that if I'm not
13 being compensated for it.
14      Q       So the service head was not related in
15 any way to the work you were doing?
16      A       No.
17      Q       Okay.  And what did you do as a result
18 of that phone call with Bernice?
19      A       Well, when she called me back, Tony
20 called me also, and he said, Marshall, can you help
21 my mother-in-law?  She's a nice old lady.
22      So me, what do I do?  Went over late in the
23 evening, threw the -- threw the extension ladder up
24 on the truck and corrected the problem and say, okay
25 now, Miss Bernice?  Have a good day.  That's what I
       D E G N A N  &  B A T E M A N ,  I N C.
```

Page 214

1  did. Didn't charge her nothing.
2     Q      And how much would that normally cost?
3     A      In the evening? At least about $250.
4     Q      So you did the work for free just
5  because you were doing your friend's mother-in-law a
6  favor?
7     A      Yep. Just to show good faith and to
8  let her know I'm not as bad as inspectors are
9  saying.
10    Q      And you obtained a statement from Miss
11 Holland?
12    A      Yes.
13    Q      And you typed that statement up?
14    A      She said to me, Marshall -- this is
15 exactly what she said, she said, you type it, she
16 said, I'll sign it. I looked at it and said, this
17 is sure, I'm not -- don't want to add or subtract no
18 word, this is sure.
19       And Tony looked at it too and Tony said --
20 Tony even said, do you want me to give a statement,
21 too? He said, because I talked to the guy, too.
22    Q      Tony talked to Mr. Revaitis?
23    A      Yeah, he said he called him too.
24    Q      And what did Tony say took place in
25 that conversation?

D E G N A N & B A T E M A N, I N C.

Page 215

1     A      He said, he should have tooken care of
2  that, he should have tooken care of that service
3  cable. He says, well, Marshall's a
4  straight-shooting guy, he did what we hired him to
5  do.
6     Q      And did Mr. Revaitis say anything in
7  response?
8     A      I don't know what he said back to Tony,
9  but I told Tony that I would go over there and take
10 care of it for his mother-in-law. And that was the
11 end of it, I went over and did it.
12    Q      Did you ever contact anyone from the
13 city of Camden regarding this property?
14    A      I spoke to Jim Rizzo about this
15 situation also.
16    Q      When?
17    A      Right during that time period, I think
18 it was like maybe the following week or a couple
19 days later I spoke to him about it. I physically
20 went up there and I talked to him about it.
21    Q      And what happened?
22    A      Same thing. He turns around, listens
23 to me, pulls me in the room, and Billy Revaitis
24 happened to be in there that afternoon, we sat there
25 and they want to make jokes, talk about other stuff

D E G N A N & B A T E M A N, I N C.

Page 216

1  going on not related, like it's no big thing. And
2  that was it.
3       I said, can you guys send her a notice that I
4  didn't do anything wrong? You know, but -- then
5  Tony said, don't worry about it, he says, man, you
6  good with us, he said, we ain't worried about what
7  they say about you. So I didn't push that.
8       But they don't never say they're wrong, when
9  they do things they never say they're wrong.
10    Q      What do you mean, you didn't really
11 push that?
12    A      I didn't turn around and keep saying,
13 Jim, you know, when are you going send me a letter
14 regarding the mistake that you guys made? It was
15 wrong for you guys to turn around and tell the
16 customer not to pay me. And also once again the
17 scope of work that you guys failed the job for
18 didn't relate to nothing I did.
19       He failed the job once again for something
20 that was not related. That's what continued to
21 happen.
22       That cable -- the hookup top there, that
23 service would continue to work, it was not the scope
24 of work. What I put on that permit -- you always
25 put on -- there's a section you always fill out with

D E G N A N & B A T E M A N, I N C.

Page 217

1  the scope of work, what you're doing, and the
2  inspector's supposed to look at that sheet and say,
3  I'm only going out to inspect what's on the scope of
4  work. That's it.
5     Q      And did Mr. Revaitis concede that he
6  made a mistake in the meeting?
7     A      He turned around and said, it's no big
8  thing. It's no big thing, that's what he said, it's
9  no big thing. I said, but you didn't understand,
10 the customer looks at me negatively like I did them
11 wrong. And I said, I got the utmost respect for
12 this guy and his family and I don't need that.
13       Because when -- I said, I gotta see these
14 people sometime. Sometime I might be at the market
15 and they look at me just like that girl Ayana, she
16 comes in at the bank and, you know, the way she
17 look. That's the kind of stuff I'm subjected to
18 when they do that.
19       I told him straight up, I said, you gotta stop
20 doing that to me, you're hurting me. No big thing,
21 don't worry about it. That's the attitude; don't
22 worry about it.
23    Q      And was the job ultimately approved?
24    A      Yes.
25    Q      When did you receive the approval

D E G N A N & B A T E M A N, I N C.

110a

Page 218

1   notice?
2       A       Maybe about three weeks later I get it
3   in my P.O. box, I get a notice that the job was
4   approved.
5       So I called Jim when I get the notice, I said,
6   Jim, you guys have a great way of like smoothing
7   things out, you send me these little approval
8   notices but you never address anything in writing to
9   me pertaining to the mistake or the reason why you
10  failed the job.
11      That's what I would always say to him, I says,
12  you send these little approval notices but you're
13  still not addressing the problem.
14      Q       So if the approval notice -- strike
15  that. If they had sent something in writing to the
16  property owner saying you didn't perform anything
17  wrong, you would have no complaint about this job?
18      A       The problem I have is that I want the
19  inspectors to quote the statute, the reason for
20  disapproval of the job if the job is disapproved.
21  Do your job as an inspector and quote the statute.
22      Q       I'm a little confused. I thought you
23  just said you wanted them to contact the property
24  owner.
25      A       Yes, and provide me the statute, the

          D E G N A N & B A T E M A N, I N C.

Page 219

1   reason why you disapproved the job.
2       Q       So you don't want them to contact the
3   property owner --
4       A       No.
5       Q       -- to say you -- hold on. You didn't
6   want them to contact the property owner to say all
7   the work you performed was correct?
8       A       I want them also to address that and
9   also provide me the statute, the reason why they
10  failed the job. But there's no statute that lets
11  the customer know that there was nothing that they
12  could have come up with.
13      That's my way of saying to them and saying to
14  the customer, see? They have nothing to go on,
15  they're just doing this here. Because if you can't
16  provide a statute to substantiate what you're
17  saying, it's weak.
18      Q       That's my question. So you wanted --
19  if they had provided a letter to Miss Holland saying
20  there was no violation, it was a mistake, the job
21  has been approved, you'd be okay with that?
22      A       Partially, along with the statute. The
23  statute has to be on there. In the contents of the
24  letter I wanted both things. That's what I kept
25  asking Jim Rizzo to do.

          D E G N A N & B A T E M A N, I N C.

Page 220

1       Q       I'm a little confused here. Because if
2   they say in a letter, there is no statute, there is
3   no violation, wouldn't that be enough?
4       A       Yes, to some degree.
5       Q       What else would be necessary?
6       A       It's important to let them know that
7   they made a mistake as inspectors, not the
8   electrician, he did an acceptable -- code acceptable
9   job, not the electrician, and we were wrong for
10  making comments like that. That's what I was asking
11  for.
12      Q       Okay. If they had done that you would
13  be okay?
14      A       I would have been much more content
15  with that, if they had did that. And not the harm
16  that they caused me as a contractor, because I lost
17  customers. I can't count the amount of customers
18  I've lost over the years, because they don't call me
19  no more.
20      Q       Well, did you believe that you lost
21  customers as a result of the Holland property?
22      A       Not that particular job, because her --
23  me and her son-in-law, we have a good relationship
24  and I know the family well. I don't think that
25  they -- that particular family will allow that one

          D E G N A N & B A T E M A N, I N C.

Page 221

1   situation to taint our relationship.
2       Q       Do you believe --
3       A       Not that one.
4       Q       -- you lost business as a result of the
5   Tony's tattoo shop?
6       A       I believe I have.
7       Q       What business?
8       A       Because Tony don't want no problems.
9   Tony's the type of person he knows that if he calls
10  me for another job he's gotta deal with that
11  nonsense with the inspector. So I know how Tony is,
12  Tony's the type of person; I like you man, but I
13  ain't going to deal with this nonsense, these
14  inspectors. That's how Tony is.
15      Q       Well, Tony gave you the statement that
16  you requested, correct?
17      A       Yeah, he did that.
18      Q       Okay.
19      A       But on the flip-side of Tony, too,
20  he'll tell me that just so me and him's cool in
21  front of each other, but I know at the end of the
22  day he don't want no problem.
23      Q       Did you have any prospective work lined
24  up with Tony after the tattoo shop?
25      A       Tony meets a lot of people, it's -- and

          D E G N A N & B A T E M A N, I N C.

3

112a

1

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
 2
     ----------------------------------------
 3   NICO ELECTRICAL CONTRACTOR, INC.:
     & MARSHALL B. WILLIAMS,          : Civil Action
 4                                    : No. 1:13-CV-06353
                                      :(JHR)(AMD)
 5                 Plaintiffs         :
                                      :
 6          vs                        :    DEPOSITION OF:
                                      :
 7   CITY OF CAMDEN, EUGENE EMENECKER: WILLIAM F. REVAITIS
     WILLIAM REVAITIS, JAMES RIZZO    :
 8   & IRAIDA AFANADOR,               :
                                      :
 9                 Defendants         :

10

11
     ----------------------------------------
12              Wednesday, November 5, 2014
     ----------------------------------------
13

14

15   R E P O R T E D   B Y:

16
        TRACY SWEETEN, Certified Court Reporter (License No.
17   1508), on the above date, commencing at 12:15 p.m. at
     the office of Weir and Partners, LLP, 457 Haddonfield
18   Road, Suite 420, Cherry Hill, NJ.

19
     A P P E A R A N C E S:
20

21      F. MICHAEL DAILY, JR., ESQUIRES
             For the Plaintiffs
22

23      WEIR & PARTNERS, LLP
        By:  Daniel Rybeck, Esquire and
24             Wesley L. Fenza, Esquire
             For the Defendants
25
```

REC'D NOV 1 ; 2014

113a

2

```
1              I N D E X
2    WITNESS           EXAMINING ATTORNEY      PAGE
3
     William F. Revaitis   Mr. Daily          3
4
     ----------------------
5
              E X H I B I T S
6                              MARKED
     NUMBER      DESCRIPTION            FOR ID
7
8    Revaitis-1  Memo - Bates City-0008        15
9
                ------------------------
10
11    (By agreement of counsel, the signing, sealing and
12    certification of the depositions were waived, and all
13    objections, except as to the form of the questions, were
14    reserved to the time of trial.)
15
                ------------------------
16
17
18
19
20
21
22
23
24
25
```

3

```
1    WILLIAM F. REVAITIS, having been duly sworn, was
2    examined and testified as follows:
3    BY MR. DAILY:
4    Q. Mr. Revaitis, my name is Mike Daily. I'm an
5    attorney. I represent Marshall Williams. I'm going to
6    ask you some questions today to see what information you
7    might have that would be relevant to a lawsuit that Mr.
8    Williams has filed in federal court. If there's any
9    question I ask you that you don't understand, tell me
10   and I'll rephrase the question and/or further explain it
11   so that you do understand when you respond. If you
12   don't ask for an explanation, I'll have to assume that
13   you understood my question.
14       The court reporter is taking down everything
15   that's said, so you have to keep all your responses
16   oral.
17       Also, you should wait until you're sure I've
18   finished my question before you respond so that we don't
19   have a transcript that's broken up with half a question
20   and half a response and half a question.
21       What we want here is your knowledge. Therefore,
22   if you don't know the answer to a question, the
23   appropriate response is that you can not answer the
24   question, you don't have the information, as opposed to
25   guessing or speculating.
```

4

```
1        Do you understand the instructions so far?
2    A. Yes.
3    Q. Do you understand you've been placed under oath
4    and have an obligation to tell us the truth here today?
5    A. Yes.
6    Q. Have you ever been deposed before?
7    A. Yes.
8    Q. How many occasions?
9    A. One.
10   Q. What kind of case was that in?
11   A. I can't recall.
12   Q. How long ago was it?
13   A. 1997 maybe.
14   Q. Were you a party in that case where you were
15   deposed? In other words, were you the person bringing
16   the lawsuit or the person against whom the lawsuit had
17   been filed?
18   A. I was the city inspector at the time.
19   Q. Did that case involve any sort of accident or
20   property loss, such as a fire or anything like that?
21   A. I can't recall.
22   Q. That's the only prior occasion you've been
23   deposed, is that correct?
24   A. There might have been one other time. I can't
25   recall the date. I was questioned in city hall by an
```

5

```
1    attorney, a woman attorney, about my director. And I
2    can't remember what that was about.
3    Q. That sounds like that may have warranted an
4    internal investigation as opposed to a deposition as
5    part of litigation.
6    A. Okay. I'm associating lawyers with depositions.
7    Q. The point is, you were put under oath and there
8    was a court reporter there?
9    A. Honestly, I can't remember.
10   Q. I understand. When were you first hired by the
11   City?
12   A. June of '96 I believe, or July. Somewhere around
13   there.
14   Q. What was your initial title?
15   A. Electrical inspector.
16   Q. What is your current title?
17   A. Electrical subcode official.
18   Q. When did you become an electrical subcode
19   official?
20   A. I'm not really sure.
21   Q. Well, has it been more than like four years?
22   A. Oh, yeah. It's been, I've been there close to 17
23   and some change as far as the time I've been there. It
24   had to be, I want to say maybe 2000 or '99. Somewhere
25   around in there. My guy, it was, my boss at the time
```

114a

6

1   left. He retired. And I can't remember the dates. I
2   have all that stuff.
3       Q. Now, Mr. Emenecker now holds the position of
4   inspector like you previously held?
5       A. Yes.
6       Q. You're his supervisor?
7       A. Yes.
8       Q. And your present supervisor is Mr. Rizzo?
9       A. Yes.
10      Q. He's the code official?
11      A. No, he's the construction official.
12      Q. Construction official. Above Mr. Rizzo is the
13  director?
14      A. Yes.
15      Q. That presently is Mr. Ruiz?
16      A. Yes.
17      Q. But previously it was Ms. Afanador?
18      A. Afanador.
19      Q. Where did you work, or where were you employed
20  before you worked for the City?
21      A. IBEW.
22      Q. So you worked out of the union?
23      A. Yes.
24      Q. Did you retire from the union?
25      A. No. I missed it by one year. I didn't have

7

1   enough time.
2       Q. What local were you in?
3       A. Montreal Local 568.
4       Q. And that local covered what geographic area?
5       A. It's an International. IBEW stands for
6   International Association -- International Brotherhood
7   of Electrical Workers. So it covers --
8       Q. I understand, the national union.
9       A. Okay, you get it. So it's international. It
10  means it's different countries. My ticket was out of
11  Canada, but I lived here in New Jersey. Montreal is in
12  Canada.
13      Q. Okay, right. So your local was actually a local
14  that was up in Canada, but because you had your card you
15  could work all over?
16      A. I could work anywhere in the --
17      Q. In the world?
18      A. Anywhere that's recognized that the International
19  Brotherhood of Electrical Workers is recognized.
20      Q. Where were you born?
21      A. Philadelphia, Pennsylvania.
22      Q. Have you always lived in this area?
23      A. Yes.
24      Q. How did it come about that you worked out of
25  Montreal? That was the local?

8

1       A. I met someone, and at the time I was nonunion.
2   And this someone said, would you like to get in the
3   union? If so, I have a guy you can meet and submit your
4   application and he'll take it, and I did.
5       Q. What is the IBEW local that covers the Camden
6   County Gloucester area?
7       A. Presently or back when I was working?
8       Q. Back when you were working.
9       A. Local 439.
10      Q. What is it presently?
11      A. Local -- I don't know because I haven't worked in
12  it since 1994 was my last job I believe with the union.
13      Q. Would you get your jobs from Local 439?
14      A. Yes, I would get them from Local 439, 269, 98,
15  211, which was Atlantic City. All over the place.
16      Q. While you were in -- back when you were doing
17  union work from time to time, did you have contact with
18  Donald Norcross?
19      A. No.
20      Q. Is there any particular reason why you left the
21  union?
22      A. Yes, I injured my shoulder and I couldn't perform
23  my duties anymore.
24      Q. Did you have to -- how did you obtain the
25  position of inspector with Camden?

9

1       A. I answered an ad for the job.
2       Q. Did you have to take any sort of civil service
3   test?
4       A. No.
5       Q. Presently, how many inspectors do you supervise?
6       A. One.
7       Q. At one point were there any more than one?
8       A. No.
9       Q. So it's only been one inspector and yourself?
10      A. Yes. Not always.
11      Q. Sometimes there's been no inspectors?
12      A. And me. I did it all.
13      Q. When did Mr. Emenecker --
14      A. I don't know.
15      Q. Come on.
16      A. I can't recall the dates. I don't know the
17  dates.
18      Q. Since he began working for Camden, have there
19  been any other inspectors that you supervised?
20      A. There are other, there have been other inspectors
21  in the office that have had the electrical license, but
22  -- yeah, there was. Duane Wallace was one of them I
23  guess now that you mentioned it. I was the subcode
24  official when he was there. And we have had one now in
25  the office who was the building subcode official, but

10

1 also has an electrical license, Keith Ravling.

2    Q. Had either Duane or Keith at some point in time

3 been IBEW members?

4    A. No.

5    Q. Do you know Marshall Williams?

6    A. Yes, I do.

7    Q. Do you recall the circumstances under which you

8 first met him or came to know of him?

9    A. Barely. Not in great depth.

10    Q. Would it be accurate to say that when you first

11 got any sort of knowledge of Mr. Williams you were both

12 union electricians?

13    A. No.

14    Q. Is it your recollection that Mr. Williams was not

15 -- strike that. Was Mr. Williams a union electrician

16 when you first got to know of him?

17    A. I just answered that question.

18    Q. So, no?

19    A. No.

20    Q. Were you working for the City of Camden when you

21 first got to know Mr. Williams?

22    A. Yes.

23    Q. Do you recall under what circumstances -- strike

24 that. Do you recall at any time Mr. Williams having any

25 contracts to do work for the City of Camden?

11

1    A. No.

2    Q. Did you ever know of an individual named Richard

3 Felcione?

4    A. Yeah, he was -- I don't know. I can't speak to

5 that. He worked for the City of Camden. I thought he

6 might have been the CFO or something like that.

7    Q. From time to time did you ever have any

8 conversations with Mr. Felcione?

9    A. No.

10    Q. Do you have any recollection of ever inspecting

11 any jobs that Mr. Williams did in the City of Camden?

12    A. Yes.

13    Q. Are there any specific jobs you recall where

14 there was any issue between you and Mr. Williams in

15 regards to the job?

16    A. No.

17    Q. To your knowledge did Mr. Williams ever complain

18 about anything you did?

19    A. Yes.

20    Q. What did he complain about?

21    A. You have to be more specific.

22    Q. Well, you said he complained, so do you recall

23 what it was that he complained about?

24    A. Not really, no. I don't remember.

25    Q. Did Mr. Rizzo or the director ever ask you for

12

1 information or question you about contacts with Mr.

2 Williams?

3    A. I don't understand the question.

4    Q. Did any of your supervisors ever come to you and

5 say, hey, this guy Williams has made a complaint --

6    A. Yes.

7    Q. -- about you?

8    A. Mr. Rizzo did.

9    Q. When approximately did that happen?

10    A. I don't know.

11    Q. What did Rizzo say was the nature of the

12 complaint of Mr. Williams, if you recall?

13    A. A job I think on South 7th Street.

14    Q. According to what Mr. Rizzo told you, what did

15 Mr. Williams accuse you of doing?

16    A. Failing a job.

17    Q. What was your side of the story in regards to

18 that particular job and it being failed?

19        MR. RYBECK: Objection to the form. Go ahead

20 and answer.

21    A. I never failed the job. I never wrote anything

22 out. I never did anything.

23    Q. Did you explain that to Mr. Rizzo?

24    A. Yeah.

25    Q. Any other supervisor besides Mr. Rizzo ever come

13

1 to you and say that Mr. Williams made any complaints?

2    A. No, there are no other supervisors except

3 Afanador, if you want to call her that.

4    Q. Did you ever have any meetings with her and Mr.

5 Rizzo present, or Mr. Rizzo not present, where at least

6 one of the topics discussed was Marshall Williams?

7    A. Yes.

8        MR. RYBECK: Objection to any questions where

9 I was present. You're not going to discuss those.

10 They're both defendants. I had a meeting with them.

11        MR. DAILY: Okay.

12    Q. I'm talking about before a lawsuit was filed.

13    A. Yes.

14    Q. And do you recall when that was?

15    A. I beg your pardon?

16    Q. Do you recall when that was?

17    A. No, I don't.

18    Q. Do you recall who requested the meeting?

19    A. Ms. Afanador.

20    Q. When you got to the meeting, what did Ms.

21 Afanador say?

22    A. That Mr. Williams was, I don't know how to put

23 it, Mr. Williams wasn't happy with the way I handled the

24 case on South 7th Street.

