# United States Court Of Appeals
## *for the*
# Third Circuit

## Case No. 16-1221

NICO ELECTRICAL CONTRACTOR, INC.; MARSHALL B. WILLIAMS
Appellants-Plaintiffs

v.

CITY OF CAMDEN, EUGENE EMENECKER, WILLIAM REVAITIS,
JAMES RIZZO, IRAIDA AFANADOR
Appellees-Defendants

On Appeal from the United States District Court for the
District of New Jersey, Camden Vicinage, Case No. 1-13-cv-06353 (JHR-AMD)

---

## BRIEF AND APPENDIX OF APPELLEES, CITY OF CAMDEN, EUGENE EMENECKER, WILLIAM REVAITIS; JAMES RIZZO; IRAIDA AFANADOR

---

WEIR & PARTNERS, LLP
A Pennsylvania Limited Liability Partnership
215 Fries Mill Road, 2nd Floor
Turnersville, New Jersey 08012
T: 856-662-1018

On the Brief:
Daniel E. Rybeck, Esq.
June 7, 2017

**TABLE OF CONTENTS**

Table of Authorities ................................. i

Table of Appendix ................................... v

Statement of Facts .................................. 1

    A. Specific Inspections Claimed to be Unlawful ..... 5

        1. 1302 Browning Street ........................ 5

        2. 931 South 7th Street ........................ 8

        3. 1571 South 8th Street ....................... 10

        4. 1207 Mt. Ephraim Avenue ..................... 12

    B. Plaintiffs' 2013 Complaint to the New Jersey
       Department of Community Affairs (DCA) ........... 13

    C. Plaintiffs' Complaints to Mr. Rizzo
       & Director Afanador ............................ 15

Statement of Standard of Review ..................... 19

Argument ........................................... 20

I.    PLAINTIFF'S STATEMENT OF FACTS VIOLATE
      FED. R. APP. P. 28(a)(8)(A) AND
      SHOULD BE STRICKEN AS RESULT .................... 20

II.   EVIDENCE OF ACTS PRIOR TO OCTOBER 24, 2011,
      DO NOT PROVIDE BACKGROUND EVIDENCE OF
      ANY COGNIZABLE CAUSE OF ACTION .................. 21

III. PLAINTIFFS DID NOT ENGAGE IN CONSTITUTIONALLY
      PROTECTED CONDUCT ............................... 23

IV.  DEFENDANTS MAINTAIN THEIR ACTIONS
      DO NOT CONSTITUTE RETALIATION ................... 25

V.    PLAINTIFFS CANNOT ESTABLISH A CAUSAL
      CONNECTION BETWEEN THEIR COMPLAINTS
      & SUPPOSED RETALIATORY ACTIONS BY DEFENDANTS ..... 25

VI.   NO SUPERVISORY LIABILITY EXISTS ...................  27

VII. NO *MONELL* LIABILITY EXISTS ......................  28


Conclusion ..........................................  29

Certifications  ......................................  30

## TABLE OF AUTHORITIES

**Cases:**

A.M. v. Luzerne County Juvenile Det. Ctr.,
372 F.3d 572 (3d Cir. 2004) .............................. 27

Bielevicz v. Dubinon, 915 F.2d 845 (3d Cir. 1990) ......... 28

Board of County Com'rs of Bryan County, Okl.
v. Brown, 520 U.S. 397 (1997) ............................ 28

Farrell v. Planters Lifesavers Co.,
206 F.2d 271, 3d Cir. 2000) .............................. 23

Gordon v. Morton, 131 Fed. App'x 797 (3d Cir. 2005) ....... 27

Kimbleton v. White, 608 Fed. Appx. 117, 120
(3d Cir. 2015) ........................................... 26

Kline v. First Western Gov't Sec.,
24 F.3d 480, (3d Cir. 1994) .............................. 19

Labov v. Lalley, 809 F.2d 220 (3d Cir. 1987) .............. 24

Lee v. The Cnty. of Passaic, 2011 WL 3159130 ............. 23

Monell v. Dep't of Soc. Servs. of New York,
436 U.S. 658 (1978) ...................................... 28

Montone v. City of Jersey City,
709 F.3d 181(3d Cir. 2013) ............................... 13

Nat'l R.R. Passenger Corp. v. Morgan,
536 U.S. 101, S. Ct. 2061, 153 L. Ed. 2d 106 (2002) ....... 23

Pa. Coal Ass'n v. Babbitt, 63 F.3d 321 (3d Cir. 1995) ...... 19

Pearson v. Callahan, 555 U.S. 223 (2009) .................. 25

Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001) .............. 26

Robinson v. Horizon Blue Cross Blue
Shield of New Jersey, - Fed Appx. - ,
2017 WL 57771 (2017) ................................. 20,25

SEC v. Hughes Capital Corp.,
124 F.3d 449 (3d Cir. 1997) .............................. 19

Smith v. Arkansas State Highway Emp., Local 1315,
441 U.S. 463, 99 S.Ct. 1826,
60 L. Ed 2d 360 (1979) ................................ 23-24

Thomas v. Independence Twp.,
463 F.3d 285 (3d Cir. 2006) .............................. 26

United States v. Hoffecker,
530 F.3d 137 (3d Cir. 2008) .............................. 20

**Rules:**

Federal Rules of Appellate Procedure 28(a)(8)(A) ......... 20-21

Federal Rules of Civil Procedure 12(b)(6) .................. 24

Federal Rules of Civil Procedure 56(a) .................... 19

**TABLE OF APPENDIX**

Unpublished Opinions:

Lee v. The Cnty. of Passaic, 2011 WL 3159130 .... Appellee-01

Robinson v. Horizon Blue Cross Blue
Shield of New Jersey, - Fed Appx. - ,
2017 WL 57771 (2017) ............................. Appellee-05

## STATEMENT OF FACTS

Plaintiff, Marshall Williams, (hereinafter "Williams") is a New Jersey licensed electrical contractor. (54a). Prior to 1998, Williams was a member of the International Brotherhood of Electrical Workers union (hereinafter "IBEW"). (55a). In approximately 1998 Williams left IBEW and became an independent non-union electrical contractor. *Id.* Initially, Williams worked as an independent contractor under the trade name of "Nico Electric," and in 2005 he formally incorporated his business as "Nico Electrical Contractor, Inc." (hereinafter "Nico"). *Id.*

In 2002 Nico was awarded a contract (hereinafter "2002 Contract") to provide electrical maintenance services to the City of Camden for a period of two (2) years on an "as needed" basis. (73a-75a). Williams alleges that shortly after being awarded the 2002 Contract, Richard Feliciano, the Chief Financial Officer (CFO) for the City of Camden at the time, called and advised that he [CFO Feliciano] received a telephone call from IBEW Assistant Business Manager Donald Norcross. During the conversation between Mr. Norcross and CFO Feliciano, Mr. Norcross purportedly stated he [Mr. Norcross] wanted the 2002 contract to be rebid and he did not want Williams to perform any work for the City of Camden. (78a).

Williams claims CFO Feliciano asked him during their conversation what was going on between Williams and Mr. Norcross, to which Williams replied that Mr. Norcross was "pissed off" that Williams was no longer a member of IBEW.  *(79a at 35:18 to 37:18)*.  Williams claims he did not receive a single job during the term of the 2002 Contract.  (55a).

William Revaitis is a former member of IBEW, who ended his membership in IBEW in 1994.  (115a at 6:19 to 8:12).  Mr. Revaitis was hired by the City of Camden as an electrical inspector in 1996, and has been the Electrical Subcode Official (ESCO) since approximately 1999-2000.  (114a-115a at 5:10 to 6:2).  ESCO Revaitis never had any conversations with CFO Feliciano.  (116a at 11:2-9).

Eugene Emenecker is a former member of IBEW, who retired from his employment as a union electrician, and from his membership in IBEW in November 1999.  (121a at 6:4-7, 7:11-20).  Mr. Emenecker has been employed since 2004 as an Electrical Inspector for the City of Camden, Building Bureau.  (*Id.* at 6:11-15).  ESCO Revaitis is Insp. Emenecker's supervisor.  (115a at 6:3-7).

To perform electrical work in the City of Camden, an electrical contractor must obtain a permit by applying to the Building Bureau, with the ESCO determining whether to issue the permit, and the Construction Official signing the permit once

2

the work has been approved by way of inspection.  (122a at 17:9-21).  After work is performed by an electrical contractor, an inspection is scheduled and subsequently performed.  (123a at 26:10-15).

Plaintiffs claim that since 2002 they were subjected to "disparate treatment" from ESCO Revaitis and Insp. Emenecker, "aimed at discouraging [Plaintiffs] from performing non-union work within the City of Camden."  See ECF at ¶20.  This alleged "disparate treatment" includes the following: (a) Plaintiffs' customers being told by ESCO Revaitis and Insp. Emenecker that Williams is a bad contractor; (b) jobs where Plaintiffs were the electrical contractors were failed by ESCO Revaitis and Insp. Emenecker for violations outside the purview of Plaintiffs' scope of work; and (c) jobs where Plaintiffs were the electrical contractors were failed by ESCO Revaitis and Insp. Emenecker when there was no violation as Plaintiffs' work was performed in accordance with the law.  (84a-85a at 99:3-16, 105:3-6).