25    Q. And your understanding was that the issue for Mr.

116a

14

1   Williams was that he had some sort of claim that you had
2   failed the job when it shouldn't have been failed, and
3   your position was, I never failed it, is that accurate?
4       A.  Yes.
5       Q.  Did Ms. Afanador ask for any more information
6   from you?
7       A.  No.
8       Q.  Do you recall what, if anything, Mr. Rizzo said?
9       A.  No.
10      Q.  At any point in time has it come to your
11  attention that Mr. Williams has accused you of making
12  improper, what he feels are improper remarks to
13  customers of his?
14      A.  Rephrase that, please.
15      Q.  At any time has -- well, let me go back.  Has Mr.
16  Williams himself ever complained to you about what he
17  felt were inappropriate remarks by you to his customers?
18      A.  No.
19      Q.  Has anyone else brought to your attention that
20  Mr. Williams has complained that you made inappropriate
21  remarks to his customers?
22      A.  Yes.
23      Q.  Okay, who did that?
24      A.  Mr. Rizzo.
25      Q.  What supposedly did you, according to Mr. Rizzo,

15

1   did Mr. Williams claim you said?
2       A.  I can't recall.
3       Q.  Do you even remember a dispute involving the
4   property located at 1302 Browning Street?
5       A.  No.
6           (Reviatis-1 marked for identification)
7       Q.  Have you ever seen that document before?
8       A.  Yes.
9       Q.  How did it come about that you saw that document?
10      A.  Either Mr. Rizzo or Ms. Afanador showed it to me.
11      Q.  And that's supposedly signed by I guess Mr.
12  Miller.  Do you deny what is attributed to you in that
13  statement?
14          MR. RYBECK:  Objection to the form.  Go ahead
15  and answer.
16      A.  Yes.
17      Q.  Would it ever be appropriate as a general matter
18  for an electrical inspector, or someone in your position
19  employed by a governmental entity, to recommend to a
20  property owner a particular contractor?
21      A.  No.
22      Q.  To your knowledge did Mr. Williams ever make any
23  complaints that work performed by him was being failed
24  without a citation to the applicable section of the
25  electric code?

16

1       A.  Is this directed at me?
2       Q.  Yes.
3       A.  No.  Was I aware of it?
4       Q.  Yes.
5       A.  Yes.  But nobody -- he's never directed anything
6   at me.
7       Q.  I understand.
8       A.  He did everything through emails to Mr. Rizzo.
9       Q.  Okay.  Was it true that when a project would be,
10  when there would be a failure, that the applicable
11  section of the electric code would not be written on --
12      A.  Yes.
13      Q.  -- the thing?  Okay.  Did you ever have any
14  conversations with Mr. Williams where you did tell him,
15  this failed because you didn't do this, which is
16  required by this section of the code?
17      A.  Not that I can recall.
18      Q.  Mr. Williams complains about lack of citation.  I
19  gather that was brought to your attention by Mr. Rizzo?
20      A.  Yes.
21      Q.  What was your response?
22      A.  There was no reason to.  There's no reason to
23  cite something when you're not being failed for it.  Do
24  you have an instance where I failed Mr. Williams and
25  didn't give him a citation?

17

1       Q.  Let's look.  That's a good question.  Thank you
2   for asking it.
3           (Pause)
4       Q.  First, Mr. Revaitis, in the inspection section
5   there's an initial.  Is that your initial?
6       A.  Here?
7       Q.  Yes.
8       A.  Yes.
9       Q.  And then there's some printing to the right of
10  that?
11      A.  Repair shorted breaker service panel.  No lights
12  on second floor.  Not done.  And then over.  Do you have
13  the over?
14      Q.  No.
15      A.  There you go.  You should have had the over.
16      Q.  Talk to him about that.  These documents were
17  supplied to me.
18      A.  All right.
19      Q.  There was some statement on there, but, okay.
20          Now, according to the according to this document,
21  the document 61, there were two inspections, am I
22  correct?
23      A.  Uh-huh.
24      Q.  There was one in January and one in February --
25      A.  Right.

117a

18

1    Q. -- of '12. And there was an initial failure, am
2  I right?
3    A. Yes, which I didn't issue any kind of, I didn't
4  issue a red sticker or anything. I spoke to Mr.
5  Williams on the phone at the time of the failure.
6    Q. Do you remember the content of that discussion on
7  the phone?
8    A. I told him the second floor had no lights and the
9  breaker wouldn't reset.
10   Q. And did he contest any of that or anything?
11   A. No, not to my knowledge. I don't remember if he
12  did or not. I just told him I was in a basement on
13  somebody's cell phone talking to him. I don't remember
14  I was in the basement of a job. After I thought about
15  it, I looked at it. I do so many inspections, I went
16  back, filed it away, and I don't know, I thought about
17  it and I said, well, the breaker did what it was
18  supposed to do. It wouldn't reset because there was a
19  direct short in it. So I passed the job and brought the
20  sticker to the homeowner.
21   Q. Well, did Mr. Williams make some sort of claim
22  that lights out of the second floor wasn't within the
23  scope of his work?
24   A. He might have, yes.
25   Q. Between the failure and the approval, did Mr.

19

1  Williams do anything? In other words --
2    A. Not to my knowledge.
3    Q. So you thought -- so in January you failed it and
4  you had a conversation with Mr. Williams?
5    A. No, I had a conversation with Mr. Williams on the
6  17th. Is that the date? 1/17/12? That's the only
7  conversation I had.
8    Q. But then Mr. Williams didn't change anything on
9  February 1st, you approved it?
10   A. Right.
11   Q. Why did you change your mind?
12   A. I already stated that. You want me to restate it
13  again?
14   Q. Yes, if you could.
15   A. I thought about it and breaker that was faulty
16  was doing its job. And he didn't do any -- I looked at
17  the work he had done on the job, the service and the
18  outlets, or whatever he put in on the second floor, I
19  think he put some stuff in, and they all were fine. But
20  he touched the service and I wasn't sure that the things
21  that he worked on weren't part of the problem on the
22  second floor with the lighting, so that's why I did what
23  I did. And then after thinking about it I said, the
24  breaker is doing what it's supposed to be doing. That's
25  what they do when there's a problem, they don't turn

20

1  back on. So I passed the job, sent the cutting card in
2  and brought the sticker to the owner, the approval
3  sticker, because she doesn't live at that address, she
4  lives at another address somewhere.
5    Q. At the meeting with Mr. Rizzo and the director,
6  was this job discussed?
7    A. I can't recall.
8    Q. Do you recall any other jobs that Mr. Williams
9  had where you had any conversations with him about
10  whether a job had failed or was approved?
11   A. I don't believe I ever failed him for any jobs.
12  I had a conversation about a job where he did a service
13  and there were some issues that I thought that he might
14  want to look into, but I didn't fail him for it.
15   Q. When you say you didn't fail, that means --
16   A. I gave him a heads up. That's what regular guys
17  do. I gave him a heads up, and he took it the way he
18  took it. I can't help that. I didn't fail the job. I
19  just gave him a heads up on something.
20   Q. Do you remember the location of that property?
21   A. No. It's off of Pine Street in South Camden. I
22  can't remember the street name. It's only a one block
23  long street.
24   Q. Do you have any opinion, and you very well may
25  not, but do you have any opinion as to Mr. Williams'

21

1  general competency as an electrician?
2        MR. FENZA: Objection to the form. Go ahead
3  and answer.
4    A. No. He's a licensed electrical contractor. He
5  can work anyplace in New Jersey, as long as his license
6  is current and in good standing. The job you were
7  speaking about, it's not on here. I can't see it.
8    Q. The city provided me with those two contractor
9  project lists.
10   A. That's my handwriting.
11   Q. Okay. Why -- first of all, what is that list?
12   A. This is a list of all the jobs that Marshall has
13  done dating back to whenever. There's no dates on here.
14  The only time I would know what the date is I think off
15  the top of my head would be there's a permit issued.
16   Q. Are you the individual that retrieved that
17  printout?
18   A. Did I?
19   Q. Yes.
20   A. I printed it out myself.
21   Q. And for what purpose did you print it out?
22   A. Because I was being sued by Mr. Williams.
23   Q. That's a good purpose. Was there --
24  specifically, what would that list show you that would
25  help you defend yourself in a lawsuit?

118a



119a

1

```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
 2
     ------------------------------------------
 3   NICO ELECTRICAL CONTRACTOR, INC.:
     & MARSHALL B. WILLIAMS,            : Civil Action
 4                                      : No. 1:13-CV-06353
                                        :(JHR)(AMD)
 5              Plaintiffs             :
                                        :
 6         vs                          :      DEPOSITION OF:
                                        :
 7   CITY OF CAMDEN, EUGENE EMENECKER:  EUGENE R. EMENECKER
     WILLIAM REVAITIS, JAMES RIZZO     :
 8   & IRAIDA AFANADOR,                 :
                                        :
 9              Defendants             :

10


11         ------------------------------------------
12              Wednesday, November 5, 2014
           ------------------------------------------
13


14


15   R E P O R T E D   B Y:

16
        TRACY SWEETEN, Certified Court Reporter (License No.
17   1508), on the above date, commencing at 10:00 a.m. at
     the office of Weir and Partners, LLP, 457 Haddonfield
18   Road, Suite 420, Cherry Hill, NJ.

19
     A P P E A R A N C E S:
20

21     F. MICHAEL DAILY, JR., ESQUIRES
            For the Plaintiffs
22

23     WEIR & PARTNERS, LLP
        By:  Daniel Rybeck, Esquire and
24             Wesley L. Fenza, Esquire
            For the Defendants
25
```

REC'D NOV 1 : 2014

## 120a

6

1    A. Henkels and McCoy.
2    Q. What was your position with Henkels and McCoy?
3    A. Electrician.
4    Q. Were you in the union?
5    A. Yes.
6    Q. What union was that?
7    A. At that time was 439 IBW.
8    Q. Approximately what year did that deposition take
9    place?
10   A. It was in the 70's. I want to say the mid-70's.
11   Q. What is your present, or who is your present
12   employer?
13   A. City of Camden, building bureau.
14   Q. What is your title?
15   A. Electrical inspector.
16   Q. Are you a civil service employee?
17   A. Yes.
18   Q. How long have you worked for the City of Camden?
19   A. Going on 11 years.
20   Q. So you started in 2003?
21   A. 4.
22   Q. 2004? And were you initially hired as an
23   electrical inspector?
24   A. Yes.
25   Q. So your title has remained the same for the 11

7

1    years that you've worked in the City of Camden, is that
2    correct?
3    A. That's correct.
4    Q. Who was your employer immediately prior to
5    employment with the City of Camden?
6    A. I was retired.
7    Q. Who was your last employer before you retired?
8    A. The actual contractor, I don't recall.
9    Q. But it was union work?
10   A. Yeah.
11   Q. What union were you in when you last worked?
12   A. IBW Local 351. It was a merger.
13   Q. Approximately when was the last time you worked
14   as a union electrician?
15   A. November '99.
16   Q. And that was with Local 351?
17   A. Right.
18   Q. When you retired, did you withdraw membership
19   from the union or did you remain in the union?
20   A. No, you retire from the union.
21   Q. I assume when you retire from the union -- strike
22   that. Did the union administer a pension that you were
23   a beneficiary of when you retired?
24   A. I don't know how to quite answer that because
25   it's not totally that way. There's an administrator,

8

1    not just a union.
2    Q. Okay. But the payments into the pension had been
3    collected through the union, had they not?
4    A. Part of your wage package.
5    Q. And I assume you still receive your pension
6    benefits?
7    A. No.
8    Q. The plan, did the plan go bust?
9    A. No, I took a lump sum disbursement.
10   Q. You took a lump sum? Okay. Other than the
11   pension benefits, when you retired from the union did
12   you receive any other benefits, such as healthcare
13   coverage?
14   A. Yeah, you have to maintain -- you have to have
15   pay COBRA payments to stay in the healthcare.
16   Q. After the 18 months for COBRA --
17   A. Two years.
18   Q. Two years?
19   A. You still have to pay. I still pay as a retiree.
20   Q. Who was the business agent of local 351 when you
21   retired?
22   A. Ed Gant was the business manager.
23   Q. In 1999 when you retired did Donald Norcross have
24   any position with Local 351?
25   A. Yes.

9

1    Q. What was his title?
2    A. Assistant business manager.
3    Q. Then from November 1999 when you retired from the
4    union until 2004 when you started working for Camden you
5    were not employed, that accurate?
6    A. No, it's not accurate.
7    Q. What was your employment in that period?
8    A. Well, I traveled and took a couple jobs out of
9    state.
10   Q. Were they union or nonunion?
11   A. They were union.
12   Q. Any other employment?
13   A. I worked at a golf course.
14   Q. Between '99 and 2004 did you have any
15   governmental employment, like a part-time inspector for
16   a small municipality?
17   A. No.
18   Q. How did you go about obtaining employment with
19   the City of Camden?
20   A. Filed an application.
21   Q. Did you have to take any sort of civil service
22   exam?
23   A. Yeah, you fill out -- yeah, a civil service exam.
24   But in order to do that, you have to have the proper
25   licenses.

121a

14

1           MR. DAILY: Yes.
2       A. I don't know how long ago it was. It was
3    probably in the early 70's.
4       Q. At that time was Marshall Williams a member of
5    the IBEW?
6       A. Yes.
7       Q. You were a member at the same time?
8       A. That's right.
9       Q. Did you ever work on the same jobs with Marshall
10   Williams?
11      A. Maybe once. I don't know. I don't think that
12   many times.
13      Q. When you were both in the union, did Marshall
14   Williams have any sort of reputation that you know of?
15          MR. RYBECK: Objection to form.
16      A. None that I can recall.
17      Q. While you were in the union did you ever hear
18   that Marshall Williams had made complaints about job
19   consignments?
20      A. Nope.
21      Q. Were you ever an officer in the union?
22      A. No.
23      Q. At the time you retired from Local 351,
24   approximately how many members were in that local?
25      A. 12 to 1400 maybe at that time in '99.

15

1       Q. What geographic area did the union cover?
2       A. Parts of Burlington County, all of Camden, all of
3    Gloucester and some of Cumberland, I think. I'm not
4    sure if they went into Atlantic County. You know,
5    without looking at the jurisdictional map, I can't give
6    you a specific area, but that's close.
7       Q. Do you remember at some point in time Marshall
8    Williams leaving the union?
9       A. I don't know exactly when. I might have heard he
10   left.
11      Q. Do you have any recollection that he had left?
12   You said you might have heard. Is that --
13      A. Not specifically. I couldn't give you a specific
14   date, no.
15      Q. Would it be accurate to say that to some degree,
16   you seem to have a recollection that there came some
17   point in time when Marshall Williams was no longer in
18   the union?
19      A. Yeah.
20      Q. After you began working for the City of Camden,
21   did you become a member of a union?
22      A. Only Council 10 Union, the city employee's union.
23      Q. So you became a member of that union?
24      A. Yes.
25      Q. Now, as an inspector with the City of Camden,

16

1    have you had contacts with Marshall Williams in regards
2    to Marshall Williams being a contractor doing electrical
3    work in Camden?
4       A. Yes.
5       Q. Do you recall approximately when your first
6    contacts with him may have been?
7       A. No, I don't.
8       Q. As you sit here today, do you have any specific
9    recollections of any conversations that you ever had
10   with Marshall Williams concerning the quality of the
11   work that he performed?
12      A. No.
13      Q. Do you have a specific recollection of Marshall
14   Williams doing work in Camden which you inspected?
15      A. I've inspected some of his jobs, yes.
16      Q. Do you have any specific recollection of any jobs
17   in particular that he did that you inspected?
18      A. No.
19      Q. Do you have any recollection of Marshall Williams
20   ever complaining about any of the jobs that you
21   inspected?
22      A. I think there was a time that something was said
23   to the construction official. I can't tell you the
24   specific date, job, whatever.
25      Q. What is your recollection as to what the nature

17

1    of the complaint was?
2       A. To tell you the truth, I can't even recall what
3    the nature of the complaint was.
4       Q. In preparation for this deposition, have you
5    reviewed any records of the City of Camden?
6       A. Briefly.
7       Q. What were the records you reviewed?
8       A. Permits that were issued to Nico Electric.
9       Q. To do electric work in Camden does a contractor
10   have to obtain a permit?
11      A. Yes.
12      Q. And how do they go about doing that?
13      A. Make application to the building bureau in our
14   office.
15      Q. Who makes the actual decision to issue the
16   permit?
17      A. Subcode official.
18      Q. That would be Mr. Rizzo?
19      A. No.
20      Q. That would be?
21      A. Mr. Revaitis. Ultimately, the construction
22   official signs the permit after it's approved.
23          (Emenecker-1 marked for identification)
24      Q. First I ask you, Mr. Emenecker, do you recognize
25   the type of document that is being shown to you?

122a

26

1   Q.  So that would have been two years after the
2   permit was issued?
3   A.  That would have been done as a cleanup.
4   Q.  And what do you mean by the term cleanup?
5   A.  That is when we have a light day, we go back in
6   the old permits and look at ones that have never been
7   inspected and put them in the log and go look at the job
8   the best we can, and then send.  When you come back, we
9   don't get in, we send a letter.
10   Q.  So, is the practice that the contractor takes out
11   a permit when he has the work done, he contacts your
12   office and you or another inspector go out and inspect
13   the work?
14   A.  If he in fact schedules an inspection for that
15   permit, yes.
16   Q.  If the contractor does not schedule an inspection
17   for a particular permit, it kind of lays there until you
18   guys have a slow day and you go back and look and say,
19   here's some permits, we never were asked to do an
20   inspection?
21   A.  That's correct.
22   Q.  It could be a couple years later that the fact
23   that there was a permit issued and no inspection hits
24   the radar, so to speak?
25   A.  Yes.

27

1   Q.  Now, do you recognize the initial as to who did
2   the inspection in October of '11?
3   A.  Yes.
4   Q.  Whose initial is that?
5   A.  That's me, GE.
6   Q.  So you conducted the inspection?
7   A.  That's right.
8   Q.  As you sit here today, do you have any
9   recollection of this particular project?
10   A.  No.
11   Q.  Is that your printing to the left of your, or to
12   the right of your initial?
13   A.  I believe it is.
14   Q.  What did you print there?
15   A.  No entry service done 12/24, and I can't tell if
16   you that's a 14 or not.
17   Q.  Or a 13?
18   A.  Or 13.  Sometimes the pen.
19   Q.  So the printing might relate to a subsequent
20   inspection?
21   A.  It might.
22   Q.  Initially this failed in October of '11, you
23   failed it?  You don't recall what the reason for the
24   failure?
25   A.  No entry.

28

1   Q.  Oh, okay.  Yeah, but the no entry relates to a
2   date of --
3   A.  No, the no entry relates to that date.  The
4   12/24/13 is another time gone by.
5   Q.  Oh, I see.  So the NE relates to the October
6   inspection, and the service done 12/24/13 relates to an
7   inspection in December?
8   A.  That's gone by.  And seeing that the work was
9   done, not an actual inspection per se.
10   Q.  Well, what would you -- okay, let me get this
11   straight here according to this document.  There was a
12   permit taken out in 2009 that involved -- what was the
13   scope of the project?  What was supposed to be done?
14   A.  12 lighting fixtures, one switch, eight emergency
15   exit lights, 200 amp service and a 60 amp subpanel.
16   Q.  In October you went out, and October of, it looks
17   to be 2011, you went out, or you tried to go out to
18   inspect it, but you couldn't gain entry, so you marked
19   it as a failure, is that correct?
20   A.  That's the way it's handled, yes.
21   Q.  And then in December of 2013 you somehow
22   determined that the service was done?
23   A.  Yeah, by looking at the outside, seeing a new
24   service cable, and maybe a new meter.  And that's as far
25   as they could go because they couldn't get in.

29

1   Q.  You have no recollection of talking to Mr.
2   Williams about this particular project?
3   A.  No.
4      (Emenecker-4 marked for identification)
5   Q.  Now, this is -- could you compare this exhibit
6   with the last exhibit?  And this actually is the same
7   project, right?
8   A.  Right.
9   Q.  It's got the same control number?
10   A.  Same permit number.
11   Q.  Except on document 0031 the date issued and the
12   permit number is typed in?
13   A.  Right, the other ones are handwritten.  I mistook
14   the bar on the first one as a 16, when in fact it's the
15   line between the month the day and the year.
16   Q.  But this document for this permit it's got the
17   service done notation on 31, just as on 30.  Do you have
18   an explanation for why this, why there's two documents
19   for the same job?
20   A.  It could be doing cleanups and for whatever
21   reason we couldn't find the original one and went into
22   the system and printed another one.
23   Q.  Now, in this situation where there was a permit
24   issued and you see evidence that the job has been
25   possibly completed, what course of action, if any, do

123a

42

1  A. That note probably pertains to the failure on
2  1/17/12. You don't put notes when you approve it.
3  Q. Right. So what was the problem on the 17th?
4  A. I don't know. I didn't do that, and it's not my
5  writing.
6  Q. But in any event, did you do the final approval?
7  A. Negative.
8  Q. Whose signature is that, Mr. Revaitis?
9  A. Mr. Revaitis.
10      (Emenecker-30 and 31 marked for identification)
11  Q. So this 62 and 63 apply to 1658 Mt. Ephraim
12  Avenue, do they not?
13  A. That's correct.
14  Q. This is another one where there was a permit
15  taken out and no inspection was accomplished? There was
16  no entry?
17  A. At that time, that date, 2/24/14, yes.
18  Q. So, I mean, obviously we can agree, can we not,
19  that if you can't gain entry and inspect the work done
20  by Mr. Williams, or any other electrician, you don't
21  know whether it was done properly or not?
22  A. You can assume that.
23      (Emenecker-32 marked for identification)
24      MR. RYBECK: Can we take a minute break?
25      MR. DAILY: Yeah.