Williams alleges that within a month of being awarded the 2002 Contract, ESCO Revaitis asked Williams how he was going to deal with IBEW when attempting to perform work in the City of Camden, to which Williams responded "well, I'll just deal with it as it comes, you know, just like every other day, I just take it day as it comes…Donald's not happy, but I'm just trying to survive."  (*Id.* at 41:1 to 42:21).  During the conversation

between Williams and ESCO Revaitis, ESCO Revaitis did not mention Mr. Norcross.  (80a-81a at 42:22 to 43:3).

Plaintiffs allege ESCO Revaitis made comments about how Williams was going to deal with IBEW on three (3) to four (4) separate occasions, stating "how you making out?", "getting any flak from the union?" and "guys that are local [union] probably look down upon you because you were a union member."  (82a at 86:7 to 88:3).  Other than these 3-4 occasions when ESCO Revaitis asked Williams how Williams was dealing with the union between 2002 and 2004, ESCO Revaitis has never mentioned the union to Williams.  (87a at 111:7 to 112:6).

Plaintiffs claim the following instances are evidence that Insp. Emenecker treated Williams disparately because of non-union membership: (1) During an inspection at 420 Chambers Street, Insp. Emenecker asked why Williams was not wearing a rubber suit when Williams was taking a panel cover off, and when Williams said he did not need a suit, Insp. Emenecker allegedly stated "see? Since you've been working nonunion you got away from all the good habits that we use out of the local"; and (2) during an inspection at 1302 Browning St., Insp. Emenecker stated to Williams "you know how you supposed to do it, y'all working out of the local before, you know that."  (*Id.* at 109:1 to 111:6).  Notably, Williams has never had any problems with IBEW since being awarded the 2002 Contract.  (81a at 43:16-18).

4

James Rizzo became a Building Inspector with the City of Camden in 2005; was then promoted to Building Subcode Official, and ultimately became the Construction Official (CO) in or around 2009. (127a at 6:17 to 8:19). As the Construction Official, CO Rizzo oversees all of the Building Bureau, which included ESCO Revaitis. (115a at 6:8-12, 127a at 8:18-22).

Iraida Afanador was the Director of the City of Camden Department of Code Enforcement up to January 2014. (131a at 4:18 to 5:1). As Director, Dir. Afanador was CO Rizzo's supervisor. (132a at 8:15-16). Plaintiffs claim the disparate treatment they received from ESCO Revaitis and Insp. Emenecker was reported by Plaintiffs to CO Rizzo and Dir. Afanador, and that CO Rizzo and Dir. Afanador "failed to take action, have ratified the aforesaid actions of their subordinates, and have continued the long existing policy of the City of Camden to discourage non-union contractors from working in the city. (58a).

A. Specific Inspections Claimed to be Unlawful

1. 1302 Browning Street

Plaintiffs' claim Insp. Emenecker rejected their work at 1302 Browning Street without a reasonable basis. (*Id.*). The property owner's name was Vynne Lewis. (87a at 112:7-12), (141a). The scope of work for this property was replacing a service cable that feeds to the electrical panel and connects to

the utility company's line on an electrical pole. (87a-88a at 113:24 to 114:9). According to Williams, the electrical code states an existing service can be cut out, and so as to not deface Ms. Lewis' property, Williams cut the cable out where it could not be re-energized as the cable was embedded in the mortar facial. (83a at 97:19-24). Plaintiffs completed the work, and Ms. Lewis scheduled an inspection in December 2012. (89a at 118:3-11, 141a).

During the inspection, Ms. Lewis called Williams and advised him there was a problem with the inspection. Insp. Emenecker then spoke to Williams on the phone, and Williams contends that Insp. Emenecker stated "you're going to do the job according to the fucking way I want it done or you're not going to get it passed," to which Williams responded "Gene, who's going to be responsible for defacing the lady's property? Long as I cut the cable off where it can't be re-energized, it's legal." (84a at 98:4-12). Williams and Insp. Emenecker screamed back and forth at one another, and Insp. Emenecker eventually hung up the phone on Williams. (89a at 118:12 to 119:17).

Williams complained verbally and in writing to CO Rizzo about Insp. Emenecker's conduct during this inspection. (90a at 123:22 to 124:23). Williams' complaint regarding Insp. Emenecker was the first time CO Rizzo became aware of

6

Plaintiffs.  (127a at 9:3-23).  Plaintiff contend Insp. Emenecker was required by New Jersey law to cite to a code section, and that the property owner was to be sent a notice that the work Plaintiffs performed met the code requirements, and that Insp. Emenecker made a mistake.  (91a at 127:22 to 129:24).

After speaking with Williams, CO Rizzo wrote Williams an email, which stated "I told you that I would speak to the electrical inspector and have either provide a code section to support his decision or reverse it."  (144a-145a).  CO Rizzo further requested in his January 3rd email to Williams "what was it that constituted conduct unbecoming a public official?  I need specific information, not vague and unclear allegations. Give me a comprehensive written account of these disrespectful actions that you elude to."  (*Id.*)

Williams responded to CO Rizzo on January 4, 9 and 10, 2013 via email, but never furnished the requested information delineating what specific conduct of Insp. Emenecker rose to the level of conduct unbecoming a public official.  (*Id.*, 147a). After receiving Williams' complaint, CO Rizzo questioned Insp. Emenecker, and Insp. Emenecker indicated he had had no problem with Williams.  (128a at 10:9-13).  CO Rizzo characterizes the disagreement between Williams and Insp. Emenecker as a difference of opinion, and the matter was resolved when Insp.

7

Emenecker passed the job.  (91a at 127:3-8, 128a at 10:13-20, 147a).

### 2.  <u>931 South 7th Street</u>

Plaintiffs claim ESCO Revaitis rejected their work at 931 South 7th Street without a reasonable basis.  See ECF at ¶24. Plaintiffs' contact person for the 931 South 7th St. job was the property owner's daughter-in-law, Ayana Jordan.  (92a-93a at 133:15 to 134:23).  Plaintiffs' scope of work for this property was installing new electrical service and interior wiring. (93a-94a at 137:10 to 138:8).  After completing the work, Ms. Jordan scheduled the inspection.  (94a at 141:5-13).

During the inspection on January 17, 2012, Ms. Jordan telephoned Williams and notified him that the inspection failed because of a lighting problem on the second floor of the residence, as indicated on the Electrical Subcode Technical Section for this property.  (94a, 149a).  During this phone conversation, Williams stated the 2nd floor lighting problem was not within his scope of work.  The circuit breaker had tripped out because of an overload, and during the inspection a breaker was off in the electric panel.  (94a-95a at 141:21 to 142:5).

In regard to the tripped circuit breaker, Plaintiff claims ESCO Revaitis "didn't look into it in detail to find out whether it was the old existing work or something I did."  (95a at 142:6 to 143:8).  After speaking with Ms. Jordan, Williams went to the

property and confirmed the tripped breaker had nothing to do
with his work.  (*Id.* at 143:9-14).  Williams then called ESCO
Revaitis and stated the job was failed for something outside of
Plaintiffs' scope of work, to which ESCO Revaitis allegedly
replied "the only thing I know is there was a breaker off."
Williams says he then told ESCO Revaitis that he [ESCO Revaitis]
did not take the panel cover off to determine if the problem was
old or new wiring, to which ESCO Revaitis supposedly replied
"yeah, you know, you get busy and I just didn't take the cover
off."  (*Id.* at 143:15-22).

ESCO Revaitis has testified that he initially failed
Plaintiffs' job without issuing a red failure sticker because
the 2nd floor had no lights and the breaker would not reset; and
he spoke to Williams at the time of the inspection, to which
Plaintiff responded that those issues were outside the scope of
his work.  (117a-118a at 17:20 to 18:24).  After thinking about
his conversation with Plaintiff, ESCO Revaitis decided the
breaker would not reset because of a direct short in it, so he
passed Plaintiffs' job on February 1, 2012, and delivered the
approval to Ms. Jordan.  (*Id.*, 149a).

According to Plaintiffs, the week after the initial
inspection, ESCO Revaitis went back to the property and did
another inspection, and then approved the job, and Williams
later received a notice from the City of Camden that the job was

9

approved.  (96a-97a at 146:10-15, 150:7-12).  Williams
complained about this job to CO Rizzo.  (95a at 144:21 to
145:23, 128a at 10:21 to 11:13).  CO Rizzo viewed the
disagreement between Williams and ESCO Revaitis as a difference
of opinion, which resulted in the job being passed.  (128a at
11:14-20).

Ms. Jordan provided a statement to the City of Camden,
which unequivocally stated her property did not pass inspection,
"but not due to Marshall [Williams]," and that she hired another
electrician after Williams, with the 2nd electrician fixing the
problem, which allowed the property to pass inspection.  (151a).

### 3. **1571 South 8th Street**

Plaintiffs claim Insp. Emenecker rejected their work at
1571 South 8th Street without a reasonable basis, and that he
made disparaging remarks to the homeowner regarding Plaintiffs.
Although the owner of 1571 S. 8th St. was Bernice Holland,
Williams' neighbor, Tony Parker (a relative of Ms. Holland),
requested Williams fix an electric problem at Ms. Holland's
residence.  (108a-109a at 209:2 to 210:21).  Thereafter,
Williams replaced an electrical panel and upgraded the ground
system at the property.  (109a at 211:2-11).