43

1      (Brief recess)
2  BY MR. DAILY:
3  Q. This is 1571 South 8th Street. And on this one
4  there was an initial failure, and then there was an
5  approval. What was this one about?
6  A. Same as the note says, service head not attached
7  to the building.
8  Q. But eventually that did occur because you
9  approved it?
10  A. That's right.
11  Q. Do you have any independent recollection of this
12  job --
13  A. No.
14  Q. -- at that location?
15      (Emenecker-33 to 38 marked for identification)
16  Q. 1596 Kaign Avenue goes from 64 to 69?
17  A. I don't have 64.
18  Q. I guess it's 65, sorry.
19      MR. RYBECK: That's correct.
20  Q. Could you, based upon a review of these
21  documents, provide me with a narrative of what occurred
22  from a project standpoint on this job?
23  A. Document 65 says, installation of smoke
24  detectors, heat detectors, rough inspection approved by
25  me. Item 66, rehab, demolition of walls, ceiling,

44

1  sheetrock, removal of trim, interior doors, insulation,
2  200 amp service. Appears not to be inspected. 67,
3  light fixtures, receptacles, switches, rough permit
4  update and it was approved by Mr. Revaitis.
5  Q. What was the update?
6  A. I can only guess that numbers were changed.
7  Q. And then there's --
8  A. Rewire single family dwelling. Evidently, there
9  was no smoke monitor system installed by others. And 69
10  appears to be a floor plan.
11  Q. On 68, who is the contractor? Marshall Williams.
12  I see, never mind. I'm sorry. Do you have any
13  independent recollection of this project?
14  A. Not really, no.
15  Q. Is there anything you recall about it?
16  A. No, just on the inspections, evidently they were
17  okay for what I did. I approved.
18  Q. 70 apparently is an application for a permit, but
19  the permit was never issued?
20      MR. RYBECK: Objection to the form. Go ahead
21  and answer.
22  A. I disagree with that.
23  Q. Okay, was the permit issued?
24  A. According to the total fee at the bottom
25  right-hand corner, it was issued.

45

1  Q. Shouldn't it have had a permit number?
2  A. I can't explain why these don't have numbers on
3  them.
4  Q. No inspections were done according to this
5  document?
6  A. According to this document, that's correct.
7      (Emenecker-39 marked for identification)
8  Q. Do you recognize this form?
9  A. Looks like a log sheet.
10  Q. Looks like it's a printout from some sort of
11  database, am I correct?
12  A. That's correct.
13  Q. And does it concern one particular property or
14  does it -- no, it's multiple properties, correct?
15  A. There's five different properties listed on
16  there. There's five different inspections.
17  Q. These were inspections done by Mr. Revaitis?
18  A. That's whose name appears on the top of the log
19  sheet.
20      (Emenecker-40 marked for identification)
21  Q. This also appears to be some sort of printout
22  from a database. What does this data cover, or what
23  does it appear to?
24  A. I can't tell you. I've never -- I don't see or
25  use this type of document.

124a



125a

1

```
 1              UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEW JERSEY
 2
       ----------------------------------------
 3   NICO ELECTRICAL CONTRACTOR, INC.:
     & MARSHALL B. WILLIAMS,           : Civil Action
 4                                     : No. 1:13-CV-06353
                                       :(JHR)(AMD)
 5              Plaintiffs             :
                                       :
 6        vs                           :   DEPOSITION OF:
                                       :
 7   CITY OF CAMDEN, EUGENE EMENECKER:    JAMES R. RIZZO
     WILLIAM REVAITIS, JAMES RIZZO     :
 8   & IRAIDA AFANADOR,                :
                                       :
 9              Defendants             :

10

11        ---------------------------------------------
                  Wednesday, November 5, 2014
12        ---------------------------------------------

13

14   R E P O R T E D   B Y:

15
        TRACY SWEETEN, Certified Court Reporter (License No.
16   1508), on the above date, commencing at 2:30 p.m. at the
     office of Weir and Partners, LLP, 457 Haddonfield Road,
17   Suite 420, Cherry Hill, NJ.

18
     A P P E A R A N C E S:
19
        F. MICHAEL DAILY, JR., ESQUIRES
20         For the Plaintiffs

21
        WEIR & PARTNERS, LLP
22      By:  Wesley L. Fenza, Esquire
             For the Defendants
23

24   A L S O   P R E S E N T:

25      Iraida Afanador
```

REC'D NOV 1 7 2014

**126a**

6

1 A. I went into a business in construction.
2 Q. Were there any disciplinary charges pending
3 against you when you retired from the police department?
4 A. No.
5 Q. How long were you -- strike that. Did you
6 operate a construction company or did you work for
7 somebody?
8 A. I had a construction company.
9 Q. What was the name you operated under?
10 A. Jim Rizzo Construction.
11 Q. How long did you engage in that?
12 A. About 15 years.
13 Q. And what was your next employment?
14 A. Habitat for Humanity.
15 Q. How long were you connected with them?
16 A. Four years.
17 Q. Have we arrived with when you started back with
18 the City?
19 A. I left there and I went to the City.
20 Q. What was your first title when you returned to
21 the City?
22 A. Building inspector.
23 Q. Now, had you obtained licenses in any building or
24 construction trades when you became, before you became a
25 building inspector?

7

1 A. There were no licenses for builders.
2 Q. Well, there are licenses for like plumbers and
3 electricians?
4 A. I wasn't a plumber or electrician.
5 Q. You were just a general --
6 A. Builder.
7 Q. And what year was it that you went back to the
8 City?
9 A. 2005.
10 Q. Did you receive a promotion at some point?
11 A. Yeah.
12 Q. What was the next title that you were promoted
13 to?
14 A. Building subcode official.
15 Q. When did that occur?
16 A. I don't know exactly.
17 Q. Was Miss Afanador the director when you became
18 the building subcode official?
19 A. Yes.
20 Q. Who did you replace as building subcode official?
21 A. Duane Wallace.
22 Q. As building subcode official, you would supervise
23 certain inspectors?
24 A. Building inspectors.
25 Q. Did you supervise Mr. Revaitis?

8

1 A. He's not a building inspector.
2 Q. Who was Mr. Revaitis' supervisor?
3 A. Construction official.
4 Q. And that is?
5 A. Was?
6 Q. Was, yeah.
7 A. Bob Schooler.
8 Q. After Mr. Schooler left?
9 A. I was.
10 Q. You became Mr. Revaitis' supervisor, correct?
11 A. Yes.
12 Q. Where did Mr. Schooler leave, if you know?
13 A. I don't know.
14 Q. After you became the -- you went from inspector
15 to building subcode official, and is that your position
16 today?
17 A. I'm construction official.
18 Q. When did you become construction official?
19 A. Approximately 2009.
20 Q. That's when you became the supervisor of Mr.
21 Revaitis?
22 A. Yeah.
23 Q. Are you familiar with the UCC?
24 A. Yes.
25 Q. And that's from your days, that's from going all

9

1 the way back to your days in construction?
2 A. Not necessarily.
3 Q. When is the first time that you heard that an
4 individual by the name of Marshall Williams had some
5 sort of complaints with regard to how he was being
6 treated by inspectors you supervised?
7 A. It was several years back.
8 Q. Do you recall the circumstances as to how this
9 was brought to your attention?
10 A. By Mr. Williams.
11 Q. By who?
12 A. Mr. Williams.
13 Q. How did he do that? Did he call you? Did he
14 write you?
15 A. Came in the office.
16 Q. When he came in the office, what did he say?
17 A. He said he had a complaint.
18 Q. And how did he explain what his complaint was?
19 A. It was a long conversation, which I don't recall
20 the details, except that he had some issues with the
21 electrical inspector.
22 Q. Who was that, or whom was that?
23 A. Eugene Emenecker.
24 Q. Did he mention he had any problems with Mr.
25 Revaitis?

10

1    A. No, quite the contrary.

2    Q. Now, this first time he came with a complaint,

3    was there anybody present besides you and him?

4    A. I don't think so.

5    Q. Do you recall anything else that he said other

6    than what you just mentioned to us?

7    A. I don't remember all the details. It was a

8    conversation.

9    Q. What, if anything, did you do in response to the

10   information that Mr. Mr. Williams had given you?

11   A. Questioned Gene Emenecker.

12   Q. What did Gene say?

13   A. He said he had no problem with Mr. Williams.

14   Q. After you had that conversation with Gene, did

15   you do anything further, or did you consider the matter

16   closed?

17   A. Well, the issue there was there was a difference

18   of opinion between him and Mr. Williams. It was

19   resolved. He passed the job and that was the end of the

20   story.

21   Q. Now at some point after that was it brought to

22   your attention that Mr. Williams still had complaints?

23   A. Yes.

24   Q. How did that occur?

25   A. Mr. Williams came in, again along with at least a

11

1    couple of emails which you probably have in your file.

2    Q. Uh-huh. Was there another meeting?

3    A. Yes.

4    Q. Who was present at this meeting?

5    A. Bill Revaitis.

6    Q. Anyone else?

7    A. Me and Mr. Williams.

8    Q. What was Mr. Williams' complaint this time?

9    A. Similar to the last time, that he was not being

10   treated fairly.

11   Q. Was there any particular property or properties

12   that seemed to be the point of contention?

13   A. The last one was 931 South 7th.

14   Q. What was the situation there?

15   A. Same thing, there was a difference of opinion.

16   In the end he passed the job.

17   Q. Well, at the time Mr. Williams came in was the

18   job, had the job been passed or did it get passed after

19   the meeting?

20   A. I'm not sure.

21   Q. Was there a subsequent time when Mr. Williams yet

22   again appeared and had complaints?

23   A. Not directly to me.

24   Q. Did he go to the director?

25   A. I'm understanding that he did.

12

1    Q. Were you ever present at a meeting with the

2    director and Mr. Williams?

3    A. I'm not sure if I was at the meeting. I know I

4    was privy to a phone call. I wasn't at the meeting.

5    Q. The phone call was from whom the director?

6    A. The phone call was between the director and Mr.

7    Miss Jordan.

8    Q. Why were you privy to that phone call?

9    A. Because I'm part of the supervision.

10   Q. Who dialed Miss Jordan?

11   A. I assume it was the director on her phone.

12   Q. She asked you to pick up?

13   A. It was a speaker.

14   Q. So you and the director were in an office

15   together?

16   A. That's correct.

17   Q. Did she indicate to you why she wanted you

18   present when she called Miss Jordan?

19   A. She didn't indicate anything specific. It was so

20   I would know what was going on.

21   Q. Do you remember what Miss Jordan had to say?

22   A. The substance of the conversation was that a

23   negative feeling on her part toward Mr. Williams as to

24   his behavior. Other than that, I don't know the

25   specifics, other than that she had to resort to her

13

1    husband getting on the phone to keep the individual from

2    calling her back and texting her.

3    Q. What was he calling her about to your

4    understanding?

5    A. I don't know what that conversation was.

6    Q. Do you recall whether part of the situation with

7    this individual was that Mr. Williams wanted her to be a

8    witness or give a statement indicating how he had been

9    treated and that that's what he had been pressing her

10   for?

11   A. It could be.

12   Q. In any opinion event, whatever Mr. Williams did,

13   she said she didn't want to get involved in it and said

14   she resorted to her husband telling Mr. Williams to

15   basically get lost?

16       MR. FENZA: Object to the form. You can

17   answer it if you understand the question.

18   A. Not exactly.

19   Q. Whatever the exact issue between Jordan and

20   Williams was, it was your understanding that she didn't

21   want to have anything more to do with Mr. Williams, and

22   she had her husband try to intervene and basically tell

23   Mr. Williams to get lost?

24   A. I saw it as just a disagreement between the

25   parties.



129a

1

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
 2
        ------------------------------------------
 3   NICO ELECTRICAL CONTRACTOR, INC.:
     & MARSHALL B. WILLIAMS,          : Civil Action
 4                                    : No. 1:13-CV-06353
                                      :(JHR)(AMD)
 5              Plaintiffs            :
                                      :
 6        vs                          :     DEPOSITION OF:
                                      :
 7   CITY OF CAMDEN, EUGENE EMENECKER:     IRAIDA AFANADOR
     WILLIAM REVAITIS, JAMES RIZZO    :
 8   & IRAIDA AFANADOR,               :
                                      :
 9              Defendants            :

10

11      ------------------------------------------
                Wednesday, November 5, 2014
12      ------------------------------------------

13

14   R E P O R T E D   B Y:

15
        TRACY SWEETEN, Certified Court Reporter (License No.
16   1508), on the above date, commencing at 1:50 p.m. at the
     office of Weir and Partners, LLP, 457 Haddonfield Road,
17   Suite 420, Cherry Hill, NJ.

18
     A P P E A R A N C E S:
19
        F. MICHAEL DAILY, JR., ESQUIRES
20           For the Plaintiffs

21
        WEIR & PARTNERS, LLP
22      By:  Wesley L. Fenza, Esquire
             For the Defendants
23

24   A L S O   P R E S E N T:

25      James R. Rizzo
```

REC'D NOV 1 7 2014

130a

2

```
 1              I N D E X
 2   WITNESS        EXAMINING ATTORNEY      PAGE
 3
     Iraida Afanador     Mr. Daily          3
 4
            --------------------
 5
            E X H I B I T S
 6                          MARKED
     NUMBER     DESCRIPTION         FOR ID
 7
 8   Afanador-1   Note - Bates City-0014     21
 9
            -------------------------
10
11     (By agreement of counsel, the signing, sealing and
12   certification of the depositions were waived, and all
13   objections, except as to the form of the questions, were
14   reserved to the time of trial.)
15
            -------------------------
16
17
18
19
20
21
22
23
24
25
```

3

```
 1     IRAIDA AFANADOR, having been duly sworn, was
 2       examined and testified as follows:
 3   BY MR. DAILY:
 4     Q.  You pronounced it Afanador?
 5     A.  Very good.
 6     Q.  Mrs. Afanador --
 7     A.  Ms..
 8     Q.  Ms. Afanador, my name is Mike Daily. I'm going
 9   to ask you some questions today in order to determine
10   what information you may have that might be relevant to
11   a lawsuit that has been instituted on behalf of my
12   client, Marshall Williams. If there's any question I
13   ask you that you don't understand, indicate that to me
14   so I can explain the question, or further explain it,
15   before you answer. If you don't ask for an explanation,
16   I'll have to assume you fully understood my question.
17       What we want here today is your knowledge. We
18   don't want you guessing or speculating. Therefore, if I
19   ask a question where you don't know the answer, the
20   appropriate response is that you don't know rather than
21   thinking that because I asked you the question, it must
22   be something you know. Many questions I ask invariably
23   end up I ask for information that the witness just
24   doesn't possess.
25     A.  Uh-huh.
```

4

```
 1     Q.  As you can see, the court reporter is recording
 2   everything that's said here today. Therefore, it's
 3   important to make all of your responses oral.
 4       It's also important to wait until I finished each
 5   of my questions before you begin your response,
 6   otherwise we can have the transcript broken up between
 7   half a question and half an answer and the second half
 8   of the question.
 9       Do you understand those instructions?
10     A.  Absolutely.
11     Q.  Do you understand you've been placed under oath
12   and have an obligation to tell us the truth here today?
13     A.  Yes.
14     Q.  Do you understand you should consider what you
15   say here today to be just as important as if you were
16   testifying in court?
17     A.  Absolutely.
18     Q.  By whom are you presently employed?
19     A.  I am not presently employed. I was a municipal
20   department head for the Department of Code Enforcement
21   up until January in the City of Camden.
22     Q.  That was as director?
23     A.  Municipal department head for code enforcement.
24     Q.  Your title was director, was it not?
25     A.  Yeah, that was the same as commissioner. But
```

5