Ms. Holland arranged for an inspection, and at his
deposition Williams testified ESCO Revaitis was the inspector
for this property.  (109a at 211:12-14, 212:25 to 213:1).  After

10

the inspection occurred, Williams claims he received a telephone call from Ms. Holland who advised ESCO Revaitis told her during the inspection that Williams should have corrected a cable on the outside and a loose outlet in the basement, and that she should not have paid Williams.  (*Id*. at 211:12 to 213:1).  There was also a problem with the service head, and as such, ESCO Revaitis wanted more straps on the service head, which Williams claims "was like that all along" and "it wasn't like the service head couldn't function," and that the service head straps were outside the scope of his work.  (*Id*. at 213:2-13).

Williams claims the service head was properly attached when he performed his work, and that it became detached at some point between his work and the inspection due to inclement weather. (157a at 46:16 to 47:18).  Mr. Parker telephoned Williams and asked him to fix the problems, which Williams did without compensation, for which he would have charged approximately $250.00.  (109a-110a at 213:17 to 214:9).

About a week after the initial inspection, Williams complained in writing to CO Rizzo about this job and averred a statement from Ms. Holland would be provided to validate his complaint.  (155a-156a at 40:15 to 41:2, 161a).  Williams also went to City Hall and complained to CO Rizzo in-person about this job.  (110a at 215:12 to 217:22).

Williams prepared a statement for Ms. Holland to sign, which states that ESCO Revaitis failed the job due to the fact that the service head was not supported and that Williams should not have been paid for work that was done incorrectly; and that when Mr. Parker called Williams, Williams stated the service head was attached to the property when he worked there. (163a, 157a at 45:24 to 46:3). The job was approved approximately three (3) weeks later. (110a-111a at 217:23 to 218:13).

Plaintiff's testimony that ESCO Revaitis was the inspector for this job contradicts the allegations in his Complaint, which alleges Insp. Emenecker was in fact the inspector. His testimony is further contradicted by the fact that the Electrical Subcode Technical Section, which contains Insp. Emenecker's initial's and handwriting in the inspections portion of the document, and indicates that the initial failure was due to the service head not being attached to the building. 109a at 212:25 to 213:1, 124a at 42:23 to 43:10, 165a).

### 4. <u>1207 Mt. Ephraim Avenue</u>

Plaintiffs claim ESCO Revaitis, while performing an inspection at 1207 Mt. Ephraim Avenue, advised the owner of the property that the owner should use the services of a contractor other than Plaintiffs. Israel "Tony" Miller owns this property, which is a tattoo shop called "Twisted Tattoos". (105a at 195:22 to 196:2).

12

After Plaintiffs performed electrical work at Twisted Tattoos in October 2011, ESCO Revaitis inspected the work and allegedly stated that if Mr. Miller needed additional work, ESCO Revaitis had a "good old boy" by the name of George Cassidy who is an electrical contractor that ESCO Revaitis would recommend over Plaintiffs. (106a-107a at 200:20 to 202:7, 141a). ESCO Revaitis denies making these comments. (117a at 15:6-16).

Williams prepared a statement on behalf of Mr. Miller, which Mr. Miller signed. (167a, 108a at 207:17-23). Notably, George Cassidy has never been a member of IBEW. (154a at 19:3-8). In fact, Plaintiffs concede that being non-union was not problematic for this job and merely claim ESCO Revaitis was improperly recommending another electrical contractor. (*Id*. at 19:9 to 20:6).

Every single one of Plaintiffs' jobs at issue in this case was approved by the City of Camden inspectors. (158a at 116:14-20).

## B. Plaintiffs' 2013 Complaint to the New Jersey Department of Community Affairs (DCA)

In 2013 Plaintiffs sent a written complaint to Carmine Gangeruso of the DCA, wherein Plaintiffs claimed that when an initial inspection would occur in the City of Camden and an inspector determined there was a violation, the inspector would

not provide a specific citation to the electrical code in support of his conclusion. (169a, 159a at 117:4-14). Ken Verbos has been an employee of the State of New Jersey, DCA, Department of Regulatory Affairs, since 1993. (172a-173a at 6:19 to 7:1). Mr. Verbos first became aware of Plaintiffs after they complained to his supervisor, Mr. Gangeruso. (173a-174a at 7:21 to 8:7). Williams complained to Mr. Verbos about the inspectors' failure to cite the code when failing a job, improperly requiring Williams to make repairs that were not his responsibility, and making derogatory remarks about him to his customers. (175a at 9:3-13). Mr. Verbos did not perform a formal investigation of the inspectors' conduct. (180a at 16:9-16). However, due to Plaintiffs' complaints, Mr. Verbos spoke to the City of Camden inspectors when he was in Camden for an unrelated reason, and instructed the inspectors to cite a specific electrical code section if they failed a job. (181a at 17:3-9, 184a 38:9-20).

In situations where an inspector mistakenly believes work performed constitutes a failure, there is no requirement to explain to the property owners that a mistake was made, and the inspectors are required only to issue an approval sticker in such a situation. (177a-179a at 13:14 to 15:10, 185a-186a at 46:13 to 47:1). Further, the DCA does not address the

14

inspectors' demeanor, this matter is to be handled by the municipality.  (175a at 9:14-22, 176a 10:11-14).

Mr. Verbos spoke to Mr. Gangeruso about Plaintiffs' issues with the City of Camden inspectors, and they agreed that the dispute did not rise to a level that required action by the DCA. (182a-183a at 22:10 to 23:7).

### C.  **Plaintiffs' Complaints to Mr. Rizzo & Director Afanador**

Plaintiffs challenge situations where the inspectors initially found violations, and upon Williams' objections, ultimately approved the work. Plaintiff also suggest it is somehow improper that CO Rizzo did not send Williams and the property owner a writing indicating there was nothing wrong with the work Plaintiffs performed, and baselessly contend an approval notice sent to Plaintiffs and the property owner is insufficient in such situations.  (86a-87a at 99:17 to 102:20).

On September 20, 2013, Williams submitted a request to meet with Dir. Afanador.  (188a).  Williams purposefully did not set forth any specific complaint in his September 20th letter because:

> I don't trust them people in the City of Camden, you gotta be very discreet what you say to them. If I was to tell [Director Afanador] in advance what the contents of what I wanted to speak about, they prepare themselves.  You gotta be very careful when you communicate with them, you can't let them know what your hand is.  Like playing a game of poker, you can't let 'em know what your hand is.  You gotta reveal that at the time.

(101a at 180:5-24).  If Williams had notified Dir. Afanador of
the specific nature of his complaints, "[t]hey would have turned
around and gathered information...and interviewed certain people..."
(*Id*. at 181:6-21).

Pursuant to Williams' request, a meeting occurred in
September 2013 at City Hall with Williams, Dir. Afanador and
other City personnel.  (99a-100a at 159:3 to 163:5, 102a at
185:13-15).  Williams claims that during this meeting he
provided statements and telephone numbers of persons for Dir.
Afanador to contact, including Ms. Jordan, and information
regarding the properties discussed *supra*: 1207 Mt. Ephraim Ave.,
1302 Browning St., 931 S. 7th St., and 1571 S. 8th St.  (104a at
190:4 to 191:11).  Dir. Afanador confirms Williams provided
information regarding Ms. Jordan and Mr. Miller.  (133a at 14:1-
7).

Dir. Afanador requested CO Rizzo investigate Williams'
complaint of his jobs failing inspections.  CO Rizzo's
investigation revealed none of Plaintiffs' jobs failed, as they
all received approval.  (*Id*. at 14:1 to 15:3).  CO Rizzo spoke
to ESCO Revaitis about not citing to the code for Plaintiffs'
jobs, to which ESCO Revaitis replied there was no reason to cite
to the code since he has never failed any of Plaintiffs' jobs,

as Plaintiff received approval for all work he performed.  (117a at 16:18-25).

Dir. Afanador contacted Mr. Miller and confirmed ESCO Revaitis made the comments attributed to him [ESCO Revaitis] in Mr. Miller's statement.  (133a at 16:10 to 17:8).  Then, Dir. Afanador contacted Mr. Miller a second time and asked if he in fact wrote his statement.  Mr. Miller indicated Williams prepared the statement and he [Mr. Miller] signed it.  Dir. Afanador advised Mr. Miller she needed a statement directly from Mr. Miller, but Mr. Miller refused to cooperate.  (133a-134a at 17:9 to 19:16).  During Dir. Afanador's and CO Rizzo's investigation of Plaintiffs' complaints, ESCO Revaitis denied, via email, Mr. Miller's accusations.  (190a).

Director Afanador stated to Williams after their meeting that she was going to reach out to Ms. Jordan.  (103a at 187:20 to 188:5).  Dir. Afanador contacted Ms. Jordan via telephone with CO Rizzo and the Director's secretary also parties to the phone conference.  Ms. Jordan had a very negative impression of Williams after he called ESCO Revaitis a "cracker".  She indicated Williams' behavior was so improper that she had to resort to having her husband speak to him on the phone to put an end to Williams' harassing phone calls and text messages.  (128a at 12:1 to 13:5, 134a-135a at 20:14 to 22:11).  Dir. Afanador requested Ms. Jordan provide a statement, and Ms. Jordan

17

complied when she provided the statement referenced *supra*.
(134a-135a at 20:14 to 22:11).

Ms. Jordan's version of events starkly contradicts
Williams' allegations regarding the inspection of her property.
She states Williams was present for the inspection and that when
ESCO Revaitis initially approached them, Williams called ESCO
Revaitis a "racist son of a bitch," and that the initial failure
of the inspection was not due to work performed by Plaintiffs.
(151a). Plaintiff blames the discrepancy between his and Ms.
Jordan's accounts on the fact that both Dir. Afanador and Ms.
Jordan are Hispanic, and "if you don't know this about the
Spanish community, they're very close. No disrespect to
anybody, but they're very close. They will support each other,
lie, or whatever it is. They will lie. They lie for one
another. That's one population, group of people that will lie
for each other…" (98a at 157:2-20).