```
 1   they don't use director here in New Jersey.
 2     Q.  That was up until January of 2014?
 3     A.  Correct. I presently just do consulting work
 4   here and there.
 5     Q.  What have you been doing since January of 2014?
 6     A.  Well, I was unemployed for six months, and
 7   thereafter I used my pension. Lived off my pension.
 8   And now I will hopefully be doing some consulting work,
 9   and have done some consulting work.
10     Q.  What kind of consulting work have you done?
11     A.  Presently or in the past? Presently?
12     Q.  Well, recently?
13     A.  Recently, I did a proposal. I write grants.
14   That's one of my things that I do, I write grants. I
15   wrote a grant for my former employer information in
16   technology management for medicine, ITM. And I do --
17     Q.  Are you a political consultant?
18     A.  No, I was a grant writer. I presently still do
19   volunteer work.
20     Q.  Did you do that as a sole proprietor or were you
21   connected with some business?
22     A.  I used to work there prior to coming to the City
23   of Camden. I was the chief operating officer there.
24     Q.  There being who?
25     A.  At ITM, I'm sorry.
```

131a

6

1    Q.  That's the Institute of what?
2    A.  It's the Information Technology and Management,
3    Incorporated, 6 Kilmer Road, Edison, New Jersey. They
4    were my former employers before I came to the City.
5    Q.  Did that company do any business for anybody
6    other than governmental entities?
7    A.  No, they are a private company.
8    Q.  Were their clients all governmental entities?
9    A.  No, they have a votech school, which is partially
10   funded by the Department of Labor, but mostly it's a
11   private sector corporation.
12   Q.  Where is the votech school located?
13   A.  The corporation is located at 6 Kilmer,
14   K-I-L-M-E-R.
15   Q.  Oh, in Edison, New Jersey?
16   A.  Yes.
17   Q.  Is that the location of the votech school?
18   A.  That's everything, yes. And in India.
19   Q.  The graduates of the votech school, do they get
20   some sort of diploma?
21   A.  They get certificates in various computer
22   technology courses.
23   Q.  So it's vocational training as opposed to basic
24   high school level?
25   A.  Oh, absolutely. You have to have a high school

7

1    degree, and it's mandated by the State.
2    Q.  When were you first employed by City of Camden?
3    A.  I believe in 2007.
4    Q.  And you are in your title of director?
5    A.  Yes.
6    Q.  What in your background qualified you for that?
7    A.  I have a bachelor's from Rutgers University. I
8    have a master's in criminal justice. I have a master's
9    in administrative science from Fairley Dickinson. And
10   35 plus years of CEO, COO, executive director,
11   government employee at the Department of Labor.
12   Q.  None of that had to do with construction though,
13   did it?
14   A.  The Department of Labor, yes.
15   Q.  In what way?
16   A.  Well, in the Department of Labor you had to know
17   OSHA standards. You also had to know Title 6 federal
18   guidelines, as well as understanding the codes that,
19   codes and standards of the State.
20   Q.  Title 6 is an EEO category, isn't it?
21   A.  Correct.
22   Q.  That has nothing to do with construction?
23   A.  No.
24   MR. FENZA:  Objection to the form.
25   Q.  OSHA is workplace safety?

8

1    A.  Uh-huh.
2    Q.  In all kinds of workplace, not just construction,
3    right?
4    A.  Yes.
5    Q.  How many people did you supervise as director?
6    A.  I started, I'm just going to say, I started off
7    supervising maybe 58. And by the time I finished, it
8    might have been 30 something. Possibly.
9    Q.  How much were you paid for this title?
10   A.  Before benefits it was $96,866, I believe. I'm
11   sorry, 94. I'm so sorry. Retract that, it was 94,866.
12   Q.  You know, you weren't in civil service, this was
13   a policy level position?
14   A.  Correct.
15   Q.  You supervised Mr. Rizzo, correct?
16   A.  Yes.
17   Q.  Mr. Rizzo supervised Mr. Revaitis, correct?
18   A.  He oversaw, as construction official, he oversees
19   all of the building bureau and its work and the staff.
20   Q.  At some point in time did a Marshall Williams
21   contact you in regards, in respect to your position as,
22   or because you were the director?
23   A.  Yes, because I was the director, yes.
24   Q.  And do you remember the first contact?
25   A.  I really can't remember. It's been a while.

9

1    It's been a long time.
2    Q.  Do you remember what he indicated to you as being
3    the reason for contacting you?
4    A.  He stated he wanted, if memory serves, he stated
5    he wanted to talk to me regarding my electrical building
6    subcode and inspector, and wanted to speak to me
7    directly because he did not want to speak to anyone
8    else.
9    Q.  Did you afford him that opportunity?
10   A.  Absolutely, as all constituents and/or
11   contractors.
12   Q.  And did you have a meeting, face-to-face meeting
13   with him?
14   A.  Yes. Myself and my secretary. And I believe, if
15   memory serves me well, it was first my secretary and Mr.
16   Williams and myself.
17   Q.  Did you make any notes of that meeting?
18   A.  My secretary made notes and I made notes, yes.
19   Let me just add, it was moreso Mr. Williams just
20   explaining to me his situation. His concerns.
21   Q.  You know, you made notes, am I correct?
22   A.  I made some notes, yes.
23   Q.  Your secretary made notes?
24   A.  Yes.
25   Q.  Did you preserve your notes?

**132a**

14

1    Q. No, did you ask for and receive any other
2    information besides the names of property owners who
3    could corroborate what Mr. Williams was saying?
4    A. I didn't receive any other information, other
5    than the two I mentioned. I don't remember the young
6    lady's name. It sounded like Ayana or something like
7    that. And also the people from the funeral home. And I
8    also asked Jimmy to look into the situation of his
9    alleged failing of inspections.
10    Q. What information did Jimmy get back to you with,
11    if any?
12    A. If memory serves me, he said that Mr. Nico was
13    not failed. What was indicated was that he was told
14    that certain, a certain box was not put in right, and he
15    was given advice from the subcode as to how it needed,
16    something needed to be done. I can't really remember
17    what it was at that time. But I remember Jim said, we
18    didn't fail him. Subcode Revaitis just asked him to fix
19    something, and he said he would.
20    Q. So that involved one particular property?
21    A. To my knowledge, yes.
22    Q. Did you ask to see the permit or any other
23    documents for that property?
24    A. No.
25    Q. Do you recall if Mr. Williams made any complaints

15

1    regarding other than that one property?
2    A. Again, just the funeral home and the property of
3    Ayana or something.
4    Q. What was his complaint regarding the funeral
5    home?
6    A. I do not remember. I really don't.
7    Q. Did you, as part of -- did you perform any sort
8    of investigation yourself?
9    A. Well, what I usually do is, I ask Jimmy to
10    investigate with the subcodes. Once my construction
11    official and I do our investigation and we receive
12    letters and/or phone call, whoever he gives me phone
13    calls for, then I get outside staff to come in to
14    meetings that are not related to the building bureau and
15    have no reason to be. It's mostly an impartial
16    investigation, yes.
17    Q. Who outside the department was involved in any
18    sort of investigation with regards to Mr. Williams'
19    complaints?
20    A. Under the municipal codes, once I serve not only
21    as a director, but I also serve as commissioner of
22    investigations and parties that are not part of any of
23    the departments being complained about. And at that
24    time, if memory serves me, it was Ms. Doris Arch. And
25    she's my license and inspection chief, and Judith Lugo,

16

1    who is my assistant, was my assistant superintendent of
2    weights and measures. And Terry Britt, of course, was
3    in there as well taking notes.
4    Q. Did you have Mr. Williams write out any sort of
5    formal complaint?
6    A. I asked him to give me information as to, you
7    know, what his complaint was. And I don't remember if
8    in fact he did give me a complaint, to be honest. But
9    he did give me numbers of people to call.
10    Q. Do you recognize the document that's been marked
11    that's Bates City-0008?
12    A. Yes.
13    Q. Is that your handwriting on the bottom of it?
14    A. Yes.
15    Q. And this appears to be a statement from an Israel
16    Miller?
17    A. Correct.
18    Q. Looks like he's the owner of a tattoo shop?
19    A. I guess -- well, it says Twisted Tattoos here,
20    but I don't remember other than that.
21    Q. In this statement apparently Israel Miller makes
22    some sort of allegation that Mr. Revaitis made some
23    comments to him?
24    A. Yes.
25    Q. And you called, so you --

17

1    A. I called in front of my secretary and Mr. Rizzo
2    on speaker phone and informed Mr. Miller that he was on
3    speaker phone.
4    Q. He said that this was true what he had written in
5    this statement?
6    A. At that time when I spoke to him the
7    first time, yes. He said, yeah, this is what happened.
8    And he emphatically said that, hence why the quotations.
9    Q. Was there a second time that you talked to him?
10    A. The second time I called him again I asked him,
11    did you write this letter, and he said, no. He said Mr.
12    Miller did, and I signed it. So then I asked him, Mr.
13    Miller, I said, Mr. Miller, I need a statement directly
14    from you, not something that was written from Mr.
15    Miller. And he says, I want nothing to do with this.
16    Q. I don't understand what you're saying here.
17    A. I asked him, did you write this letter or type
18    this letter, and he said, no. And then I said, well
19    then --
20    Q. He admitted he signed it?
21    A. He said he signed it, but he said that Mr. Miller
22    was the one who wrote it. I'm sorry, Mr. Miller said
23    Mr. Williams wrote it and he signed it. And I said, I
24    need a letter from you directly, not something signed by
25    your contractor, or not something -- strike that. Not

18

1    something written by or typed by your contractor.

2    Q. Let me understand this. Because this statement

3    was typed by Mr. Williams but signed by Mr. Miller, you

4    found that this statement was, or you felt that you

5    needed a follow-up statement that was actually typed by

6    Mr. Miller and signed by Mr. Miller?

7    A. Correct, due to the fact that Mr. Miller stated

8    he did not type this, but he signed it.

9    Q. How is that significant?

10    A. Well, the significance is that when I asked

11    someone to sent me a letter, it has to be typed or

12    written, however you want to do, it by the person that

13    I'm trying to talk to. At that time I called him, I

14    must have called a couple times, he said, I didn't want

15    to talk about it. Finally, when I did speak to him, I

16    said, did you write this letter, and he said, no, I

17    didn't. I said, but your signature is on it. And he

18    said, well, I didn't. Mr. Miller wrote it, and I just

19    signed it.

20    Q. Mr. Williams?

21    A. Strike that, Mr. Williams wrote it, but I signed

22    it. And I want nothing to do with it.

23    Q. First you get this statement signed by Mr.

24    Miller. And it's dated September 25th, 2013?

25    A. Correct.

19

1    Q. Okay. A few days later, October 3rd, 2013, you

2    call --

3    A. Mr. Miller.

4    Q. -- Mr. Miller, and he at that time emphatically

5    stated that the above statement was true?

6    A. Uh-huh.

7        MR. FENZA: Is that a yes?

8        THE WITNESS: I'm sorry, yes.

9    Q. And then?

10    A. He further continued to say -- I said, so, this

11    is your statement that you wrote and you signed? And he

12    said no, I did not write it, Mr. Williams wrote it, but

13    I signed it. And I want nothing else to do with this.

14    Q. And then you asked him, well, I want you to send

15    me one that you actually typed and signed?

16    A. And he said, no, he would not.

17    Q. Now, Mr. Miller, to your knowledge Mr. Miller was

18    a property owner in the city of Camden?

19    A. To my knowledge, yes.

20    Q. And Mr. Miller said to you that what was in the

21    statement that he signed was true?

22    A. At that moment on October 3rd, yes.

23    Q. Why did you need further verification if he said

24    what was in there was true?

25    A. I again reiterated to him, what you typed up here

20

1    is true? And he said, well, I didn't type it. That's

2    when a flag raised up for me as an administrator. I

3    said, who typed it? He said, Mr. Miller typed it and

4    asked me, or made me sign it. I said, okay, I'm going

5    to need a statement from you, Mr. Williams, not -- Mr.

6    Miller. You need to write a statement, or write me a

7    letter what took place with a little more detail. And

8    he said, absolutely not. I don't want anything to do

9    with this. And that's...

10    Q. Yes? I'm sorry?

11    A. No, nothing else.

12    Q. You can go ahead and clarify your answer.

13    A. No, I'm very clear about what my answer is.

14    Q. Is there anybody else you contacted?

15    A. Mr. Williams, Nico Electric gave me a number of

16    Ayana. I can not remember or recall her last name. But

17    I said, can I have someone else or anyone else that can

18    verify these alleged allegations against my building

19    subcode and electrical subcode and electrical inspector?

20    Mr. Williams then said, this lady by the name of Ayana.

21    I just can't remember her full name at this moment.

22    Q. Jordan?

23    A. Maybe, yes.

24    Q. Have you seen that document before?

25    A. Yes.

21

1        (Afanador-1 marked for identification)

2    Q. Is that a statement Mr. Williams gave you, or is

3    that a statement that was provided at your request or

4    someone in your office's request?

5    A. No. Actually, it was hard getting in touch with

6    her, but I finally got in touch with her, and had Miss

7    Ayana on speaker phone, and myself, construction

8    official Rizzo and my secretary, Terry Britt. And she

9    said, I don't want anything to do with this man. He's

10    been harassing me and my husband. I said, please,

11    ma'am, I need a statement from you as to what took place

12    at that moment when Mr. Williams went and inspected your

13    home. She said, can I write it to you and fax it to

14    you? I said, sure, I have no problems you writing it,

15    faxing it, however you want, as long as it's legible.

16    Q. What did she say in the statement, or what did

17    you take out of the statement, let's put it that way?

18    A. What I took out of the statement was that, well,

19    she called me and she said, did you receive it? I said,

20    yes. I said, so this is factual as to what happened? An

21    And she said, yes, this is exactly what happened. She

22    said also Mr. Williams has been harassing me at two

23    o'clock in the morning, four o'clock in the morning, so

24    much so to the point where my husband had to intervene

25    and tell him to stop calling me. And she said, quite

134a

22

1  frankly I was taken aback by the fact that he called Mr.
2  Revaitis a cracker. And I said, what do you mean by
3  that? And she said, while he was waiting, while we were
4  waiting for Mr. Revaitis to come to the inspection, Mr.
5  Williams said to me, you see that cracker over there?
6  He's a racist, quote/unquote. Miss Ayana then stated
7  that she was quite embarrassed and taken aback because
8  she has Caucasian members in her family. She didn't
9  know what to do and she kept quiet. And I said, okay.
10  Just, you know, she said, I want nothing to do with this
11  man. I'm going to somebody else on Craig's List.
12      Q. Anybody else that you talked to or got
13  information from as part of your investigation other
14  than your staff?
15      A. Mr. Williams could not provide me with anyone
16  else that I could recall. He just said, those two
17  people, and then he mentioned someone from DCA. I don't
18  remember the name of the person from DCA. And I said,
19  well, if that's the case, I will have my construction,
20  if DCA does call me or come, they must speak to my
21  construction official, as is the regulations. First
22  they speak to Mr. Rizzo as construction official, then
23  me and Mr. Rizzo if there is an issue that needs further
24  investigation.
25      Q. Did you ever talk to anybody from DCA about Mr.

23

1  Williams?
2      A. Absolutely not. Not to my recollection.
3      Q. Was the conclusion arrived at at the end of your
4  investigation that nobody had done anything
5  inappropriate?
6      A. Correct, at least from my staff.
7      Q. Do you know Donald Norcross?
8      A. Yes.
9      Q. Have you ever worked for him?
10      A. Not for him, no. I've just known him as I'm a
11  committeewoman, so I know him through politics, like I
12  know everybody else in the state of New Jersey.
13      Q. Committeewoman for what, the democratic party?
14      A. Correct, and my town as well.
15      Q. And your town is? I'm sorry?
16      A. Collingswood. Can I preface that by saying,
17  irregardless of who I know and what I know, and Mr.
18  Rizzo is here and can attest to that, I don't play
19  politics. My job is my job. I do it to the best of my
20  ability and knowledge. And I do not play favoritism.
21      Q. Politics had nothing to do with you getting a
22  $96,000 job with the City of Camden?
23      A. 94,000.
24      MR. FENZA: Objection.
25      Q. Had nothing to do with it?

24

1      MR. FENZA: Object to the form.
2      Q. He didn't tell you not to answer.
3      MR. FENZA: You can answer the question if
4  you understand it.
5      A. No, it didn't have anything to do with it. I
6  think my credentials speak for itself. I have a
7  master's in government and public policy. I have over
8  30 years experience as an executive level person. If I
9  didn't have that, why would I have the job?
10      Q. Through politics.
11      MR. FENZA: Object to the form. I think
12  she's answered the question.
13      MR. DAILY: Never mind. I'm not going to go
14  any further with this anyway.
15      That's all I have. Thank you.
16
17      (Deposition concludes 2:25 p.m.)
18
19      -----------------
20
21
22
23
24
25

25

1      C E R T I F I C A T E   O F   O F F I C E R
2
3      I, TRACY SWEETEN, a Certified Court Reporter, do
4  hereby certify that prior to the commencement of the
5  examination, the witness was duly sworn by me.
6      I DO FURTHER CERTIFY that the foregoing is a true and
7  accurate transcript of the testimony as taken
8  stenographically by and before me at the date, time and
9  place aforementioned.
10      I DO FURTHER CERTIFY that I am neither a relative nor
11  employee, nor attorney or counsel to any parties
12  involved; that I am neither related to nor employed by
13  any such attorney or counsel, and that I am not
14  financially interested in the action.
15
16
17  _____C.C.R.
    NJ C.C.R. License No. XI-01508
18
19
20  Date: 1-1014
21
22
23
24
25

CAMPISE REPORTING, INC., 504 Rt. 130 North, Suite 284, Cinnaminson, NJ 08077 - (856) 234-6646    Page 22 to 25 of 25.

135a.

7

136a

Contractor Project Listing - _____

10/3/2013  7:28:12AM

Contractor Information

| Name: | License: | Expiration Date |
|---|---|---|
| Contact: | License No.: | |
| Email: | Builder Reg No.: | |
| Address: | Irrigation Cert No.: | |
| City/State/Z | Home Improv No. | |
| Phone Number | Elec Lic No.: | |
| Federal ID. | Plumb Lic No.: | |
| Status: Active | Elev Lic No.: | |
| | Mech Lic No.: | |
| | Fire Contractor No.: | |
| | Fire Installer No.: | |
| | Fire Permit No.: | |

| Control No. | Permit No. | Upd No. | Permit Dt | Close Dt | Block | Lot | Qualifier | Owner | | | | | Work Description | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Site Address | | | | Owner Address | | | | Agent | Building | Electrical | Plumbing | Fire | Elevator | Mechanical |

City-0072

City of Camden                                                          Page 1 of 6

137a

City-0073



| Control No. | Permit No. | Upd No. | Permit Dt | Close Dt | Block | Lot | Qualifier Owner | | | Work Description | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Site Address | | | | Owner Address | | | | Agent | Building | Electrical | Plumbing | Fire | Elevator | Mechanical |

City of Camden                                                                                    Page 2 of 6

City-0074

| Control No. | Permit No. | Upd No. | Permit Dt | Close Dt | Block | Lot | Qualifier Owner | | Work Description | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Site Address | | | | Owner Address | | | | Agent | Building | Electrical | Plumbing | Fire | Elevator | Mechanical |



City of Camden                                                                                     Page 3 of 6

139a



| Control No. | Permit No. | Upd No. | Permit Dt | Close Dt | Block | Lot | Qualifier Owner | | Work Description | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Site Address | | | | Owner Address | | | | Agent | Building | Electrical | Plumbing | Fire | Elevator | Mechanical |

City of Camden

Page 4 of 6

City-0075

140a

| Control No. | Permit No. | Upd No. | Permit Dt | Close Dt | Block | Lot | Qualifier Owner | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Site Address | | | | Owner Address | | | | Agent | Building | Electrical | Plumbing | Fire | Elevator | Mechanical |
| 26245 | 20110979 | 0 | 10/28/2011 | 11/25/2011 | 410 | 1 | RELIANT ENTERORISES | | | | | | | INSTALLATION OF (4) G. F. I. PROTECTED RECEPTACLES |
| 1207 MT EPHRAIM AVENUE | | | | 14 SORREL AVE | | | | Yes | No | Yes | No | No | No | No |
| 30506 | 20111170 | 0 | 12/08/2011 | 02/03/2012 | 312 | 74 | ROSS BOGER | | | | | | | LIGHT FIXTURES, RECEPTACLES, SWITCHES, 150 AMP SERVICE |
| 931 SO 7TH ST | | | | 931 SO 7TH STREET | | | | Yes | No | Yes | No | No | No | No |
| 33006 | 20121397 | 0 | 12/19/2012 | 01/03/2013 | 1377 | 5 | LEWIS EUGENE C & VYNE | | | | | | | 100 AMP SERVICE |
| 1302 BROWNING ST | | | | 1302 BROWNING ST | | | | Yes | No | Yes | No | No | No | No |

City of Camden                                                                 Page 5 of 6

City-0076



| Control No. | Permit No. | Upd No. | Permit Dt | Close Dt | Block | Lot | Qualifier Owner | | Work Description | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Site Address | | | | Owner Address | | | | Agent | Building | Electrical | Plumbing | Fire | Elevator | Mechanical |
| 34154 | 20130759 | 0 | 06/27/2013 | 09/19/2013 | 523 | 24 | HOLLAND W ET UX | | 100 AMP SERVICE | | | | | |
| 1571 SO 8TH ST | | | | 1571 SO 8TH ST | | | | Yes | No | Yes | No | No | No | No |

City of Camden

Page 6 of 6

City-0077

142a



143a

## marshall willaims

| | |
|---|---|
| **From:** | marshall willaims <nicoelectric@comcast.net> |
| **Sent:** | Friday, January 04, 2013 4:44 PM |
| **To:** | 'James Rizzo' |
| **Subject:** | FW: NICO ELECTRICAL Basic heading  Letter to Jim Rizzo-City of Camden |

| **Tracking:** | **Recipient** | **Read** |
|---|---|---|
| | 'James Rizzo' | Read: 1/4/2013 4:47 PM |

**From:** marshall willaims [mailto:nicoelectric@comcast.net]
**Sent:** Friday, January 04, 2013 4:42 PM
**To:** 'James Rizzo'
**Subject:** RE: NICO ELECTRICAL Basic heading Letter to Jim Rizzo-City of Camden

Mr. Rizzo

In respect to your email, I requested originally the section in the code which would support the inspectors' position for failing the job and also I meant to ask isn't it a standard procedure for an electrical inspector to have in his possession the of the electrical technical portion of the application available during the time of an inspection or should this be reviewed prior to doing an inspection to avoid misunderstanding between all parties? In respect to your question if I have a complaint I await your response to the question I have directed to you for the second time mention above, thank you for reaching out to speak to me pertaining to this matter and hopefully some form of resolution can be meant.

Marshall/Nico Electrical Contractor

**From:** James Rizzo [mailto:JaRizzo@ci.camden.nj.us]
**Sent:** Thursday, January 03, 2013 6:10 PM
**To:** 'marshall willaims'
**Cc:** Eugene Emenecker; William Revaltis; James Rizzo
**Subject:** RE: NICO ELECTRICAL Basic heading Letter to Jim Rizzo-City of Camden

MR WILLIAMS,

YOU HAVE MISQUOTED SEVERAL THINGS CONCERNING OUR PHONE CONVERSATION. NAMELY THAT I WOULD FIND DOCUMENTATION TO SUPPORT THE INSPECTOR'S POSITION.
I TOLD YOU THAT I WOULD SPEAK TO THE ELECTRICAL INSPECTOR AND HAVE HIM EITHER PROVIDE A CODE SECTION TO SUPPORT HIS DECISION OR REVERSE IT. THAT IS WHAT I SAID!

NOW TO YOUR COMPLAINT , IF YOU HAVE ONE, WHAT WAS IT THAT CONSTITUTED CONDUCT UNBECOMING A PUBLIC OFFICIAL? I NEED SPECIFIC INFORMATION NOT VAGUE AND
UNCLEAR ALLEGATIONS. GIVE ME A COMPREHENSIVE WRITTEN ACCOUNT OF THESE DISRESPECTFULL ACTIONS, THAT YOU ELUDE TO.

I THANK YOU FOR CONTACTING ME TO RESOLVE WHATEVER HAS TAKEN PLACE CONCERNING 1302 BROWNING ST. PLEASE FORWARD THE INFORMATION THAT I HAVE REQUESTED, AT YOUR EARLIEST CONVENIENCE.

JAMES R RIZZO, CONSTRUCTION OFFICIAL
CITY OF CAMDEN

## William Revaitis

| | |
|---|---|
| **From:** | James Rizzo |
| **Sent:** | Thursday, January 03, 2013 6:10 PM |
| **To:** | 'marshall willaims' |
| **Cc:** | Eugene Emenecker; William Revaitis; James Rizzo |
| **Subject:** | RE: NICO ELECTRICAL Basic heading Letter to Jim Rizzo-City of Camden |

MR WILLIAMS,

YOU HAVE MISQUOTED SEVERAL THINGS CONCERNING OUR PHONE CONVERSATION, NAMELY THAT I WOULD FIND DOCUMENTATION TO SUPPORT THE INSPECTOR'S POSITION.
I TOLD YOU THAT I WOULD SPEAK TO THE ELECTRICAL INSPECTOR AND HAVE HIM EITHER PROVIDE A CODE SECTION TO SUPPORT HIS DECISION OR REVERSE IT. **THAT IS WHAT I SAID!**

**NOW TO YOUR COMPLAINT , IF YOU HAVE ONE.** WHAT WAS IT THAT CONSTITUTED CONDUCT UNBECOMING A PUBLIC OFFICIAL? I NEED SPECIIFIC INFORMATION NOT VAGUE AND
UNCLEAR ALLEGATIONS. GIVE ME A COMPREHENSIVE WRITTEN ACCOUNT OF THESE DISRESPECTFULL ACTIONS, THAT YOU ELUDE TO.

I THANK YOU FOR CONTACTING ME TO RESOLVE WHATEVER HAS TAKEN PLACE CONCERNING 1302 BROWNING ST. PLEASE FORWARD THE INFORMATION THAT I HAVE REQUESTED, AT YOUR EARLIEST CONVENIENCE.

*JAMES R RIZZO, CONSTRUCTION OFFICIAL*
*CITY OF CAMDEN*
*BUILDING BUREAU, ROOM 403*
*(856)-757-7489*
*E-MAIL JARIZZO@CI.CAMDEN.NJ.US*

---

**From:** marshall willaims [mailto:nicoelectric@comcast.net]
**Sent:** Thursday, January 03, 2013 1:23 PM
**To:** James Rizzo
**Subject:** NICO ELECTRICAL Basic heading Letter to Jim Rizzo-City of Camden

Attn: Jim Rizzo

Attached you will find a confirmation letter in respect to our conversation as of yesterday, hopefully I will hear from you before the close of the day as promised.

Marshall/Nico Electrical Contractor

1

**145a**

**9**

146a

## marshall willaims

| From: | marshall willaims <nicoelectric@comcast.net> |
| --- | --- |
| Sent: | Thursday, January 10, 2013 1:06 PM |
| To: | 'James Rizzo' |
| Subject: | RE: Requesting Response pertaining to Statute |

| Tracking: | Recipient | Read |
| --- | --- | --- |
| | 'James Rizzo' | Read: 1/10/2013 1:19 PM |

Attn: James Rizzo

This issue was discussed at length to your satisfaction and all I requested of you was documentation that as a contractor that from my understanding should be documented and available to the Public/Public record/available for review and unfortunately it appears that this matter and all the conversation that we discussed in your office on 1/3/2013 and in the past has produced no positive or productive result and should be addressed by a HIGHER AUTHORITY.