The week after the meeting, Dir. Afanador telephoned
Williams and allegedly stated the electrical inspectors had done
an excellent job and that Williams was the problem, to which
Williams replied "I understand your position, you're the
director and it's only fitting that you take that position
because it makes it look like you don't have any control over
your office." (102a-103a at 185:25 to 186:25). Since the only
evidence supporting Plaintiffs' allegations was a statement

18

prepared by Williams on Mr. Miller's behalf, Dir. Afanador found no wrongdoing on the part of ESCO Revaitis or Insp. Emenecker. Accordingly, due to virtually a complete lack of evidence Dir. Afanador was left with no choice but to conclude Williams' complaints had no merit. (135a at 23:3-6, 190a).

## STATEMENT OF STANDARD OF REVIEW

This Court employs "a *de novo* standard of review to grants of summary judgment, 'applying the same standard as the District Court.'" Montone v. City of Jersey City, 709 F.3d 181, 189 (3d Cir. 2013 (quoting Pa. Coal Ass'n v. Babbitt, 63 F.3d 321, 326 (3d Cir. 1995)). A plaintiff opposing summary judgment has the burden to "produce evidence, that, when considered in light of [his] burden of proof at trial, could be the basis for a jury finding in" his favor. SEC v. Hughes Capital Corp., 124 F.3d 449, 452 (3d Cir. 1997) (citing Kline v. First Western Gov't Sec., 24 F.3d 480, 485 (3d Cir. 1994)) (internal quotation marks omitted). A Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).

**ARGUMENT**

## I.    PLAINTIFF'S STATEMENT OF FACTS VIOLATE FED. R. APP. P. 28(a)(8)(A) AND SHOULD BE STRICKEN AS RESULT

The Statement of Facts on pages 8-10 of Appellant's Brief do not contain a single citation to the record.  Consequently, the same should be stricken and not considered as a basis to overturn the District Court's ruling.

Fed. R. App. P. 28(a)(8)(A) provides: "APPELLANT'S BRIEF. The appellant's brief must contain, under appropriate headings and in the order indicated…(8) the argument, which **must** contain: (A) appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies…" (emphasis added).  An opening brief that merely contains bare assertions "devoid of the references to the record required by Fed. R. App. P. 28(a)(8)(A)" provides no basis to overturn a District Court's ruling.  Robinson v. Horizon Blue Cross Blue Shield of New Jersey, - Fed Appx. - , 2017 WL 57771 (2017), citing United States v. Hoffecker, 530 F.3d 137, 162-63 (3d Cir. 2008).

Plaintiffs' brief is the epitome of what the *Robinson* Court discussed: devoid of *any* references to the record as required by Fed. R. App. P. 28(a)(8)(A).  As such, the purported facts cannot provide a basis to overturn the District Court's grant of summary judgement to Defendants.  In the alternative, in the

20

event Plaintiffs filed a reply brief in compliance with Fed. R. App. P. 28(a)(8)(A), Defendants respectfully request leave to file a sur-reply brief because they would be prejudiced if precluded from responding to factual citations in the record by Plaintiffs.

## II. EVIDENCE OF ACTS PRIOR TO OCTOBER 24, 2011, DO NOT PROVIDE BACKGROUND EVIDENCE OF ANY COGNIZABLE CAUSE OF ACTION

Plaintiffs submit that evidence of prior alleged retaliatory acts outside the statute of limitations constitute background evidence in support of their various claims. However, Plaintiffs only cite to one specific occurrence in 2002 in support of their claim that "he had to endure a continuing series of issues with the City Inspectors" thereafter that continued past October 24, 2011.

The statement on page 15 of Plaintiffs' brief alleging CFO Feliciano told Williams that Plaintiffs would not receive work because Mr. Norcross was displeased they were granted the contract is not supported by the record. Williams did not testify CFO Feliciano stated Plaintiffs would receive no work, but that Mr. Norcross, "said that he wanted the bid to go back out for bids, he said he didn't want me doing any work and that he didn't want me performing any work." 78a at 25:13-16. Plaintiffs merely allege Mr. Norcross stated he wanted the contract rebid. Notably, Mr. Norcross' alleged demand for a

rebid did not materialize, and there is no evidence of record to suggest otherwise.

Williams does not allege IBEW was ever mentioned during this conversation between Mr. Norcross and CFO Feliciano. Accordingly, CFO Feliciano could not have inferred the purported conversation had anything to do with IBEW, and he clearly did not make such an inference since he asked Plaintiff what the problem between Williams and Mr. Norcross was.  Plaintiffs' footnote on pages 13-14 that it is a matter of judicial notice that Mr. Norcross became a member of the New Jersey legislature conveniently omits that the above conversation supposedly took place in 2002, approximately eight (8) years before Mr. Norcross became a member of the New Jersey General Assembly.  There is not a scintilla of evidence demonstrating that Mr. Norcross has any involvement with Plaintiffs' disputes with the named Defendants.

The following are the dates of record before this Court of the incidents Plaintiffs claim amount to some kind of wrongdoing by City of Camden officials: (1) 1207 Mt. Ephraim Ave: November 2011; (2) 931 S. 7th St: December 2011; (3) 1302 Browning St: December 2012; and (4) 1571 S. 8th St: August 2013. See Exhibits 7 and 15.  Remarkably, absent from the record are any other incidents Plaintiffs reference as a "continuing series of issues with the City Inspectors…"

Williams left IBEW in 1998.  ESCO Revaitis and Insp.
Emenecker have been City employees since 1996 and 2004,
respectively, but there are no specific incidents set forth by
Plaintiffs of misconduct by City inspectors from the time of the
comments ascribed to Mr. Norcross by Plaintiffs in 2002 and 1207
Mt. Ephraim Ave. in November 2011.  This lack of temporal
proximity clearly demonstrates Plaintiffs' claims have no merit.
*See* Farrell v. Planters Lifesavers Co., 206 F.2d 271, 280 (3d
Cir. 2000) (temporal proximity alone is insufficient to
establish the necessary causal connection when the temporal
relationship is not "unusually suggestive").  Thus, Plaintiffs'
citation to *Nat'l R.R. Passenger Corp. v. Morgan* has no bearing
in this matter as the only background evidence submitted by
Plaintiff – the 2002 conversation – is so remote in time to the
specific incidents in dispute that it cannot establish a causal
connection.

## III. PLAINTIFFS DID NOT ENGAGE IN CONSTITUTIONALLY PROTECTED CONDUCT

Plaintiffs rely on Smith v. Arkansas State Highway Emp.,
Local 1315 ,441 U.S. 463, 465, 99 S.Ct. 1826, 60 L. Ed 2d 360
(1979), for the proposition that "[t]he public employee surely
can associate and speak freely and petition openly, and he is
protected by the First Amendment from retaliation for doing so."
As in *Lee v. The Cnty. of Passaic*, 2011 WL 3159130, cited in

Defendants' brief below, the *Smith* Court also found the plaintiffs were not engaging in protected union activity, with the *Smith* plaintiffs' allegation being merely that the defendants ignored the union and nothing more. Smith, supra at 466.

The Third Circuit decision in Labov v. Lalley, 809 F.2d 220, 222-23 (3d Cir. 1987) is also cited by Plaintiffs, but this case also provides no guidance to this appeal. In *Labov*, the Third Circuit was reviewing the Eastern District of Pennsylvania District Court's dismissal of the plaintiffs' complaints pursuant to a Fed.R.Civ.P. 12(b)(6) motion. The *Labov* Court overruled the District Court's dismissal and held the plaintiffs' allegation that the Sheriff's Department conspired to deprive the plaintiffs of their right to form a union was sufficient to survive a 12(b)(6) motion. Ibid. *Labov* is distinguishable from Plaintiffs' matter as Defendants filed for summary judgment after the close of discovery, and Plaintiffs cannot prove based on the record below that they have engaged in a constitutionally protected activity. Plaintiffs' grievance with the inspections in the City of Camden since 2011 are personal in nature, and in no way have any relation to Williams leaving IBEW in 1998.

## IV. DEFENDANTS MAINTAIN THEIR ACTIONS DO NOT CONSTITUTE RETALIATION

As argued below, Defendants maintain their actions cannot constitute retaliation.  Plaintiffs submit the inspectors' actions of demeaning Williams to his customers adversely effected Plaintiffs' business profits.  However, the record is devoid of any specific evidence profit loss.  An assertion by Plaintiff's counsel that income was lost does not constitute evidence. *See* Robinson, supra.  Based on the foregoing, Plaintiffs have not met their burden in proving an ascertainable loss that would constitute retaliation for exercising their 1st Amendment right not to associate.

## V. PLAINTIFFS CANNOT ESTABLISH A CAUSAL CONNECTION BETWEEN THEIR COMPLAINTS & SUPPOSED RETALIATORY ACTIONS BY DEFENDANTS

"[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal citation and quotation omitted). The first question is whether a constitutional violation occurred and, if so, whether it was clearly established the right was violated at the time of the misconduct.  *Id.* at 232.

A First Amendment retaliation claim requires "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from

25

exercising his constitutional rights, and (3) a causal link
between the constitutionally protected conduct and the
retaliatory action." Thomas v. Independence Twp., 463 F.3d 285,
296 (3d Cir. 2006); see also Kimbleton v. White, 608 Fed. Appx.
117, 120 (3d Cir. 2015) (citing Rauser v. Horn, 241 F.3d 330,
333 (3d Cir. 2001).