Marshall/Nico Electrical Contractor

**From:** James Rizzo [mailto:JaRizzo@ci.camden.nj.us]
**Sent:** Wednesday, January 09, 2013 1:58 PM
**To:** 'marshall willaims'
**Cc:** William Revaltis; Eugene Emenecker
**Subject:** RE: Requesting Response pertaining to Statute

MR WILLIAMS,

WE DISCUSSED THIS ISSUE AT LENGTH. I EXPLAINED TO YOU THAT THE JOB WAS APPROVED AND IT IS A CLOSED SUBJECT.

THANKS

*JAMES R RIZZO, CONSTRUCTION OFFICIAL*
*CITY OF CAMDEN*
*BUILDING BUREAU, ROOM 403*
*(856)-757-7489* · · ·
*E-MAIL JARIZZO@CI.CAMDEN.NJ.US*

**From:** marshall willaims [mailto:nicoelectric@comcast.net]
**Sent:** Wednesday, January 09, 2013 1:24 PM
**To:** James Rizzo
**Subject:** Requesting Response pertaining to Statute

Attn: James Rizzo

As of today, originally we spoke on 1/3/2013 and as of today I have not received a response in regard to my request pertaining to a written explanation/providing the statute why the job failed inspection originally and what supporting documentation can be provided to support the issue presented which when we last spoke you stated that you would have the inspector research the issue, I would appreciate your response.

1

147a
Williams-15

# 10

**City of Camden**

ELECTRICAL SUBCODE TECHNICAL SECTION

Date Received: 11/10/2011
Control #: 30506
Date Issued: 12/8/11
Permit #: 0    11-1170

**A. IDENTIFICATION APPLICANT: COMPLETE ALL APPLICABLE INFORMATION. WHEN CHANGING CONTRACTORS, NOTIFY THIS OFFICE.**

Block: 312    Lot: 74    Qualification Code:
Work Site Location: 931 SO 7TH ST
Owner in Fee: ROSS BOGER
Address: 931 SO 7TH STREET
CAMDEN NJ 08104

E-mail:
Telephone: 0
Contractor: NICO ELECTRICAL CONTRACTOR
ATTN.
Address: P.O BOX 1427    Telephone: (856) 488-8344
DELRAN NJ 08075    Fax:

E-mail:
Home Improvement Registration No. or Exemption Reason: 13957
Contractor License No.:   Exp Date:    Federal Emp. No.: 14-9526668

**B. ELECTRICAL CHARACTERISTICS**
Use Group:    Present    R-5    Proposed
[   ]Pole/Pad #    [   ]Temporary    [   ] Other
Building Occupied as _____    Utility Co. _____
1. New Building $0.00    2. Rehabilitation $3,500.00
3. Demolition $0.00    Est.Cost of Elec.Work (1+2+3) $3,500.00

| Job Summary(Office Use Only) | | INSPECTIONS | | Dates(Month/Day) | | |
|---|---|---|---|---|---|---|
| PLAN REVIEW    Date  Initial | | Type: | Failure | Failure | Approval | Initial |
| [ ] No Plans Required | | Rough | | | | |
| Joint Plan Review Required | | Barrier-Free | | | | |
| [ ] Building   [ ] Plumbing | | Trench | | | | |
| [ ] Fire      [ ] Elevator | | Temp.Serv | | | | |
| [ ] Elec.Plans Approved | | Const.Serv | | | | |
| Date: | | TCO | | | | |
| | | Other | | | | |
| Approved by: | | Service | | | | |
| SUBCODE APPROVAL | | Final | 1-12-12 | | 2-1-12 | |
| [ ] CO  [ ] CCO  [√] CA | | Barrier-Free | | | | |
| Date:    2-1-12 | | Temp Cut-in-Card Date Issued | | | | |
| | | Final Cut-in-Card Date Issue | | | | |
| Approved by: | | Annual Pool Inspection | | | | |
| | | Date of Grounding and Bonding | | | | |
| | | Certification | | | | |

reflush sheet D
Breakers in service
Panel Notices
on 2nd Fl
Not Done

**C. CERTIFICATION IN LIEU OF OATH**
I hereby certify that I am the (agent of) owner of record and am authorized to make this application and perform the work listed on this application.

[ ] Licensed Electrical Contractor
[ ] Certified Landscape Irrigation Contractor
[ ] Exempt Applicant

_____
Applicant's Signature/Contractor's seal and Signature

U.C.C.F120/e

**D. TECHNICAL SITE DATA**

| QTY. | SIZE | ITEMS | FEE (Office Use Only) |
|---|---|---|---|
| 1 | | Lighting Fixtures | |
| 12 | | Receptacles | |
| 1 | | Switches | |
| | | Detectors | |
| | | Light Poles | |
| | | Motor-Fract.HP | |
| | | Emergency&Exit Lights | |
| | | Communication Points | |
| | | Alarm Devices/F.A.C. Panel | |
| | | Other 1: | |
| | | Other 2: | |
| | TOTAL NUMBER    14 | $61.00 |
| | | Pool Permit/with UW Lights | |
| | | Storable Pool/Spa/Hot Tub | |
| | | KW Elec. Range/Receptacle | |
| | | KW Oven/Surface Unit | |
| | | KW Elec. Water Heater | |
| | | KW Elec. Dryer/Receptacle | |
| | | KW Dishwasher | |
| | | HP Garbage Disposal | |
| | | KW Central A/C Unit | |
| | | HP/KW Space Htr./Air Handler | |
| | | KW Baseboard Heat | |
| | | HP Motors 1/+HP | |
| | | KW Transformer/Generator | |
| 1 | 150.00 | AMP Service | $102.00 |
| | | AMP Subpanels | |
| | | AMP Motor Control Center | |
| | | KW Elec. Sign/Outline Light | |
| | | KW Photovoltaic Systems | |
| | | Other 3: | |
| | | Other 4: | |
| | | Other 5: | |
| | | Other 6: | |
| | | Other 7: | |
| | | Other 8: | |
| | | Other 9: | |

| | |
|---|---|
| Administrative Surcharge | |
| Minimum Fee | |
| State Permit Surcharge Fee | $6.00 |
| TOTAL FEE | $169.00 |

Applicant: When submitting this form to your local Construction Code Enforcement Office, please pr. and three photocopies    or original

City-0061

149a

11

150a

To Director of [illegible] Jaxada.

I Ayana Jania Jordan did not
get any kickbacks from
the inspectors at all at
no time. The 2nd electrican
I found upon craigs list or
Angies list. I head Marshall
the electrican say "Oh hes
a racist Son of a Bitch." When
the gentleman got out of the
car. I was then a lil puzzled
on what was going on. The
Inspector did fail us but
not due to Marshall. When I
spoke to him about the situation
he said he had him before and
"I didn't know him". I then no
longer used him and found
[illegible] my current electrican. He
fixed the problem and we
passed. I was really pleased.

Ayana Jordan
10-8-13

151a

# 12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 1:13-cv-06353 (JHR-AMD)

NICO ELECTRICAL CONTRACTOR, INC., and MARSHALL B.
WILLIAMS,

                              Plaintiffs,

        vs.

CITY OF CAMDEN, EUGENE EMENECKER, WILLIAM REVAITIS,
JAMES RIZZO and IRAIDA AFANADOR,
                              Defendants.

------------------

January 13, 2015

------------------

        Oral sworn deposition of MARSHALL B.
WILLIAMS, 5328 Browning Road, Pennsauken, New
Jersey, was taken at the law office of F. MICHAEL
DAILY, JR., LLC, 216 Haddon Avenue, Suite 106,
Westmont, New Jersey, before Jean B. Delaney,
Certified Shorthand Reporter and Notary Public of
the State of New Jersey, on the above date,
commencing at 10:19 a.m., there being present:

A P P E A R A N C E S :

        F. MICHAEL DAILY, JR., LLC
        216 Haddon Avenue, Suite 106
        Westmont, New Jersey 08108
        (856) 833-0006
        Attorneys for Plaintiff

        WEIR & PARTNERS, LLP
        BY: RUSSELL T. ULIASE, ESQUIRE
        457 Haddonfield Road, Suite 420
        Cherry Hill, New Jersey 08002
        (856) 740-1490
        Attorneys for Defendants

---

Page 3

| | I N D E X | |
|---|---|---|
| Witness | | Page |
| MARSHALL B. WILLIAMS | | |
| By Mr. Uliase | | 4 |
| | E X H I B I T S | |
| Marked for I.D. | | Page |
| Williams-1 | Plaintiff's discovery | 4 |
| Williams-2 | Defendant's discovery | 4 |
| Williams-3 | Drawing | 28 |

---

Page 4

MARSHALL B. WILLIAMS

1        MARSHALL B. WILLIAMS, having been duly
2   sworn, was examined and testified as follows:
3                (Williams-1 Plaintiff's discovery
4        marked for identification.)
5                (Williams-2 Defendant's discovery
6        marked for identification.)
7   BY MR. ULIASE:
8        Q      Again, I'm Russel Uliase. I'm the
9   attorney for Camden. We are here to take your
10  deposition on the case that you filed against
11  Camden. Have you taken a deposition before?
12       A      Yes.
13       Q      Okay. And regarding what case? What
14  kind of case was it?
15       A      This case here.
16       Q      Before that at any point?
17       A      Oh, boy. Long, long time. I guess I
18  was a young kid then. I think it was an accident.
19  That's a long, long time ago, though.
20       Q      Do you have an approximation as to a
21  year?
22       A      I would say maybe -- it might be -- if
23  I'm 58, maybe about 35 years ago, maybe.
24       Q      Okay. All right. So the court
25  reporter swore you in. That's the same thing as

MARSHALL B. WILLIAMS    17

1    A    No.  They were saying that you have to
2  state the reason why you failed a job.  It has to be
3  actually on the sticker.  Either it is approve --
4  approved or a failure sticker, and you have to state
5  the statute, and that was the primary issue.
6    Q    My question is, would they have to
7  make that citation?  Did the DCA say that the
8  inspector had to make that citation even if it was
9  ultimately approved?
10    A    No.  That had to be done at the time
11  of the inspection, if I'm answering your question
12  correctly.  They were saying at the time of the
13  inspection, that citation would have to be done at
14  that time.  When the inspector is on the site, he
15  would have to note the citation at that time.
16    Q    Okay.  Okay.  All right.  Let's move
17  onto the next property then.
18    The next property is 1207 Mount Ephraim,
19  Tony's Tattoo shop.  It is Williams-17 within
20  Williams-1.  Take a second to review that.
21    A    I remember that.
22    Q    Who prepared this document?
23    A    I prepared it.
24    Q    Okay.  And then she signed it, he
25  signed it?

MARSHALL B. WILLIAMS    18

1    A    Yes.  As a matter of fact, it was
2  presented to me, and I asked Tony, I said to him,
3  would you be willing to provide a statement because
4  he called me and explained to me what happened word
5  for word.  And he said, sure, I don't have a problem
6  with it.  It is the truth.  I will sign it.  So
7  that's basically what happened.
8    Q    When you say he presented it to me?
9    A    He called me.  He said to me, do you
10  have a problem with the electrical inspectors in the
11  City of Camden?  And I said, what's going on?  And
12  he explained to me the situation with Mr. Revaitis
13  came out and did the inspection, and I said to him,
14  I appreciate you calling me and informing me on
15  that.  I said, would you be willing to provide a
16  statement on that?  He said, you know, prepare it
17  for me.  I prepared it for him.  I said, is this
18  exactly what happened?  He said I don't have a
19  problem signing it.  It's the truth.  That's exactly
20  what they did.
21    Q    Mr. Miller indicated that Mr. Revaitis
22  stated to Mr. Miller that if Mr. Miller needed any
23  additional work performed, that he had a good old
24  boy by the name of George Cassidy that is an
25  electrical contractor, and that Mr. Revaitis would

MARSHALL B. WILLIAMS    19

1  recommend Mr. Cassidy as opposed to you; correct?
2    A    Correct.
3    Q    So at this time, was Mr. Cassidy a
4  member of the union?
5    A    George Cassidy?
6    Q    Yes.
7    A    No.  He was never a member of the
8  electrical union.  No.
9    Q    Okay.  So, it is not your
10  understanding that the inspector was recommending
11  someone from the union over you?
12    A    No.  The issue pertaining to the union
13  never was the issue.
14    Q    Okay.  Then what is the issue?
15    A    The issue is the inspector does not
16  have the authority to recommend myself or anyone to
17  do any work, and he doesn't have the authorization
18  to basically put down, badmouth another contractor.
19  He is supposed to stay neutral in that position.
20    Q    You are not concerned about any
21  inspectors giving favorable treatment to the union
22  as opposed to you?
23    A    The issue -- when you bring the issue
24  pertaining to the union, that's two separate
25  issues -- the issue of the union, but an inspector

MARSHALL B. WILLIAMS    20

1  pertaining to this exhibit you are presenting,
2  that's a different issue.  The issue there was that
3  the inspector for the City of Camden, he basically
4  encouraged a customer to utilize my services and
5  he recommended another contractor, and that's
6  illegal.  An inspector is not supposed to do that.
7    Q    Is there a specific section or code
8  that you can cite to?
9    A    It was brought to my attention.  I
10  would have to reach out to someone in regard to
11  that.  It is unethical.  It is just not of a common
12  practice to do that.
13    Q    Nothing off the top of your head then?
14    A    I'm sure I could provide information.
15  I could research it.
16    Q    If you could do so and provide
17  something to your attorney or have your attorney
18  find it, that would be fantastic.
19    So Mr. Miller stated that he was happy with
20  all the work that you performed for his family;
21  correct?
22    A    Yes.  I've done work for his family
23  for a long time.
24    Q    Okay.  I guess aside from what is
25  mentioned here, what problems did Tony have with

154a

MARSHALL B. WILLIAMS 37

1  do that as to have a paper trail in regard to
2  showing that I've communicated with certain
3  officials. I would say that this was written after
4  the inspection. This was a follow-up.
5      Q      I'm asking about the document we were
6  just talking about. Turn to Williams-7.
7      A      Seven, okay. Let me go back to seven.
8      Q      Was this or Williams-20 written first?
9      A      This was after.
10     Q      This being? You have to say it out
11 loud.
12     A      This was after.
13     Q      What document was after?
14     A      The one on page 20 was after.
15     Q      After seven through eight?
16     A      Right.
17     Q      Okay. So at the point Williams-20 was
18 written, the approval was out, it was already
19 approved?
20     A      Now, the approval -- I can't be exact
21 on that. Was the approval out? I'm looking at the
22 time period. I don't think the approval was out yet
23 because they never respond quickly. Normally when
24 you have an issue with the City of Camden, you might
25 get a response back maybe a month later. I went to

MARSHALL B. WILLIAMS 38

1  my P.O. Box one day, and I said they approved the
2  job. That doesn't clarify the issue. I always --
3  when there is an issue, they always turn around and
4  make it look like you are doing it right. They send
5  out the approval stickers. All they are doing is
6  saying, basically, we approve your job. And
7  sometimes I would call Mr. Rizzo and say, Jim, we
8  are not addressing the issue here. I know finally
9  the job is approved, but that does not resolve the
10 job at hand. He didn't want to hear that.
11     Q      All right. So as of the date that
12 this letter was written, this letter being the
13 letter from February 10th, 2012, Williams-20, were
14 you represented by an attorney?
15     A      I don't believe at that time I was
16 represented by an attorney.
17     Q      All right. Because I'm just
18 referencing the quote, which is -- I just saw it.
19 Excuse me. Okay. Four lines up from the bottom.
20     A      Page 20?
21     Q      On page 20, it says, for legal reasons
22 I would not bring to a count the multiple facts
23 which have acquired and can be identified.
24     A      That was my way of telling him that I
25 document everything. I put that in. That was me

MARSHALL B. WILLIAMS 39

1  speaking. There was no attorney speaking on behalf
2  of me. I was letting Jim know that I was keeping a
3  record of what's going on.
4      Q      So there is not an actual reason that
5  you can identify like you say in that sentence? I
6  was just confused by, I guess, the phrasing of that
7  sentence.
8      A      That's just the way I talk. I just
9  do --
10     Q      You didn't really mean anything
11 towards legal reasons?
12     A      I was leaning towards reaching out to
13 an attorney but I didn't have an attorney at the
14 time.
15     Q      That said for blank, blank, blank --
16     A      That's to let him know I'm not
17 ignorant of what you are doing to me. If I have to
18 reach out to an attorney, I will do that. That's me
19 saying I'm not ignorant to what you are doing and it
20 is getting old.
21     Q      Okay. Let's move onto the next
22 property. 1571 East 8th Street, Bernice Holland.
23     A      What page is that on?
24     Q      During the last deposition you said
25 Ninth Street. It is Eighth Street.

MARSHALL B. WILLIAMS 40

1      A      I think Ms. Bernice lives on Ninth
2  Street. I believe that's Ninth Street she lives on.
3      Q      Let's turn to 19 then, the page
4  before. That's in the exhibit marked as Williams-1.
5  So do you think this document is right in
6  saying Eighth Street?
7      A      Let me take a minute to review it.
8      Q      Please, please.
9      A      I believe -- I believe that is Eighth
10 Street. I think that's Ms. Holland.
11     Q      You think it is Eighth Street?
12     A      I'm sure that's Eighth Street. I'm
13 thinking Ninth Street, and she lives the next street
14 over. I'm sure that's Eighth Street.
15     Q      Okay. So with Williams-19, when did
16 you send this letter? It is not dated. Do you have
17 an approximation?
18     A      I would say it had to be within --
19 within a week after the inspection.
20     Q      Within a week. Is there a reason you
21 didn't date it?
22     A      That's one of the times I didn't --
23 oversight on my part. I didn't date it. Normally,
24 if I went back to my computer, if I put something
25 together, I try to keep a trail, a paper trail. I

MARSHALL B. WILLIAMS                                    41

1    would say it had to be within a week from the time
2    of the occurrence.
3        Q     All right. You say in the first
4    paragraph toward the end, he made comments, he being
5    Revaitis, made comments to the homeowner which have
6    been directed at me as a contractor, an individual
7    who takes pride in his integrity to others which was
8    questioned due to the inspector's comments. What
9    comments are you referring to?
10       A     Okay. When I received a phone call
11   from Ms. Holland, as a matter of fact, it came from
12   her son-in-law who lives directly across the street
13   from me. He said the inspector came out and failed
14   the job. And when I went out there, same thing
15   again. He didn't look at the scope of work. What I
16   was hired to do was replace the panel on the load
17   side. He failed the job because -- there was a fail
18   because of the line side of the cable side of the
19   meter. When I was there, Ms. Holland said the
20   inspector said you shouldn't have paid him. That's
21   terrible what he did. She turned around and shared
22   with me what he said. And I turned around and I
23   reached out and spoke to Mr. Rizzo about that and,
24   you know, and I said you failed the job. Did you
25   look at the scope of work that was on the dec sheet?

MARSHALL B. WILLIAMS                                    42

1    No. It was a service. No, it is not a service.
2    You have to look at the dec sheet. If it says
3    replace panel, anything beyond that, I'm not
4    responsible for.
5        Q     Okay. So he looked at the old work
6    that wasn't yours at all and said this is shoddy
7    work, you shouldn't have hired him?
8        A     No. I didn't say that.
9        Q     Okay.
10       A     He told her, well, you shouldn't have
11   paid him.
12       Q     Okay. For what reason?
13       A     Because the line side of the cable
14   wasn't supported properly. Line side, meaning the
15   cable that's on the upper side of the meter, the top
16   or line meaning the same.
17       Q     And that was a piece of work that you
18   performed?
19       A     No. That was existing.
20       Q     Okay. So he saw existing work, like I
21   said, he saw existing work, old work, thought it was
22   yours and said it was shoddy?
23       A     He didn't say shoddy, but along those
24   lines.
25       Q     Okay.

MARSHALL B. WILLIAMS                                    43

1        A     He said that he failed the job and
2    that she should -- should not have paid me.
3        Q     So at the end of the day, so to speak,
4    did she understand that the work he was referring to
5    wasn't your work?
6        A     Did she say --
7        Q     Uh-huh.
8        A     Oh, yes. Once I spoke with her and
9    her son-in-law came over and also her daughter,
10   they've known me for some time, and so I turned
11   around, and as a courtesy I went over there and did
12   some additional work, didn't get paid for it, but I
13   did it to maintain a good relationship, not to lose
14   that relationship. But I should have not had to go
15   over and do work free of charge, but I did it so
16   Ms. Holland to have negative thoughts about me. I
17   try to keep good relationships with people. I
18   mentioned to Mr. Rizzo that had nothing to do
19   with my scope of work but, once again, maybe a month
20   later, he sent me this approval sticker, and it was
21   never put on the sticker why the job failed. They
22   don't put on there the reason why. That's the whole
23   issue.
24       Q     All right. So I guess back to my
25   original question, she understood that

MARSHALL B. WILLIAMS                                    44

1    Mr. Revaitis's comments saying you should not have
2    paid him were in reference to work that you didn't
3    do? She understood, okay, Marshall's work was good.
4    The inspector was referring to work that he didn't
5    do.
6        A     No. She didn't understand because she
7    don't have the knowledge of electrical work. The
8    only thing she understood was the job failed. 
9    People's mind sets are very narrow. They look at,
10   the bottom line is I got a red sticker on my panel
11   and it means it is failed. It is an open issue.
12   They want to finalize things. They don't want
13   problems. In her mind, I had to go over and explain
14   to her what it was and make a phone call and say
15   what's it about. This is nothing to do with my
16   work, and I said I will tell you what I will do. I
17   just want you to understand I didn't do anything
18   wrong, but what I will do as a courtesy, I will take
19   care of the other things. But I want you to
20   understand, too, that I didn't do anything wrong.
21   She understood exactly once -- her son-in-law, he is
22   an inspector, too. He explained it to her, too. It
23   helped her to clarify. He said Marshall is okay.
24   It brought clarification. But she is not bitter
25   with me like the other person.

MARSHALL B. WILLIAMS     45

1    Q     That other person being --
2    A     Ayanna. I guess that's how you say
3  her name. Yeah. Yeah.
4    Q     So, I guess, just to sum that, she
5  thought -- she didn't feel that you were to blame
6  for anything that the inspector failed, like none of
7  it was your fault?
8    A     She just felt as though it should have
9  been communicated with her a lot clearer, and I said
10  I will see if I can get Mr. Rizzo or somebody to
11  call you to explain it, but nobody called her to
12  explain it to her.
13    Q     So was your business relationship with
14  her ultimately affected after everything was said
15  and done?
16    A     No. She -- she is okay. She is the
17  type of person, if she doesn't like you, she will
18  let you know. She is very direct.
19    Q     And she didn't let you know, I guess?
20    A     She is a feisty old lady. She let you
21  know if she is not satisfied. Once I took the time
22  and clarified it and didn't charge her, she was
23  thrilled with me.
24    Q     Turning to Williams-16, take a look at
25  that for me.

MARSHALL B. WILLIAMS     46

1    A     Yes, I'm familiar with this.
2    Q     Who prepared this statement?
3    A     I prepared it.
4    Q     Okay. It says, I was informed that
5  the job failed due to the fact that the service head
6  was not supported, and that the electrician that
7  performed the work should not have been paid for the
8  work which was not performed correctly; correct?
9  That's what it said in that letter?
10    A     Uh-huh.
11    Q     Tony Parker then called you and stated
12  that the service head was attached to the property
13  when you performed the work; correct? Tony parker
14  was her --
15    A     Tony Parker stated --
16    Q     So Tony Parker called you and informed
17  you that the service head was attached to the
18  property?
19    A     Was not attached?
20    Q     Was attached when you performed the
21  work. He made that contact with you?
22    A     That's her son-in-law.
23    Q     Right. So, again, I guess, just to
24  make sure we are clear, Tony Parker called you and
25  said, hey, that service head was attached when you

MARSHALL B. WILLIAMS     47

1  were working on it?
2    A     That's correct.
3    Q     Okay. So is it your understanding
4  that the service head, at some point in between your
5  work and the inspection, became detached?
6    A     That's a possibility. Had to.
7    Q     How so?
8    A     Because it was attached at the time
9  when I did the job but the inspector, he wanted
10  additional straps put up, and he wanted the service
11  head reattached. I think we might have had a storm
12  during that time. I think we got a real bad
13  rainstorm during that period, and maybe it became
14  detached during that time.
15    Q     Okay. So you testified on the first
16  day of the deposition that Mr. Revaitis wanted a
17  couple more straps on the service head.
18    A     Service cable, on the service cable.
19    Q     Would that solve the issue with the
20  service head?
21    A     No. You put the service head up and
22  then you put the straps up so many feet away. That
23  was not on the scope of work. That was not my scope
24  of work.
25    Q     Okay. Okay. All right. Let's move

MARSHALL B. WILLIAMS     48

1  onto the next property. And now we are going to
2  move onto Williams-2, which is this packet right
3  here. We are going to switch back eventually, but
4  first I'm going to refer to City-15, which is the
5  1596 Kaighns Avenue.
6    A     Okay.
7    Q     Just take a look at that document.
8    A     Okay.
9    Q     Okay. Was there any improper action
10  on behalf of the City of Camden in regards to this
11  property or was this one of the --
12    A     Okay. This is something more recent.
13    Q     Okay.
14    A     This particular job on Kaighns Avenue
15  and the situation there, the owner hired a general
16  contractor initially and then she went with another
17  contractor. She fired the initial general
18  contractor. She brought another guy on board, and
19  this guy turned around and he is a general
20  contractor. He is limited in what he can do, and he
21  allowed some of the workers on the job to start
22  doing electrical work on the job.
23    Q     Okay. And who is this general
24  contractor you are referring to?
25    A     Global Construction.

MARSHALL B. WILLIAMS 113

1    Q    And those conversations were with --

2    A    Mr. Verbos.

3    Q    Okay. And in your note you say,

4 direction was presented. Starting there, read that

5 sentence for me.

6    A    Okay.

7    Q    So who was presented this direction,

8 quote/unquote?

9    A    Mr. Rizzo.

10    Q    What was that direction?

11    A    The direction, after Mr. Verbos

12 visited the City of Camden, he said to me that I

13 gave you guys specific instructions in regard to how

14 to perform their inspections. They were supposed to

15 cite the violations. If they fail, they are

16 supposed to identify the violation.

17    Q    Who was given this direction, which

18 code officials? Do you know?

19    A    Mr. Verbos told me that he had shared

20 that with Mr. Rizzo, and he was supposed to

21 downstream, pass it on to his inspectors.

22    Q    Okay. Was that relayed by letter, by

23 phone?

24    A    We spoke on the phone several times.

25    Q    His contact with Mr. Rizzo, he said he

MARSHALL B. WILLIAMS 114

1 called him?

2    A    He told me he -- the week before,

3 visiting City of Camden, he told me he was going to