The inspectors' alleged comments referenced by Plaintiff
are benign and are not evidence of a causal connection.  The
supposedly disparaging remark to Mr. Miller that he should hire
Mr. Cassidy, another ***nonunion*** electrician, does not demonstrate
a causal connection for one very simple reason: if the
inspectors were attempting to discourage the citizens of Camden
from hiring nonunion electricians, they would not recommend
another nonunion electrician.

For every job that was not initially approved, but
ultimately received approval, a legitimate non-retaliatory
reason was set forth by Defendants.  1302 Browning St. was
nothing more than a difference of opinion, and the matter was
resolved when Insp. Emenecker passed the job.  931 S. 7th St. is
merely another difference of opinion, which too was decided in
Plaintiffs' favor. 1571 S. 8th St. was the result of inclement
weather, and Plaintiffs have never claimed the inspectors should
have realized the same.

## VI. NO SUPERVISORY LIABILITY EXISTS

There can be no supervisory liability when no constitutional violation by an individual officers exists. See Gordon v. Morton, 131 Fed. App'x 797, 799 (3d Cir. 2005) ("because Gordon fails to demonstrate he suffered a constitutional violation, he cannot satisfy any theory of supervisory liability.")(citing A.M. v. Luzerne County Juvenile Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004)).

Plaintiffs concede nothing was reported to CO Rizzo or Dir. Afanador suggesting Plaintiffs believed they were retaliated against based on their nonunion status.  Nor are Plaintiffs claiming that either CO Rizzo or Dir. Afanador were ever actually aware Plaintiffs were nonunion.  Thus, it would be impossible for either of them to acquiesce in retaliating against Plaintiffs for not being in IBEW if they had no knowledge of the issue.

Plaintiffs' theory of liability against CO Rizzo and Dir. Afanador is that they conducted a "most cursory investigation", however, Plaintiffs fail to assert anything more than a general allegation, and provide no specific proofs, e.g., what was lacking in the investigation.  Notably, by Williams' own admission, Plaintiffs maintained an adversarial posture from the outset of the investigation.  Further, Ms. Jordan inculpated Williams, and Mr. Miller would not participate in the

27

investigation; Mr. Miller's matter also does not involve Plaintiffs' nonunion status, as another nonunion contractor was supposedly recommended him.  A mere claim of a cursory investigation, without further explanation, cannot impose supervisory liability upon either CO Rizzo or Dir. Afanador.

## VII.  NO *MONELL* LIABILITY EXISTS

"Custom . . . can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well settled and permanent as virtually to constitute law." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990); see also Board of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 404 (1997) ("[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.").

As noted by the District Court, the record is devoid of any evidence that would support a finding that retaliation against nonunion contractors was either "well settled," "permanent," or "widespread" in the City of Camden.

## CONCLUSION

For all of the foregoing reasons, it is respectfully submitted that this Court should affirm the December 30, 2015, Order of the District Court granting Summary Judgment.

Respectfully submitted,

s/ Daniel E. Rybeck, Esquire
Daniel E. Rybeck, Esquire
Weir & Partners LLP
Attorneys for Appellees

Dated: June 7, 2017

### CERTIFICATION OF BAR MEMBERSHIP
### LAR 28.3(d) AND 46.1(e)

Daniel E. Rybeck. Esq., hereby certifies: I am a duly admitted member of the Bar of the United States Court of Appeals for the Third Circuit and have been so since June 14, 2013.

s/ Daniel E. Rybeck, Esquire
Daniel E. Rybeck, Esquire
Weir & Partners LLP
Attorneys for Appellees

Dated: June 7, 2017

### CERTIFICATION OF WORD COUNT

Daniel E. Rybeck. Esq., hereby certifies that the text of the within Brief is 6,087 words in length.

s/ Daniel E. Rybeck, Esquire
Daniel E. Rybeck, Esquire
Weir & Partners LLP
Attorneys for Appellees

Dated: June 7, 2017

### CERTIFICATION OF SERVICE

Daniel E. Rybeck, Esq., hereby certifies:  On the 7th day of June, 2017, I electronically filed the within Brief with the Clerk of the United States Court of Appeals for the Third Circuit; and did cause to be delivered by hand on the 8th day of

June, 2017, seven (7) hard copies of the within Brief to the

Clerk of the United States Court of Appeals for the Third

Circuit.  Copies of the aforementioned documents have been

served via Electronic Filing and United States Mail upon the

following counsel of record:

David J. Khawam, Esq.
Law Office of David Khawam, Esquire, LLC
Sentry Office Plaza, Suite 604
216 Haddon Avenue
Westmont, NJ 08108

s/ Daniel E. Rybeck, Esquire
Daniel E. Rybeck, Esquire
Weir & Partners LLP
Attorneys for Appellees

Dated: June 7, 2017

## CERTIFICATION OF IDENTICAL COMPLIANCE OF BRIEFS

Daniel E. Rybeck. Esq., hereby certifies that the text of

the Electronic Brief and hard copies of the Brief filed with the

Clerk of the United States Court of Appeals for the Third

Circuit are identical.

s/ Daniel E. Rybeck, Esquire
Daniel E. Rybeck, Esquire
Weir & Partners LLP
Attorneys for Appellees

Dated: June 7, 2017

31

## CERTIFICATION OF VIRUS CHECK

Daniel E. Rybeck. Esq., hereby certifies on June 7, 2017, a virus check was performed on this filed document with Symantec Endpoint Protection.

s/ Daniel E. Rybeck, Esquire
Daniel E. Rybeck, Esquire
Weir & Partners LLP
Attorneys for Appellees

Dated: June 7, 2017

# APPENDIX

2011 WL 3159130
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
D. New Jersey.

Curtis LEE et al., Plaintiffs,
v.
THE COUNTY OF PASSAIC and
Anthony Denova, Defendants.

Civil Action No. 2:09–cv–5735 (SDW).
|
July 26, 2011.

**Attorneys and Law Firms**

Paul I. Weiner, Law Offices of Weiner & Weiner LLC, Morristown, NJ, for Plaintiffs.

Alexander Louis D'Jamoos, Genova, Burns & Giantomasi, Newark, NJ, for Defendants.

**OPINION**

WIGENTON, District Judge.

*\*1* Before the Court is Defendants', the County of Passaic (the "County") and County Administrator Anthony J. DeNova ("DeNova"), Motion for Summary Judgment (the "Motion") pursuant to Federal Rule of Civil Procedure 56. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1367. Venue is proper pursuant to 28 U.S.C. § 1391(b). This Court, having considered the parties' submissions, decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons stated below, this Court **GRANTS** Defendant's Motion.

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs, forty-nine former employees of the Passaic County Juvenile Detention Center (the "Center"), were overpaid an average of $35,000 each due to payroll miscalculations in the salary schedule of their 2003–2006 collective bargaining agreement (the "CBA"). (*See* Ex. 49 at 1–3; *see also* Independent Accounting Report at SOMF, Appendix I.) In total, Plaintiffs were overpaid

approximately $1.7 million by the County. (Ex. 49 at 1–3; Independent Accounting Report at SOMF, Appendix I.)

When the CBA expired on December 31, 2006, the County and Plaintiffs negotiated with Plaintiffs' Union (the "Union") to negotiate a new agreement. (*See* Ex. 5 at 28:13–18, 42:16–17.) After nearly two years of negotiations, two potential plans were devised that would account for the overpayment situation.[1] (*See* Ex. 5 at 57:10–59:2.) "Plan A" would give Plaintiffs the same wage increases and compensation that other County employees received, but the County would implement payroll deductions to recover overpayments made to Plaintiffs under the CBA. (Ex. 5 at 58:12–23.) Under "Plan B," Plaintiffs would not receive any wage increases over an eighteen-month period, but the County would not make payroll deductions to reduce the overpayment made under the CBA. (Ex. 5 at 58:17–59:1.)

Mario Rivera, the Union representative, scheduled a meeting for October 28, 2008 for the Union members to consider the two proposed plans. (Ex. 5 at 57:10–58:4.) Due to time constraints—and because of the importance of the overpayment issue as it related to future salaries —only the economic terms of the plans were considered and noneconomic terms were scheduled for discussion at a subsequent meeting. (Ex. 5 at 53:1–7, 58:2–11, 61:17–24.) A majority of the Union membership voted to adopt Plan B, but because the noneconomic terms had not been discussed, neither plan was officially ratified at the meeting. (Ex. 5 at 59:5–61:24, 72:7–73:8, 78:5–13.)

On October 29, 2008, the day after the vote was taken, a few employees—only one of whom is a Plaintiff, Sergeant William Crawley ("Crawley")—made statements to the media opposing Plan B. (Ex. 10 at 14:7–15:7, 15:24–16:8; *see also* Ex. 37.) These statements informed DeNova of lingering discontent with Plan B. (*See* Ex. 7 at 71:15–72:8.) The situation was exacerbated when twenty-seven employees petitioned DeNova to oppose Plan B. (Ex. 39.) In addition, DeNova received phone calls from numerous taxpayers encouraging him to recover the overpayments. (Ex. 6 at 52:12–16.) In light of these events, DeNova called Rivera to inform him that ratification for Plan B would no longer be possible and that it was "off the table." (Ex. 5 at 80:7–81:13.)