4 go to City of Camden. His boss had authorized for

5 him to go to Camden to, you know, question him in

6 regard to the problems I had been experiencing.

7    Q    Who was his boss?

8    A    Carmine. I can't think of his last

9 name.

10    Q    Who?

11    A    Mr. Verbos's superior. What happened

12 was, I had to send a complaint to his superior for

13 him to authorize for him to go to the City of

14 Camden. So once I spoke with his superior, first

15 name is Carmine, I can't think of his last name, he

16 scheduled for Mr. Verbos to come to the City of

17 Camden.

18    Q    What documents were attached to this?

19    A    I would have to look at my emails.

20 You said what documents were attached? I'm not

21 totally sure.

22    Q    Okay. Yeah. There we go. This is

23 the accompanying email possibly in Williams-2.

24    A    Two.

25    Q    The exhibit marked as Williams-1.

MARSHALL B. WILLIAMS 115

1    A    Exhibit-2, you say?

2    Q    Williams-2, Exhibit-1.

3    A    Okay. I believe this was -- sent to

4 him initially, I believe. I'm looking at the date

5 on it, also, in August. I would have to actually

6 look at my emails to be totally sure.

7    Q    All right. Would you please do that

8 and send us some sort of letter stating what was in

9 it along with everything else I requested today?

10         All right. So I guess turning now to

11 Williams-3, so you met with Mr. Rizzo in January.

12 What was the purpose of that January meeting?

13    A    To discuss the problems encountered,

14 the problems that we were having with respect to the

15 inspectors.

16    Q    Okay. Were there any meetings between

17 January and August when this -- when this email was

18 sent?

19    A    I believe I met with Mr. Rizzo on

20 maybe two or three occasions physically at his

21 office downtown on the fourth floor. I couldn't get

22 any kind of favorable response from him. I kept

23 reaching out for Afanador. When you go in the

24 office and you ask for Afanador, the secretaries

25 pretty much direct you to Mr. Rizzo. They like, no,

MARSHALL B. WILLIAMS 116

1 you don't want Ms. Afanador to hear any complaints.

2 I was always redirected to Mr. Rizzo.

3    Q    And all three of those meetings, two

4 of those three meetings were regarding the same

5 topics?

6    A    They were different jobs. I would

7 say, Mr. Rizzo, I have another issue here. They

8 would downplay it like it is no big thing. Don't

9 worry about it.

10    Q    Because?

11    A    In my opinion, I can't say why. But

12 it was quite obvious that he was very protective of

13 his employees, the guys working under him, his

14 inspectors.

15    Q    Were all these jobs that you were

16 referring to that you met with him regarding, were

17 they all ultimately approved or did any of them stay

18 as a violation?

19    A    They never stayed the violation. They

20 would ultimately approve them.

21    Q    Okay. So what were the attachments to

22 this email? Was it the same situation?

23    A    The attachment here?

24    Q    This is Williams-3.

25    A    If I sent it to Ken Verbos, I sent him

MARSHALL B. WILLIAMS                    117

1  a copy of what I sent to Mr. Rizzo. Because of the
2  time lapse, I would have to go on the computer and
3  see what was sent out.
4      Q      Okay. Let's turn to Williams-4. So
5  when was this sent? I'm not seeing a date here.
6      A      This was prior to Mr. Verbos visiting
7  the City of Camden. I would say approximately,
8  maybe a couple weeks prior to his visit.
9      Q      Okay. Is there a reason there is no
10 date here?
11     A      Just an oversight on my part. If I
12 went on the computer, it would show me what date I
13 generated that. And I think I faxed this over to
14 DCA, also.
15     Q      Right. Did you fax over what we had
16 marked as Williams-3?
17     A      Yes, I believe I did. Yeah. Yeah,
18 I -- it shows an attachment, also. I spoke to
19 Mr. Verbos, and he told me that any formal
20 correspondence, send it over to him. So I would
21 have to see what was actually sent over. That's how
22 he would say, and that's how he would do it. He was
23 telling me, when he went to the City of Camden, they
24 didn't know he was coming in that day.
25     Q      All right. Back to Williams-4. You

MARSHALL B. WILLIAMS                    118

1  refer, I guess, the letter -- to the attention of
2  Carmine Gangeruso. G-A-N-G-E-R-U-S-O. Who is that?
3      A      He was the -- if I'm not mistaken, he
4  was the head in regard to that department,
5  regulatory affairs.
6      Q      How did you get your -- his
7  information?
8      A      When I spoke to Mr. Verbos, he said
9  that, you know, we've been talking about this for
10 years. He said, I spoke to my boss about this here.
11 Put a letter together requesting, you know, your
12 concerns, and he will authorize for me to come to
13 the City of Camden.
14     Q      Okay. So what was discussed?
15     A      What was discussed between me and
16 Mr. Verbos?
17     Q      Did you ever actually meet with Ms. --
18 Mr. Gangeruso?
19     A      We spoke on the phone briefly.
20     Q      What was discussed?
21     A      I told him some of the problems I had
22 been experiencing for some time, and Ken Verbos
23 confirmed that, also. And they felt as though, with
24 the amount of time that has gone on, he thought it
25 was worth paying a visit to the City of Camden. He

MARSHALL B. WILLIAMS                    119

1  said he would make arrangements for him to come to
2  the City of Camden.
3      Q      Did he ever come to the City of
4  Camden?
5      A      Ken Verbos --
6      Q      That's V-E-R-B-O-S.
7      A      -- called me and told me when he
8  visited the City of Camden.
9      Q      So could you read the first paragraph
10 for me? Not aloud. Just to yourself.
11     A      All right.
12     Q      What is the meaning of the first
13 paragraph? What are you referring to?
14     A      I'm requesting that someone that has
15 the authority come to the City of Camden and bring
16 it to the attention of Mr. Rizzo that there are
17 certain guidelines that must be followed in regard
18 to their inspections. It would have to come from a
19 higher source. That's why I went to the State of
20 New Jersey.
21     Q      And you did say that that ultimately
22 did happen?
23     A      He spoke to him, but they never
24 followed up in regard to providing statutes.
25     Q      Okay. What was attached to this?

MARSHALL B. WILLIAMS                    120

1      A      Probably supporting documentation of
2  communications that I sent out to Mr. Rizzo. I had
3  to, you know, validate what I was saying. I
4  couldn't verbally say this, so I sent him copies of
5  things. And I think after they reviewed everything,
6  they made a decision that they were going to come to
7  the City of Camden.
8      Q      How did they relay that decision to
9  you?
10     A      We spoke on the phone.
11     Q      Do you recall exactly what was
12 attached to it?
13     A      I don't like to assume, but I'm almost
14 sure I had to validate my communications to
15 Mr. Rizzo. So more than likely I sent copies of
16 those documents to the state DCA.
17     Q      Okay. All right. Let's turn to 12
18 and 13 in Williams-1. Familiarize yourself with
19 this.
20     A      Okay.
21     Q      Was this document drafted and sent
22 before the meeting with Afanador?
23     A      I believe this was sent after.
24     Q      After?
25     A      As a matter of fact, I know it was

# 13

# NICO ELECTRICAL CONTRACTOR, INC.



## MARSHALL B. WILLIAMS, OWNER/PRESIDENT
### We're Wired for Hire



P.O. Box 1427 • Delran, NJ 08075-0147
Phone: (856) 488-8344 • Fax: (856) 488-8268
Email: nicoelectric@comcast.net • http://nicoelectric.web.officelive.com

To: James Rizzo, Code official-City of Camden, 4th Floor, Building Inspection Department, Camden, NJ 08101

From: Marshall B. Williams

Re: Permit No.130759

Complaint-Failure of inspector to inspect scope of work outlined on permit application/Comments made to homeowner which are beyond the scope of the inspection

*Continuing problems encountered with inspections within the City of Camden

The purpose of this letter is bring to your attention that on 8/26/2013 an inspection was performed at 1571 S. 8th Street and the scope of work was not followed and the job failed for reasons which had nothing to do pertaining to the work performed by Nico Electric and the inspector that performed the inspection not only failed the job due to something that he notice during his inspection but, failed to review the scope of work outlined, also he made comments to the homeowner which had been directed at me as contractor and individual who takes pride in his integrity to others which was question due to the inspectors comments.

I will provide you a statement to validate the above, once again we have revisited an old situation that I have ask you previously to address, unfortunately it is not being handled in the proper manner.

Marshall/Nico Electrical Contractor

161a
Williams 19

# 14

To: Whom it may concern

From: Bernice Holland

Re: Inspection Performed on 8/26/2013-Permit No. 13-0759

The purpose of this memo is to state for the record that during the inspection which was performed on my property by the electrical inspector for the City of Camden, I was informed that the job failed due to the fact that the service head was not supported and that the electrician that performed the work should not have been paid for work which was not performed correctly, after the inspector departed my step son contacted the electrician and the electrician, Marshall Williams stated that this was not in the scope of his work and he also stated that during the time that he performed the work the service head was attached to the property, finally he wanted to make it clear that he would return to attach the service head as professional tradesmen and a person of integrity, but he stated that it should be made known to the City of Camden that the job failed not due to the work performed by his company, but due to the inspectors failure to review the scope of work report.

Bernice Holland 8/27/13

*Bernice Holland*

# 15

ELECTRICAL SUBCODE TECHNICAL SECTION

Date Received: 06/07/2013
Control #: 34154

Date Issued: 6/27/13
Permit #: 0   13-0759

City of Camden:

**A. IDENTIFICATION APPLICANT: COMPLETE ALL APPLICABLE INFORMATION. WHEN CHANGING CONTRACTORS, NOTIFY THIS OFFICE. CALL UTILITY DIG NO. 1-800-272-1000.**

Work Site Location: 1571 SO 8TH ST
Block: 521  Lot: 24  Qualification Code:

Owner in Fee: HOLLAND W RUX

Address: 1571 SO 8TH ST
CAMDEN NJ 08104

E-mail:
Telephone:
Contractor: NICO ELECTRICAL CONTRACTOR

Address: P.O BOX 1427
DEHAHN J  08025

E-mail:
Home Improvement Registration No. or Exemption Reason: 13357
Contractor License No.:  Exp Date:  13 957

**B. ELECTRICAL CHARACTERISTICS**
Use Occup:  Present  R-5  Proposed

[ ] Pole/Pad #  [ ] Temporary  [ ] Utility Co.  [ ] Other
Building Occupied as
1. New Building $0.00
2. Rehabilitation $810.00
3. Demolition $0.00   Est.Cost of Elec.Work (1+2+3) $800.00

**SUBCODE APPROVAL for PERMIT**

DESCRIPTION OF WORKS
100 AMP SERVICE

Telephone (856) 488-8344
Fax:

Federal Emp. No.: 16-5326668

**D. TECHNICAL SITE DATA**

| QTY. | SIZE | ITEMS | | FEE (Office Use Only) |
|---|---|---|---|---|
| | | Lighting Fixtures | | |
| | | Receptacles | | |
| | | Switches | | |
| | | Detectors | | |
| | | Light Poles | | |
| | | Motor/Fract.HP | | |
| | | Emergency/Exit Lights | | |
| | | Communication Points | | |
| | | Alarm Devices/F.A.C. Panel | | |
| | | Other 1: | | |
| | | Other 2: | | |
| | | TOTAL NUMBER | | |
| | | Pool Permit/with UW Lights | | |
| | | Storable Pool/Spa/Hot Tub | | |
| | | KW Elec. Range/Receptacle | | |
| | | KW Oven/Surface Unit | | |
| | | KW Elec. Water Heater | | |
| | | KW Elec. Dryer/Receptacle | | |
| | | KW Dishwasher | | |
| | | HP Garbage Disposal | | |
| | | KW Central A/C Unit | | |
| | | HP/KW Space Htr/Air Handler | | |
| | | KW Baseboard Heat | | |
| | | HP Motors 1/HP | | |
| | | KW Transformer/Generator | | |
| 1 | 100.00 | AMP Service | | $51.00 |
| | | AMP Subpanels | | |
| | | AMP Meter Control Center | | |
| | | KW Elec. Sign/Outline Light | | |
| | | KW Photovoltaic Systems | | |
| | | Other 3: | | |
| | | Other 4: | | |
| | | Other 5: | | |
| | | Other 6: | | |
| | | Other 7: | | |
| | | Other 8: | | |
| | | Other 9: | | |

Administrative Surcharge  $1.00
Minimum Fee
State Permit Surcharge Fee
**TOTAL FEE**  $52.00

Tax permissible

State permissible: this item to your Local Construction Code Enforcement Office, please provide one copy.

**Job Summary (Office Use Only)**
**PLAN REVIEW**
[ ] No Plans Required
[ ] Partial-Underslab Utilities Approved
Date:  Approved by:
Electric Plans Approved
Date:  Approved by:
Joint Plan Review Required
[ ] Building   [ ] Plumbing
[ ] Fire   [ ] Elevator

**SUBCODE APPROVAL for CERTIFICATE**
Approved By [ ] CCO  [ ] CO
Date:
Approved by:

**INSPECTIONS**  Date(s/month/Day)

| Type | Pass | Failure | Failure | Approval | Initial |
|---|---|---|---|---|---|
| Rough | | | | | |
| Barrier-Free | | | | | |
| Trench | | | | | |
| Temp-Serv | | | | | |
| Const-Serv | | | | | |
| TCO | | | | | |
| Other | | | | | |
| Service | | | | | |
| Final | | | | | |
| Barrier-Free | | | | | |

Temp Cut-in-Card Date Issued
Final Cut-in-Card Date Issue
Annual Pool Inspection
Date of Grounding and Bonding
Certification

**C. CERTIFICATION IN LIEU OF OATH**
I hereby certify that I am the (agent of) owner of record and am authorized to make this application and perform the work listed on this application.

Applicant's Signature/Contractor's real and Signature  Print Name
[ ] Licensed B*  *nical Contractor  [ ] Certified Landscape Irrigation Contractor  [ ] Exempt Agent   [ ] Exempt Agent

U.C.C-F19(rev.11

City-0064

EXHIBIT
13-14  15

165a

# 16

To: Whom it may concern

From: Owner: Israel Miller/Tony-Twisted Tattoos

Re: Inspection Performed at 1207 Mt Ephraim Ave/Tattoo Shop

Previously during an inspection at my place of business at the above location, the electrical sub code official William Rivaitis, during the course of his inspection, stated to me , Mr. Miller that if I needed any additional work performed that he had a "Good old boy" by the name of George Cassidy that is an electrical contractor and that he would recommend Cassidy as opposed to calling Nico Electric for future work, I explain that he has done work for my family previously and we have been happy with all of his work, I was surprised at the inspectors comments and I shared this information with Marshall the owner of Nico Electric.

Israel Miller/Tony-9/23/2013

9/25/2013

# 17

168a




# NICO ELECTRICAL CONTRACTOR, INC.

## MARSHALL B. WILLIAMS, OWNER/PRESIDENT

### We're Wired for Hire

P.O. Box 1427• Delran, NJ 08075-0147

Phone: (856) 488-8344 • Fax: (856) 488-8268

Email: nicoelectric@comcast.net • http://nicoelectric.web.officelive.com

To: Regulatory Affairs

Attn: Carmine Gangeruso

Re: Failure of Pubic Official to supply contractor code statue for failure of job

*Conduct exhibited unbecoming of a public official/Failure of superiors to address issues requested

The purpose of this communication to your department is that I may request assistance in respect to having the authorities locally acknowledge the statute mandated by the State of New Jersey and that those statutes be respected and enforced by those having jurisdiction to monitor such laws, attached you will find supporting documentation that will validate a simple request that I placed before a code official, and as of today it has been not acknowledged and has not been addressed in manner which is outlined by our mandated statute by the State of New Jersey, that from my understanding and account inspectors must follow and acknowledge.

Note: My primary objective during this communication to you is to primarily stay focus on the subject matter in respect to the responsibilities and obligation of a public official and the manner of conduct that must exhibited, but I will say that I have experience problems for a long time period whenever I'm granted an opportunity to work in the City of Camden and I ask only that if someone could offer any form of assistance or inquire why? I ask for no special treatment, but to be granted the same opportunity without unfair treatment.

Your assistance to this matter will be greatly appreciated

Marshall/Nico Electrical Contractor-Cell No. 609-760-2185

Pages Attached Including Cover Letter-6

169a

# 18

1

1          UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF NEW JERSEY

2          CIVIL ACTION NO. 1:13-cv-06353 (JHR-AMD)

3

4     NICO ELECTRICAL CONTRACTOR, INC., and MARSHALL B.

      WILLIAMS,

5                               Plaintiffs,

6          vs.

7     CITY OF CAMDEN, EUGENE EMENECKER, WILLIAM REVAITIS,

      JAMES RIZZO and IRAIDA AFANADOR,

8                               Defendants.

9

10             ------------------

11               January 16, 2015

12             ------------------

13

14          Oral sworn deposition of KENNETH W.

15    VERBOS, 2060 Yardville-Hamilton Square Road,

16    Hamilton, New Jersey  08690 was taken at the law

17    office of WEIR & PARTNERS, LLP, 457 Haddonfield

18    Road, Cherry Hill, New Jersey, before Jean B.

19    Delaney, Certified Shorthand Reporter and Notary

20    Public of the State of New Jersey, on the above

21    date, commencing at 10:09 a.m., there being present:

22

23

24

25

6

1        A        101 South Broad Street, Trenton, New

2    Jersey 08625.

3        Q        And what's the highest grade or level

4    of education that you have?

5        A        Some college.

6        Q        Some college?

7        A        Apprenticeship throughout the UEW.

8        Q        What years?

9        A        I started my apprenticeship in 1976.

10   I guess until 1980,'81.  When it finished, college,

11   I -- appears -- I started in '70 to about '72,

12   stopped, and I've taken courses throughout the time

13   up to about '86.  Maybe later.

14       Q        Did you receive a certificate for the

15   apprenticeship?

16       A        Yes, I did.

17       Q        What kind?

18       A        Journeyman electrician.

19       Q        Okay.  With what entity are you

20   currently employed?

21       A        I'm employed by the State of New

22   Jersey through the Department of Community Affairs.

23   I work out of the Office of Regulatory Affairs.

24       Q        And what years were you employed by

25   them?

7

1        A        I started with DCA in 1993.

2        Q        Okay. Have you ever been arrested for

3    a crime or offense in the State of New Jersey

4    before?

5        A        No.

6        Q        What involvement have you had with any

7    unions of any sort? Have you been --

8        A        I was a union -- IBEW Local 143 out of

9    Harrisburg. I'm still a member, still pay my dues.

10   I'm a member of the CWA, I think 1039, which is the

11   union for the state employees.

12       Q        And what is the -- the number for

13   IBEW?

14       A        143.

15       Q        What years did you start with each of

16   these unions?

17       A        In the union, in the IBEW, I started

18   my apprenticeship in 1976. I worked out of a hall

19   on -- numerous halls up to 1993 when I went to work

20   for the state.

21       Q        Okay. How did you become familiar

22   with the claimant in this case, Mr. Williams?

23       A        Mr. Williams, I believe, contacted my

24   former supervisor, Carmine Gangeruso, and Carmine --

25       Q        How do you spell that name?

8

1        A       Good question.  Let's see.  I think

2    it's in one of the emails he sent to me.

3    G-A-N-G-E-R-U-S-O.

4        Q       Okay.  And when did you first speak

5    with him, the claimant in this matter?

6        A       The complainant?  Sometime in 2012.

7    I'm not really sure.

8        Q       Aside from today, when's the last time

9    you spoke with him?

10        A       Was it last week I called you, you

11    called me?

12               MR. WILLIAMS:  I believe the week

13    before.  I believe you called me -- I think you

14    might have called me Monday, maybe.

15    BY MR. ULIASE:

16        Q       What were your conversations with

17    Mr. Williams regarding the legality of Camden

18    inspector's conduct?  Do you recall them?

19        A       There were --

20               MR. DAILEY:  I don't think he

21    mentioned anything about the topic of the

22    conversations.  He just said that there were

23    conversations.  So the record is clear, you should

24    first ask him whether the conversation was about

25    Mr. Williams claiming illegality, or legality, or

9

1    whatever.

2    BY MR. ULIASE:

3        Q        Let's just leave the conduct of the

4    city inspectors, just conversations with

5    Mr. Williams regarding inspector's conduct in

6    Camden.

7        A        The complaints that they were not

8    given code citations.  They were improperly

9    enforcing, requiring him to fix things that weren't

10   his responsibility.  They were -- Mr. Williams

11   stated that they were making derogatory remarks

12   about him to his customers and recommending other

13   contractors.

14       Q        Okay.  Did you give him any advice

15   with regard to those complaints?  What was your

16   response?

17       A        As far as the code issues, not given

18   code cites, I told him I would make arrangements,

19   and I've talked to the inspectors in Camden about

20   that, the electrical inspectors, which I did.  And

21   as far as the demeanor, that's a local issue to take

22   up with the local authorities.  And he complained

23   that the construction official wasn't doing it.  The

24   other things, if there was enough, that it would

25   become official misconduct, we could look at it, but

175a

1    just the demeanor and how they addressed people is a

2    local issue.

3         Q        Did you ever get to the point of

4    addressing their demeanor or did you just say it is

5    a local issue?

6         A        When I talked to them about the code

7    issues, I did mention it that, you know, they can't

8    be doing this, but I let it drop there for the most

9    part.  And that was handled by the then director.  I

10   forget her name.

11        Q        Okay.  All right.  So you never cited

12   them for anything regarding their demeanor, solely

13   their demeanor?

14        A        No.

15        Q        In what form were your discussions

16   with Mr. Williams about this conduct of the city

17   officials?  Was it by telephone, letter?

18        A        Emails, faxes, I believe.  Phone

19   conversations.

20        Q        Okay.  All right.  Do you have the

21   emails from Mr. Williams?

22        A        The ones that I still have.  I thought

23   there was one more, but Carmine would have -- again,

24   it wasn't a case, so it was more, handle the

25   situation, and what Carmine would have had or what I

13

1    specific work, what are they supposed to do with the
2    customer?

3         A        The customer, they got to, again,
4    notify the customer either through a red sticker,
5    here, this is yours, here is the approval from
6    Mr. Williams.

7         Q        And they are supposed to explain to
8    the customer what happened, as well?

9         A        Well, yeah, that it is not his
10   responsibility.

11        Q        Is that pursuant to a statute or rule?
12   Is there anything that you can cite?

13        A        As far as -- rephrase that.

14        Q        Is there any statute, code, or rule
15   that says whenever a code official mistakenly
16   believes that an electrician failed their --
17   performed work that constituted failure, do they
18   have to explain to the customer --

19        A        As far as how they explain, no.  They
20   have to, again -- if Mr. Williams' job was approved
21   or did not cause a code violation, if the scope of
22   his work was compliant, they are required to give
23   him approval, and an approval is a sticker.  Now, if
24   there is outstanding code violations that they
25   noticed that were an issue that should have been

14

1    addressed, such as the owner did work without a

2    permit, took something apart or was unsafe, then

3    they have to address that to the owner.

4         Q       Right.  Right.  And -- and back to

5    square one.  If they mistakenly believed that it was

6    Mr. Williams' work, do they have to relay that to

7    the customer, and if so, pursuant to what rule or

8    statute?

9         A       Well, again, through their inspection

10   process, they are required either to cite the code

11   violation that the contractor made or approve it.

12        Q       Okay.  So if they ultimately approve

13   it --

14        A       That's -- they've given -- they've

15   approved it.  It is done.

16        Q       So do they have to explain to the

17   customer what happened?

18        A       I don't think there is anything to say

19   other than here is your approval for Mr. Williams'

20   work.  No.

21        Q       Do they have to cite a violation if

22   they ultimately approve the work, and if so,

23   pursuant to what work?

24        A       If they find an unsafe condition, what

25   we would call an unsafe condition that was in the

15

1    house that Mr. Williams did not cause, a contractor

2    did not cause?  Or are you saying -- trying to say a

3    violation that Mr. Williams caused?

4        Q        Any sort of violation.  If there is a

5    violation, they don't approve it, and then they say

6    for whatever reason, it was our mistake, it was

7    supposed to be approved, and then they send an

8    approval, do they have to send anything with that

9    approval?  Do they have to send anything else?

10       A        No.

11       Q        Okay.  Did you ever speak with

12   Mr. Williams regarding specific interactions with

13   any Camden officials that he had?  Were their names?

14   Were there addresses?

15       A        Yes, and the emails.  I don't remember

16   them without going through each one of them.

17       Q        Do you have an approximation of about

18   how many different instances you spoke with him

19   about?

20       A        No.  I truthfully can't remember.

21       Q        Less than ten, more than ten, around

22   ten?

23       A        I would be guessing.

24       Q        I forgot to mention that.  Don't

25   guess.  Just approximate where you can.  Don't

1    guess.

2         A       Like I said, I don't remember how many

3    conversations we had on different issues and the

4    demeanor of the issues with the people.

5         Q       Okay.  Did you speak with

6    Mr. Williams, to your recollection, in September of

7    2013 or around that area?

8         A       I don't recall.

9         Q       Maybe this will jog your memory.  Did

10   you have an ongoing investigation into the conduct

11   of Camden City electrical inspectors and other

12   employees in the Department of Code Enforcement?

13   Was there a formal investigation?

14        A       In regards to Mr. Williams?

15        Q       In regards to Mr. Williams.

16        A       Never a formal investigation.

17        Q       Okay.  Did you ever visit the Camden

18   officials unannounced due to an informal

19   investigation regarding Mr. Williams?

20        A       I don't remember if it was

21   unannounced, but I did visit them.

22        Q       Okay.  You don't remember if you

23   contacted them beforehand telling them that you were

24   coming?

25        A       I don't remember, because there

17