*\*2* Plaintiffs commenced the instant action by filing a Complaint against Defendants on November 11,

2009. On February 2, 2010, Plaintiffs filed a Third Amended Complaint, alleging violations of Plaintiffs' First Amendment rights to freedom of speech and association under the United States Constitution, enforceable under 42 U.S.C. § 1983 ("Section 1983"), and violations of Plaintiffs' First Amendment rights to freedom of speech and association under the New Jersey Civil Rights Act, N.J. Stat. Ann. 10:6–1 *et seq.* (the "Act") and the New Jersey Constitution. (Ex. 1 at ¶¶ 32–38, 43–46.) On February 25, 2011, Defendants filed a Motion for Summary Judgment.

## LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party meets the initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Shields v. Zuccarini,* 254 F.3d 476, 481 (3d Cir.2001). The court may not weigh the evidence and determine the truth of the matter but rather determine whether there is a genuine issue as to a material fact. *Anderson,* 477 U.S. at 249. In doing so, the court must construe the facts and inferences in a light most favorable to the nonmoving party. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). The nonmoving party "must present more than just bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. United States Postal Serv.,* 409 F.3d 584, 594 (3d Cir.2005) (quoting *Celotex Corp.,* 477 U.s. at 325). If the nonmoving party "fail[s] to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then the moving party is entitled to

judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. at 323.

## DISCUSSION

### Freedom of Speech

42 U.S.C. § 1983 ("Section 1983"), provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ....

**\*3** The plaintiff in a Section 1983 action "must allege that some person has deprived him of a federal right ... [and] that the person who has deprived him of that right acted under color of state or territorial law." *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Plaintiffs here allege that they were deprived of their First Amendment right to freedom of speech in violation of Section 1983.

In determining if an employee suffered retaliation in violation of that employee's right to freedom of speech, the Court "must 'balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [public employer], in promoting the efficiency of the public services it performs through its employee.' " *Miller v. Clinton County,* 544 F.3d 542, 548 (3d Cir.2008) (quoting *Pickering v. Board of Ed. of Tp. High School Dist. 205, Will County, Illinois,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). The balancing test consists of a three prong inquiry. *Id.* The plaintiff must establish that (1) the speech was protected; and (2) "that it was a motivating factor in the alleged retaliatory [act]." *Id.* Finally, if the plaintiff proves these points, the employer must then demonstrate that the same employment action would have taken place "even in the absence of the protected conduct." *Id.*

A statement made by a public employee is considered protected speech when "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." *Hill v. Borough of Kutztown,* 455 F.3d 225, 241–42 (3d Cir.2006). Thus, "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employees behavior." *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *see also Miller v. Clinton County,* 544 F.3d 542 (holding that an employee's speech was not protected although it "brushed upon" a matter of public concern because the reason for her grievance was essentially her supervisor's treatment of her); *see e.g., Beresford v. Wall Twp. Bd. of Educ.,* 2010 U.S. Dist. LEXIS 9180 *16, 2010 WL 445684 (D.N.J. Feb. 3, 2010) (stating that "[a]lthough union-related speech is generally a matter of public concern," speech relating "only to the employee's generalized personal grievances and gain" does not rise to that level especially when "the speech was not engaged in with the purpose of informing the public that the government discharged its responsibilities or of bringing to light the government's breach of public trust); *James v. Valley Twp.,* 1998 U.S. Dist. LEXIS 41 *8, 1998 WL 51292 (E.D.Pa. Jan. 6, 1998) (holding that an employee's complaint of another employee's hourly rate was due to her "own personal discontent[ ] ..., rather than concern for the public good").

*4 The only plaintiff to make comment to the media was Sergeant Crawley. Therefore this claim must be dismissed as to the other plaintiffs as they do not allege that they made any statement purported to be protected speech. Further, Sergeant Crawley's claim also fails as his comments do not rise to the level of protected activity. According to Plaintiff's Complaint, Sergeant Crawley's comments were regarding cost o f living increases; salary readjustments; and whether the County overpaid certain officers. The statements, much like the cases cited above, fall into the category of personal grievance. He was not speaking to the County's mismanagement of funds, its discharge of its responsibilities, or any breaches of the public's trust. Sergeant Crawley's comments were only related to the salary and compensation demands of himself and his fellow employees. Although these comments were made in connection to negotiations with the Union, concerns over personal salaries and benefits cannot be said to "relat[e] to any matter of political, social, or other concern to the community." *See Connick v. Myers,* 461 U.S. at 146. It is not necessary for this Court to discuss whether Defendants engaged in retaliatory conduct since Plaintiffs' speech was not protected under the First Amendment.

**Freedom of Association**

The Third Circuit has stressed that the "right of association is a basic constitutional freedom,' that is 'closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society.' " *Mariani v. United States,* 212 F.3d 761, 771 (3d Cir.2000) (quoting *Buckley v. Valeo,* 424 U.S. 1, 25, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (internal citations omitted). Government action having "the effect of curtailing the freedom to associate is subject to the closest scrutiny." *Id.* (quoting *Buckley v. Valeo,* 424 U.S. at 25). Further, employees do not forego their right to exercise freedom of association when their employer is the government. *Rode v. Dellarciprete,* 845 F.2d 1195, 1204 (3d Cir.1988). However, employees claiming that retaliatory action "was taken against them based upon the exercise of their associational rights must show that they were engaged in constitutionally protected conduct, which conduct was a 'substantial' or 'motivating factor' in the government employer's decision." *Id.; see also Bradshaw v. Twp. of Middletown,* 296 F.Supp.2d 526, 544 (D.N.J.2003) (stating that "[t]o state a claim under § 1983, plaintiffs must allege instances of union activity for which they were retaliated against by persons acting under color of state law").

Plaintiffs' claim that Defendants retaliated against all union members by not ratifying the agreement as punishment for speech emanating from dissenting members. However, as stated above, this Court cannot hold that Sergeant Crawley's speech was protected activity under the First Amendment. Plaintiffs have not presented this Court with a valid union activity that amounted to constitutionally protected conduct as required for a claim for retaliatory action due to freedom of association. Thus, these claims also fail.

Lee v. The County of Passaic, Not Reported in F.Supp.2d (2011)
2011 WL 3159130

**CONCLUSION**

*\*5* For the reasons stated above, Defendants' motion for summary judgment is **GRANTED.** Further, this Court declines to exercise jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3159130

Footnotes

1       There was also a third plan, which was "none of the above." (Ex. 5 at 59:1–4, 72:25–73–2.)

End of Document                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 57771
Only the Westlaw citation is currently available.
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also U.S.Ct. of
Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals,
Third Circuit.

Kenneth E. ROBINSON, Jr., Appellant

v.

HORIZON BLUE CROSS BLUE SHIELD OF
NEW JERSEY; Victoria Wright-gibson; Cheryl
Concannon; Colette White; Beatriz Mesa

No. 15-3049
|
Submitted Pursuant to Third Circuit
LAR 34.1(a) September 2, 2016
|
(Opinion filed: January 5, 2017)

**Synopsis**
**Background:** African-American former employee brought
action against his former employer, asserting claims under
Title VII and the New Jersey Law Against Discrimination
(NJLAD) for discrimination on the basis of his gender
and race. The United States District Court for the
District of New Jersey, Joseph A. Dickson, United States
Magistrate Judge, 2013 WL 6858956, granted in part and
denied in part employee's motion to compel, 2015 WL
790578, denied employee's motion seeking his recusal,
2015 WL 802705, granted in part and denied in part
employee's motion for leave to file amended complaint,
Salas, J., 2014 WL 3573339, affirmed the order partially
denying employee's motion to compel, Leda Dunn Wettre,
United States Magistrate Judge, 2015 WL 4394210, denied
employee's motion to strike employer's answer to his
amended complaint, and, Madeline C. Arleo, J., 2015
WL 4603647, granted summary judgment in employer's
favor and denied employee's motion for reconsideration.
Employee appealed.

**Holdings:** The Court of Appeals held that:

[1] district court's interlocutory orders were sufficiently
related to its entry of summary judgment to permit review;

[2] Court of Appeals lacked jurisdiction over district
court's denial of motion for reconsideration;

[3] magistrate judge did not abuse his discretion by
partially denying employee's motion to compel;

[4] magistrate judge did not abuse his discretion by
denying employee's motion for recusal;

[5] magistrate judge did not abuse his discretion by
reviewing employee's proposed defamation claim for
futility; and

[6] employer's proffered reason for denying employee's
request to work remotely was not pretext for
discrimination.

Affirmed.

West Headnotes (7)

[1]     **Federal Courts**
        ⟶ Requisites and sufficiency;defects

        In former employee's action against former
        employer under Title VII and the New Jersey
        Law Against Discrimination (NJLAD), the
        district court's interlocutory orders, including
        denial of employee's motion seeking recusal,
        partial denial of employee's motion to compel,
        and partial denial of employee's motion
        for leave to file amended complaint, were
        sufficiently related to its entry of summary
        judgment in employer's favor to permit
        review, even though employee mentioned only
        entry of summary judgment in his notice of
        appeal. Civil Rights Act of 1964, § 701 et seq.,
        42 U.S.C.A. § 2000e et seq.; N.J. Stat. Ann. §
        10:5-12 et seq.; Fed. R. App. P. 3(c)(1)(B).