```
1   were -- there was another issue going on in Camden
2   at the time that we were dealing with.
3        Q        So were you there pursuant to that
4   other reason, and then at the same time you brought
5   up the code --
6        A        I was there for a recycling plant, and
7   I discussed Mr. Williams' issues with what's his
8   name, Bob, the subcode official, and one of the
9   electrical inspectors.
10        Q        What was the primary reason for your
11  visit?
12        A        With regard to Mr. Williams?
13        Q        Yes.
14        A        I discussed the fact that Mr. Williams
15  complained that they weren't giving him code cites
16  and they are required to do that.  I discussed the
17  fact that if there was work done that Mr. Williams
18  didn't do, they cannot cite him, and there was a
19  rehab issue.  I'm not sure what it was.  It would
20  have been something that they did in rehab which was
21  not required.  They were requiring something that
22  was taken out of the rehab.  I remember discussing
23  it, because we went into their storeroom to discuss
24  those issues, not out in the open.
25        Q        Okay.  I guess what I was asking is,
```

DEGNAN & BATEMAN, INC.
(856) 232-7400

181a

22

1    could write citations against the city but you never

2    did because you wanted them to work it out?

3           A        I didn't hear you.

4           Q        Did you ever say, their conduct

5    constitutes enough for me to write them a citation,

6    but I'm not going to.  I'm going to let them work it

7    out.

8           A        I don't remember saying something like

9    that.

10          Q        Do you feel like you could have cited

11   them for some misconduct?

12          A        For misconduct?  The courts have ruled

13   that the demeanor is local --

14          Q        Okay.

15          A        -- if they are not enforcing Uniform

16   Construction Code properly.  As far as the issues

17   that were brought up for code, we did not feel

18   talking to -- I remember talking to Carmine, we

19   didn't feel they came up to the level that we should

20   take action, and if they did not --

21          Q        And what do you mean?

22          A        Well, citing contractors for work that

23   they didn't do, enforcing the rehab code improperly.

24          Q        Okay.  And if that's all the

25   occurrences they subsequently approved, would that

23