        Cases that cite this headnote

[2]     **Federal Courts**
        ⟶ Requisites and sufficiency;defects

Court of Appeals lacked jurisdiction over district court's denial of former employee's motion for reconsideration of its grant of summary judgment in former employer's favor in employee's action alleging violations of Title VII and the New Jersey Law Against Discrimination (NJLAD), where employee did not file another or an amended notice of appeal from that ruling. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; N.J. Stat. Ann. § 10:5-12 et seq.; Fed. R. App. P. 4(a)(4)(B)(ii).

Cases that cite this headnote

[3] **Federal Civil Procedure**
 Failure to Comply;Sanctions

Magistrate judge did not abuse his discretion by partially denying former employee's motion to compel former employer to produce documents in response to 45 additional document requests, in employee's action alleging violations of Title VII and the New Jersey Law Against Discrimination (NJLAD), absent showing of what additional discovery employee sought or how it might have been relevant to his claims. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; N.J. Stat. Ann. § 10:5-12 et seq.

Cases that cite this headnote

[4] **United States Magistrate Judges**
 Bias;recusal

Magistrate judge's order granting in part and denying in part former employee's motion to compel production of documents did not suggest any bias or partiality, and thus magistrate judge did not abuse his discretion by denying employee's motion for recusal in employee's action alleging former employer violated Title VII and the New Jersey Law Against Discrimination (NJLAD). Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; N.J. Stat. Ann. § 10:5-12 et seq.

Cases that cite this headnote

[5] **United States Magistrate Judges**
 Nature of case, proceeding, dispute, or issue in general

Magistrate judge did not abuse his discretion by reviewing former employee's proposed defamation claim against former employer for futility even though employer did not argue that specific point; in evaluating employee's request to amend his complaint, magistrate judge was required to consider whether justice required leave to be freely given, and action had been pending for almost two years after discovery had closed.

Cases that cite this headnote

[6] **Civil Rights**
 Motive or intent;pretext

Employer's proffered reason for denying employee's request to work remotely, namely, that employee did not meet the requirements for the job, was not a pretext for discrimination in violation of Title VII and the New Jersey Law Against Discrimination (NJLAD). Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; N.J. Stat. Ann. § 10:5-12 et seq.

Cases that cite this headnote

[7] **Federal Courts**
 Specification of errors;points and arguments

Former employee's passing reference to his argument that employer should have used his mid-year review only as a guide and that he wanted to depose a witness to discuss that and other issues was insufficient to raise that issue on appeal from district court's denial of employee's motion seeking additional discovery before district court ruled on former employer's motion for summary judgment in employee's action alleging employer violated Title VII and the New Jersey Law Against Discrimination (NJLAD). Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; N.J. Stat. Ann. § 10:5-12 et seq.; Fed. R. Civ. P. 56(d).

Cases that cite this headnote

On Appeal from the United States District Court for the District of New Jersey (D.C. Civil Action No. 2-12-cv-02981), District Judge: Honorable Madeline C. Arleo

**Attorneys and Law Firms**

Kenneth E. Robinson, Jr., Pro Se

Jonathan S. Krause, Esq., Klehr Harrison Harvey Branzburg, Philadelphia, PA, James P. Walsh, Jr., Esq., Morgan Lewis & Bockius, Princeton, NJ, for Defendants-Appellees

Before: CHAGARES, KRAUSE and ROTH, Circuit Judges

OPINION[*]

PER CURIAM

**\*1** Kenneth E. Robinson, Jr., appeals from the District Court's entry of summary judgment against him and several of its prior orders in this employment discrimination case. We will affirm.

### I.

Robinson is a law school graduate but apparently has never practiced law. He was employed by Horizon Blue Cross Blue Shield of New Jersey as a Vendor Outsourcing Specialist for less than two years before Horizon terminated his employment in 2012. Shortly thereafter, Robinson filed suit alleging that Horizon discriminated against him on the basis of his gender and his African-American race. Robinson asserted claims under Title VII of the Civil Rights Act of 1964 and the New Jersey Law Against Discrimination ("NJLAD"). He also named as defendants several Horizon employees and asserted various state-law tort claims. (We will refer to the defendants collectively as "Horizon.") Robinson claims that Horizon terminated him and took other adverse actions because of his gender and race and in retaliation for his complaints. Horizon claims that it took those actions because of Robinson's poor performance and unprofessional conduct.

Horizon answered the complaint and the parties engaged in discovery, which proved to be protracted and which spawned numerous interlocutory orders. Four of them are at issue here. First, Magistrate Judge Joseph A. Dickson[1] granted in part and denied in part one of Robinson's motions to compel. (ECF No. 74.) Second, Magistrate Judge Dickson denied Robinson's motion seeking his recusal. (ECF No. 103.) Third, Magistrate Judge Dickson granted in part and denied in part Robinson's motion for leave to file a Second Amended Complaint. (ECF No. 104.) Finally, a different Magistrate Judge denied Robinson's motion to strike defendants' answer to his Second Amended Complaint. (ECF No. 131.) Robinson filed objections to each of these rulings and, with the one exception noted below, the District Court overruled them.

Horizon ultimately moved for summary judgment. Robinson both opposed summary judgment on the merits and filed a motion under Fed. R. Civ. P. 56(d) asserting that he required additional discovery.[2] By order entered July 30, 2015, the District Court denied Robinson's Rule 56(d) motion, granted Horizon's motion for summary judgment, and entered judgment in its favor.

In doing so, the District Court applied the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to Robinson's claims of disparate treatment and retaliation. The District Court concluded that Robinson had not presented evidence suggesting that Horizon's proffered reasons for its actions were pretextual or that the real reason was discrimination. The District Court also concluded that Robinson had not presented sufficient evidence in support of a hostile-environment claim. Finally, the District Court concluded that the individual defendants were not subject to liability under Title VII or the NJLAD and that Robinson's state-law claims were preempted by the NJLAD. Robinson filed both a motion for reconsideration and a notice of appeal. The District Court later denied reconsideration, but Robinson did not file another notice of appeal.

### II.

Robinson v. Horizon Blue Cross Blue Shield of New Jersey, --- Fed.Appx. ---- (2017)

2017 WL 57771

*2 In his brief, Robinson challenges the District Court's interlocutory rulings noted above, its entry of summary judgment, and its denial of reconsideration. Horizon contests our jurisdiction over the first and third of these challenges.

[1] Horizon argues that we lack jurisdiction to review the District Court's interlocutory rulings because Robinson mentioned only the entry of summary judgment in his notice of appeal. See Fed. R. App. P. 3(c)(1)(B). The District Court's discovery and other rulings, however, are sufficiently related to its entry of summary judgment to permit review under the circumstances presented here. See Pacitti v. Macy's, 193 F.3d 766, 776–77 (3d Cir. 1999).

[2] Horizon also argues that we lack jurisdiction over the District Court's denial of reconsideration because Robinson did not file another or an amended notice of appeal from that ruling as required by Fed. R. App. P. 4(a)(4)(B)(ii). We agree. See Witasick v. Minn. Mut. Life Ins. Co., 803 F.3d 184, 191 n.7 (3d Cir. 2015). Thus, our review is limited to the District Court's interlocutory rulings and its entry of summary judgment. As to those rulings, we have jurisdiction under 28 U.S.C. § 1291.

A. The District Court's Interlocutory Rulings[3]

Robinson devotes most of his briefing to the four interlocutory rulings noted above. His challenges to those rulings lack merit and are largely frivolous.

[3] Robinson's first challenge is to Magistrate Judge Dickson's order granting in part and denying in part his motion to compel. (ECF No. 74.) At the time of that ruling, Horizon had responded to 85 document requests and produced over 56,000 pages of documents. Robinson's motion sought an order compelling Horizon to produce documents in response to 45 additional requests. The Magistrate Judge concluded that most of Robinson's requests were duplicative or of marginal relevance, but he ordered Horizon to produce six additional categories of documents. Although Robinson now challenges this ruling, he has not specified what additional discovery he sought or how it might have been relevant to his claims. His challenge fails for that reason alone.

His specific arguments on this point also lack merit. Robinson argues that the Magistrate Judge, in his order denying recusal, later "admitted he had not read Plaintiff's pleadings, discovery motions and letters prior to his rulings [.]" (Appellant's Br. at 2.) That argument mischaracterizes the record. The Magistrate Judge held a status conference after issuing his discovery rulings. At that conference, the Magistrate Judge informed the parties that he had not previously received Robinson's motion to amend his complaint. It was that statement that the Magistrate Judge quoted in his order denying recusal. (ECF No. 103 at 7.) Thus, the Magistrate Judge did not "admit" that he had not read Robinson's "discovery motions and letters." To the contrary, the Magistrate Judge wrote in his discovery opinion that he had "considered the parties' submissions" and "thoroughly reviewed the record in this case." (ECF No. 73 at 1 & n.1.) The Magistrate Judge's careful consideration of Robinson's requests confirms as much.

*3 Robinson also faults the Magistrate Judge for not requiring evidence of how much it would cost to respond to his additional requests. The Magistrate Judge need not have required evidence that responding to discovery entails some burden and expense, and he did not base his rulings on the extent of that burden and expense in any event.[4]

[4] Robinson's second challenge is to Magistrate Judge Dickson's denial of his motion for recusal. (ECF No. 103.) That motion was based primarily on the discovery rulings just discussed. As the Magistrate Judge explained and as Robinson concedes, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." Liteky v. United States, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). This case is no exception.