```
1     rise to the level for you to cite them?
2          A     Well, after discussing with them, if
3     they approved it, then the issue was no longer an
4     issue.
5          Q     So you wouldn't cite them if that was
6     the case?
7          A     No.
8          Q     Did any DCA officials visit the
9     department at all or was it only you?
10         A     On that day?
11         Q     In regards to Mr. Williams.
12         A     In regards to Mr. Williams, it was
13    only me.
14         Q     Okay.  Was the DCA ever in receipt of
15    a formal complaint from Mr. Williams?
16         A     We had gotten written complaints, and
17    then it is up to my bosses or my supervisors to
18    determine which route we are going to take.  Are we
19    going to try to work with the building department to
20    try to get them on the correct path, say, or apply
21    the Uniform Construction Code properly?  Or is this
22    a level where they are just so far out that we need
23    to investigate and maybe take action against them?
24         Q     And how would you describe the route
25    that you took?
```

38

1    should be documentation.

2         Q        One of the reasons for documentation,

3    if you are a cynical guy or if you are a regulator,

4    is you want to be sure that you know the accurate

5    history, that there wasn't a groundless failure,

6    followed by a bribe, followed by an approval;

7    correct?

8         A        Correct.

9         Q        Now, Marshall's grumble, in part, was

10   that these guys are failing me and they are not

11   telling me why I got failed on some jobs.  That was

12   part of his complaint, was it not?

13        A        They weren't citing code sections,

14   yes.

15        Q        Did they admit that they weren't doing

16   that?

17        A        The conversation, when I said you have

18   to give it, I don't think I even gave them -- if he

19   wants code cites, you have to give it.  I don't

20   think I gave them a choice.

21        Q        At any time did they say, when you

22   said you have to do that or in the course of your

23   conversation, at any time did they say Marshall is

24   full of BS, we do that?

25        A        No.

46

1    violation for reception spacing which does not exist

2    in the rehab code, and they cited receptacle spacing

3    and all of a sudden realized, hey, I can't do that

4    under the rehab code, and then they approve it, and

5    say rehab, and just mark it rehab.

6        Q      So when they do see a violation

7    outside of the work, they have to send a violation

8    to the homeowner?

9        A      Yes.

10       Q      How about to the electrician?

11       A      No.  He is not responsible for it if

12   it is outside his scope of work.

13       Q      So the distinction we are making here

14   at this point from my understanding is that if they

15   go out, they see a violation, say it is a violation,

16   go back, realize it is out of the scope and then

17   approve it, nothing needs to be said about that

18   violation?

19       A      No.  If the violation exists that was

20   not caused by the contractor, they approve his

21   permit, his scope of work, then they have to follow

22   up to the homeowner.  Hey, we got a violation here,

23   a code issue that could be dangerous.

24       Q      Again, nothing to the electrician.

25       A      Nothing to the electrician.  The

185a

1    homeowner.

2        Q        But if they come out and see that

3    there is a violation that's to that electrician's

4    work and within the scope of their work, go back,

5    but then subsequently approve that, they have to

6    tell that electrician what the violation was even

7    though there was an approval?

8        A        Well, they -- again, if they saw a

9    violation, they should not approve it until the

10    violation is fixed.  So if they have a violation,

11    they have to notify the electrician so he can fix

12    it.

13        Q        So if they say there is a violation to

14    this project and then realize that it wasn't a

15    violation and then approve it --

16        A        Okay.

17        Q        -- do they have to say to the

18    electrician what the violation was and pursuant to

19    what rule?

20        A        Well, they failed the electrician.

21    And all of a sudden they realize that's not a

22    violation.  That electrician has the notice of

23    violation or the sticker that has the violation.

24        Q        Before they got the notice of

25    violation, they realized --

# 19



# NICO ELECTRICAL CONTRACTOR, INC.
## MARSHALL B. WILLIAMS, OWNER/PRESIDENT
### We're Wired for Hire



P.O. Box 1427 • Delran, NJ 08075-0147
Phone: (856) 488-8344 • Fax: (856) 488-8268
Email: nicoelectric@comcast.net • http://nicoelectric.web.officelive.com

To: Director-City of Camden, City of Camden-4th Floor-Building Inspection Dept.-Camden, NJ 08101

From: Marshall B. Williams

Re: Meeting with Director of Building Dept.

The purpose of my requesting to meet with you is to provide some form of clarity in respect to the difficulty that I have experienced in the course of my operation as a business owner attempting to perform work in the City of Camden, and secondly I would like to thank you for taking the time out to hear my concerns and complaint. I remember not too long ago speaking to you pertaining to the problems that I was experiencing previously and you mention that if the problems continued that you would be available and I have exercise patience and tolerance prior to approaching and reaching out for your assistance.

First I would like to bring to your attention that I have requested to speak to you and on several occasions and in the process I have been constantly directed to speak to the Sub Code Official and on each occasion he has diligently worked to suppress the matter and protected the wrongful act of his inspectors, and has concluded that they have conducted themselves correctly, I have spoken to the State of NJ over the years pertaining to this ongoing problem and most recently a visit was conducted by a State Investigator and at present a clear understanding has been reached.

Note: Direction was presented in respect to the violation and as of today I have not received a response from the Code Official who was granted direction in regard to the correct format that should be followed, based upon the guidelines outlined for inspectors.

Your assistance to this matter will be greatly appreciated.

Marshall B. Williams

Marshall B. Williams 9/20/13

188a

# 20

189a

## William Revaitis

| | |
|---|---|
| **From:** | Iraida Afanador, Dir. of Code Enforcement |
| **Sent:** | Friday, October 04, 2013 12:46 PM |
| **To:** | William Revaitis |
| **Cc:** | Terri L. Britt; Christine T. J. Tucker, Business Administrator; James Rizzo |
| **Subject:** | RE: nico electric accusations |

*Thank you Bill.*

*Iraida Afanador, M.A.S*
*Municipal Department Head*
*Department of Code Enforcement*
*Suite 403, City Hall*
*520 Market Street,*
*Camden, NJ 08102*
*(Office) 856-757-7345*
*(Fax) 856-968-4723*

---

**From:** William Revaitis
**Sent:** Friday, October 04, 2013 12:14 PM
**To:** Iraida Afanador, Dir. of Code Enforcement; James Rizzo
**Subject:** nico electric accusations

Director,
         I WOULD LIKE TO REFUTE THE LETTER FROM MR.MILLER CONCERNING NICO ELECTRIC AND STATEMENTS
ALLEGEDLY MADE BY ME. I BILL REVAITIS ELECTRICAL SUB CODE UNEQUIVOCALLY DENY THE STATEMENTS AND/OR
ACCUSATIONS MADE IN SAID LETTER.

                                        THANK YOU,
                                        BILL REVAITIS

1

**190a**

Plaintiffs' Responses to Statements of Facts (Only)
from Plaintiffs' Brief in Opposition to Motion for
Summary Judgment
*[Doc 24]*
*Filed 04/20/2015*

191a

## MATERIAL FACTS

The Plaintiffs' pursuant to Local R. Civ. Rroc. 56.1, herewith respond to the Defendants' Statement of Material Facts.

1. Admitted.

2. Admitted.

3. Admitted.

4. Admitted.

5. Admitted.

6. Admitted.

7. Admitted.

8. Admitted.

9. Admitted.

10. Admitted.

11. Admitted.

12. Admitted that Revaitis testified that he never had any conversations with CFO Feliciano. However, this is a self serving statement that calls for a credibility determination and hence a "fact" that a jury would not be required to accept.

13. Admitted.

14. Admitted.

15. Admitted.

16. Admitted.

17. Admitted.

-2-

192a

18.  Admitted.

19.  Admitted.

20.  Admitted.

21.  Admitted.

22.  Admitted.

23.  Disputed in that the exact testimony was:

> "He's mentioned that particular comment [about the union] four or five times; how you making out dealing with the union? And I told him, the only problem I have every now and then I'd run into Donald [Norcross] and Donald pulled out after a while. That was it." *111-13 to 17.*

Furthermore the testimony was ambiguous as to whether the "union" comments by Revaitis ever occurred after 2004: "So from 2002 to 2004 I believe you said there was three to four times Mr. Revaitis made that comment about – A That's correct." *Id. 18 to 21.*

24.  Disputed. Plaintiff testified that Inspector Emenecker made two negative comments about plaintiff's non-union status. However, Plaintiff did not concede that Emenecker's two comments constituted the sum total of his disparate treatment evidence.

25.  Admitted that Fact 25 accurately paraphrases plaintiff's testimony. However, plaintiff challenges the relevance of this statement since the question: "Have you ever had any problems with the union since being awarded this bid?" is unduly vague.

26.  Admitted.

-3-

**193a**

27. Admitted.

28. Admitted.

29. Admitted.

30. Admitted.

31. Admitted.

32. Admitted.

33. Admitted.

34. Admitted.

35. Admitted.

36. Admitted.

37. Admitted.

38. Admitted.

39. Disputed. Rizzo testified that this was the first time that Rizzo became aware of plaintiffs' complaint. *Def. Exhibit 5 at 9:3-15.*

40. This "fact is compound and confusing. What Plaintiff testified was that when failing a job, state law requires the inspector to give a specific code section specifying the reason for the failure. Plaintiff further testified that in the event a job were wrongfully failed, state law then would require the City to send a notice to the owner correcting the error and acknowledging that the work did, in fact, meet code. *Def Exhibit 2 at 127:22 to 129:24.* See also *Def. Exhibit 8, January 3, 2013 email from Rizzo to plaintiff,* quoted in

-4-

194a

response to ¶ 41 *infra*.

41.  Objection, necessary words are omitted from the quotation. The January 3, 2013 email actually reads: "I told you that I would speak to the electrical inspector and have him either provide a code section to support his decision or reverse it."

42.  Admitted.

43.  Admitted only to the extent that emails from plaintiff Williams in Exhibits 8 and 9 do not furnish the detailed account of misconduct which Rizzo requested. The remainder of Fact 43 appears to be unsupported.

44.  Disputed. Fact 44 does not fairly convey the meaning of the testimony being paraphrased. When Rizzo questioned Emenecker, Emenecker denied that a dispute with Williams had occurred. *Id.*

45.  Admitted.

     **2.  931 South 7th Street**

46.  Admitted.

47.  Admitted.

48.  Admitted.

49.  Admitted.

50.  Admitted.

51.  Misleading paraphrase. Williams testified that the owner's continued use of an old knob and tube circuit, which was not included within the scope of Williams' new work, caused the

195a

circuit breaker to trip out. Williams also testified that before failing the job, the inspector did not bother to ascertain the cause of the tripped circuit breaker. *Def. Exhibit 2 at 141 :21 to 142:5.*

52. Admitted.

53. Admitted.

54. Admitted.

55. Misleading paraphrase. Revaitis testified that 1) he did not issue a red sticker; 2) the 2nd floor had no lights and the breaker would not reset and 3) Williams might have said that those issues were outside the scope of his work.

56. Admitted.

57. Admitted.

58. Admitted.

59. Admitted.

60. Objection, hearsay. The October 8, 2013 handwritten statement of Ayana Jordan is unsworn hearsay and does not comply with Fed. Rule Civ. Proc. 56(c)(4) or 28 U.S.C. § 1746.

61. Admitted.

62. Admitted.

63. Admitted.

64. Admitted

65. Admitted.

66. Admitted.

**196a**

67. Admitted.

68. Admitted.

69. Admitted.

70. Admitted.

71. Admitted that Williams prepared a statement for Ms. Holland to sign, but disputed that this fact is material. Attorneys prepare statements for witnesses to sign all the time. However, the remainder of Fact 71 is disputed because it is based on the inadmissible and unsworn statement of Bernice Holland, which statement is hearsay and fails to comply with Fed. Rule. Civ. Proc. 56(c)(4) or 28 U.S.C. § 1746. Accordingly, the Holland statement should not be considered on a motion for summary judgment.

72. Admitted.

73. Admitted except to state that the later contradiction is immaterial since Emenecker acknowledged being the inspector on the job.

74. Admitted.

75. Disputed, unsupported. No citation is provided for "Tony's" legal first or last name.

76. Admitted.

77. Admitted, however, Defendant Revaitis' denial only creates a material issue of disputed fact.

78. Disputed, unsupported.

-7-

197a

79. Disputed.  Williams testified that he did not believe that Cassidy had ever been a member of the electrical union.

80. Disputed.  Immaterial.  Plaintiff testified that the wrongful act was Revaitis' encouraging a customer not to use plaintiffs' services.

81. Admitted.

82. Admitted, except to note that Exhibit 17 is incomplete.  It fails to include 6 pages of attachments.

83. Admitted.

84. Admitted.

85. Admitted but incomplete.  Verbos testified that Williams also complained that the inspectors were recommending other contractors.  *Def's Exhibit 18, 9:7-13.*

86. Admitted.

87. Objection, Fact 87 is generalized and incomplete.  Admitted that Mr. Verbos told ESCO Revaitis and an electrical inspector that if they failed a job they were required to provide a specific code citation.  However, Mr. Verbos also told Revaitis and the electrical inspector that they were not allowed to cite Mr. Williams for work which Williams did not do:

> "I discussed the fact that Mr. Williams complained that they weren't giving him code cites and they are required to do that. I discussed the fact that if there was work done that Mr. Williams didn't do, they cannot cite him, and there was a rehab issue. I'm not sure what it was. It would have been something that they did in

-8-

rehab which was not required. They were requiring something that was taken out of the rehab." *Def. Exhibit 18, 17:14-22. See also 9:3-20.*

88. Objection, confusing and misleading. Verbos testified that the inspectors are required to approve or fail, nothing more; and if they approve the job they must issue an approval sticker. *See Def. Exhibit 18, 13:14-15:10.* If they fail it they have to give a reason when they fail it. *Id 38-9 to 25.* The remainder of Fact 88 is disputed as not having support in the record.

89. Admitted that Verbos testified that inspector demeanor was a local issue. But Fact 89 is materially incomplete. Verbos testified that if there was more to it than just demeanor: "The other things, if there was enough, that it would become official misconduct, we could look at it." *Def. Exhibit 18, 9:23-25.*

90. Disputed, incomplete. Verbos testified that "official misconduct" (as opposed to an issue limited to demeanor) would have required DCA action. Verbos also testified that he discussed Williams' allegations of official misconduct by defendants Revaitis and Emenecker with Gangeruse, and Verbos and Gangeruse agreed that Williams' allegations did not rise to the level where DCA action should be taken. *(See Exhibit 18, 22:19-20 ("we didn't feel they came up to the level that we should take action ...").)*

-9-

**D.   Plaintiff's Complaint to Mr. Rizzo & Director Afanador**

91.  Objection, defendants' paraphrase of plaintiff's contentions
is misleading and incomplete.   Plaintiff contends that the
inspectors had failed properly completed jobs several times,
and each time they gratuitously told the customer to find a
better contractor next time because Williams was not a good
electrical contractor.   Williams testified that the City's
ultimate grant of approval -- obtained only after Williams
complained to higher officials and after an unnecessary delay
to the customer -- was inadequate to correct the damage to
Williams' reputation caused by the inspectors' repeated
official misconduct.   *Def. Exhibit 2, 99:3-102:20.*

92.  Admitted.

93.  Admitted.

94.  Disputed because Fact 94 calls for speculation, but admitted
that  plaintiff  testified  that  he  did  not  believe  an
investigation would have been undertaken in good faith if he
had detailed his complaint in writing prior to meeting in
person with the Director.

95.  Admitted.

96.  Admitted.

97.  Admitted.

98.  Disputed.   First, the citation given to Director Afanador's
testimony only refers to one citation, not to the full scope

-10-

200a

of plaintiffs' complaint. Director Afanador did not have a present recollection of all of the jobs Williams complained about. Second, Director Afanador's testimony is unreliable because, what little testimony she gave was vague, speculative and qualified by multiple admissions as to her inability to remember:

> "Q. What information did Jimmy get back to you with, if any? A. **If memory serves me,** he said that Mr. Nico was not failed. What was indicated was that he was told that certain, a certain box was not put in right, and he was given advice from the subcode as to how it needed, something needed to be done. **I can't really remember what it was at that time.** But I remember Jim said, we didn't fail him. Subcode Revaitis just asked him to fix something, and he said he would. Q. So that involved one particular property? A. To my knowledge, yes." *Def. Exhibit 6, 14:10-21.*

See also:

> "Q. What was his complaint regarding the funeral home? A. **I do not remember. I really don't.** *Id, 15:4-6.*

See also:

> "A. I asked him to give me information as to, you know, what his complaint was. **And I don't remember if in fact he did give me a complaint, to be honest.** *Id, 16:6-8.*

99. Disputed. Fact 99 is unsupported by the record citations. In addition, Fact 99 is disputed as immaterial. The issue being litigated is whether the initial inspection failure was official misconduct motivated by anti-union animus. The fact that Williams' work was eventually approved each time -- but only after an unnecessary delay to Williams' customers, and a

-11-

201a

complaint by Williams to the City -- is immaterial.  The harm

to Williams and Nico Electric had already been done.

100. Admitted that Director Afanador testified that she called the

owner of the Tattoo Shop (Mr. Miller) who confirmed that ESCO

Revaitis told Miller that, if Miller needed additional work,

Revaitis recommended another contractor, a "good old boy" by

the name of George Cassidy as opposed to calling plaintiffs.

*See Defendant's Fact 76.*

101. Admitted that Director Afanador attempted to place obstacles

in front of any investigation.  The remainder of Fact 101 is

disputed hearsay.

102. Disputed.   Exhibit 20, an email embedded in an email

purportedly from Director Afanador to ESCO Revaitis is hearsay

within hearsay.

103. Admitted.

104. Disputed.  The testimony of CO Rizzo (*Def's Exhibit 5*) about

what Customer Jordan (a non-party) said on the telephone is

hearsay.  The testimony of Director Afanador (*Def's Exhibit 6*)

about what Customer Jordan (a non-party) said on the telephone

is also hearsay.

105. Plaintiff  admits  that  Director  Afanador  testified  that

Afanador requested a statement from Customer Jordan.  However,

the remainder of Fact 105 is disputed as hearsay.

106. Disputed.   Customer Jordan's purported statement is unsworn

hearsay and fails to comply with Fed. Rule. Civ. Proc. 56(c)(4) or 28 U.S.C. § 1746. Fact 106 is also improper in asking plaintiff to admit or dispute defendants' legal argument premised on disputed hearsay. Accordingly, no response is required.

107. As the statements of Jordan cannot be properly considered in determining this motion because they are hearsay, Mr. Williams explanation for them is irrelevant.

108. Disputed. Defendant's paraphrase is incomplete and mischaracterizes plaintiff Williams' testimony in that what he actually said was:

"Q And what took place in that conversation? A I says -- I asked her, I says, what's the status? Have we made any progress? And she went on the attack on me, she says, oh, my inspectors have done an excellent job, you're the problem. That's how she came off. And so I turned around and said to her -- she didn't like what I said -- I said, I understand your position, you're the director and it's only fitting that you take that position because it makes it look like you don't have any control over of your office. *See Def. Exhibit 2, 186:14-25.*

109. Plaintiff admits that Afanador concluded that her inspectors had not engaged in wrongdoing. However, Fact 109 infers that Afanador's investigation was complete and impartial. Such an inference is not supported by the record and is disputed. *(See response to Fact 98 where plaintiff provides three examples of Director Afanador's inability to recollect facts material to the scope of Afanador's investigation.)* In

-13-

203a

addition, Director Afanadaor testified:

"Q. Anybody else that you talked to or got information from as part of your investigation other than your staff? A. Mr. Williams could not provide me with anyone else **that I could recall.** He just said, those two people, and then he mentioned someone from DCA. **I don't remember the name of the person from DCA.**" Def. Exhibit 6, 22:12-18.

As suggested by Williams' testimony in Fact 108 and by Afanador's lack of recollection on key issues, Afanador had a motive to vindicate her own inspectors.

204a

Defendants' Reply to Plaintiffs' Responses to
Defendants' Initial Statement of Material Facts (Only)
from Defendants' Brief in Reply to Plaintiff's
Opposition to Defendants' Motion for Summary Judgment
*[Doc 25]*
*Filed 04/27/15*

א - 7 0

205a

## LEGAL ARGUMENT

**POINT I.     REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS' INITIAL STATEMENT OF MATERIAL FACTS**

While Plaintiffs have not furnished a supplemental statement of disputed material facts pursuant to L.Civ.R. 56.1, Defendants aver it is important to reply to a number of Plaintiffs' responses to Defendants' initial statement of material facts. In ¶12, Plaintiffs admit that ESCO Revaitis testified that he never had any conversations with CFO Feliciano, but characterizes said testimony as a "self serving statement that calls for a credibility determination and hence a 'fact' that a jury would not be required to accept." Such a response is in violation of L.Civ.R. 56.1 as Plaintiff does not cite to the record for any document disputing this fact; and his reference to a jury not having to accept this testimony is of no moment as for all intents and purposes in the matter *sub judice*, this is an undisputed fact.

Plaintiffs dispute the cited testimony set forth in ¶23 that other than the aforementioned 3-4 occasions when ESCO Revaitis asked Williams how Williams was dealing with the union between 2002 and 2004, ESCO Revaitis has never mentioned the union to Williams; Plaintiffs cite to 111:13-17 of Defendants' Exhibit 2, but ignores the follow-up questions contained in 111:18 to 112:6 that there were no other comments other than the 3-4 occasions. It was specifically asked "[a]ny other time since 2004 has Mr. Revaitis ever mentioned the union to you?" with Plaintiff responding unambiguously "[n]o. I try to avoid him. I try to avoid them guys." Ibid.

Likewise, Plaintiffs dispute in ¶24 that "Plaintiff did not concede that Emenecker's two comments constituted the sum total of his disparate treatment evidence" is specious. Williams was asked what evidence he has that the disparate treatment he believes he was receiving from Insp. Emenecker was a result of Insp. Emenecker not wanting Plaintiffs to perform nonunion

1

206a

work in Camden, and Williams' only responses were the two (2) comments. Id. at 109:1 to 111:6. Plaintiffs have cited to no other portion of the record where Williams has stated there was additional evidence that he claims supports his allegation.

Plaintiffs' response to ¶25 is in violation of L.Civ.R. 56.1(a) as it contains legal argument that the question "Have you ever had any problems with the union since being awarded this bid?" is unduly vague. See De LaTorre v. Lockheed Martin Corp., 2014 WL 2931268 (D.N.J. June 30, 2014) (Kugler) (advance of legal arguments inappropriate in parties' respective Rule 56.1 statements). Moreover, it is respectfully submitted that the question cannot be any more straightforward, and Plaintiffs do not cite to any portion of the record contrary to this fact.

While the October 8, 2013 statement of Ayana Jordan referenced in ¶60, as well as the verbal statements of Ms. Jordan referenced in ¶¶104-107, are not affidavits or declarations, the statements are admissible in the context of why Dr. Afanador found no wrongdoing on the part of ESCO Revaitis or Insp. Emenecker as a result of what Ms. Jordan stated. See U.S. v. Reynolds, 715 F.2d 99 (3d Cir. 1983). The statement of Ms. Holland referenced in ¶71 is admissible under Fed.R.Civ.P. 56 as Williams formally adopted the contents of the same in his deposition testimony. See Exhibit 12 at 45:24 to 46:3.

The statements of fact under §4 1207 Mt. Ephraim Avenue in ¶¶74-81 are inexplicably disputed by Plaintiffs that Williams did not prepare a statement for Israel "Tony" Miller to sign, or what Mr. Miller's legal first or last name is. Williams admitted that Mr. Miller's name is Israel Miller and his nickname is Tony, and that Williams "prepared [the statement] for him" to sign. See Exhibit 2 at 208:9-23.

In regard to George Cassidy never being a member of IBEW, Plaintiffs erroneously characterize his testimony as "he did not believe that Cassidy had every been a member of the

207a

electrical union" in response to ¶79.  However, Williams plainly states "[George Cassidy] was never a member of the electrical union."  See Exhibit 12 at 19:3-8.  Furthermore, Plaintiffs dispute ¶80 that he conceded that his non-union status was not an issue for this complaint, yet his deposition testimony is "[t]he issue pertaining to the union was never the issue.  Id. at 19:9 to 20:6.

Plaintiffs are correct that Exhibit 17, referenced in ¶82, is incomplete as it does not include six (6) pages of attachments.  The reason the attachments are not included is due to Plaintiffs never producing the same, and Williams not being able to recall what was attached to the document that he authored.  Id. at 118:25 to 120:16.

It is contended by Plaintiffs in ¶91 "that the inspectors had failed properly completed jobs several times, and each time they gratuitously told the customer to find a better contractor next time because Williams was not a good electrical contractor" and they cite to Exhibit 2 at 99:30-102:20 in support thereof.  Nowhere in the cited portion of the record does Williams state each time the inspectors told the customer to find a better contractor next time.  Additionally, Williams claims the aforementioned portion of his deposition testimony also states he suffered damages to his reputation caused by the inspectors' official misconduct.  Again, nowhere in this testimony does Williams accuse the inspectors of engaging in official misconduct.

Plaintiffs' response to ¶98 is in violation of L.Civ.R. 56.1(a) as it contains legal argument when they characterize Dir. Afanador's testimony as unreliable, vague, speculative and qualified by multiple admissions as to her inability to remember.  See De LaTorre, supra.  The same analysis applies to Plaintiff's response to ¶109 that Dir. Afanador's investigation was not complete and impartial.

208a

Plaintiffs' characterization in ¶99 that the issue being litigated is whether the initial

inspection failure was official misconduct motivated by anti-union animus is incorrect. This is

not a criminal trial wherein Defendants have been accused of official misconduct in Plaintiffs'

Complaint. Also, Plaintiffs concede in ¶90 that Messrs. Verbos and Gangeruso determined in

their informal DCA investigation that the actions of the inspectors did not rise to a level that

required action by the DCA.

It is "admitted" in Plaintiffs' response to ¶101 that Dir. Afanador "attempted to place

obstacles in front of any investigation." Defendants' statement of fact in ¶101 does not even

remotely state anything about Dir. Afanador "attempting to place obstacles in front of any

investigation." Nor do Plaintiffs cite to the record in support of their response in violation of

L.Civ.R. 56.1.

## POINT II.    PLAINTIFFS HAVE PRODUCED NO EVIDENCE OF INCIDENTS PRIOR TO OCTOBER 24, 2011 OTHER THAN UNSUBSTANTIATED COMMENTS FROM THE CITY OF CAMDEN CFO IN 2002

While Plaintiffs concede that any and all claims are time barred prior to October 24,

2011, they submit that evidence of prior alleged retaliatory acts outside the statute of limitations

constitute background evidence in support of their present grievances. It is further submitted by

Plaintiffs that incidents outside the statute of limitations establish a pattern of hostility against

Williams and his company on account of his nonunion status, as well as a custom of the City of

Camden and its officials to placate the politically connected IBEW to the detriment of nonunion

contractors. Interestingly, Plaintiffs only cite to one specific occurrence in 2002 in support of

their claim that "he had to endure a continuing series of issues with the City Inspectors"

thereafter that continued past October 24, 2011.

209a