Robinson argues that the Magistrate Judge displayed bias by not revisiting his discovery rulings after "becoming aware that he had not read Plaintiff's filings." (Appellant's Br. at 5.) There is no basis for that argument as explained above. Robinson also argues that the Magistrate Judge took out of context a statement that Robinson made in court. Robinson has not provided the transcript of that proceeding necessary for us to review that issue, however, and his argument does not suggest bias in any event. These points aside, Magistrate Judge Dickson's rulings reflect thorough and thoughtful consideration of Robinson's filings and do not suggest any bias or partiality.

**[5]** Robinson's third challenge is to the Magistrate Judge's order granting in part and denying in part his motion for leave to file a Second Amended Complaint. (ECF No. 104.) Robinson sought leave to: (1) raise additional allegations in support of his existing claims; (2) assert a new claim for defamation; and (3) assert against new defendants his existing claim for breach of the covenant of good faith and fair dealing. The Magistrate Judge granted his motion as to the first request but denied it as to the others on the grounds that those proposed amendments would be futile.[5]

**\*4** Robinson raises essentially two arguments on this point. First, he argues that the Magistrate Judge, in deeming these claims futile, overlooked his allegations of discrimination. The Magistrate Judge, of course, was well aware of those allegations. Robinson does not explain how he believes that his allegations of discrimination undermine the Magistrate Judge's legal analysis of these claims, and they do not.

Second, Robinson challenges the Magistrate Judge's decision to review his proposed defamation claim for futility even though Horizon did not argue that specific point. In evaluating Robinson's request to amend, however, the Magistrate Judge was required to consider whether "justice so requires." Fed. R. Civ. P. 15(a) (2). We cannot say that the Magistrate Judge abused his discretion in considering the legal sufficiency of Robinson's proposed amendments, particularly after this action had been pending for almost two years and after discovery had closed. Robinson also appears to suggest that the Magistrate Judge's decision to review this claim for futility is a further indication of bias, but he did not raise that issue as a ground for recusal in the District Court and it does not suggest bias in any event.

Robinson's fourth challenge is to a different Magistrate Judge's denial of his motion to strike Horizon's answer to his Second Amended Complaint. Robinson argues that it was unfair to limit his ability to amend his complaint but then to allow Horizon to raise additional allegations in its answer to that amended complaint. This argument is baseless. Robinson does not specify which allegations he believes that Horizon should have been permitted to make or how they prejudiced him, and we discern no way in which they might have done so.

**B. Summary Judgment**[6]

Robinson raises three arguments regarding summary judgment that require discussion. These arguments lack merit as well.

**[6]** First, Robinson argues that the District Court mischaracterized various items of evidence. He is partially right about one of them, but the point is immaterial. One of the issues in the case was Horizon's denial of Robinson's request to work remotely. Horizon attributed that denial primarily to Robinson's unsatisfactory 2011 mid-year review. In addressing this claim, the District Court wrote that Horizon's policy was to consider authorization to work remotely only for those employees "whose performance exceeded expectations." (ECF No. 133 at 3.) As Robinson argues, Horizon's policy on working remotely actually applied to employees who "meet or exceed the requirements for the job." (ECF No. 115-3 at 7 ¶ 17) (emphasis added).

That point is immaterial, however, because Horizon presented evidence that Robinson did not meet the requirements for the job and Robinson has presented nothing suggesting that its reliance on that point was pretextual. Robinson argues that his 2011 mid-year review was satisfactory "overall" and that the District Court erred in concluding otherwise. The review itself does not provide an "overall" rating. (ECF No. 115-19.) Instead, the review lists eight discrete areas of work performance, and Robinson received a rating of "needs improvement" on four of them. (Id. at 3-5.) Horizon presented evidence both that it deemed the review unsatisfactory and that it denied authorization for that reason. (ECF Nos. 115-8 at 5; 115-9 at 1 ¶ 3; 115-23.) Robinson has not cited anything calling that evidence into question.

**\*5** **[7]** Second, Robinson argues that the District Court erred in denying his Rule 56(d) motion for additional discovery. As above, however, Robinson has largely failed to specify the discovery he sought or how it might have been relevant to his claims. Robinson's only specific argument on this point is his statement that Horizon should have used his mid-year review only "as a guide," and that he wanted to "depos[e] Victoria Wright-Gibson, to discuss that and other issues." (Appellant's Br. at 15.) Robinson provides no other details in this regard, and this passing reference is insufficient to raise this issue on

review. See United States v. Hoffecker, 530 F.3d 137, 162 (3d Cir. 2008). In addition, Horizon presented evidence that it made Wright-Gibson available for a deposition during discovery but that Robinson never followed up. (ECF No. 123-1 at 19.) The District Court relied on that evidence in denying Robinson's Rule 56(d) motion (ECF No. 133 at 1-2 n.2), but Robinson has not acknowledged that point on appeal.

Finally, Robinson asserts at various points that the evidence was sufficient to raise an issue of material fact regarding whether Horizon discriminated against him. Robinson, however, has not developed any meaningful argument on this point beyond his mere assertions. Robinson argues that the sheer volume of exhibits should have led the District Court "to find at least one genuine issue of triable fact" (Appellant's Br. at 13), but Robinson himself has not identified any specific evidence that supports his claims, let alone argued how it does so.

Robinson's cursory discussion of the evidence in his opening brief also is completely devoid of the references to the record required by Fed. R. App. P. 28(a)(8)(A). Thus, Robinson's bare assertions provide no basis to disturb the District Court's ruling. See Hoffecker, 530 F.3d at 162–63. We have reviewed Robinson's remaining arguments and conclude that they lack merit for reasons that do not require discussion.

III.

For these reasons, we will affirm the judgment of the District Court.

**All Citations**

--- Fed.Appx. ----, 2017 WL 57771

Footnotes

\* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

1 Four different Magistrate Judges and two different District Judges presided over this action at various times.

2 We have noted that courts sometimes "rather casually" refer to Rule 56(d) filings as "motions" even though the rule does not contemplate or require an actual motion. Shelton v. Bledsoe, 775 F.3d 554, 567 (3d Cir. 2015). We refer to Robinson's Rule 56(d) filing as a motion in this case because that is how he styled it.

3 Robinson preserved his challenges to the Magistrate Judges' rulings by filing objections pursuant to Fed. R. Civ. P. 72(a) and 28 U.S.C. § 636(b)(1)(A). We review these rulings for abuse of discretion except to the extent that they turn on issues of law, which we review de novo. See Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp., 823 F.3d 184, 189 (3d Cir. 2016) (amendment of pleadings); Eisai, Inc. v. Sanofi Aventis U.S., LLC, 821 F.3d 394, 402 & n.10 (3d Cir. 2016) (discovery rulings); Selkridge v. United of Omaha Life Ins. Co., 360 F.3d 155, 166 (3d Cir. 2004) (recusal). Robinson frames his arguments primarily as challenges to the Magistrate Judge rulings. Although it is the District Court's orders affirming them that we review, see Anjelino v. N.Y. Times Co., 200 F.3d 73, 88, 100 (3d Cir. 1999), we will address Robinson's arguments as he frames them because the District Court affirmed largely for the reasons explained by the Magistrate Judges.

4 Robinson also challenges the District Court's order affirming these discovery rulings. (ECF No. 80.) His challenges are largely repetitive, and only one requires separate discussion. Robinson argues that the District Court failed to review the Magistrate Judge's rulings de novo as purportedly required by Rule 72(b). Robinson's discovery rulings, however, are a non-dispositive matter governed by Rule 72(a) and 28 U.S.C. § 636(b)(1)(A). Those authorities permit District Courts to reverse Magistrate Judge orders only when the orders are clearly erroneous or contrary to law. The District Court properly applied that standard in this case.

5 Robinson objected to the Magistrate Judge's partial denial of leave to amend (ECF No. 107), but it appears that the District Court never addressed his objection. Robinson has not raised that issue on appeal, and we see no need to remand for an express ruling. Other courts have held that, when a District Court enters final judgment without ruling on a Rule 72(a) objection, its judgment "functions as the final order overruling that objection." Fielding v. Tollaksen, 510 F.3d 175, 179 (2d Cir. 2007) (addressing objection to Magistrate's order denying leave to amend and citing Alpine View Co. v. Atlas Copco AB, 205 F.3d 208, 219–20 (5th Cir. 2000)); see also United States v. Freedman, 763 F.3d 322, 346 n.10 (3d Cir. 2014) ("[T]he denial of a pending motion may be implied by the entry of final judgment.") (quotation marks omitted), cert. denied —– U.S. —––, 135 S.Ct. 1189, 191 L.Ed.2d 144 (2015), and —– U.S. —––, 135 S.Ct. 1467, 191 L.Ed.2d 412 (2015). It is particularly appropriate to apply that principle in this case because the District Court made a

ruling in its final order that is relevant to Robinson's proposed amendment. Robinson already had asserted a breach-of-covenant claim against certain defendants, and the Magistrate Judge denied him leave to assert the same claim against additional defendants. In entering summary judgment, the District Court held that Robinson's existing breach-of-covenant claims were preempted by the NJLAD. That ruling would have applied equally to Robinson's proposed amendment, and Robinson has not challenged that ruling on appeal.

6    Our review of the District Court's entry of summary judgment is plenary. See Munroe v. Cent. Bucks Sch. Dist., 805 F.3d 454, 465 n.4 (3d Cir. 2015). In conducting that review, we view the evidence in the light most favorable to Robinson as the non-moving party and will affirm if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. (quoting Fed. R. Civ. P. 56(a)). We review the District Court's response to a request for additional discovery under Rule 56(d) for abuse of discretion. See Shelton, 775 F.3d at 559.

End of Document                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.